# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

NAVIENT SOLUTIONS, LLC
2001 Edmund Halley Drive
Reston, VA 20191

        Plaintiff,

    v.

CIVIL ACTION No. _____

THE LAW OFFICES OF JEFFREY
LOHMAN, A PROFESSIONAL
CORPORATION
4740 Green River Road, Suite 206
Corona, CA 92880

JURY TRIAL DEMANDED

JEFFREY LOHMAN,
c/o The Law Offices of Jeffrey Lohman, a
Professional Corporation
4740 Green River Road, Suite 206
Corona, CA 92880

JEREMY BRANCH,
c/o The Law Offices of Jeffrey Lohman, a
Professional Corporation
4740 Green River Road, Suite 206
Corona, CA 92880

ALYSON DYKES,
c/o The Law Offices of Jeffrey Lohman, a
Professional Corporation
4740 Green River Road, Suite 206
Corona, CA 92880

IBRAHIM MUHTASEB,
647 S. Glassell Street
Orange, CA 92866-3018

DAVID MIZE LAW, PLLC
2415 East Camelback Road, Suite 700
Phoenix, AZ 85016

DAVID MIZE,
c/o DAVID MIZE LAW, PLLC
2415 East Camelback Road, Suite 700
Phoenix, AZ 85016

CHAMPION MARKETING
SOLUTIONS, LLC d/b/a CMS
860 F Avenue, Suite 104
Plano, TX 75074

JOHN DOES # 1–20,

                    Defendants.

## AMENDED COMPLAINT

1.      Plaintiff Navient Solutions, LLC, ("NSL") brings this action against The Law Offices of Jeffrey Lohman, a Professional Corporation, Jeffrey Lohman, Jeremy Branch, Alyson Dykes, Ibrahim Muhtaseb, David Mize Law, PLLC, David Mize, Champion Marketing Solutions, LLC d/b/a CMS, and John Does #1–20 (collectively, "Defendants") for a conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO") through a pattern of mail fraud and wire fraud, along with other tortious acts.

## Preliminary Statement

2.      NSL brings this complaint to address an abuse of the law by legal professionals and associated "debt counseling" practitioners.  Since at least 2015, Defendants have operated as an association in fact to carry out a scheme (the "Scheme") seeking to defraud NSL out of millions of dollars and to inhibit it from collecting outstanding student loan debt.  Through a network of referral and fee-sharing arrangements, and by preying upon unsuspecting NSL customers, Defendants have conspired to manufacture federal lawsuits and arbitration proceedings against NSL.

3.     Defendants operated the Scheme by recruiting and exploiting borrowers in search of so-called "debt-relief counseling"—misleading them into stopping payments on their loans (and thus ruining their credit) and instead paying Defendants.  Because certain of the Defendants and other involved persons have been sanctioned, sued, or charged in connection with aspects of the Scheme previously, Defendants knew that the Scheme was wrong.  Defendant Mize has also been reprimanded and placed on probation by the Arizona Bar for his participation in similar improper "debt counseling" actions.  Amanda Johanson, a related non-Defendant third party to this action who was involved in the Scheme, also was the subject of disciplinary charges and ultimately suspended by the California Bar for, *inter alia*, taking fees from clients to renegotiate loans and then not performing any services.[1]  Defendant Mize and Ms. Johanson also have been the subject of lawsuits by aggrieved consumers.  Those prior actions and sanctions, however, have not deterred Defendants from continuing to operate the Scheme.

4.     The Scheme was often initiated by mailings originating from certain "debt counseling" companies, including CMS, that purported to offer consumers a chance to consolidate, reduce, or eliminate altogether their student loans.  Many consumers believed these mailings originated with the federal government based on their wording and appearance.  Once a consumer contacted the number listed in the mailing and agreed to utilize the services being advertised, he

---

[1] Upon information and belief, Amanda Johanson is a natural person domiciled in the state of California who was the principal of Amanda Johanson & Associates, previously known as Knepper & Johanson Law Group.  Ms. Johanson, Amanda Johanson & Associates, and Knepper & Johanson Law Group are referred to collectively herein as "Ms. Johanson."  On March 12, 2018, the Central District of California entered a verdict against Ms. Johanson in a civil RICO case involving a substantially similar scheme.  *See Mantolino v. Knepper & Johanson Law Group, et al.*, No. 8:17-cv-867 (C.D. Cal. filed May 17, 2017).  The Plaintiff reserves the right to name Amanda Johanson, Amanda Johanson & Associates, and/or Knepper & Johanson Law Group as defendants pending discovery concerning the full scope of their involvement.

or she was charged exorbitant sums to consolidate or lower his or her federal student loan payments – something that the consumer could have accomplished for free under existing federal student loan programs.  When a consumer called these "debt counseling" companies seeking to reduce or eliminate private student loans, for which consolidation was not available, the consumer was referred to one of the Attorney Defendants, as defined below.

5.   Even after consumers were referred to the Attorney Defendants, these "debt counseling" companies, including CMS, would often still field calls and e-mails from consumers, have the debtor sign the attorney retainer, set up an auto-debit program to pay the attorney unearned monthly fees, and instruct the debtor to stop paying their student loans.

6.   These "debt counseling" companies, including CMS, and/or the Lohman Defendants, as defined below, would then instruct the consumer to follow a script intended to induce telephone calls from NSL with the goal that those calls would form the purported basis for a claim under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227.  In this variant of the Scheme, Defendants would then instruct their clients to tally how many calls they received from NSL.  Certain Defendants would often provide their clients with a "script" for "revoking" consent to receive telephone calls from NSL, and would surreptitiously stay on the telephone lines while calls with NSL were taking place, disconnecting such calls after they determined that their clients had sufficiently regurgitated the prepared dialogue.  These Defendants often recorded such conversations, without the knowledge or consent of at least NSL.  Thereafter, Defendants frequently instructed their clients not to answer any further calls from NSL, the intent and effect being to ensure the number of potentially actionable calls was inflated as much as possible.

7.   Alternatively, the Mize Defendants, as defined below, (or Ms. Johanson in some instances) would issue letters to NSL on behalf of their purported clients requesting to redirect

4

communications to them.  In their letters, the Mize Defendants/Ms. Johanson advised the debt was "disputed" and also requested "verification" of the debt under the Fair Debt Collection Practices Act ("FDCPA") when in fact the debt was not genuinely disputed, NSL was not subject to the FDCPA, and the Defendants had no interest or use in receiving such voluminous documents. Rather, this letter was intended as a smokescreen to conceal the real purpose of the request: to manufacture TCPA claims by laying an arguable predicate for such claims with a deliberately vague and muddled "revocation" of TCPA consent.

8.      In either instance, when certain of the Defendants judged that NSL had made a sufficient number of calls to the consumer, they would refer the matter to the Lohman Defendants, and the Lohman Defendants would initiate legal actions either in federal court or through arbitration.

9.      The Scheme has resulted in substantial losses to NSL, including losses due to the fact that otherwise paying customers were induced to stop paying, as well as losses associated with defending numerous TCPA lawsuits, such as settlement payments, cancellation of hundreds of thousands of dollars in student loan debt, and attorneys' fees and costs incurred to defend against these lawsuits.

10.     The Scheme also victimized the very consumers whom Defendants claimed to help. In following Defendants' instructions to cease payments to NSL and to instead make monthly payments to Defendants, borrowers suffered significant and lasting damage to their public credit when their student loans defaulted.  Borrowers also suffered direct monetary losses when Defendants pocketed the borrowers' monthly loan payments with no guarantee that the borrowers would receive any pecuniary relief from the Scheme or any tangible benefits with respect to their

outstanding student loans, which would ultimately default as a result of the instructions to cease payment.

## Parties

11.     Plaintiff NSL is a Delaware limited liability company in the business of servicing student loans with its principal place of business in Reston, Virginia.  NSL's sole member is Navient Corporation, a Delaware Corporation.  NSL was formerly known as "Navient Solutions, Inc." and, before that, "Sallie Mae, Inc."

12.     Defendant The Law Offices of Jeffrey Lohman, a Professional Corporation ("Law Offices of Jeffrey Lohman") is a California corporation in the business of providing legal services with its principal place of business in Corona, California.

13.     Defendant Jeffrey Lohman is a natural person domiciled in the state of California and is a principal of the Law Offices of Jeffrey Lohman.  At all times relevant to this Complaint, Defendant Lohman managed the affairs of the Law Offices of Jeffrey Lohman and participated in and supervised its work on TCPA matters.

14.     Defendant Jeremy Branch is a natural person domiciled in the state of California and is an employee of Law Offices of Jeffrey Lohman.  Defendant Branch was lead counsel in many TCPA matters in which the Law Offices of Jeffrey Lohman served as counsel, including, but not limited to, the representations of A.C. and J.S. [2], as described below.

15.     Defendant Alyson Dykes is a natural person domiciled in the state of California and is an employee of the Law Offices of Jeffrey Lohman.  Defendant Dykes was associate counsel in

---

[2] The names of certain consumers are redacted and concealed because many aspects of their cases are protected pursuant to confidentiality orders entered in their respective arbitration proceedings.

many TCPA matters in which the Law Offices of Jeffrey Lohman served as counsel, including, but not limited to, the representation of E.A., D.D., and K.W., as described below.

16.    Defendant Ibrahim Muhtaseb is a natural person domiciled in the state of California and, on information and belief, is a former employee of the Law Offices of Jeffrey Lohman.  At all relevant times, Defendant Muhtaseb was lead counsel in many TCPA matters in which the Law Offices of Jeffrey Lohman served as counsel, including, but not limited to, the representations of E.A., Shanna Helvey, L.L., C.S., and K.W., as described below.

17.    Defendant David Mize Law, PLLC ("David Mize Law") is an Arizona professional limited liability company with its principal place of business in Phoenix, Arizona.

18.    Defendant David Mize is a natural person domiciled in the state of Arizona and is the principal of David Mize Law.  Defendant Mize was lead counsel representing various consumers including, but not limited to, A.C., Shanna Helvey, L.L., C.S., J.S., and K.W. in proceedings against NSL, as described below.

19.    Defendant Champion Marketing Solutions, LLC d/b/a CMS ("CMS") is a Texas limited liability company with its principal place of business in Plano, Texas.

20.    Defendants John Does #1–20 are additional individuals or entities that have participated in the Scheme whose identities will be determined through discovery from known members of the Scheme.

21.    Defendants Law Offices of Jeffrey Lohman, David Mize Law, Lohman, Branch, Dykes, Muhtaseb, and Mize are referred to herein as the "Attorney Defendants."

22.    Defendants Law Offices of Jeffrey Lohman, Lohman, Branch, Dykes, and Muhtaseb are referred to herein as the "Lohman Defendants."

23.   Defendants David Mize Law and David Mize are referred to herein as the "Mize Defendants."

## Jurisdiction

24.   This Court has subject matter jurisdiction over the claims herein under 28 U.S.C. § 1331 because this case arises under the laws of the United States, namely, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

25.   This Court has subject matter jurisdiction over state-law claims brought herein under 28 U.S.C. § 1367(a) because such claims form part of the same case or controversy as those arising under the laws of the United States, and under 28 U.S.C. § 1332 because there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

26.   Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this District, namely, Defendants directed their actions towards NSL knowing that it is based in this district and Defendants advertised their services in the Commonwealth of Virginia.

27.   Venue also is proper in this District under 18 U.S.C. § 1965(a), because Defendants all transact their affairs in the Commonwealth of Virginia by advertising for clients and/or operating the Scheme here.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### NSL and the TCPA

28.   NSL is one of the largest servicers of student loans in the United States, servicing a multi-billion-dollar portfolio in outstanding student loans for over twelve million customers, including a mix of loans owned by the federal government, privately owned loans guaranteed by the federal government, and wholly private loans.

29.     Privately-owned loans serviced by NSL—whether or not those loans are guaranteed by the federal government—are owned by various trusts or other entities for which NSL is the servicer and authorized agent.

30.     Most of NSL's twelve million customers pay down their student loans without incident.

31.     When a borrower falls behind on his or her loan payments, NSL may contact that borrower, as well as others associated with the account.  NSL does this to help borrowers to avoid default by making sure that they are aware of their repayment options.

32.     NSL also does this to protect both the public and private funds with which it is charged.  By working with customers to avoid default, NSL protects taxpayer funds that are at risk when a federally owned or guaranteed loan is not repaid.

33.     In fact, the Higher Education Act of 1965 (as amended) and United States Department of Education regulations require NSL to make certain due diligence contacts with customers who fall behind on repaying certain types of loans.

34.     NSL's telephone contact with its customers is subject to regulation by various state and federal laws, including the federal TCPA.

35.     The TCPA was enacted by Congress in 1991 with the purpose of "balanc[ing]" "individuals' privacy rights, public safety interests, and commercial freedoms of speech and trade . . . in a way that protects the privacy of individuals and permits legitimate telemarketing practices." TCPA Pub. L. No. 102-243 § 2(9), 105 Stat. 2394 (1991).

36.     To achieve this balance without discriminating against certain types of speech, the TCPA restricts the manner in which calls can be made, including placing restrictions on the ability of NSL and other companies to call customers using an automatic telephone dialing system

("ATDS") without their express consent.  The definition of an ATDS subject to the TCPA has been the subject of significant litigation in the federal courts.  NSL contends that its processes are compliant with the TCPA.

37.   In order to deter improper autodialing practices, the TCPA provides for outsized $500 statutory damages for every call that violates the statute.  If violations are willful or knowing, a court may increase the damages to up to $1,500 per violation.

38.   The size of these potential statutory damages has enticed many plaintiffs' attorneys to seek out TCPA cases.  These attorneys frequently bring class action claims against large defendants and use the threat of potentially crippling damages to extract settlements for suits that may be of questionable merit or which depend on unsettled legal issues.  Other attorneys, like those named as Defendants here, are not content to seek these cases out, but have undertaken a scheme to manufacture claims where none otherwise existed.

39.   To manufacture these claims, scammers like CMS attract student loan borrowers by advertising themselves as "debt counselors" or "debt relief services."  Rather than help these customers to pay or restructure their obligations, many of these scammers instead advise customers to purposefully stop paying their loans and attempt to misuse the TCPA and other laws offensively in an effort to reduce or avoid their loan obligations.

40.   To comply with the TCPA and other laws, NSL has implemented comprehensive compliance programs pursuant to which, *inter alia*, it will only call customers manually, unless it possesses their express consent to contact them with the use of automated dialing technology.  NSL may obtain such consent as part of the loan application process, but also may do so at various points during the course of servicing a customer's loan.

41.     When NSL understands that it lacks such consent, for example, if a customer asks NSL to stop contacting him or her using automated means, NSL honors that request and will only contact such customer manually.

42.     Because these customers still are obligated to pay often-substantial sums on outstanding student loans, NSL may continue to contact customers using permitted, manual dialing methods, even if the customer has withdrawn their consent to be contacted using automated dialing methods.

43.     As part of the Scheme, the Attorney Defendants have targeted NSL's customers to bring TCPA suits on their behalf, seeking windfalls through the threat of costly litigation.

## The Scheme

44.     To carry out the Scheme, Defendants engaged in a pattern of wire and mail fraud.

45.     Defendants repeatedly sent false and fraudulent mailings both to consumers and to NSL using the U.S. Postal Service ("USPS").  For instance, the "debt counseling" companies that recruited consumers into the Scheme, including CMS, sent letters and flyers to consumers that misleadingly appeared to be from a government entity offering assistance in reducing borrowers' student loan debts.  These mailers also promised consumers assistance in negotiating down their student loan debt, when instead these "debt counseling companies," including CMS, never intended to do so; they only intended to manufacture TCPA claims against NSL.  Many of the consumers who subsequently filed suit against NSL believed that the mailings were sent from or on behalf of the United States, and relied on the representations contained therein.

46.     The Attorney Defendants, for their part, sent various demand letters to NSL on behalf of "clients" whom they oftentimes did not actually represent and for whom they had no authority to act.  In other instances, the Attorney Defendants sent letters to NSL in which these

Defendants stated their intention to negotiate their clients' debts with NSL, when in truth they had no such intention. In still other instances, the Attorney Defendants sent letters to NSL in which they stated that they were "looking to verify" a disputed debt when they knew that no basis to dispute the debt existed.

47.     The "debt counseling" companies that recruited consumers into the Scheme, including CMS, also misrepresented via telephone conversations with consumers that the Attorney Defendants would negotiate consumers' student loan debts with NSL, when in fact the Attorney Defendants only intended to manufacture TCPA claims against NSL.

48.     The Attorney Defendants repeatedly made fraudulent misrepresentations to NSL in communications and other legal papers sent over the wires. For example, in the exchange of discovery during litigation with NSL, the Attorney Defendants submitted discovery responses containing certifications that they represented a particular client and that they were answering on that client's behalf when in fact no such representation existed, as NSL later learned. Alternatively, the Attorney Defendants submitted these responses certifying that they had consulted with their clients when, in truth, those clients were unaware that any discovery had been exchanged. Further still, the Attorney Defendants instructed their clients to call NSL operators stating that they did not want to receive calls from NSL when their entire Scheme depended on receiving such calls. At times, the Attorney Defendants or their employees were on the calls with their clients when these false statements were made to NSL.

49.     In addition, Defendants misled their own clients by advising them to default on their loans as part of a purported debt relief plan, putting their clients in a materially worse position, injuring their credit, and, in some cases, increasing rather than decreasing their student loan debt as a result of this fraud.

**"Debt Counseling" Companies**

50.     A client is brought into the Scheme by a "debt counseling" company such as CMS. These companies, including CMS, hold themselves out as debt counselors who can help consumers get out of their student loan debt using a variety of techniques.

51.     These "debt counseling" companies, including CMS, recruit student loan debtors by advertising "debt counseling" and debt relief services via mailed flyers and cold calls sent to student loan debtors.  Initial contact with the NSL borrower is typically through a mail solicitation. The recruitment of debtors occurs nationwide.  On first glance, the solicitation appears to be some sort of governmental or official document, and typically includes a relatively accurate reference to the amount of the borrower's then-outstanding student loan(s).  These solicitations advise the recipients that they might be eligible for consolidation, reductions, or, potentially, "total forgiveness" of their student loans.  An example of one such solicitation is attached as **Exhibit A**, which is filed concurrently herewith.  Often these solicitations reference "new federal laws" that might help reduce a borrower's payments and/or appear to have originated from the federal government.  When asked, borrowers did not recall discussing any "new" law with the "debt counseling" company.

52.     These solicitations were fraudulent and misleading.

53.     The phone number listed on the solicitations leads the borrower to a "debt counseling" company such as CMS.  Based on deposition testimony and files produced by individual borrowers in discovery, several other recruiters (or aliases) also appear to be involved. The borrowers are often confused about whom they contacted, and with whom they were working. Some borrowers believed they were working directly with the United States Department of Education or its duly-authorized agents.

54.     Upon information and belief, in some instances for federal student loans, these "debt counseling" companies, including CMS, appear to have charged a fee for signing up borrowers for consolidation, forbearance/deferment, enrollment in income-driven repayment plans, or other benefits that borrowers easily could have obtained on their own for free.

55.     With respect to consumers' private student loans, despite making contrary statements to the borrowers, the "debt counseling" companies that recruited consumers into the Scheme, including CMS, do not provide debt relief services at all.  Instead, they abuse their knowledge of standard industry practices to manufacture TCPA lawsuits against NSL.

56.     The "debt counseling" companies that recruited consumers into the Scheme, including CMS, refer consumers to attorneys, including the Mize Defendants and Ms. Johanson, for the stated purpose of trying to negotiate with NSL and other loan servicers.

57.     After referring consumers to the Mize Defendants or Ms. Johanson, these "debt counseling" companies, including CMS, would continue to field calls and e-mails from these same consumers.  These companies, including CMS, are made up of non-lawyers acting "on behalf" of the Mize Defendants and/or Ms. Johanson, who are tasked with having student loan debtors sign attorney retainers, setting up auto-debit programs to pay the attorneys' monthly fees, and instructing debtors to stop paying their loans in order to trigger phone calls from NSL.

58.     Further, the "debt counseling" companies that recruited consumers into the Scheme, including CMS, intended to deceive consumers, and encouraged consumers to contact them directly instead of the Attorney Defendants.  For example, certain of these "debt counseling" companies, including CMS, would send direct communications thanking student loan borrowers for choosing to become a client of the Mize Defendants or Ms. Johanson.  And many of the consumers testified that they believed these "debt counseling" companies, including CMS, were

employees of the Mize Defendants or Ms. Johanson. This is the type of conduct for which Mize was disciplined by the Arizona Bar.

59.     In the instance of the Mize Defendants' engagement agreement, the agreement provides for Defendant Mize to represent a client in dealings with student lenders or other creditors in exchange for a "fixed fee," which appears to be calculated as exactly 40% of the outstanding student loan debt. Ms. Johanson's agreement is functionally identical, and similarly requires the client to pay a "fixed fee" which appears to be calculated at exactly 40% of the outstanding debt disclosed by the consumer.

60.     In some instances, after having the consumer execute an engagement agreement, the "debt counseling" companies that recruited consumers into the Scheme, including CMS, would then instruct the consumer to follow a script intended to induce telephone calls from NSL, with the goal that those calls would form the basis for a claim under the TCPA. Often, an employee of these "debt counseling" companies would be on the line and would record the telephone call, sometimes illegally.

61.     Some clients of the Scheme asked NSL to stop calling them before they ever became delinquent on their loans, and at a time when they had not received any calls from NSL. There is no obvious reason why a person would request for NSL to stop making calls that had never begun unless he had been instructed to do so as part of the Scheme.

62.     Because it is NSL's policy to attempt to contact delinquent borrowers to help them avoid default, NSL often would continue trying to contact these individuals by placing manually-dialed calls. Typically, these borrowers had been instructed not to answer any calls from NSL, leading NSL to continue trying to reach and assist them regarding their loans.

63.     After clients called NSL and read from the script, they were instructed to tally any calls received from NSL or businesses to whom they owed money.  Clients were instructed to send regular e-mails to the "debt counseling" companies that had recruited them into the Scheme, such as CMS, listing any calls that they believed they may have received from NSL or any other creditor.

64.     Because the TCPA provides for $500 to $1500 in potential statutory damages for each call, clients were advised that they could expect to receive this much every time NSL called them.  The Defendants typically did not inform their clients that calls made by NSL without the use of an ATDS did not violate the TCPA.  Accordingly, participants in the Scheme considered the phone calls to be equivalent to money.

65.     For instance, in a currently-pending federal matter handled by the Lohman Defendants against NSL, the Lohman Defendants' client answered calls from NSL at various times (after allegedly revoking consent from NSL) with the following remarks:

- "Right, but you keep calling me. Every time you call me, that's a $500 fine. And you called me 3 times."

- "They told me this was going to happen. They said your two departments don't talk to one another. Every time you call me, it's $500 off the bottom line. So, I'm perfectly fine, anytime you guys want to call, give me a call."

- "Every time you guys call me it's a $500 fine so call me as much as you want."

66.     Clients were advised to track incoming calls until the value of those logged calls, based on anticipated statutory damages claims, was large enough to offset the client's outstanding debt, provide fees for the members of the Scheme, and provide the client with an additional windfall.

16

67.     When the "debt counseling" companies that had recruited these clients into the Scheme, such as CMS, and/or the Mize Defendants and/or Ms. Johanson judged that NSL had made a sufficient number of calls, it would refer the matter to the Lohman Defendants, and the Lohman Defendants would initiate legal actions either in federal court or through the filing of arbitration demands.

68.     During this time, monthly payments were being made to the Mize Defendants (or in some earlier cases, Ms. Johanson) for the ostensible purpose of resolving the client's student loan debts, though this money was, in fact, pocketed by these attorneys.   Despite limited communications with NSL in some one-off matters, neither the Mize Defendants (nor Ms. Johanson) actually negotiated their clients' debts in the vast majority of cases.

69.     These actions harmed the very consumers Defendants were purporting to help by causing them to miss loan payments and ruining their credit.  Several consumers have caught on to the Scheme, as evidenced by an action recently filed in the United States District Court for the Central District of California, *Mantolino v. Knepper & Johanson Law Group, et al.*, No. 8:17-cv-867 (C.D. Cal. filed May 17, 2017) (attached hereto as **Exhibit B**).  Among others, Ms. Mantolino named CMS as a defendant who had "engaged in a multi-state conspiracy to defraud consumers by obtaining monthly ACH payments as a direct result of fraudulently claiming that Defendants would represent consumers in the handling of student loan processing."  Compl., Dkt. 1, ¶ 2.  In reality, "Defendants never intended to actually represent consumers in the handling of student [loan] processing" and they "knew that the consumer loans would go directly into default."  *Id*. ¶¶ 4, 5.  As part of this conspiracy, Ms. Mantolino alleges that CMS and others "instructed [her] to stop paying her debts and to go into default."  *Id.* ¶ 19.  Further, Ms. Mantolino alleges that CMS and others "never attempted to negotiate [her] loans" and "instead only sent a cease and desist

letter to [her] creditors and did nothing else while [her] loans defaulted and her credit score plummeted." *Id.* ¶¶ 23, 24.

70.     Numerous consumers were irreparably harmed by the conduct of the Mize Defendants, Ms. Johanson, and CMS.  The State Bar of California filed disciplinary charges against Ms. Johanson in July 2017 and December 2017 related to her representation of clients and their student loan debt.  *In the Matter of Amanda Lynn Johanson*, State Bar Court Case No. 16-O-11041 (attached hereto as **Exhibit C**); *see also In the Matter of Amanda Lynn Johanson*, State Bar Court Case No. 17-O-01254.  Significantly, many of the charges related to Ms. Johanson's conduct involving non-attorney employees of CMS, such as "allowing them to perform initial case consultation", "set, charge and collect fees from the clients for legal services, [and] provide legal advice to the clients regarding the purported invalidity of their student loans . . . independently and without supervision . . . ." *Id.* ¶ 18.  In numerous instances, Ms. Johanson accepted advance payment of attorney's fees but ultimately failed to negotiate with the clients' lenders, and failed to perform any legal services. *Id.* ¶¶ 2–16.  Further, Ms. Johanson was accused of charging hundreds of thousands in unconscionable legal fees to clients under false pretenses, in which "no portion of the fees was used to pay any portion of the clients' student loan debts." *Id.* ¶¶ 20, 23.

### Mize Defendants

71.     Although Defendant Mize is located in Arizona, his attorney engagement agreement directs "Responsive Documents" to be sent to an address in Plano, Texas, which appears also to correspond to CMS, which operates from 860 F Avenue, Suite 104, Plano, TX 75074.

72.     Upon information and belief, Defendant Mize did not meet initially with clients before receiving signed fee agreements.  Rather, the "debt counseling" companies that recruited

consumers into the Scheme, such as CMS, were given access to their representation agreements, and purportedly enrolled prospective clients without speaking to Defendant Mize or Ms. Johanson[3].

73.     In many cases, student loan debtors who were current on their student loans would stop paying NSL at the instruction of these "debt counseling" companies that recruited these debtors into the Scheme, such as CMS, and begin paying the Mize Defendants or Ms. Johanson instead, defaulting on their loans as a result.

74.     In instances in which clients had not already revoked consent telephonically to receive non-manual phone calls from NSL, after those clients executed their respective attorney engagement agreements, an employee of an entity named Consumer Financial Services, LLC d/b/a Student Loan Resolve, which upon information and belief is an affiliate or subsidiary of CMS, acting on behalf of the Mize Defendants or Ms. Johanson, would send form letters to NSL via facsimile, instructing it to redirect further communications to them, falsely advising that they "disputed" those borrowers' debts, and requesting voluminous account information.  The form letters used by Defendant Mize are identical to—and have the same return address as—form letters used by Ms. Johanson.  An example of one such letter is attached as **Exhibit D**.  NSL has received hundreds of these form letters from the Mize Defendants (and Ms. Johanson prior to her suspension by the California Bar).

---

[3] Indeed, in October 2017, Defendant Mize was reprimanded and placed on probation by the State Bar of Arizona for violating Arizona Rules of Professional Conduct 1.4 and 1.6.  Specifically, Mr. Mize admitted that while practicing law, he gave access to his representation agreement forms to debt relief companies, including CMS, and negligently permitted non-attorneys employed at those companies to sign his name on representation agreements.  This effectively resulted in certain of Mr. Mize's clients hiring him for legal services and making payments to him without first being given an option to speak to him directly.

75.     In response to these form letters from the Mize Defendants, NSL frequently requested that the Mize Defendants obtain verification from their purported clients before NSL would provide information to them.  NSL received no response from these law firms or from their purported clients the vast majority of the time.

76.     Once the debt dispute letter had been issued, the Mize Defendants would instruct their clients to cease communicating with NSL, tally the number of calls received from NSL, and to regularly submit those tally logs to the "debt counseling" companies that had recruited these clients into the Scheme, such as CMS.

77.     When the potential statutory damages were equal to or greater than a client's outstanding student loan debt, the Mize Defendants referred the client to other attorneys, including the Lohman Defendants, to file a lawsuit or an arbitration demand against NSL.

### Lohman Defendants[4]

78.     In some instances, the "debt counseling" company that had recruited a client into the Scheme had not instructed the client to call to revoke consent from NSL.  In other instances, the Mize/Lohman Defendants had not issued a debt dispute letter.  When the Lohman Defendants received case files for cases that fit either of these categories, they would themselves instruct a referred consumer to follow a script intended to lay the foundation for a TCPA claim by revoking consent to be called, operating on the assumptions that NSL would continue to call the consumer and would use an ATDS to do so.  In several instances, one or more of the Lohman Defendants

---

[4] The Law Offices of Jeffrey Lohman took on cases previously handled by the law firm Krohn & Moss Ltd, which were the subject of a similar RICO action filed in the United States District Court for the Eastern District of Virginia, case number 1:17-cv-01178-LMB-TCB.  Following the disposition of the prior RICO action, Krohn & Moss Ltd. withdrew from its representation of individuals involved in the lawsuit.  Jeffrey Lohman, who used to work for Krohn & Moss Ltd., took over those cases for Krohn & Moss Ltd. despite knowing (or perhaps because he knew) that their provenance was rotten.

would initiate a three-way call with the consumer and NSL, maintain silence on the line, and record the call without NSL being aware of or consenting to the recording.

79.     As described above, some clients called to revoke consent before NSL began calling them over defaulted loans or before they even had defaulted on the loans.  And, as before, many of these clients were instructed not to answer NSL's calls.  Other clients called to revoke consent once they had already become delinquent at the Attorney Defendants' instruction and had begun receiving calls from NSL.  Clients were then instructed to maintain logs tallying calls received from NSL.

80.     The Attorney Defendants also instructed their clients not to not pick up any calls from NSL after they had revoked consent in order to inflate the call count and to avoid the possibility of a client re-giving consent or resolving the delinquency.

81.     In both circumstances, the Lohman Defendants intended the revocation call to manufacture a TCPA claim.  That is, the Lohman Defendants intended the call to serve as the revocation of any prior consent given by the client to NSL.  The Lohman Defendants understood NSL would then keep calling in a manual mode.  Or, the Lohman Defendants hoped an NSL agent would make, in rare instances, a mistake and NSL would inadvertently call by automatic means that could be characterized as an ATDS.  In either case, such calls would then serve as a foundation for a legal action that would take advantage of unsettled legal issues in the TCPA and apply pressure on NSL to settle or else incur substantial litigation costs to defend.  Typically, to then complete the Scheme, the Lohman Defendants would file a lawsuit or arbitration demand against NSL and either seek a settlement or force NSL to defend itself in federal court or in a costly arbitration hearing.

82.     In addition to harming NSL, the Lohman Defendants are harming consumers.  Just as with Defendant CMS, the Lohman Defendants' actions have resulted in civil suits from consumers.  In a recent, Missouri state court case, *Johnson v. Law Offices of Jeffrey Lohman & Veritas Legal Plan, Inc.*, No. 1822-AC07686 (Mo. Cir. Ct. filed Mar. 15, 2019), Theresa Johnson alleges that she reached out to a debt counseling company that referred her to Veritas Legal Plan, who in turn referred her to the Lohman Defendants as part of Veritas's "Debt Validation Program." First Am. Pet. (attached hereto as **Exhibit E**) ¶¶ 32–36, 49.  The debt counseling company "abused [Ms. Johnson's] relative ignorance and its own position of power and enticed Plaintiff to enter into an agreement whereby [Ms. Johnson] agreed to (1) stop paying all of her unsecured creditors and (2) send $391.26 every month to [the debt counseling company]."  *Id.* ¶ 40.  Ms. Johnson alleges that "[a]fter signing up with the [debt counseling company], [she] noticed that the collection calls and letters actually increased."  *Id.* ¶ 45.  Ms. Johnson alleges that the Lohman Defendants attempted to "solicit Telephone Consumer Protection Act ('TCPA') cases from [her]" and contacted her repeatedly to generally solicit business regarding her debts and debt collectors and take on TCPA cases. *Id.* ¶¶ 57, 60.  Further, Ms. Johnson alleges that the Lohman Defendants gave her a "statement" that she "was supposed to read over the phone to her debt collectors."  *Id.* ¶ 65.  Finally, Ms. Johnson alleges that "Lohman deceived and misled [her] into continuing to use its services for either direct payment by [Ms. Johnson] to Lohman or payment in the form of attorney's fees paid through TCPA case settlements," "pocket[ing] all or most of [Ms. Johnson's] money and . . . not perform[ing] as they promised," leaving Ms. Johnson's credit ruined with no resolution of her debt.  *Id.* ¶¶ 74, 77–81

83.     To date, the Attorney Defendants have engaged hundreds of debtors in multiple states and filed dozens of claims in multiple states.

## Role of the Attorney Defendants

84.    David Mize Law is one of the law firms participating in the Scheme.

85.    Upon information and belief, David Mize Law became involved in the Scheme at the direction of Defendant Mize.

86.    The Law Offices of Jeffrey Lohman is one of the attorney partners participating in the Scheme.

87.    Upon information and belief, the Law Offices of Jeffrey Lohman became involved in the Scheme at the direction of Defendant Lohman.

88.    Once a "debt counseling" company such as CMS referred a consumer to the Mize Defendants, the Mize Defendants would tally how many calls the client had received from NSL following the client's purported revocation of consent.

89.    The "Scope of Services" outlined in the Mize Defendants' retainer agreement states that Defendant Mize will make all efforts to "eliminate (or reduce, as the facts of your case dictate) [the borrower's] student loan debts, primarily through negotiations with [the borrower's] lenders." Despite this representation to borrowers, Defendant Mize actually attempted to negotiate the debt with NSL in only a miniscule fraction of cases where his firm was retained by NSL's customers.

90.    The fee for Defendant Mize's service was a flat fee that amounts to approximately 40% of the borrower's outstanding loan balance.  Payments to the Mize Defendants were made on a monthly basis and were automatically debited from a borrower's bank account.  The monthly payment to the Mize Defendants was often very close to the borrower's monthly student loan payment, but was sometimes higher.  This fee *did not* include a separate 40-45% contingency fee later charged by the Lohman Defendants in connection with litigating a TCPA claim.

91.     When deposed, some borrowers testified they were instructed to stop paying NSL and instead pay the Mize Defendants (or in some cases, Ms. Johanson).  Others said they were told "it would work better" if they stopped paying NSL (so calls would ensue).  Yet others testified they were not instructed to stop paying, but simply could not pay both the Mize Defendants and NSL, so chose to pay the Defendants.

92.     The Mize Defendants would refer a "ripe" file to the Lohman Defendants for litigation.  Per an express agreement with the Lohman Defendants, Defendant Mize would take no part in the litigation, but would receive 10% of the contingency fee from the client, on top of the 40% he would take pre-suit.  Although required by both Arizona and California ethical rules, there is no indication that clients ever expressly agreed to this division of fees.

93.     Upon information and belief, prior to her suspension, Ms. Johanson shared a similar agreement with the Lohman Defendants in which she agreed to refer "ripe" files to the Lohman Defendants.

94.     From 2015 to the date of filing of this Complaint, NSL suffered millions of dollars in losses to its business by reason of Defendants' racketeering activity.  Further, NSL paid not over $750,000 in settlements to plaintiffs represented by the Attorney Defendants and who are believed to have been involved in the Scheme.

95.     Each of these payments was obtained by a pattern of fraud and deception, including various acts of wire fraud, mail fraud, witness tampering, and other wrongful and tortious activity, as detailed below.

96.     NSL may not have entered into these settlements were it not for the Scheme and the inflated damages manufactured by the Defendants as part of their arbitration demand.

97.     Further, the Scheme's efforts have required NSL to cancel over $1,000,000 in valid student debt as a condition of settlements extracted by fraud and the concealment of the Scheme. This does not include the value of debts that remain outstanding but that, because of Defendants' interference in NSL's contractual relationships with its customers, are unlikely ever to be repaid. Defending against TCPA suits that were manufactured by the Scheme was costly and required NSL to incur over $1.8 million in attorneys' fees, not including time and resources devoted by NSL's in-house attorneys and other employees.  Upon information and belief, Defendants continue to recruit debtors and to pursue their manufactured claims, with only slight changes in their tactics, as they have since at least 2015.  Absent relief, Defendants will continue to engage in this pattern of racketeering activity.

## Cases Exemplifying the Scheme

### C.S.

98.     C.S. lives in Missouri and is the borrower of a private student loan serviced by NSL.

99.     C.S. retained the Mize Defendants in October 2015 after she learned of this law firm through an unsolicited flyer she received in the mail from "Student Processing Relief."  The flyer indicated that Student Processing Relief could assist C.S. in reducing or eliminating her student loans.

100.    After C.S. provided documentation concerning her student loans to Student Processing Relief, it referred her to attorney David Mize and his law firm for her private student loan, and indicated that David Mize specialized in debt reduction matters.

101.    However, instead of being directed to Defendant Mize personally, C.S. was in fact referred to various employees of CMS, including Terry Belser, Joel Knapp, and Perla Ortiz.  C.S.

was under the impression that CMS was a "servicing branch" that corresponded with clients of Defendant Mize.

102.    On or about October 15, 2015, C.S. signed an attorney engagement agreement with the Mize Defendants, and agreed to pay a fixed fee for legal services in monthly installments of $311.71 for eighteen months, to be withdrawn automatically from her bank account.  The amount of the fixed fee was exactly 40% of the amount owed on C.S.'s private student loan.

103.    C.S. made payments to the Mize Defendants instead of NSL because she had been falsely told that the money paid to the Mize Defendants would be used to resolve her student loan debt to NSL.

104.    On October 22, 2015, Terry Belser, an account manager at CMS, sent C.S. an e-mail with the subject line "Welcome Aboard! (David Mize Law Firm)."  This e-mail requested C.S. begin gathering her loan documents to prepare her claim, and included a "Welcome Letter" from CMS Servicing Group, as well as a blank "Monthly Communication Log" template.  The Welcome Letter advised C.S. to document all telephone calls on the template, and to send the log to CMS every week.

105.    Terry Belser's e-mail signature indicated the e-mail was from Terry Belser, "Account Manager, CMS – David Mize Law."  This communication was deceptive, and reinforced C.S.'s belief that CMS was a part of Defendant Mize's law firm, even though CMS provided legal advice despite consisting of all non-attorneys.

106.    Prior to retaining CMS and the Mize Defendants, C.S. had made regular monthly payments toward her student loan since 2012.  But following the instructions provided by CMS, C.S. ceased making payments on her loan.  C.S.'s final payment toward her student loan was made

on September 24, 2015, and she failed to make her regularly scheduled payment in October 2015. Calls from NSL to attempt to cure the delinquency ensued.

107.    On or about October 20, 2015, an employee of CMS, purporting to be Defendant Mize, sent a letter to NSL, requesting that NSL redirect future communications to him, falsely advising the debt was "disputed," and demanding validation for the debt of C.S.'s student loan. The substance of the letter was materially false and incorrect: Defendant Mize in fact wanted calls to continue to C.S., did not genuinely dispute the debt, and had no purpose in obtaining "validation" of it.  Instead, the purpose of Defendant Mize's letter was to manufacture a TCPA claim against NSL.  Additionally, the letter claimed that Defendant Mize also represented C.S.'s cosigner, M.C.  This statement was false, as Defendant Mize had not been retained by M.C.

108.    Starting in October 2015, per instructions from CMS, C.S. maintained a log tallying all calls she received from NSL, using the "Monthly Communication Log" template provided by CMS.  C.S. dutifully sent the log to CMS on a regular basis by e-mail.

109.    On May 31, 2016, C.S.'s private student loan defaulted.

110.    Throughout this process, C.S. did not speak directly with Defendant Mize until 2016.  On April 13, 2016, Defendant Mize sent C.S. an e-mail asking to speak with her, and identifying the TCPA as "a great tool for our firm to use when attempting to settle [her] private student loan."  The April 13, 2016 e-mail further advised C.S. that his staff, and the staff of the Lohman Defendants, would be reaching out to her to discuss the TCPA.

111.    Thereafter, C.S. began copying Attorney Lohman and the Lohman Defendants (at a specific e-mail address set up for correspondence, documents@jlgportal.com) on her e-mails to CMS, as well as providing copies of her updated "Monthly Communication Log," including but not limited to: May 12, 2016, May 17, 2016, May 19, 2016, May 23, 2016, and May 27, 2016.

112.    On November 8, 2016, non-Defendant attorney Ryan Lee of the Law Offices of Ryan Lee, PLLC, sent a copy of a draft complaint identifying C.S. to NSL, and inquired about the possibility of settling her claims for alleged TCPA violations.

113.    On January 26, 2017, a demand for arbitration was submitted by Mr. Lee on behalf of C.S., alleging violations of the TCPA.  Thereafter, Mr. Lee withdrew from representing C.S., and the Lohman Defendants entered their appearance as counsel for C.S.

114.    In her deposition on January 4, 2018, at which Defendant Muhtaseb was present, C.S. testified that either the Mize Defendants and/or CMS told her that it was not in her best interest to pick up the phone when NSL called her.  An e-mail dated November 10, 2015, confirms that Terry Belser, a CMS employee, instructed her not to answer these calls.  Mr. Belser's instruction to C.S. furthered the Scheme because, without C.S. answering her phone, NSL would be forced to continue to call in an attempt to reach her.

115.    Unbeknownst to NSL at the time, in an e-mail dated February 29, 2016, to a CMS employee, C.S. expressed doubt about the Scheme:

| Subject: | Credit Bureau/ Navient Docs |
|---|---|
| Date: | Monday, February 29, 2016 at 1:53:00 PM Pacific Standard Time |
| From: | ▮▮▮▮ |
| To: | Terry Belser |
| Attachments: | Equifax_pg1.pdf, Equifax_pg2.pdf, Experian_pg1_2.pdf, Navient.pdf, Monthly Communication Log_2.docx |

Hi Terry,

Here are the correspondence that i received via USPS last week. Along with those is another updated version of calls I received as of this afternoon. You will read in the comments of the latest conversation i had with them that they do not have any indication of a C&D on file nor do they have my legal action via Mize Law Firm on file. I don't understand this at all. Are they able to say this? Given that you, me and Mize Law Firm have each other's best interest at hand, i was under the impression that they have had direct correspondence from us to them regarding my legal claim? So them saying they do not have anything on file is a blatant lie. Which to me and how disconnected i am with details on my own case is disconcerting.

You can see why given that it has now been right at 6 months since this this thing began. And it kinda makes me believe them about not having anything on their files. I am very skeptical about all of the above and have been from day one, i just chalked it up to me not knowing enough about how quick legal happenings take place and such. But six months is a long time. The more and more this thing drags out the more i want to speak with Navient and get back to normal with my life. I mean, as far as i can tell my credit report is suffering because of this and my debt with Navient is just rising to unprecedented amounts for the amount of time i have not paid them. I'm am very nervous about this turning out in my favor. Especially since monthly payments are coming out of my account to your Secured Agency of over $300/mo. Which i still assume i will recoup all of it if the case doesn't go in our favor but then i'm back right where i started with Navient 3 yrs ago or worse with interest and principal. You see my thought process, right.

116.    In an e-mail dated April 1, 2016, it was apparent that C.S.'s skepticism about the Scheme persisted:

> Evidently yesterday was the deadline for me to call Navient back to hear about options they could offer in potentially getting back on a regular payment plan with them. . .. Please let me know if there are ramifications of this that may occur to my credit report or to other parts of my livelihood now that they are pushing my file along to a debt collector.

117.    Indeed, C.S. nearly elected to withdraw from the litigation process, and in November 2017, the Law Offices of Jeffrey Lohman, P.C. expressed to counsel for NSL that C.S. was considering dismissing her arbitration.

118.    C.S.'s doubt about the Scheme was well-founded.  The Defendants' illegal, fraudulent efforts to divert funds owed by C.S. to NSL injured both C.S. and NSL alike.

119.   On the eve of her arbitration hearing, C.S. and NSL agreed to a settlement of her claims.   Pursuant to this settlement, NSL was obligated to discharge over $17,000.00 of an otherwise valid debt, and suffered losses as a result of the Defendants' Scheme.

### D.D.

120.   D.D. lives in Georgia and is the borrower of several federal and private student loans serviced by NSL.

121.   In or around the end of 2015, D.D. first spoke to "Student Debt Doctor LLC," ("SDD") a company in Oakland Park, Florida, purporting to assist consumers in reducing or eliminating student loan debt, which eventually charged a fee for consolidating her federal student loans.   In or around December 2, 2015, SDD then referred her to a related entity known as "Fidelity Debt Reserve LLC," with the same business address and also controlled by the ownership of SDD, to assist D.D. in reducing or eliminating her private loans.   Both SDD and Fidelity Debt Reserve LLC are no longer in business.

122.   Specifically, on or about October 2, 2017, the Federal Trade Commission filed a Complaint for Permanent Injunction and Other Equitable Relief against Student Debt Doctor, LLC and Gary Brent White, Jr., in the United States District Court for the Southern District of Florida under Case Number 0:17-cv-61937-WPD.

123.   The Complaint alleged, *inter alia*, that the Defendants had engaged in deceptive marketing and sale of student loan debt relief services in violation of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101–6108.  Among other things, the FTC alleged that Defendants "promised to enroll consumers in student-loan-repayment programs to reduce or eliminate their

payments and principal balances" and "instructed consumers not to contact, work with, make payments to, or respond to contacts from their loan servicers."

124. On October 3, 2017, the United States District Court for the Southern District of Florida entered an *Ex Parte* Temporary Restraining Order against Defendants, and appointed a receiver, finding "good cause to believe that immediate and irreparable harm [would] result from Defendants' ongoing violations of the FTC Act and the TSR . . .."

125. Thereafter, the court-appointed receiver, Mr. Robert Carey, proceeded to implement the terms of the Temporary Restraining Order by locating and freezing assets of SDD and Mr. White, and issued various status reports following his appointment. Among other things, the receiver (with the assistance of local law enforcement) took possession and secured the physical premises of SDD at 3221 NW 10th Terrace, Oakland Park, Florida, and began inspecting the books and records therein. During this process, the receiver identified at least 83 employees present who marketed, advertised, and/or sold to consumers purported student loan debt relief services. The receiver also identified that SDD purchased and was actively operating at least 182 telephone lines, and maintained a sophisticated database identifying nearly 30,000 potential consumer victims since 2014.

126. The court-appointed receiver also found sufficient grounds to expand the receivership to include other entities owned or operated by Defendants, including Fidelity Debt Reserve LLC. Specifically, on February 28, 2018, the receiver filed a motion to expand the receivership to include five additional entities and their assets. Among other things, the receiver found that Gary Brent White, Jr. owned and controlled Fidelity Debt Reserve LLC, which provided debt settlement services, and also operated out of the SDD physical premises.

127.    In his most recent status report, filed on October 16, 2018, the court-appointed receiver maintained that "it is still my conclusion that Mr. White used [Student Debt Doctor LLC] and related entities he owned and/or controlled to operate deceptive student debt relief and other deceptive debt relief businesses to the detriment of consumers and to enrich himself personally and others."

128.    At some point in 2015, D.D. ceased making payments toward her student loans.  At her deposition taken on August 28, 2018, D.D. testified that she was instructed to stop paying her student loans by SDD, and that "in order for them to help me with my private student loans, I needed to go into default."  On or about December 2, 2015, D.D. received an e-mail from "Whitney Wade" at Fidelity Debt Reserve, which stated – "I can put you in a debt settlement immediately . . . whether the account [sic] are current or not . . . you would discontinue paying your servicers and LET THE ACCOUNTS GO DELINQUENT!"

129.    D.D. testified that she agreed to pay SDD $348 each month for three years via monthly debits from her bank account, and that she believed she had retained SDD in order to help her reduce her student loan payments.  In an e-mail from October 21, 2015, Ms. Wade at Fidelity Debt Reserve LLC told D.D. that "Once the account [D.D.'s payments were being made to] has built up enough equity we will start negotiating the best settlement possible."  This statement was false.

130.    At no point thereafter did SDD or Fidelity Debt Reserve LLC attempt to negotiate with NSL to settle the outstanding balance of D.D.'s student loans.  Despite requiring D.D. to authorize a general power of attorney to Fidelity Debt Reserve LLC using a form prepared by Fidelity Debt Reserve LLC, neither SDD nor Fidelity Debt Reserve LLC ever contacted NSL on D.D.'s behalf.

131.   Instead, Fidelity Debt Reserve LLC referred D.D. to the Lohman Defendants to manufacture a TCPA claim against NSL.  In short time, D.D. signed a retainer agreement with the Lohman Defendants.

132.   Following the instructions from SDD, D.D. ceased making payments on her loans in or around October 2015.  Calls from NSL ensued when the loans became past due in January 2016.

133.   On or about January 19, 2016, D.D. spoke with an NSL call-center agent and stated that she wished for NSL to cease calling her cell phone.  This statement was a lie.  In fact, Defendants and D.D. wanted the calls to continue so that they could form the basis for a possible TCPA claim.

134.   At her deposition taken on August 28, 2018, at which Defendant Dykes was present, D.D. admitted that she made the revocation call to NSL at the instruction of the Lohman Defendants, that the Lohman Defendants gave her instructions of what to say during that phone call, and that one of the Lohman Defendants recorded the January 19, 2016, telephone call.

135.   D.D. also stated that she began tallying all calls received from NSL after this purported revocation at the Lohman Defendants' instruction.  She further testified that she was instructed by the Lohman Defendants not to answer any of the calls, and to not have any further contact with NSL.

136.   In that same deposition, D.D. admits that she was told to stop paying NSL and needed to default in order to take advantage of the "program."

137.   On October 3, 2016, attorney Rory Leisinger of the law firm Leisinger Law, LLP, submitted a demand for arbitration on behalf of D.D., alleging violations of the TCPA.  Thereafter,

Mr. Leisinger withdrew from representing D.D., and the Lohman Defendants entered their appearance as counsel for D.D.

138.    When Defendant Lohman was deposed on November 6, 2017, he testified that in 2016, the Lohman Defendants were sending cases to Leisinger Law to "[litigate] the cases that our office produced."  The referral relationship subsequently terminated because Defendant Lohman concluded that he "make[s] more money when the in-house attorneys handle the cases."

139.    On the eve of her arbitration hearing, D.D. and NSL agreed to a settlement of her claims.  Pursuant to this settlement, NSL was obligated to discharge over $31,000.00 of an otherwise valid debt, and suffered losses as a result of the Defendant's Scheme.

### E.A.

140.    E.A. lives in Mexico and is the borrower of several student loans serviced by NSL.

141.    In or around the beginning of March 2016, E.A. received an unsolicited flyer in the mail from an entity purportedly called Go2Finance, LLC ("Go2Finance").  The flyer was captioned "Important Private Student Loan Reduction Benefits Prepared For [E.A.]," identified the total amount of E.A.'s outstanding student loan debt, and stated "you are now eligible to receive benefits from laws that may reduce your debt and in many cases total discharge of debt."

142.    E.A. called the toll-free number on the flyer and first spoke to someone named Ryan Smith at Go2Finance, who then referred her to Terry Belser, an employee of CMS.  At her deposition on February 26, 2018, E.A. testified to her belief that "[s]omehow they're all linked together."

143.    After several telephone communications with Mr. Belser in March 2016, he recommended and referred her to the Mize Defendants to obtain further assistance.  Interestingly, while E.A. believed that Mr. Belser worked for Go2Finance, she received an e-mail from him on

March 28, 2016 welcoming her to the "program," but indicating that he actually worked for the Mize Defendants.  Specifically, Terry Belser's e-mail signature indicated that the e-mail was from "Account Manager, CMS – David Mize Law" and was sent from e-mail address "tbelser@jlgportal.com."  This e-mail included attachments, including a "Welcome Letter" from CMS Servicing Group, as well as a blank "Monthly Communication Log" template.

144.    This communication was deceptive, and reinforced E.A.'s belief that Terry Belser and CMS were a part of Defendant Mize's law firm.  In response to an e-mail from E.A. asking "Who do you work for?  Are you a part of David Mize's law firm?"  Terry Belser at CMS responded, "Yes I am your account manager per the voice mail I left you."

145.    On or about March 30, 2016, after five or six telephone communications with the Mize Defendants, E.A. signed a retainer agreement with the Mize Defendants.

146.    Also on or about March 30, 2016, E.A. sent an e-mail to Terry Belser stating "I have spoken to all parties on my end as well as David Mize and I feel comfortable moving forward. . .. When speaking to David, he said there is a script you have that I can give to my grandmother/cosigner that she can tell the lenders to stop calling her.  Do you have that script?"

147.    Defendant Mize's retainer agreement stated that he would charge E.A. a fixed fee of $39,312.88 for his services, representing 40% of the $98,282.20 in debt to be enrolled in the "program" – which included debts owed to NSL, as well as other creditors and servicers such as Discover, Great Lakes, Citi, and Capital One.  However, at her February 26, 2018, deposition, at which Defendant Lohman was present, E.A. could not identify a single thing that the Mize Defendants had done for her, except refer her to the Lohman Defendants.

148.    Upon information and belief, E.A. made payments to the Mize Defendants instead of NSL because she had been falsely told that the money paid to the Mize Defendants would be used to resolve her debt to NSL.

149.    Upon information and belief, Defendant Mize explained to E.A. some options to enhance her settlement position, including an option to deliberately default on her student loans.

150.    Prior to retaining CMS and the Mize Defendants, E.A. had made regular monthly payments toward her student loans since 2009.  But following the instructions provided by CMS and Defendant Mize, E.A. ceased making payments on her loan.  E.A.'s final payment toward her student loans was made on April 12, 2016, and she failed to make her regularly scheduled payment in May 2016.  Calls from NSL in an attempt to cure the delinquency ensued.

151.    Eventually, and even months before she purported to revoke her consent to receive calls from NSL, E.A. became aware that the purpose of the Scheme and her call logs was to create a TCPA violation.  In an e-mail to Terry Belser on April 12, 2016, E.A. inquired about the potential consequences for her co-signer, "[i]f I am not supposed to pay the loans in order for the lenders to keep calling me."  E.A. further inquired whether her cosigner should switch banks to avoid potential bank levies by a creditor, after she took the future action of stopping payments toward all of her loans.

152.    Before she decided to stop making payments toward her NSL loans, E.A. spoke to her grandmother, E.H., who was a co-signer on the loans, to inform E.H. that she would be receiving collection calls from NSL because E.H.'s land line was not covered by the TCPA.

153.    When her NSL account became past due/delinquent, E.A. began receiving calls from NSL.  When E.A. informed the Mize Defendants of these calls, they referred her to the Lohman Defendants, who described to her the TCPA Scheme.  Specifically, the Lohman

Defendants informed her of the possible statutory damages under the TCPA, so she knew that each call after the revocation could result in $500 in statutory damages or more.

154.    E.A. was led to believe by CMS and the Mize Defendants that a letter had been sent on her behalf to NSL, when in fact, no such letter had been sent.  As a result, the Lohman Defendants set out to create a "revocation" for E.A.

155.    Prior to retaining the Lohman Defendants, she was coached by either Defendant Lohman or Defendant Muhtaseb on how to revoke TCPA consent from NSL via a telephone call.

156.    On or about June 22, 2016, E.A. spoke with an NSL call-center agent and stated that she wished for NSL to cease calling her on her cell phone.  This statement was a lie.  In fact, Defendants and E.A. wanted the calls to continue so that they could form the basis of a possible TCPA claim.  During her deposition, E.A. testified that Defendant Lohman was on the revocation call with E.A. and NSL, even though E.A. had not yet retained him, and the call was recorded by the Lohman Defendants without NSL's knowledge or consent, in violation of applicable state laws.

157.    After June 22, 2016, following the instruction of the Lohman Defendants, E.A. maintained a log tallying all calls she received from NSL and her other creditors.  E.A. dutifully sent the log to the Lohman Defendants on a monthly basis by e-mail.

158.    On or about July 19, 2016, E.A. officially retained the Lohman Defendants.

159.    On or about May 25, 2017, a lawyer with the Georgia law firm Wakhisi-Douglas, LLC, filed a federal court action purportedly on E.A.'s behalf.  During her deposition, however, E.A. stated that she had no knowledge of the federal court action or of the law firm that filed suit on her behalf.  Further, she stated that she had never spoken to anyone at that law firm.

160.    On or about July 19, 2017, Defendant Muhtaseb filed an arbitration demand against NSL purportedly on E.A.'s behalf.  E.A., however, stated in her deposition that she did not know

that an arbitration demand had been filed on her behalf. She also stated that she did not know that NSL had filed a $25,000 counterclaim against her.

161. In her deposition on February 26, 2018, at which Defendant Lohman was present, E.A. testified that she did not answer any of the calls from NSL, but did not recall whether she had been advised not to answer any of the calls. However, she admitted that she knew each phone call was a potential $500 to add to her future TCPA claim.

162. On the eve of her arbitration hearing, E.A. and NSL agreed to a settlement of her claims. Pursuant to this settlement, NSL was required to pay a cash settlement of $75,000.00 and discharge over $26,000.00 of an otherwise valid debt, suffering losses as a result of the Defendants' Scheme.

163. During her deposition, E.A. even expressed further interest in continued participation in the Scheme. She expressed her intention to retain the Lohman Firm to sue her other creditors and servicers, Great Lakes, Discover, and Citi. When asked about her lawsuit against NSL, she stated she had not yet sued the others, because NSL was a test case – "lucky number one."

**Shanna Helvey**

164. Shanna Helvey lives in Indiana and is a borrower of at least one student loan serviced by NSL.

165. In February 2017, Defendant Lohman sent a threat in the form of a draft complaint to NSL on Ms. Helvey's behalf.

166. Acting through local counsel, Andrew K. Homan, the Lohman Defendants filed a complaint against NSL alleging violations of the TCPA on behalf of Ms. Helvey in the U.S.

38

District Court for the Northern District of Indiana captioned *Shanna Helvey v. Navient Solutions,
LLC*, Case No. 1:17-cv-00186-WCL-SLC.

167.    On June 14, 2017, Defendant Muhtaseb filed a Notice of Appearance on behalf of
Ms. Helvey.

168.    In April 2018, Ms. Helvey contacted NSL to inquire as to why her loan was past
due when she had instructed NSL to directly debit her loan payments from her bank account.

169.    Because it had received a litigation threat, NSL's call-taker informed Ms. Helvey
that the call-taker was not permitted to speak with her because the case was in litigation status and
that Ms. Helvey would need to speak with her lawyer.

170.    During that call, Ms. Helvey insisted that she did not have a lawyer and asked
NSL's call-center agent if she could tell her who her lawyer was.  Ms. Helvey subsequently
confirmed that she had never heard of Mr. Hohman, Defendant Muhtaseb, or Defendant Law
Offices of Jeffrey Lohman.

171.    Notwithstanding Ms. Helvey's statement that she did not have a lawyer, Defendant
Muhtaseb pursued the litigation on her behalf from April 2017 until voluntarily dismissing the
lawsuit in July 2017, claiming that Ms. Helvey had ceased communicating with him.

172.    Upon information and belief, neither the Lohman Defendants nor Mr. Hohman ever
consulted with Ms. Helvey or entered into an attorney-client relationship with Ms. Helvey before
purporting to file a lawsuit on her behalf.

173.    Defendants' filing and pursuit of a complaint against NSL without Ms. Helvey's
knowledge or permission constituted an act of fraud against NSL in furtherance of the Scheme
because they falsely purported to act on her behalf against NSL.

**L.L.**

174.    L.L. lives in California and is the borrower of two private student loans serviced by NSL.

175.    L.L. stated in his December 8, 2017 deposition, at which Defendant Muhtaseb was present, that he received either a call or a flyer from the Mize Defendants regarding their student loan debt reduction services in or around March 2016.

176.    In or around April 2016, L.L. retained the Mize Defendants to lessen or eliminate the debt owed to NSL.  The Mize Defendants instructed L.L. to stop making payments on his student loan debt.

177.    In return, L.L. agreed to pay the Mize Defendants monthly payments of $130–150 per month.

178.    L.L. made payments to the Mize Defendants instead of NSL because he had been falsely told that the money paid to the Mize Defendants would be used to resolve his debt to NSL.

179.    At the Mize Defendants' instruction, L.L. ceased making payments on his loans in or around July 2016.  Calls from NSL ensued.

180.    The Mize Defendants also instructed L.L. to call NSL and revoke his consent for NSL to contact him on his cell phone.  Accordingly, on or about June 1, 2016, L.L. spoke to an NSL call-center agent and stated that he wished for NSL to stop calling him on his cell phone. This statement was a lie.  In fact, Defendants and L.L. wanted the calls to continue so that they could form the basis of a possible TCPA claim.

181.    The Mize Defendants instructed L.L. to not pick up any calls from NSL after he had revoked his consent in order to inflate the call count and to avoid the possibility of L.L. re-giving consent or resolving the delinquency.  The Mize Defendants explained to L.L. that any call

40

from NSL after he revoked consent would be "a violation" and would help him in negotiating down his debt to NSL.

182.    Per the Mize Defendants' instruction, L.L. tallied each call he received from NSL. Upon information and belief, he did not answer any other calls from NSL after he revoked consent. Further, per the Mize Defendants' instruction, L.L. submitted his logs of tallied calls to the Mize Defendants.

183.    Subsequently, L.L. terminated the Mize Defendants' representation because he was dissatisfied with their services.  On or about November 11, 2016, L.L. attempted to negotiate his student loan debt directly with NSL.

184.    A month earlier, however, on or about October 17, 2016, an attorney by the name of Ryan Leisinger of Leisinger Law LLP, based in Los Angeles County, California, filed an arbitration demand against NSL purportedly on L.L.'s behalf.[5]

185.    During his December 8, 2017, deposition, L.L. testified that he first learned of the arbitration when the Lohman Defendants called him and e-mailed him regarding his notice of deposition at the end of November 2017.

186.    Further, L.L. testified that this contact at the end of November 2017 was the first time he learned of the Lohman Defendants and that they purportedly represented him.  L.L. also testified that he does not know who Ryan Leisinger is.

187.    Defendant Muhtaseb sent to NSL responses to NSL's requests for production of documents purportedly on L.L.'s behalf and with L.L.'s assistance.  This was a material misrepresentation.

---

[5] Plaintiff reserves the right to name Ryan Leisinger, Rory Leisinger, and/or Leisinger Law LLP as defendants pending discovery concerning the full scope of their involvement.  At present, Plaintiff understands that Mssrs. Leisinger and Lohman work closely together.

188.     During his December 8, 2017, deposition L.L. testified that he only ever sent call logs to his attorneys and was never asked to produce anything in response to NSL's discovery requests.

189.     In L.L.'s case, then, not only did the Defendants file a legal proceeding without the consumer's knowledge, but they also falsely certified discovery submissions claiming a representation that never existed.

190.     In or around January 2018, NSL paid L.L. $10,000 and provided him with a debt waiver for certain of his student loans in the approximate amount of $35,000 in settlement of his TCPA claims.

**J.S.**

191.     J.S. lives in Texas and is a co-signer of two student loans serviced by NSL.

192.     On or about April 14, 2016, A.S., J.S.'s father and the primary signatory on the two student loans for which J.S. was a co-signer, executed an attorney engagement agreement with the Mize Defendants.  This process was facilitated by employees of CMS.  Pursuant to this agreement, A.S. began paying monthly installments of $311.36 to the Mize Defendants.

193.     A.S. made payments to the Mize Defendants instead of NSL because he had been falsely told that the money paid to the Mize Defendants would be used to resolve his debt to NSL.

194.     Soon after A.S. executed the attorney engagement agreement with the Mize Defendants, he relayed to J.S. that Defendant Mize had instructed them to stop paying on the debts owed to NSL.  Instead, A.S. advised J.S. to pay him instead, and A.S. began remitting the above-mentioned payments to the Mize Defendants.

195.     Prior to retaining CMS and the Mize Defendants, J.S. and A.S. had made regular monthly payments toward their student loans since 2006.  At the Mize Defendants' instruction,

J.S. and A.S. ceased making payments on their loans.  J.S. and A.S.'s final payment toward their loans was made on April 3, 2016.  Calls from NSL in an attempt to cure the delinquency ensued.

196.    On or about June 1, 2016, a letter that purported to be from the Mize Defendants was sent to NSL on behalf of J.S. requesting that NSL redirect communications to them, advising the debt was "disputed," and demanding validation for J.S.'s debt.  The fax cover sheet for this letter shows it was actually sent by Debbie Hepler, an employee of CMS.

197.    The substance of the letter was materially false and incorrect: the Mize Defendants in fact wanted calls to continue to J.S. and A.S., the debt was not genuinely disputed, and the Mize Defendants had no desire to obtain "validation" of the debt.  Instead, the purpose of the letter was to manufacture a TCPA claim against NSL.

198.    Although the June 1, 2016 letter indicated that Defendant Mize represented both A.S. and J.S., this statement was materially false and incorrect, as discussed further below.  Additionally, the letter failed to contain a signed authorization on behalf of J.S.  Realizing that they could not manufacture a TCPA claim without a revocation request from J.S., the Lohman Defendants contacted him directly.

199.    On or about December 8, 2016, on the Lohman Defendants' instruction, J.S. spoke with an NSL call-center agent and stated that he wished for NSL to cease contacting him on his cell phone.  This statement was a lie.  In fact, Defendants and J.S. wanted the calls to continue so that they could form the basis of a possible TCPA claim, the only "debt relief" strategy employed by the Defendants in his case.

200.    J.S. admitted that he received no additional calls after this request.

201.    On January 31, 2017, J.S. and A.S.'s private student loans defaulted.

202.    Nonetheless, on February 15, 2017, Defendant Branch filed an arbitration demand purportedly on J.S.'s behalf.

203.    On or about August 1, 2017, Defendant Branch sent to NSL's counsel witness disclosures purportedly on J.S.'s behalf.  On or about that same day, Defendant Branch sent to NSL's counsel amended witness disclosures purportedly on J.S.'s behalf.

204.    On or about August 16, 2017, Defendant Branch sent to NSL's counsel a response to NSL's first set of requests for production of documents purportedly on J.S.'s behalf.  Then, on or about September 15, 2017, Defendant Branch filed an amended arbitration demand purportedly on J.S.'s behalf.

205.    J.S. testified at his deposition on December 22, 2017, however, that he never authorized Defendant Mize to act on his behalf, nor did he consider Defendant Mize to be his attorney.  J.S. also testified that he never authorized Defendant Mize to send a letter requesting NSL to stop contacting him, and that he had never spoken with anyone at Defendant Mize's law office.

206.    In spite of J.S.'s deposition testimony, the Lohman Defendants continued to litigate the lawsuit, even though the sole basis for J.S.'s legal claim against NSL was a letter from an attorney to whom he had never spoken, and whom J.S. did not consider to be his attorney.

207.    The Lohman Defendants' repeated filings and arbitration submissions defrauded NSL by stating they represented J.S. when in fact they did not.

208.    On the eve of his arbitration hearing, J.S. and NSL agreed to a settlement of his claims.  Pursuant to this settlement, NSL was required to pay a cash settlement of $15,000.00 and discharge over $63,000.00 of an otherwise valid debt, suffering losses as a result of the Defendants' Scheme.

**K.W.**

209.    K.W. lives in Texas and is the borrower of two student loans serviced by NSL.

210.    On or about June 26, 2016, K.W. stopped making payments on his NSL-serviced student loans.

211.    At some point in the first half of 2016, K.W. received automated telephone calls from a company called DocuPrep Center ("DocuPrep") offering to help him consolidate his federal student loan debt.

212.    K.W. contacted DocuPrep and the representative with whom he spoke referred him to the Mize Defendants for assistance in lowering or eliminating his private student loan debt.

213.    On or about July 14, 2016, K.W. signed an attorney engagement agreement with the Mize Defendants.

214.    As part of this agreement, K.W. agreed to pay the Mize Defendants monthly payments of approximately $445.

215.    K.W.'s monthly payments to the Mize Defendants were greater than his monthly payments on his NSL-serviced student loans.

216.    K.W. made payments to the Mize Defendants instead of NSL because he had been falsely told that the money paid to the Mize Defendants would be used to resolve his debt to NSL. In fact, the Mize Defendants never made any effort to contact NSL to negotiate K.W.'s debt.  That is because their only "debt reduction plan" was to manufacture K.W.'s TCPA claim.

217.    On or about July 27, 2016, in response to a request from K.W., NSL sent to K.W. copies of his loan applications and promissory notes for his student loans serviced by NSL.

218.    The Mize Defendants subsequently referred the matter to the Lohman Defendants to manufacture a TCPA claim.

219.    On or about March 23, 2017, in an e-mail to Law Offices of Jeffrey Lohman employee Dave Abeling, K.W. consented to representation by the Lohman Defendants.

220.    Following K.W.'s retention of the Lohman Defendants, an employee of Law Offices of Jeffrey Lohman called K.W. and told him to call NSL while he/she was on the phone. That employee further instructed K.W. to revoke his consent for NSL to contact him on his cell phone during the call.  Finally, the employee instructed K.W. to covertly record his call to NSL.

221.    K.W. called NSL and stated that he wished for NSL to no longer contact him on his cell phone.  This statement was a lie.  In fact, Defendants and K.W. wanted the calls to continue so that they could form the basis for a possible TCPA claim, the only "debt relief" strategy employed by the Defendants in his case.

222.    Moreover, in this call, K.W. talked over the NSL representative and either he or an employee of the Lohman Defendants abruptly and purposefully hung up the call before the NSL representative could understand K.W.'s request.  Given NSL's confusion, NSL continued to try to reach K.W.  The Lohman Defendants advised K.W. not to answer any calls but rather to tally them until K.W.'s loans defaulted and the phone calls ceased.

223.    On or about July 1, 2017, after the phone calls from NSL were exhausted, Defendant Muhtaseb filed an arbitration demand against NSL purportedly on K.W.'s behalf.

224.    On or about February 1, 2018, Defendant Dykes sent to NSL responses to NSL's request for production of documents purportedly on K.W.'s behalf and with K.W.'s assistance.

225.    However, in his February 12, 2018 deposition, at which Defendant Dykes was present, K.W. testified that he never spoke to the Lohman Defendants about NSL's request for production of documents.

226. On or about March 30, 2018, Defendant Dykes filed an amended arbitration demand against NSL purportedly on K.W.'s behalf.

227. A few days before the arbitration hearing, the parties agreed to a settlement of K.W.'s claim. Pursuant to this settlement, NSL was required to pay a cash settlement of $35,000.00 and discharge over $11,000.00 of an otherwise valid debt, suffering losses as a result of the Defendants' Scheme.

**A.C.**

228. A.C. lives in Arizona and is the borrower of several student loans serviced by NSL.

229. On or about April 7, 2016, A.C. received a flyer in the mail from CDC advertising student loan consolidation and debt reduction that she believed was from the federal government. The flyer purported to be from the "Student Loan Assistance Department" and prominently displayed the misleading statement, "New Laws Discounting Federal Student Loans."

230. A.C. testified that she believed the flyer "came from the government," and that she understood herself to be "calling a government agency."

231. Soon after receiving the flyer, A.C. contacted the number listed on the flyer and was referred to the Mize Defendants who stated that they could assist her in lowering or eliminating her private student loan debt.

232. On or about April 14, 2016, A.C. retained the Mize Defendants and executed an attorney engagement agreement with the Mize Defendants. Pursuant to this agreement, A.C. began paying monthly installments of $309.53 to the Mize Defendants.

233. A.C. made payments to the Mize Defendants instead of NSL.

234. On or about April 18, 2016, at the Mize Defendants' instruction, A.C. stopped making her student loan payments to NSL.

235.   On or about May 16, 2016, although she had never received a single telephone call from NSL, A.C., following instructions from CMS, spoke with an NSL call-center agent and requested that NSL cease contacting her cell phone.  One of the Defendants recorded this call.

236.   Following that date, A.C., again followed instructions from CMS, and tallied each subsequent call that she purportedly received from NSL.

237.   A.C. testified that she had not been receiving calls from NSL in April 2016, when she first retained the Mize Defendants.  A.C. further testified that she made the request that NSL stop calling her before she had received any telephone calls, and that she had done so at the instruction of the Mize Defendants.

238.   On or about January 24, 2017, the Defendant Branch filed an arbitration demand against NSL, purportedly on A.C.'s behalf.

239.   However, in A.C.'s deposition on August 18, 2017, at which Defendant Branch was present, she testified that she never decided to file the arbitration demand and had never given authorization to the Lohman Defendants to file on her behalf.

240.   Despite believing that she had signed up for a debt relief program, Defendants in fact conspired to file a lawsuit on her behalf without her knowledge in order to defraud NSL.

241.   In or about January 2018, A.C. and NSL agreed to a settlement of her claims. Pursuant to this settlement, NSL paid $65,000 to settle this matter.

### Further Allegations of Racketeering Activity

242.   As set forth above, Defendants have conspired to engage and have engaged in a pattern of racketeering activity for the purpose of fraudulently extracting settlements from NSL and conducting costly litigation against NSL through fraud.

243.    The "debt counseling" companies that recruited consumers into the Scheme, including CMS, made numerous false and misleading statements to consumers through the mails in order to recruit consumers into the Scheme.  These misleading statements include designing the flyer's language and appearance to make consumers believe the flyers had been sent by the United States government.

244.    Consumers reasonably relied on statements made by these "debt counseling" companies, including CMS, because they had no reason to believe that these companies would be lying about their ability to assist consumers with their student loan debt.

245.    The Attorney Defendants made numerous fraudulent and false statements through the mails in letters sent via the USPS to NSL purportedly on behalf of the Scheme's clients.  For instance, and as detailed above, the Attorney Defendants submitted various letters, filings, and discovery responses on behalf of "clients" when either no such representation existed or the Defendants were acting without their clients' consent.  Further, letters from the Attorney Defendants stated that the consumers disputed their debts in instances when the consumers did not actually dispute the debts, but rather sought to reduce or eliminate them.

246.    NSL reasonably relied upon the Attorney Defendants' misrepresentations because it had no reason to believe that the Attorney Defendants would be lying about their representation of clients or about their intentions.

247.    The "debt counseling" companies that recruited consumers into the Scheme, including CMS, made numerous false and misleading statements to consumers via telephone in order to recruit consumers into the Scheme.  For example, these companies, including CMS, told consumers that their participation in the Scheme was completely legal and that they would be better off adhering to the Scheme when in fact consumers were unwittingly (and sometimes

wittingly) perpetuating a fraud and would be worse off in the long run, as measured by overall debt owed and by public credit scores.

248.    Consumers reasonably relied on statements made by these "debt counseling" companies, including CMS, because they had no reason to believe that these "debt counseling" companies, including CMS, would be lying about their ability to assist consumers with student loan debt.

249.    The Attorney Defendants made numerous fraudulent and false statements to NSL through the wires, primarily in communications and other legal papers submitted to NSL through electronic mail.  Specifically, the Attorney Defendants represented in pleadings and filings with arbitrators and in federal courts that their TCPA claims were well-founded, that clients wished to have communication from NSL cease, that consumers wished to negotiate disputed debts, that the representations of clients were real, and that clients had assisted in responding to discovery.  The Attorney Defendants also directed their clients, and in many instances, directly participated in attempts, to falsely represent to NSL in telephone calls through the wires that they wished calls to cease.  Further, the Attorney Defendants instructed clients not to pick up the phone when NSL called so that NSL would continue to call the consumer in an effort to resolve the debt.

250.    NSL reasonably relied upon the Attorney Defendants' misrepresentations because it had no reason to believe that the Attorney Defendants, as officers of the court, would be lying about, among other things, their representation of clients, their desire to negotiate disputed debts, or that consumers would lie about their desire to not be contacted by NSL.

251.    Both consumers and NSL acted in reasonable reliance upon these misrepresentations and did not initially suspect the existence of the Scheme.

252.     As a proximate result of the misrepresentations by "debt counseling" companies, including CMS, consumers were recruited into the Scheme whose desires to lessen or eliminate student loan debt would be morphed into TCPA claims by the Attorney Defendants.

253.     As a proximate result of the Attorney Defendants' misrepresentations, NSL was deprived of the opportunity to raise colorable defenses and adjudicators were deprived of information necessary to render a fully informed decision.

254.     NSL also has been damaged as a result of the Defendants' fraud and misrepresentations to the various consumers involved.   As a result of consumers' reliance on misrepresentations by "debt counseling" companies, including CMS, NSL suffered real and significant damages in the form of monetary damages awarded against it and settlement costs, as well as attorneys' fees incurred as a result of the Scheme and the concealment thereof.

### FIRST CAUSE OF ACTION
*Claim Against All Defendants Under*
*Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)*

255.     NSL repeats and incorporates by reference paragraphs 1–254 of the Complaint.

256.     NSL is a "person" within the meaning of 18 U.S.C. § 1964(c).

257.     Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

258.     Defendants operate as an association in fact that is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), which enterprise has, at all relevant times, been engaged in activities to carry out the Scheme that are in and affect interstate commerce.

259.     At all relevant times, Defendants Lohman, Branch, Dykes, and Muhtaseb have been employed by or associated with the Law Offices of Jeffrey Lohman.

260.     At all relevant times, Defendant Mize has been employed by or associated with David Mize Law.

51

261.    CMS engaged in a pattern of racketeering activity within the meaning of §§ 1961(1)(B), 1961(5), and 1962(c), namely the Scheme as described more fully above and including multiple related instances of mail fraud in violation of 18 U.S.C. § 1341.  Specifically, CMS sent fraudulent mailings to consumers that misrepresented the nature of CMS's services and misleadingly appeared to be from the federal government in order to recruit these consumers into the Scheme.

262.    Defendants Lohman, Branch, Dykes, and Muhtaseb have participated in the affairs of the Law Offices of Jeffrey Lohman, Defendant Mize has participated in the affairs of David Mize Law through a pattern of racketeering activity within the meaning of §§ 1961(1)(B), 1961(5), and 1962(c), namely the Scheme as described more fully above and including multiple related instances of mail fraud in violation of 18 U.S.C. § 1341.  Specifically, Defendants Lohman, Branch, Dykes, Muhtaseb and Mize have sent various demand letters to NSL on behalf of "clients" whom they did not actually represent; sent letters to NSL in which they stated an intent to negotiate their client's debt with NSL, when in truth they had no such intention; and sent letters in which they stated they were "looking to verify" a disputed debt when no valid basis to dispute the debt existed.   In addition, upon information and belief, the Defendants counseled their clients to provide false testimony in depositions, which constitutes witness tampering in violation of 18 U.S.C. § 1512.

263.    In furtherance of the fraudulent Scheme, Defendants Lohman, Branch, Dykes, and Muhtaseb utilized the resources of Law Offices of Jeffrey Lohman, and Defendant Mize has used the resources of David Mize Law to carry out the pattern of racketeering activity in furtherance of the Scheme.

264.    The Defendants' association had a formal organizational structure, which included an automatic billing system, communications with clients through email, telephone, and standardized attorney-client retainer agreements.

265.    The Defendants used the wires to collect sums from consumers that otherwise would have been paid to NSL.

266.    The Defendants operated the Scheme over the course of years and in multiple states.

267.    By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants through this pattern of racketeering activity in furtherance of the Scheme, including the multiple related instances of mail fraud described above, NSL was injured within the meaning of 18 U.S.C. § 1964(c) in an as-yet-undetermined amount to be proved at trial.

268.    By reason of Defendants' violations as specified above, NSL is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

### SECOND CAUSE OF ACTION
*Claim Against All Defendants Under*
*Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)*

269.    NSL repeats and incorporates by reference paragraphs 1–268 of the Complaint.

270.    NSL is a "person" within the meaning of 18 U.S.C. § 1964(c).

271.    Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

272.    Defendants have formed an association in fact that is an "enterprise" within the meaning of 18 U.S.C. §1961(4), which enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce in carrying out the Scheme.

273.    At all relevant times, Defendants Lohman, Branch, Dykes, and Muhtaseb has been employed by or associated with the Law Offices of Jeffrey Lohman.  Defendant Lohman has principally directed the Law Offices of Jeffrey Lohman's affairs.

274.    At all relevant times, Defendant Mize has been employed by or associated with David Mize Law.  Defendant Mize has principally directed David Mize Law's affairs.

275.    CMS has engaged in a pattern of racketeering activity within the meaning of §§ 1961(1)(B), 1961(5), and 1962(c), namely and as described more fully above, multiple related instances of wire fraud in violation of 18 U.S.C. § 1343.  Specifically, in order to recruit consumers into the Scheme, CMS engaged in telephone communication with consumers in which CMS misrepresented the nature of its services and misleadingly stated that it would negotiate with NSL regarding consumers' private student loans.

276.    Defendants Lohman, Branch, Dykes, and Muhtaseb have participated in the affairs of the Law Offices of Jeffrey Lohman, and Defendant Mize has participated in the affairs of David Mize Law through a pattern of racketeering activity within the meaning of §§ 1961(1)(B), 1961(5), and 1962(c), namely and as described more fully above, multiple related instances of wire fraud in violation of 18 U.S.C. § 1343.  Specifically, Defendants Lohman, Branch, Dykes, Muhtaseb, and Mize have signed or caused to be signed and sent or caused to be sent through the wires multiple fraudulent communications and discovery filings that induced NSL to settle TCPA claims and/or deceived adjudicators on the facts of pending cases.  Defendants Lohman, Branch, Dykes, Muhtaseb, and Mize also have by corrupt means induced their clients to make false statements via telephone to NSL operators stating that they did not want to receive calls from NSL when these calls formed the very basis of the Scheme.  Upon information and belief, they further counseled their clients to provide false testimony during their depositions in violation of 18 U.S.C. § 1512.

277.    In furtherance of the fraudulent Scheme, Defendants Lohman, Branch, Dykes, and Muhtaseb utilized the resources of the Law Offices of Jeffrey Lohman, and Defendant Mize has used the resources of David Mize Law to carry out the pattern of racketeering activity in furtherance of the Scheme.

278.    By reason of the violation of 18 U.S.C. § 1962(c) committed by Defendants through this pattern of racketeering activity in furtherance of the Scheme, including the multiple related instances of wire fraud described above, NSL was injured within the meaning of 18 U.S.C. § 1964(c) in an as-yet-undetermined amount to be proved at trial.

279.    By reason of Defendants' violations as specified above, NSL is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

### THIRD CAUSE OF ACTION
*Claim Against All Defendants for Conspiracy to Violate*
*Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d)*

280.    NSL repeats and incorporates by reference paragraphs 1–279 of the Complaint.

281.    NSL is a "person" within the meaning of 18 U.S.C. § 1964(c).

282.    Defendants are "persons" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

283.    Defendants have formed an association in fact that is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a), which enterprise has, at all relevant times, been engaged in activities that are in and affect interstate commerce in carrying out the Scheme.

284.    Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) in furtherance of the Scheme as described above, in violation of 18 U.S.C. § 1962(d).

285.     Upon information and belief, Defendants knew that they were engaged in a conspiracy to commit the predicate acts, they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

286.     Upon information and belief, Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Scheme's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

287.     Each Defendant knew about and agreed to facilitate the Scheme to manufacture lawsuits against NSL.  It was part of the conspiracy that Defendants and their co-conspirators would commit a pattern of racketing activity in the conduct of the Scheme, including the acts of racketeering set forth above.

288.     Defendants took overt acts in furtherance of the Scheme (as described in paragraphs 44–254 above).

289.     By reason of the violation of 18 U.S.C. § 1962(d) committed by Defendants, NSL was injured within the meaning of 18 U.S.C. § 1964(c) in an as-yet-undetermined amount to be proved at trial.

290.     By reason of Defendants' violations as specified above, NSL is entitled to three times its actual damages pursuant to 18 U.S.C. § 1964, with interest from the date of loss and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION
*Claim Against Attorney Defendants for Common Law Fraud*

291.     NSL repeats and incorporates by reference paragraphs 1–290 of the Complaint.

292.     As outlined above, the Attorney Defendants falsely represented in various demand letters sent to NSL that they represented certain clients when no such representation existed; falsely represented in letters sent to NSL an intention to negotiate their clients' debts when they had no such intention; falsely represented in letters sent to NSL that they were seeking to verify a disputed debt when no grounds for dispute existed; and made various false representations in communications and other legal papers that induced NSL to settle TCPA claims and/or deceived adjudicators on the facts of pending cases.

293.     These false statements were material because they went to the strength of legal cases brought by the Attorney Defendants against NSL as well as to the existence of certain defenses.

294.     As a direct and proximate result of Defendants' fraudulent statements and Scheme, NSL agreed to pay settlements to clients of the Attorney Defendants and/or was required to litigate or arbitrate claims manufactured by the Attorney Defendants at considerable expense.

## FIFTH CAUSE OF ACTION
*Claim Against All Defendants for Tortious Interference with Contract*

295.     NSL repeats and incorporates by reference paragraphs 1–294 of the Complaint.

296.     NSL and/or its affiliates had entered into valid promissory notes with each and every client of the Scheme.

297.     Each of these promissory notes memorialized a valid and binding agreement to repay a student loan that had been disbursed.

298.     CMS was aware of the existence of these promissory notes.   In fact, CMS advertised that they could help potential customers with existing, valid contractual obligations relating to student loan debt.

299.     CMS interfered with these repayment obligations by inducing the Scheme's clients to terminate any pre-scheduled or automatic payments to NSL, and instead route payments to the Attorney Defendants.

300.     The Defendants further interfered with these repayment obligations by advising the Scheme's clients to cease communicating with NSL, and not to answer any telephone calls from NSL advising options to cure the delinquencies on the student loans.

301.     As a direct and proximate result of this interference, NSL was denied payments that it was owed on valid and outstanding student loans.

302.     As a further result of this interference, NSL wrote off or wrote down all or part of outstanding student loans, further reducing the value of NSL's loan portfolio.

## PRAYER FOR RELIEF

WHEREFORE NSL prays that judgment be entered in its favor against each and every Defendant, jointly and severally, as follows:

1.     Compensatory damages for legal settlements, attorneys' fees incurred, and lost loan value or revenues, in an amount to be determined at trial;

2.     Trebling of compensatory damages pursuant to 18 U.S.C. § 1964(c);

3.     Punitive damages in an amount to be determined at trial;

4.     Costs and reasonable attorneys' fees as provided for by 18 U.S.C. § 1964(c) and any other applicable law;

5.     Pre- and post-judgment interest; and

6.     All other damages and other or further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands trial by jury in this Court with respect to all issues so triable.

DATED:  May 7, 2019     Respectfully submitted,


/s/ Jeffrey R. Hamlin
Jeffrey R. Hamlin (Va. Bar No. 46932)
George R. Calhoun V (*pro hac vice* forthcoming)
James M. Trusty (*pro hac vice* forthcoming)
IFRAH PLLC
1717 Pennsylvania Avenue NW
Suite 650
Washington, DC 20006-2004
(202) 524-4140 – Tel.
(202) 524-4141 – Fax
jhamlin@ifrahlaw.com
george@ifrahlaw.com
jtrusty@ifrahlaw.com

*Counsel for Plaintiff Navient Solutions, LLC*

# Exhibit A



DEFENDANT'S
EXHIBIT
5
10-31-17

BENEFIT ID#: ███

Address Change? Please contact our
Customer Service Department

**Final
Notice**

Contact: 1-855-789-4467
Assigned Dept. Certified Document Center
NOTICE DATE: ███

## Student Loan Consolidation & Payment Reduction Program Prepared For:

███

*NEW LAWS DISCOUNTING FEDERAL STUDENT LOANS*

Dear ███,

Our records indicate that your federal student loans may be eligible for a consolidation with the U.S. Department of Education. As a federal student loan holder, you may be eligible to convert your existing high-interest loan into a federally-backed consolidation with a lower rate*. Your loans in the amount of $56,859 may even be eligible for total loan forgiveness.

Benefits of the Consolidation Program may include:

- **No credit check**
- **Interest rate reduction regardless of balance or pay history**
- **Lower monthly payments based on income and family size**
- **Loan forgiveness**

No other calls or notices will be sent to you in regards to this offer. **Due to a high call volume, we ask that you complete the process below prior to calling.**

Please create your Federal Student Aid ID and call by June 24th, 2016 or before your next payment is due: 1-855-789-4467

If unsure on how to create your Federal Student Aid ID, please contact us for assistance.

### CREATING YOUR FSA ID

To create your new student FSA ID, go to the URL below to reach the Federal Aid website. Follow the steps completely to create your ID. **IMPORTANT:** This is a government website which CDC does not own. FSA ID Creation is a government program which CDC did not create.

https://www.nslds.ed.gov

- Step 1 – Click 'Financial Aid Review'
- Step 2 – Click 'Accept'
- Step 3 – Click 'Create an FSA ID'

Student Loan Assistance Department
1-855-789-4467
Monday – Friday 7:00am – 6:00pm PST

 **CALL TOLL-FREE TODAY TO REDEEM YOUR FEDERAL BENEFITS: 1-855-789-4467**
**REFERENCE BENEFIT ID: 3241239**

CDC is not affiliated with the government or any of its programs. We offer private, fee-based application assistance to aid consumers in applying for government offered programs. While such programs may be available for free directly by various government agencies, our services are fee-based and focus on application and document preparation. We do not charge fees for access to such programs, only to prepare and counsel application to these programs. Services may be fulfilled by a third-party processing agency.
*The Department of Education may offer an interest rate reduction with set-up of automatic payments.

# Exhibit B

Nathaniel Clark, Esq. (SBN 276621)
LAW OFFICES OF SCOTT WARMUTH
17700 Castleton Street, Suite # 168
City of Industry, California 91748
Telephone: (626) 282-6868
Facsimile:  (626) 642-0808
nclark@law888.com

ATTORNEYS FOR PLAINTIFF
*Krystle Mantolino*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KRYSTLE MANTOLINO, | CASE NO.  8:17-cv-867 |
| Plaintiff, | |
| vs. | **1. CIVIL RICO (18 U.S.C. § 1962(c))** |
| | **2. UNFAIR COMPETITION (Bus. & Prof Code 17200)** |
| KNEPPER & JOHANSON LAW GROUP, entity form unknown; | **3. BREACH OF CONTRACT** |
| AMANDA JOHANSON & ASSOCIATES, entity form unknown; | **4. INTENTIONAL MISREPRESENTATION** |
| JOHANSON LAW GROUP, a Nevada corporation CMS, entity form unknown; | **5. FRAUD** |
| AMANDA JOHANSON, an individual; | **6. CONVERSION** |
| PERLA ORTIZ, an individual; | **7. LEGAL MALPRACTICE** |
| JOHN DAVI, an individual; TERRY BELSER, an individual, an individual, and DOES 1-10. | **JURY TRIAL DEMANDED** |
| Defendants. | |

**<u>NATURE OF THE CASE</u>**

1.      Plaintiff KRYSTLE MANTOLINO hereby alleges the following upon personal knowledge and information and belief against Defendants KNEPPER & JOHANSON LAW GROUP, AMANDA JOHANSON & ASSOCIATES, CMS, JOHANSON LAW GROUP, AMANDA JOHANSON, PERLA ORTIZ, JOHN DAVI, TERRY BELSER, and other defendants presently unknown (collectively referred to as "Defendants").

2.      Defendants have engaged in a multi-state conspiracy to defraud consumers[1] by obtaining monthly ACH payments as a direct result of fraudulently claiming that Defendants would represent consumers in the handling of student loan processing.

3.      However, Defendants never intended to actually represent consumers in the handling of student processing.

4.      Instead, Defendants intentionally deceived consumers into paying monthly payments while Defendants knew that the consumer loans would go directly into default.

5.      Defendants claimed to act as attorneys of law in the representation of consumers.

6.      In reality, Defendants never intended to engage in any meaningful practice of law in the representation of consumers.

7.      Defendants in fact never engaged in any meaningful practice of law in the representation of consumers.

8.      Defendants only claimed that they would represent consumers as attorneys of law for the direct purpose of tricking consumers into agreeing into monthly payments for the representation of student loan processing.

9.       On or about October 8, 2015, in the County of Orange, Defendants,

---

[1] All references to consumers include Plaintiff Krystle Mantolino.

**COMPLAINT**

through intentional misrepresentations, deceived Plaintiff into signing a purported attorney-client retainer contract by claiming Defendants would handle all aspects of Plaintiff's student loan processing, including settling and resolving her outstanding student loans in exchange for monthly payments.

10. The purported retainer failed to comply with the ABA and California State Bar Rules of Professional Conduct.

11. The purported retainer contained an illegal attorney's fee provision of $23,691.60 at paragraph 2.

12. The purported retainer states that "unearned fees will be returned to Client".

13. Defendants never earned any fee in this matter.

14. The Scope of Services for the purported retainer required Defendants to take all efforts to "eliminate (or reduce, as the facts of your case dictate) your student loan debts), primarily through negotiations with your lenders" at paragraph 1.

15. The Scope of Services further requires that Defendants will conduct an "analysis of Client's rights and remedies" and "may recommend that Client consent to initiate litigation".

16. The Scope of Services further requires that Defendants shall "defend" client in litigation.

17. The Scope of Services further requires that Defendants shall engage in "negotiation and drafting of settlement and release agreements to discharge or alter the terms of the debts".

18. Defendants never intended to (and did not) fulfill the Scope of Services provisions in the purported retainer.

19. Defendants instructed Plaintiff to stop paying her debts and to go into default.

20. Defendants represented that if litigation ensued as a result of Plaintiff going into default, that Defendants would successfully represent Plaintiff in defense

of said litigation.

21.     Defendants knew that their actions would result in Plaintiff's student loan accounts being charged off and the severe damaging of Plaintiff's and her co-signer's credit.

22.     Nonetheless, motivated by their desire to trick consumers into paying fraudulent retainer fees, Defendants intentionally misled Plaintiff down a path of financial ruin.

23.     Defendants never attempted to negotiate Plaintiff's loans.

24.     Defendants instead only sent a cease and desist letter to Plaintiff's creditors and did nothing else while Plaintiff's loans defaulted and her credit score plummeted.

25.     Instead of using Plaintiff's payments to help satisfy her loan, Defendants took the money for their own personal gain.

26.     Defendants' conduct is completely outrageous and intolerable in a civil society. Defendants' conduct was intentionally designed to hurt consumers including Plaintiff who were vulnerable due to recently incurring significant student debt.

27.     Plaintiff paid Defendants over $7,050.12 as a result of the fraudulent scheme but has suffered additional damages in the form of ruined credit, and unknown interest and late penalties.

28.     The payments were secured by Defendants through interstate wire transactions.

29.     Plaintiff has incurred significant default and interest penalties to the loans as a result of Defendants' actions.

30.     Moreover, Plaintiff's credit score has significantly fallen as a result of defaults of charge-offs that are a direct result of Defendants' fraudulent misrepresentations.

///

///

- 4 -
**COMPLAINT**

**JURISDICTION**

31.     This Court has subject matter jurisdiction over these proceedings because federal courts retain jurisdiction over claims properly brought pursuant to 18 U.S.C. § 17200.

32.     The remaining causes of action are properly brought pursuant to federal courts' retention of supplemental jurisdiction over claims brought pursuant to the same conduct constituting the underlying violations of 18 U.S.C. § 17200.

**PARTIES**

33.     Plaintiff Krystle Mantolino is an individual and at all relevant times was a resident in Orange County, California. Plaintiff was in this jurisdiction when she was manipulated into signing the purported retainer.

34.     Defendant Amanda Johanson is an individual residing in this state and practicing law under a California State Bar license.

35.     All Defendants intentionally deceived Plaintiff into signing the purported agreement while within state boundaries and benefited from interstate wire fraud in the form of receiving consumers' monthly payments.

36.     Defendant Knepper & Johanson Law Group is an entity form unknown conducting business and residing in California.

37.     Defendant Amanda Johanson & Associates is an entity form unknown conducting business and residing in California.

38.     Defendant CMS is an entity form unknown conducting business and residing in California.

39.     Defendant Perla Ortiz is an individual residing in the United States.

40.     Defendant John Davi is an individual residing in the United States.

41.     Defendant Terry Belser is an individual residing in the United States.

42.     Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendants, and each of them, were the co-conspirators, co-collaborators, agents, joint venturers, trustees, servants, partners, alter-egos, parent

corporations, subsidiaries, affiliates, contractors, and/or employees of each of the remaining Defendants, and that the acts and/or omissions herein alleged were done by them, acting individually and as part of a RICO enterprise, through such capacity or through the scope of their authority, and that said conduct was thereafter ratified by the remaining Defendants.

43.    Except as otherwise alleged, Plaintiff is not currently aware of the true names and capacities of the Defendants designated herein as DOES 1 through 10, inclusive. As such, Plaintiff will hereafter seek leave of court to amend this Complaint in order to allege the true names and capacities of each such Defendant when such information is ascertained.

## FIRST CAUSE OF ACTION
## CIVIL RICO 18 U.S.C. § 1962(c)
### *Against All Defendants*

44.    Plaintiff realleges and incorporates herein by reference each and every allegation set forth in this Complaint before and after this paragraph.

45.    Plaintiff and each Defendant are "persons" as defined in 18 U.S.C. § 1961(3).

46.    Defendants, including all individual Defendants, including their employees and agents, formed an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), the "False Hope Enterprise".

47.    The False Hope Enterprise is an ongoing organization consisting of a variety of legal "persons" that associated for common and shared purposes, including: (a) to engage in wire fraud by tricking consumers into providing their bank account information to set up monthly deposits for illegal retainer fees; (b) to deceive consumers into believing they were paying for valid legal services, including full representation for settlement, resolution, and necessary litigation for consumer student loans; (c) to convert said consumers' monthly deposits for Defendants' personal monetary gain; and (d) to lead consumers on as long as possible while

**COMPLAINT**

withdrawing as much money as possible without ever performing any legitimate services, legal or otherwise.

48.    Defendants knew that Defendants would never provide consumers any legitimate services, legal or otherwise, yet convinced consumers to sign up for Defendants' services and make monthly payments for services that would never come.

49.    As a direct and proximate result of Defendants' False Hope Enterprise, Plaintiff has suffered ongoing economic and emotional loss and Plaintiff's credit continues to be damaged as a result of her loans entering in default, charge-off, and collections.

50.    If not for Defendants' False Hope Enterprise, Plaintiff would have continued to make normal payments on her loans directly to her original creditors. Unfortunately, she was deceived by Defendants, who repeatedly promised Plaintiff that all aspects of her student loan processing would be handled by Defendants, including settlement, resolution, and necessary litigation.

51.    Defendants knew Defendants were making false statements to Plaintiff in order to secure her banking information for purposes of committing wire fraud.

52.    Defendants' actions as oppressive, fraudulent and malicious, as these acts were committed in conjunction with a wider campaign to injure Plaintiff and other consumers.  They were taken with a complete disregard to common decency and with complete knowledge that they would injure consumers.  Thus, Plaintiff is entitled to punitive damages to be proven at trial.

53.    The False Hope Enterprise has necessarily used the mail and wires to perpetuate its fraud.  The False Hope Enterprise specifically conspired to obtain consumers bank account information through deception for purposes of setting up automatic monthly deposits.  Moreover, Defendants used email and fax and the telephone as they managed and operated the False Hope Enterprise, including directly contacting Plaintiff and consumers for monthly "status reports" and to convey

misleading and confusing publications and agreements to lengthen the amount of time consumers would send Defendants money wire transfers. This constitutes a pattern of racketeering activity by mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

54. The False Hope Enterprise also affects interstate commerce. The False Hope Enterprise could not be carried out without the United States mail or interstate wires, which were used to convey fraudulent misrepresentations and to actually convert consumer funds. Further, Defendants fraudulent retained thousands of dollars of Plaintiff's money, and on information and belief, millions of dollars owed to consumers generally. The False Hope Enterprise leads consumers, like Plaintiff, into a path of loan default, which hurts not only original creditors, but consumers who see drastic drops in credit scores. On information and belief, Defendants operates in multiple states including but not limited to, California, Arizona and Nevada and employ dozens of employees who operate across multiple state lines.

55. Defendants' violations of 18 U.S.C. § 1962(c) directly and proximately caused Plaintiff substantial economic injury because Defendants' pattern of racketeering activity not only deceived Plaintiff into believing her loans were at least being paid on a monthly basis, thereby causing Plaintiff to suffer late fees, interest, and penalties, but further harmed Plaintiff by causing her credit score to plummet.

56. Defendants' misrepresentations of fact made to Plaintiff in writing and by telephone are additional predicate acts of mail and wire fraud performed by an in furtherance of the False Hope Enterprise. All of these fraudulent representations and omissions were relied on by Plaintiff to her injury.

57. As a direct and proximate result of Defendants' unlawful racketeering activity, Plaintiff suffered and continues to suffer damages in an amount to be proven at trial. Under the provisions of 18 U.S.C. § 1964(c), Defendants are jointly and severally liable to Plaintiff for three times the damages that Plaintiff has suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

### CIVIL RICO CONSPIRACY 18 U.S.C. § 1962(d)

### *Against All Defendants*

58.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in this Complaint before and after this paragraph.

59.     The Defendants formed an agreement to violate 18 U.S.C. § 1962(c). Each Defendant knew of the False Hope Enterprise's conspiracy to defraud Plaintiff, and other consumers, by fraudulently representing the willingness and ability to engage in legal services for the sole purposes of engaging in wire fraud to convert consumers' funds send via interstate wires.  Defendants all took steps to conceal the fraud.

60.     Each Defendant agreed to join this conspiracy and each agreed to commit, facilitate, or participate in a pattern of racketeering activity in furtherance of the conspiracy.

61.     During the existence of the conspiracy, each of the Defendants agreed to the commission of an indefinite stream of predicate acts in furtherance of the conspiracy.

62.     Defendants agreed to and did commit multiple instances of mail and wire fraud in furtherance of the conspiracy by mailing and wiring fraudulent misrepresentations, agreements, and retainers, to consumers including Plaintiff. Defendants devised the scheme using teleconference, the internet, mail, and email.

63.     The predicate acts of mail and wire fraud that Defendants agreed to and did commit directly and proximately caused Plaintiff to suffer substantial injury to her credit score and damaged her financially.

64.     Under the provisions of 18 U.S.C. § 1964(d), each of the Defendants are jointly and severally liable to Plaintiff for three times the damages that Plaintiff has suffered, plus the costs of bringing this suit, including reasonable attorneys' fees.

**THIRD CAUSE OF ACTION**

**UNFAIR COMPETITION BUSINESS & PROFESSIONS CODE § 17200**

***Against All Defendants***

65.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in this Complaint before and after this paragraph.

66.     Defendants' schemes involving fraudulent misrepresentations and omissions constitute unlawful, unfair, or fraudulent business acts and practices, under the California Unfair Competition Law ("UCL"), California Bus. & Prof. Code § 17200 *et seq.*

67.     Each Defendant violated section 17200's prohibitions against engaging in an unlawful act or practice through conduct that violates, among other things, RICO, 18 U.S.C. § 1962, as described herein.  Through their unfair and improper practices, Plaintiff suffered injury by virtue of the Defendants' fraudulent misrepresentations and wire fraud.

68.     Defendants' unfair and unlawful practices were performed in California.

69.     Plaintiff has suffered emotional and economic injury as a direct and proximate result of Defendants' unfair and unlawful practices, as alleged herein.

**FOURTH CAUSE OF ACTION**

**INTENTIONAL MISREPRESENTATION**

***Against All Defendants***

70.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in this Complaint before and after this paragraph.

71.     Defendants' conduct, including but not limited to, transmitting the purported retainer agreement, constitutes repeated instances of the tort of intentional misrepresentation.

72.     Defendants' conduct violates California Civil Code Sections 1709, 1710, 1572, and 1573.

73.     Plaintiff has suffered emotional and economic injury as a direct and

**COMPLAINT**

proximate result of Defendants' unfair and unlawful practices, as alleged herein.

## FIFTH CAUSE OF ACTION

## FRAUD

### Against All Defendants

74.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in this Complaint before and after this paragraph.

75.     Defendants' conduct, including but not limited to, transmitting the purported retainer agreement, constitutes repeated instances of fraud.

76.     Defendants' conduct violates California Civil Code Sections 1709, 1710, 1572, and 1573.

77.     Plaintiff has suffered emotional and economic injury as a direct and proximate result of Defendants' unfair and unlawful practices, as alleged herein.

## SIXTH CAUSE OF ACTION

## CONVERSION

### Against All Defendants

78.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in this Complaint before and after this paragraph.

79.     Defendants' conduct, including but not limited to, holding and refusing to retain consumers' funds, constitutes conversion.

80.     Plaintiff has suffered emotional and economic injury as a direct and proximate result of Defendants' unfair and unlawful practices, as alleged herein.

## SEVENTH CAUSE OF ACTION

## LEGAL MALPRACTICE

### Against Amanda Johanson Only

81.     Plaintiff realleges and incorporates herein by reference each and every allegation set forth in this Complaint before and after this paragraph .

82.     Defendant Amanda Johanson's conduct, in engaging in aforesaid

- 11 -

**COMPLAINT**

actions, and in ratifying them, constitutes legal malpractice.

83. Plaintiff has suffered emotional and economic injury as a direct and proximate result of Defendants' unfair and unlawful practices, as alleged herein.

## **PRAYER**

Plaintiff prays for the following relief:

AS TO ALL CAUSES OF ACTION:

(1) General and special damages in a sum to be proven at a trial with pre-judgment and post-judgment interest thereon at the maximum rate permitted by law;

(2) Mandatory treble damages;

(3) Reasonable attorney's fees;

(4) Punitive and exemplary damages in an amount appropriate to punish and set example of defendants;

(5) Costs; *and*

(6) For recovery of all attorneys' fees pursuant to California Code of Civil Procedure § 1021.5.

Dated: May 17, 2017 **LAW OFFICES OF SCOTT WARMUTH, A.P.C.**


*/s/*Nathaniel Clark*
Nathaniel Clark, Esq.
ATTORNEYS FOR PLAINTIFF,
**Krystle Mantolino**

# Exhibit C

1   STATE BAR OF CALIFORNIA
    OFFICE OF CHIEF TRIAL COUNSEL
2   STEVEN J. MOAWAD, No. 190358
    CHIEF TRIAL COUNSEL
3   DONNA S. HERSHKOWITZ, No. 172480
    DEPUTY CHIEF TRIAL COUNSEL
4   RENE L. LUCARIC, No. 180005
    ASSISTANT CHIEF TRIAL COUNSEL
5   MELANIE J. LAWRENCE, No. 230102
    SUPERVISING ATTORNEY
6   ANAND KUMAR, No. 261592
    SENIOR TRIAL COUNSEL
7   845 South Figueroa Street
    Los Angeles, California 90017-2515
8   Telephone: (213) 765-1714

**FILED**

**JUL 20 2017**

STATE BAR COURT
CLERK'S OFFICE
LOS ANGELES

# PUBLIC MATTER

9

10                        STATE BAR COURT

11               HEARING DEPARTMENT - LOS ANGELES

12

13  In the Matter of:              )   Case Nos.  16-O-11041, 16-O-12010,
                                   )              16-O-13056, 16-O-16804,
14  AMANDA LYNN JOHANSON,          )              16-O-18150, 17-O-00932
    No. 290144,                    )
15                                 )
                                   )   NOTICE OF DISCIPLINARY CHARGES
16  A Member of the State Bar      )

17              **NOTICE - FAILURE TO RESPOND!**

18      **IF YOU FAIL TO FILE A WRITTEN ANSWER TO THIS NOTICE
        WITHIN 20 DAYS AFTER SERVICE, OR IF YOU FAIL TO APPEAR AT
19      THE STATE BAR COURT TRIAL:**

20      **(1)  YOUR DEFAULT WILL BE ENTERED;**
        **(2)  YOUR STATUS WILL BE CHANGED TO INACTIVE AND YOU
21            WILL NOT BE PERMITTED TO PRACTICE LAW;**
        **(3)  YOU WILL NOT BE PERMITTED TO PARTICIPATE FURTHER IN
22            THESE PROCEEDINGS UNLESS YOU MAKE A TIMELY MOTION
              AND THE DEFAULT IS SET ASIDE, AND;**
23      **(4)  YOU SHALL BE SUBJECT TO ADDITIONAL DISCIPLINE.
              SPECIFICALLY, IF YOU FAIL TO TIMELY MOVE TO SET ASIDE
24            OR VACATE YOUR DEFAULT, THIS COURT WILL ENTER AN
              ORDER RECOMMENDING YOUR DISBARMENT WITHOUT
25            FURTHER HEARING OR PROCEEDING. SEE RULE 5.80 ET SEQ.,
              RULES OF PROCEDURE OF THE STATE BAR OF CALIFORNIA.**

26  ///

27  ///

28

kwiktag®   226 150 407

1    The State Bar of California alleges:

2                                   JURISDICTION

3        1.  Amanda Lynn Johanson ("Respondent") was admitted to the practice of law in the

4    State of California on June 5, 2013, was a member at all times pertinent to these charges, and is

5    currently a member of the State Bar of California.

6                                   COUNT ONE

7                              Case No. 16-O-11041
                  Rules of Professional Conduct, rule 3-110(A)
8                    [Failure to Perform with Competence]

9        2.  On or about September 15, 2015, Freddie Velazquez employed Respondent to

10   perform legal services, namely to negotiate a modification of his private student loan debt, which

11   Respondent intentionally, recklessly, or repeatedly failed to perform with competence, in willful

12   violation of Rules of Professional Conduct, rule 3-110(A), by failing to take any steps to attempt

13   to negotiate a modification of the student debt on his behalf beyond sending a cease and desist

14   letter on or about September 16, 2015 to his student lender.

15                                  COUNT TWO

16                             Case No. 16-O-12010
                  Rules of Professional Conduct, rule 3-110(A)
17                   [Failure to Perform with Competence]

18       3.  On or about September 22, 2015, Pamela Husten employed Respondent to perform

19   legal services, namely to negotiate a modification of her private student loan debt, which

20   Respondent intentionally, recklessly, or repeatedly failed to perform with competence, in willful

21   violation of Rules of Professional Conduct, rule 3-110(A), by failing to negotiate or attempt to

22   negotiate a modification of the student debt on her behalf beyond sending a cease and desist

23   letter on or about October 13, 2015 to her student lender.

24   ///

25   ///

26   ///

27   ///

28
                                       -2-

1

## COUNT THREE

2

Case No. 16-O-12010
Rules of Professional Conduct, rule 3-700(D)(2)
[Failure to Refund Unearned Fees]

3

4      4.  Between on or about October 13, 2015 and on or about February 12, 2016,

5  Respondent received advanced fees totaling $3,033.45 from a client, Pamela Husten, to negotiate

6  a modification of her private student loan debt.  Respondent failed to negotiate or attempt to

7  negotiate a modification of her private student loan debt, or perform any legal services for the

8  client, and therefore earned none of the advanced fees paid.  Respondent failed to refund

9  promptly, upon Respondent's termination of employment on or about February 15, 2016 any part

10  of the $3,033.45 fees to the client, in willful violation of Rules of Professional Conduct, rule

11  3-700(D)(2).

12

## COUNT FOUR

13

Case No. 16-O-12010
Rules of Professional Conduct, rule 4-100(B)(3)
[Failure to Render Accounts of Client Funds]

14

15      5.  Between on or about October 13, 2015 and on or about February 12, 2016,

16  Respondent received from a client, Pamela Husten, the sum of $3,033.45, as advanced fees for

17  legal services to be performed.  Respondent thereafter failed to render an appropriate accounting

18  to the client regarding those funds upon the termination of Respondent's employment on or

19  about February 12, 2016, in willful violation of the Rules of Professional Conduct, rule

20  4-100(B)(3).

21

## COUNT FIVE

22

Case No. 16-O-13056
Rules of Professional Conduct, rule 3-110(A)
[Failure to Perform with Competence]

23

24      6.  On or about August 31, 2015, Arielle Egan employed Respondent to perform legal

25  services, namely to negotiate a modification of her private student loan debt, which Respondent

26  intentionally, recklessly, or repeatedly failed to perform with competence, in willful violation of

27  Rules of Professional Conduct, rule 3-110(A), by failing to negotiate or attempt to negotiate a

28

-3-

1  modification of the student debt on her behalf beyond sending two cease and desist letters

2  between on or about September 9, 2015 and on or about December 7, 2015 to her student lender,

3  and a demand for validation of the loan on or about May 16, 2016 to her student lender.

4  <u>COUNT SIX</u>

5  Case No. 16-O-13056
Rules of Professional Conduct, rule 3-700(D)(2)
6  [Failure to Refund Unearned Fees]

7  7.  Between on or about September 4, 2015 and on or about June 6, 2016, Respondent

8  received advanced fees totaling $7,855.80 from a client, Arielle Egan, to negotiate a

9  modification of her private student loan debt.  Respondent failed to negotiate or attempt to

10  negotiate a modification of her private student loan debt, or perform any legal services for the

11  client, and therefore earned none of the advanced fees paid.  Respondent failed to refund

12  promptly, upon Respondent's termination of employment on or about June 16, 2016 any part of

13  the $7,855.80 fees to the client, in willful violation of Rules of Professional Conduct, rule

14  3-700(D)(2).

15  <u>COUNT SEVEN</u>

16  Case No. 16-O-13056
Rules of Professional Conduct, rule 4-100(B)(3)
17  [Failure to Render Accounts of Client Funds]

18  8.  Between on or about September 4, 2015 and on or about June 6, 2016, Respondent

19  received from a client, Arielle Egan, the sum of $7,855.80, as advanced fees for legal services to

20  be performed.  Respondent thereafter failed to render an appropriate accounting to the client

21  regarding those funds upon the termination of Respondent's employment on or about June 16,

22  2016, in willful violation of the Rules of Professional Conduct, rule 4-100(B)(3).

23  <u>COUNT EIGHT</u>

24  Case No. 16-O-16804
Rules of Professional Conduct, rule 3-110(A)
25  [Failure to Perform with Competence]

26  9.  On or about August 18, 2015, Shane Harbour employed Respondent to perform legal

27  services, namely to negotiate a modification of his private student loan debt, which Respondent

28

-4-

1  intentionally, recklessly, or repeatedly failed to perform with competence, in willful violation of

2  Rules of Professional Conduct, rule 3-110(A), by failing to negotiate or attempt to negotiate a

3  modification of the student debt on his behalf beyond sending a cease and desist letter on or

4  about August 19, 2015 to his student lender.

5                                             COUNT NINE

6                                        Case No. 16-O-16804
                                Rules of Professional Conduct, rule 3-700(D)(2)
7                                   [Failure to Refund Unearned Fees]

8          10. Between on or about August 27, 2015 and on or about April 27, 2016, Respondent

9  received advanced fees totaling $2,905.92 from a client, Shane Harbour, to negotiate a

10  modification of her private student loan debt.  Respondent failed to negotiate or attempt to

11  negotiate a modification of his private student loan debt, or perform any legal services for the

12  client, and therefore earned none of the advanced fees paid.  Respondent failed to refund

13  promptly, upon Respondent's termination of employment on or about May 10, 2016 any part of

14  the $2,905.92 fees to the client, in willful violation of Rules of Professional Conduct, rule

15  3-700(D)(2).

16                                             COUNT TEN

17                                        Case No. 16-O-16804
                                Rules of Professional Conduct, rule 4-100(B)(3)
18                              [Failure to Render Accounts of Client Funds]

19         11. Between on or about August 27, 2015 and on or about April 27, 2016, Respondent

20  received from a client, Shane Harbour, the sum of $2,905.92, as advanced fees for legal services

21  to be performed.  Respondent thereafter failed to render an appropriate accounting to the client

22  regarding those funds upon the termination of Respondent's employment on or about May 10,

23  2016, in willful violation of the Rules of Professional Conduct, rule 4-100(B)(3).

24  ///

25  ///

26  ///

27  ///

28

## COUNT ELEVEN

Case No. 16-O-18150
Rules of Professional Conduct, rule 3-110(A)
[Failure to Perform with Competence]

12. On or about September 11, 2015, Christine Woodell employed Respondent to perform legal services, namely to negotiate a modification of her private student loan debt, which Respondent intentionally, recklessly, or repeatedly failed to perform with competence, in willful violation of Rules of Professional Conduct, rule 3-110(A), by failing to negotiate or attempt to negotiate a modification of the student debt on her behalf beyond sending a cease and desist letter on or about October 1, 2015 to her student lender.

## COUNT TWELVE

Case No. 16-O-18150
Rules of Professional Conduct, rule 3-700(D)(2)
[Failure to Refund Unearned Fees]

13. Between on or about September 24, 2015 and on or about October 24, 2016, Respondent received advanced fees totaling $4,030.74 from a client, Christine Woodell, to negotiate a modification of her private student loan debt.  Respondent failed to negotiate or attempt to negotiate a modification of her private student loan debt, or perform any legal services for the client, and therefore earned none of the advanced fees paid.  Respondent failed to refund promptly, upon Respondent's termination of employment on or about October 25, 2016 any part of the $4,030.74 fees to the client, in willful violation of Rules of Professional Conduct, rule 3-700(D)(2).

## COUNT THIRTEEN

Case No. 16-O-16804
Rules of Professional Conduct, rule 4-100(B)(3)
[Failure to Render Accounts of Client Funds]

14. Between on or about September 24, 2015 and on or about October 24, 2016, Respondent received from a client, Christine Woodell, the sum of $4,030.74, as advanced fees for legal services to be performed.  Respondent thereafter failed to render an appropriate accounting to the client regarding those funds upon the termination of Respondent's employment

on or about October 25, 2016, in willful violation of the Rules of Professional Conduct, rule

4-100(B)(3).

COUNT FOURTEEN

Case No. 17-O-00932<br>
Rules of Professional Conduct, rule 3-110(A)<br>
[Failure to Perform with Competence]

15. On or about August 19, 2015, Kandis Kissinger employed Respondent to perform

legal services, namely to negotiate a modification of her private student loan debt, which

Respondent intentionally, recklessly, or repeatedly failed to perform with competence, in willful

violation of Rules of Professional Conduct, rule 3-110(A), by failing to negotiate or attempt to

negotiate a modification of the student debt on her behalf beyond sending a cease and desist

letter on or about August 20, 2015 to her student lender.

COUNT FIFTEEN

Case No. 17-O-00932<br>
Rules of Professional Conduct, rule 3-700(D)(2)<br>
[Failure to Refund Unearned Fees]

16. Between on or about August 31, 2015 and on or about December 2, 2016,

Respondent received advanced fees totaling $6,364.48 from a client, Kandis Kissinger, to

negotiate a modification of her private student loan debt. Respondent failed to negotiate or

attempt to negotiate a modification of her private student loan debt, or perform any legal services

for the client, and therefore earned none of the advanced fees paid. Respondent failed to refund

promptly, upon Respondent's termination of employment on or about January 9, 2017 any part

of the $6,364.48 fees to the client, in willful violation of Rules of Professional Conduct, rule

3-700(D)(2).

COUNT SIXTEEN

Case Nos. 16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932<br>
Rules of Professional Conduct, Rule 3-110(A)<br>
[Failure to Perform with Competence – Failure to Supervise]

17. From on or about August 18, 2015 through on or about December 2, 2016, clients

Freddie Velazquez, Pamela Husten, Arielle Egan, Shane Harbour, Christine Woodell, and

-7-

1  Kandis Kissinger ("clients") employed Respondent to perform legal services, namely to

2  negotiate modifications of their respective private student loan debt, which Respondent

3  intentionally, recklessly, or repeatedly failed to perform with competence, in willful violation of

4  Rules of Professional Conduct, rule 3-110(A), by failing to supervise non-attorney agents for her

5  firm, including, but not limited to, Champion Marketing Solutions ("CMS"), Terry Belser,

6  Crystal Bleau, Stephen Bartlett, Joel Knapp, and Perla Ortiz, and thereby allowing them to

7  perform initial case consultation, communicate with and evaluate legal issues for the clients,  set,

8  charge and collect fees from the clients for legal services, provide legal advice to the clients

9  regarding the purported invalidity of their student loans, unfair debt collection practices by their

10  student lenders, and their eligibility for modifications of their student loans, correspond with

11  third parties on behalf of the clients, and perform legal services independently and without

12  supervision by Respondent.

13  <u>COUNT SEVENTEEN</u>

14  Case Nos. 16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932
   Rules of Professional Conduct, Rule 1-300(A)
15  [Aiding the Unauthorized Practice of Law]

16        18. From on or about August 18, 2015 through on or about December 2, 2016,

17  Respondent aided non-attorney agents for her firm, including, but not limited to, Champion

18  Marketing Solutions ("CMS"), Terry Belser, Crystal Bleau, Stephen Bartlett, Joel Knapp, and

19  Perla Ortiz, none of whom was licensed to practice law in California, in the unauthorized

20  practice of law by providing the agents with unfettered access and control in operating her law

21  office without adequate supervision and by delegating her attorney responsibilities to the agents,

22  including initial case consultation, communicating with and evaluating legal issues for clients

23  Freddie Velazquez, Pamela Husten, Arielle Egan, Shane Harbour, Christine Woodell, and

24  Kandis Kissinger ("clients"), setting, charging and collecting fees from the clients for legal

25  services, providing legal advice to the clients, corresponding with third parties on behalf of the

26  clients, and performing legal services independently and without supervision by Respondent, in

27  willful violation of Rules of Professional Conduct, rule 1-300(A).

28

-8-

COUNT EIGHTEEN

Case Nos. 16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932
Rules of Professional Conduct, Rule 1-320(A)
[Sharing Legal Fees with a Non-Lawyer]

19. Between on or about August 18, 2015 through on or about December 2, 2016, Respondent shared legal fees with persons who are not lawyers, namely Champion Marketing Solutions, Champion Marketing Solutions ("CMS"), Terry Belser, Crystal Bleau, Stephen Bartlett, Joel Knapp, and Perla Ortiz, in relation to Respondent's performance of legal services, namely to negotiate modifications of her clients' private student loan debt, in willful violation of Rules of Professional Conduct, Rule 1-320(A).

COUNT NINETEEN

Case Nos. 16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932
Rules of Professional Conduct, rule 4-200(A)
[Unconscionable Fee]

20. Between on or about August 18, 2015 through on or about December 2, 2016, Respondent charged legal fees totaling approximately $135,676.49 from clients, including $26,878.50 from Freddie Velazquez, $28,641.19 from Pamela Husten, $37,227.86 from Arielle Egan, $15,498.19 from Shane Harbour, $8,337.16 from Christine Woodell, and $19,093.59 from Kandis Kissinger ("clients") to perform legal services, namely to negotiate modifications of their respective private student loan debt, that was unconscionable for the following reasons, in willful violation of Rules of Professional Conduct, rule 4-200(A):

    a. the false pretenses under which clients retained Respondent wherein the clients were led to believe an attorney would perform the legal services for which they paid the legal fees, when in fact all, or nearly all, of the legal services performed for the clients were completed by Respondent's non-attorney agents with little to no supervision by Respondent;

    b. the amount of legal fees paid by each of the clients was disproportionate to the value of the services performed by Respondent;

    c. the amount of legal fees paid by each of the clients was disproportionate to the relative lack of results obtained for the clients;

    d. the fixed nature of the legal fees;

e.  the lack of relative difficulty and legal skill requisite to properly negotiate student loan modifications for the clients;

f.  the time and labor required; and

g.  the clients' highly vulnerable financial circumstances.

## COUNT TWENTY

Case Nos. 16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932
Rules of Professional Conduct, rule 4-200(A)
[Illegal Fee]

21. On or about August 18, 2015 through on or about December 2, 2016, Respondent collected legal fees totaling approximately $27,040.24 from clients, including $2,849.85 from Freddie Velazquez, $3,033.45 from Pamela Husten, $7,855.80 from Arielle Egan, $2,905.92 from Shane Harbour, $4,030.74 from Christine Woodell, and $6,364.48 from Kandis Kissinger ("clients") to perform legal services, namely to negotiate modifications of their respective private student loan debt, that were illegal because Respondent collected the fees prior to the completion of the loan debt negotiation services offered to each individual client and prior to her negotiating any settlement agreement on the clients' behalves with their student lenders, in violation of the Telemarketing Sales Rule (16 CFR 310.4(a)(5)(i)(A) and (B)), and therefore in willful violation of the Rules of Professional Conduct, rule 4-200(A).

## COUNT TWENTY-ONE

Case Nos. 16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932
Business and Professions Code section 6106
[Moral Turpitude – Habitual Disregard of Clients' Interests]

22. Between on or about August 18, 2015 through on or about January 9, 2017, Respondent, in willful violation of Business and Professions Code section 6106, habitually disregarded the interests of her clients and thereby committed an act of moral turpitude by intentionally or grossly negligently failing to supervise non-attorney agents for her firm, including, but not limited to, Champion Marketing Solutions ("CMS"), Terry Belser, Crystal Bleau, Stephen Bartlett, Joel Knapp, and Perla Ortiz, none of whom was licensed to practice law in California or any other jurisdiction, by providing the agents with unfettered access and control in operating her law office without adequate attorney supervision, and by delegating her attorney

1   responsibilities to the agents, including initial case consultation, communicating with and

2   evaluating legal issues for clients Freddie Velazquez, Pamela Husten, Arielle Egan, Shane

3   Harbour, Christine Woodell, and Kandis Kissinger ("clients"), setting, charging and collecting

4   fees from the clients for legal services, providing legal advice to the clients, corresponding with

5   third parties on behalf of the clients, and performing legal services independently and without

6   supervision by Respondent, when Respondent, nor any other attorney, provided those legal

7   services on behalf of the clients, and no attempts to negotiate a modification of the student debt

8   for the clients were provided at all.

9   <u>COUNT TWENTY-TWO</u>

10  Case Nos. 16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932
    Business and Professions Code section 6106
11  [Moral Turpitude – Scheme to Defraud]

12      23. Between on or about August 18, 2015  through on or about January 9, 2017,

13  Respondent, in willful violation of Business and Professions Code section 6106, intentionally

14  engaged in a scheme to defraud clients Freddie Velazquez, Pamela Husten, Arielle Egan, Shane

15  Harbour, Christine Woodell, and Kandis Kissinger ("clients") and thereby committed an act of

16  moral turpitude by engaging non-attorney agents, including, but not limited to, Champion

17  Marketing Solutions ("CMS"), Terry Belser, Crystal Bleau, Stephen Bartlett, Joel Knapp, and

18  Perla Ortiz, to solicit clients for private student loan debt relief services under the pretense that

19  such services would be provided by an attorney and for a fee, a portion of which was for legal

20  services and a portion of which would be used for purposes of paying the clients' respective

21  student loan debt, when Respondent, nor any other attorney, provided those legal services on

22  behalf of the clients, no attempts to negotiate a modification of the student debt for the clients

23  were provided at all, and the entirety of the fees the clients paid were collected by a factoring

24  company, GST Factoring Inc. ("GST"), Respondent engaged and were thereafter, shared

25  between Respondent, GST and CMS, and no portion of the fees was used to pay any portion of

26  the clients' student loan debts.

27

28
                                              -11-

## NOTICE - INACTIVE ENROLLMENT!

**YOU ARE HEREBY FURTHER NOTIFIED THAT IF THE STATE BAR COURT FINDS, PURSUANT TO BUSINESS AND PROFESSIONS CODE SECTION 6007(c), THAT YOUR CONDUCT POSES A SUBSTANTIAL THREAT OF HARM TO THE INTERESTS OF YOUR CLIENTS OR TO THE PUBLIC, YOU MAY BE INVOLUNTARILY ENROLLED AS AN INACTIVE MEMBER OF THE STATE BAR.   YOUR INACTIVE ENROLLMENT WOULD BE IN ADDITION TO ANY DISCIPLINE RECOMMENDED BY THE COURT.**

## NOTICE - COST ASSESSMENT!

**IN THE EVENT THESE PROCEDURES RESULT IN PUBLIC DISCIPLINE, YOU MAY BE SUBJECT TO THE PAYMENT OF COSTS INCURRED BY THE STATE BAR IN THE INVESTIGATION, HEARING AND REVIEW OF THIS MATTER PURSUANT TO BUSINESS AND PROFESSIONS CODE SECTION 6086.10.**

Respectfully submitted,

THE STATE BAR OF CALIFORNIA
OFFICE OF CHIEF TRIAL COUNSEL

DATED: July 20, 2017            By: _____
Anand Kumar
Senior Trial Counsel

-12-

# DECLARATION OF SERVICE
by
U.S. FIRST-CLASS MAIL / U.S. CERTIFIED MAIL / OVERNIGHT DELIVERY / FACSIMILE–ELECTRONIC TRANSMISSION

CASE NUMBER(s): **16-O-11041, 16-O-12010, 16-O-13056, 16-O-16804, 16-O-18150, 17-O-00932**

I, the undersigned, am over the age of eighteen (18) years and not a party to the within action, whose business address and place of employment is the State Bar of California, 845 South Figueroa Street, Los Angeles, California 90017-2515, declare that:

- on the date shown below, I caused to be served a true copy of the within document described as follows:

## NOTICE OF DISCIPLINARY CHARGES

☐ **By U.S. First-Class Mail: (CCP §§ 1013 and 1013(a))**
- in accordance with the practice of the State Bar of California for collection and processing of mail, I deposited or placed for collection and mailing in the City and County
- of Los Angeles.

☒ **By U.S. Certified Mail: (CCP §§ 1013 and 1013(a))**

☐ **By Overnight Delivery: (CCP §§ 1013(c) and 1013(d))**
- I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for overnight delivery by the United Parcel Service ('UPS').

☐ **By Fax Transmission: (CCP §§ 1013(e) and 1013(f))**
Based on agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed herein below. No error was reported by the fax machine that I used. The original record of the fax transmission is retained on file and available upon request.

☐ **By Electronic Service: (CCP § 1010.6)**
Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the person(s) at the electronic addresses listed herein below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☐ *(for U.S. First-Class Mail)* in a sealed envelope placed for collection and mailing at Los Angeles, addressed to: *(see below)*

☒ *(for Certified Mail)* in a sealed envelope placed for collection and mailing as certified mail, return receipt requested,
Article No.: **7196-9008-9111-1007-5508**         at Los Angeles, addressed to: *(see below)*

☐ *(for Overnight Delivery)* together with a copy of this declaration, in an envelope, or package designated by UPS,
Tracking No.: _____         addressed to: *(see below)*

| Person Served | Business-Residential Address | Fax Number |
|---|---|---|
| Edward O. Lear | **Century Law Group, LLP**<br>**5200 W. Century Blvd., #345**<br>**Los Angeles, CA 90045** | **Electronic Address** |

I am readily familiar with the State Bar of California's practice for collection and processing of correspondence for mailing with the United States Postal Service, and overnight delivery by the United Parcel Service ('UPS'). In the ordinary course of the State Bar of California's practice, correspondence collected and processed by the State Bar of California would be deposited with the United States Postal Service that same day, and for overnight delivery, deposited with delivery fees paid or provided for, with UPS that same day.

I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date on the envelope or package is more than one day after date of deposit for mailing contained in the affidavit.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed at Los Angeles, California, on the date shown below.

DATED: July 20, 2017         SIGNED: *Kathi Palacios*
Kathi Palacios
Declarant

# Exhibit D

# David Mize Law, PLLC
An Arizona Law Firm

**David Mize Law, PLLC**
2415 East Camelback Rd., Ste. 700
Phoenix, Arizona 85016
P: (602) 912-8509
info@davidmizelaw.com

Responsive Documents:
860 F Avenue, Suite 104
Plano, Texas 75074
F: (602) 391-2647

David Mize, Esq.*

*Licensed in Arizona

February 22, 2016

Navient
P.O. Box 9640
Wilkes-Barre, PA 18773-9640

Re: 

To Whom It May Concern:

Please be advised that this law firm represents ▓▓▓▓▓▓▓▓ ("Client") in connection with student loan debt matters (the "Student Loan Matters"), including but not limited to the above-referenced account (the "Alleged Debt"). The purpose of this letter is to advise you of such representation, and to require that all future communications by you to Client with respect to the Alleged Debt and/or other Student Loan Matters be directed to my attention at the above-stated mailing address, e-mail address, and/or telephone number.

Moreover, pursuant to the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, to the extent you are a "debt collector" as defined therein, please take further notice that you must immediately terminate any contact with Client and members of Client's family or household regarding any matter concerning the collection of the Alleged Debt and/or any other debt you allege is owed to your company, your principal, customer, client, and/or predecessor in interest. This notice and demand shall include, but is not limited to, any and all written correspondence (including U.S. mail, e-mail, text, or otherwise), as well as telephonic communication.

Finally, please be advised that the Alleged Debt referenced above is hereby disputed and demand is hereby made for validation. As such, please immediately provide my office with the following information:

- Verification of the above-referenced Alleged Debt
- The name and address of the original creditor and current creditor (if applicable)
- Confirmation that any such debt and the accuracy of the items in the files relating to Client will be treated as disputed

In addition to the foregoing, forward to my attention any copies of any and all loan agreements, disclosure statements, collection demands, account statements, and/or other communications by you (and/or your principal, customer, client, or predecessor in interest, if applicable) with Client concerning the above-referenced Alleged Debt.

Your prompt attention to these matters is appreciated.

Regards,

**Please note that the Texas address to which you have been directed to send the loan documents is that o an outside service provider that provides remote document handling/scanning services to this law firm  There are no legal staff at that location and, as such, any and all substantive inquiries concerning this matter in general, and this letter in particular, must be directed to the legal staff o this law firm at the address, telephone number, and/or email address set forth above.**



## <u>David Mize Law, PLLC</u>
An Arizona Law Firm

**David Mize Law, PLLC**
2415 East Camelback Rd., Ste. 700
Phoenix, Arizona 85016
P: (602) 912-8509
info@davidmizelaw.com

<u>Responsive Documents</u>:
860 F Avenue, Suite 104
Plano, Texas 75074
F: (602) 391-2647

David Mize, Esq.*

*Licensed in Arizona

David Mize, Esq.

**Please note that the Texas address to which you have been directed to send the loan documents is that o an outside service provider that provides remote document handling/scanning services to this law firm  There are no legal staff at that location and, as such, any and all substantive inquiries concerning this matter in general, and this letter in particular, must be directed to the legal staff o this law firm at the address, telephone number, and/or email address set forth above.**

# Exhibit E

### IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
### STATE OF MISSOURI
### ASSOCIATE DIVISION

THERESA JOHNSON,

     Plaintiff,

v.

LAW OFFICES OF JEFFREY LOHMAN, A
PROFESSIONAL CORPORATION

and

VERITAS LEGAL PLAN, INC.

Serve at:
Michael J. McGoey, CPA, INC.
639 E. Ocean Ave. Suite 101
Boynton Beach, FL 33435

     Defendants.

Cause No. 1822-AC07686

Division 28

**JURY TRIAL DEMANDED**

### FIRST AMENDED PETITION

COMES NOW Plaintiff, Theresa Johnson, by and through her undersigned counsel, and

for her First Amended Petition states as follows:

### INTRODUCTION

1.    This is an action for actual and punitive damages brought by an individual for

violations of the Missouri Merchandising Practices Act, Sections 407.010 RSMo. et seq.

("MMPA").

1

2. This is an action for actual and punitive damages brought by an individual consumer for violations of the Credit Repair Organizations Act, 15 U.S.C. Sections 1679 et seq. ("CROA").

3. This is an action for actual and punitive damages brought by an individual for violations of Sections 407.635 RSMo. et seq. governing credit service organizations ("CSO Statutes").

4. This is an action for compensatory and punitive damages brought by an individual for the unauthorized practice of law.

5. Plaintiff demands a trial by jury on all issues so triable.

## JURISDICTION AND VENUE

6. This Court has jurisdiction of Plaintiff's claims under Sections 407.025(1) and 407.644 RSMo.

7. Venue is proper in the City of St. Louis, Missouri under Section 508.010.2(4) RSMo. because Plaintiff resides in the City of St. Louis, Missouri and was damaged in the City of St. Louis, Missouri.

8. The circuit court has jurisdiction of all claims under Section 478.070 RSMo.

## PARTIES

9. Plaintiff Theresa Johnson ("Plaintiff") is an individual person and a resident of the City of St. Louis, Missouri.

10. Defendant Law Offices of Jeffrey Lohman, a Professional Corporation ("Lohman") is a foreign entity doing business in Missouri without any attorneys in its office admitted to practice in this state.

2

11.     At all times relevant, Lohman acted as former Defendant Burlington ("Burlington")'s partner.

12.     Veritas Legal Plan Inc. ("Veritas") is a Florida corporation providing prepaid legal service plans with its principal place of business in Florida.

13.     At all times relevant, Lohman acted as the agent of Veritas and Burlington and acted for their benefit and with their express consent and approval.

14.     In the alternative, Veritas acted as the agent of Lohman and Burlington and acted for their benefit and with their express consent and approval at all times relevant.

15.     In the alternative, Burlington acted as the agent of Lohman and Veritas and acted for their benefit and with their express consent and approval at all times relevant.

16.     In the alternative Lohman, Veritas, and Burlington are all coagents and acted for the benefit of one another and with the express consent and approval of one another at all times relevant.

### FACTS

*Former Defendant Burlington Convinces Plaintiff to Sign Up*

17.     Plaintiff is a disabled individual who lives on Social Security and Disability payments.

18.     As a result of being unable to work, Plaintiff's credit card and unsecured debts began to accumulate in 2016 and 2017.

19.     Plaintiff owed debts to many unsecured creditors and her situation had become unmanageable.

3

20.     Plaintiff wanted advice on whether she should try to pay off the debts and as to what the consequences would be if she did not pay off the debts.

21.     In approximately August of 2017, Plaintiff saw a Burlington television advertisement that promised Burlington could eliminate Plaintiff's debt through a process called debt "validation" or "verification."

22.     Burlington's advertisement offered services that would get the debt collectors to stop bothering Plaintiff and proclaimed that Burlington's "debt validation" would actually eliminate Plaintiff's bills.

23.     Plaintiff thought that Burlington might be able to help her with her situation and inquired into the services that Burlington was offering.

24.     Plaintiff received a pamphlet and other items in the mail containing more information about the services Burlington was offering.

25.     Burlington offered a one-size-fits-all plan that involved using their debt "validation" techniques that would help plaintiff "take back control of [her] finances."

26.     Burlington communicated to Plaintiff that its techniques would be better for Plaintiff than filing for bankruptcy, and that once debt collectors receive Burlington's "proprietary dispute documentation, all collection calls and activity should stop."

27.     Burlington also communicated to Plaintiff that Burlington's second step of sending a "letter of nonresponse/non-compliance to the debt collector" would have the Plaintiff's account removed from active collection status.

28.     Among other representations, Burlington advised Plaintiff that if a creditor could not "validate" a debt, Plaintiff would not have to pay the debt.

4

29.     All of Burlington's representations about all of its services were completely false.

30.     Burlington specifically provided information on the Fair Debt Collection Practices Act ("FDCPA") to Plaintiff and explained that Burlington would "fully utiliz[e] . . . the FDCPA, and other Federal and State consumer protection statutes" to stop collection activities.

31.     Burlington, without a single in-house lawyer doing any work on Burlington's behalf, did not utilize the FDCPA for its clients like it represented to Plaintiff that it would.

32.     Burlington communicated to Plaintiff that she would receive the "Veritas Legal Plan" ("the Plan") which would provide "protection against creditor lawsuits and aggressive collectors."

33.     The Plan offered "national legal defense".

34.     The Plan promised "full legal representation" by a "local network attorney" for "any debt collection matter that arises."

35.     The plan was for "full representation" and "preparation of all court filings: Answers, motions, demands, interrogatories, counterclaims" and "court appearances- until case is closed."

36.     Lohman, a California law firm, was the "local network attorney" that Veritas was going to provide to Plaintiff as part of Burlington's sale of its "Debt Validation Program".

37.     Burlington promised that Plaintiff, in exchange for monthly payments of $391.26, would receive value for those payments because Burlington was going to provide their "Debt Validation Program" and the "Veritas Legal Plan."

38.     As Burlington provided a wide span of advice to Plaintiff about her secular rights as a Missouri debtor to various creditors, Burlington engaged in the practice of law with Plaintiff.

39.     At all times relevant, Burlington knew that Plaintiff was unsophisticated and that Plaintiff had little to no knowledge of her legal responsibilities regarding her debts and that Plaintiff had little to no knowledge of the consequences that would occur if she simply stopped paying her creditors.

40.     In September or October of 2017, Burlington abused Plaintiff's relative ignorance and its own position of power and enticed Plaintiff to enter into an agreement whereby Plaintiff agreed to (1) stop paying all of her unsecured creditors and (2) send $391.26 every month to Burlington.

41.     For six months thereafter, Plaintiff did everything that Burlington instructed her to do and Burlington took $391.26 from Plaintiff's checking account via a pre-authorized electronic funds transfer.

42.     Upon information and belief, Burlington used part of this money to pay Defendants Lohman and Veritas in exchange for the services Lohman and Veritas provided.

43.     To the extent the agreement ever contained a valid arbitration provision, Plaintiff never received a countersigned copy of the agreement and is no longer bound by any arbitration provision.

44.     Plaintiff never agreed to arbitrate anything.

*Defendants Take Plaintiff's Money and Do Nothing For Her*

45.    After signing up with Burlington, Plaintiff noticed that the collection calls and letters actually increased.

46.    As a result, Plaintiff made numerous calls to Burlington to question them about the uptick in collection activity and found Burlington to be non-responsive.

47.    Specifically, Burlington refused to explain why collection activity was increasing and instead told Plaintiff to keep sending Burlington money.

48.    Plaintiff soon learned that the creditors were not going away and that Burlington's program was worthless.

49.    Burlington eventually referred Plaintiff to Lohman through the Veritas Plan.

50.    No attorney at Lohman is licensed to practice law in Missouri.

51.    As such, no attorney at Lohman was familiar with Missouri laws relating to the collection of debts and/or consumer rights in such a situation.

52.    Veritas did not provide a "local network attorney" as promised and had no intent of providing an attorney actually licensed to practice law in Missouri.

53.    Veritas's own agreement with Plaintiff was for "full representation", which could not be provided by Lohman, as no attorney at Lohman was licensed in Missouri.

54.    Plaintiff would have never paid for or otherwise agreed to the Veritas Plan if Veritas had not made representations that beneficial legal services would be provided.

55.    Upon information and belief, Veritas continued to accept payment even though no beneficial services were ever provided by Veritas to Plaintiff.

56.    Veritas provided Lohman with Plaintiff's contact information as part of Veritas's agreement to provide legal services to Plaintiff.

7

57.     Nonetheless, Lohman provided legal advice to Plaintiff about dealing with her creditors and tried to further solicit Telephone Consumer Protection Act ("TCPA") cases from Plaintiff without a proper license.

58.     Sometime in 2017, Burlington directed Plaintiff to call Lohman, and she did so.

59.     From the end of September, 2017 until the middle of August, 2018 Defendant Lohman contacted or attempted to contact Plaintiff over 50 times in the form of telephone calls, emails, and text messages.

60.     The substance of these contacts ranged from general solicitation of business regarding Plaintiff's debts and debt collectors, to specific attempts to take on TCPA cases, to general advice about how Plaintiff should deal with her creditors.

61.     Plaintiff spoke primarily with two individuals who identified themselves as "Kenya" and "Samantha" and purported to be attorneys.

62.     Neither Kenya nor Samantha was ever licensed to practice law in Missouri.

63.     Lohman and all of its personnel, including Kenya and Samantha, were located in California.

64.     Kenya and Samantha provided advice to Plaintiff on how to respond to debt collectors that were calling Plaintiff over the phone in Missouri.

65.     Kenya and Samantha provided Plaintiff with a "statement" that Plaintiff was supposed to read over the phone to her debt collectors that would call in Missouri.

66.     Kenya and Samantha told Plaintiff to tell debt collectors not to call Plaintiff's cellular telephone located in Missouri.

8

67.     Lohman continually provided Plaintiff with bad legal advice that made her situation worse.

68.     Lohman's conduct was at all times the unauthorized practice of law in Missouri.

69.     Even after getting out of the program with Burlington, Lohman sent Plaintiff a text message on August 4, 2018 advising about debt collections calls and asking "[d]id you still want us to take on the case for you?"

70.     Lohman sought to mislead and deceive Plaintiff into working with Lohman, even though no one at Lohman was able to practice law in Missouri.

71.     This was deceptive conduct designed to get the benefit of Plaintiff's business.

72.     Lohman again on August 13, 2018 sent Plaintiff a text saying "[s]ince we were already working with you I wanted to know if you still wanted to pursue the case against Kohls for calling you."

73.     Lohman's actions were repeated, continuous solicitation of Plaintiff's business when Defendant Lohman was never licensed to practice law in Missouri.

74.     Lohman deceived and misled Plaintiff into continuing to use its services for either direct payment by Plaintiff to Lohman or payment in the form of attorney's fees paid through TCPA case settlements.

75.     Plaintiff paid valuable consideration to Burlington for this legal advice, and upon information and belief, paid indirectly to Lohman and Veritas.

76.     Defendants' legal advice was deficient, wrong, and incredibly damaging to Plaintiff.

77.     Plaintiff, after taking Defendants' advice and not paying any of her creditors for six months, put herself in a much worse financial position.

78.     At least one creditor, Synchrony Bank, sued Plaintiff after Plaintiff followed Defendants' advice to stop paying Synchrony Bank.

79.     Defendants have not improved Plaintiff's credit as they promised; Defendants destroyed Plaintiff's credit.

80.     Defendants, upon information and belief, have pocketed all or most of Plaintiff's money and have not performed as they promised.

81.     Defendants' actions have caused Plaintiff to suffer loss in excess of the minimum jurisdictional amount of this Court.

82.     Defendants' actions were wanton, willful, and in deliberate disregard of Plaintiff's rights.

83.     Former Defendant Burlington has reached a confidential settlement outside of court and has been dismissed from this case.

**COUNT I: VIOLATION OF THE MMPA - ALL DEFENDANTS**

84.     Plaintiff incorporates all prior paragraphs as if fully stated herein.

85.     Plaintiff paid former Defendant Burlington for the Veritas Legal Plan services under the assumption that the Plan would be beneficial to Plaintiff, specifically by providing local counsel.

86.     Veritas's statements about their services were deceptive, false, unfair, and concealed material facts in connection with its sale of their services to Plaintiff.

10

87.     Specifically, Veritas represented that it would provide Plaintiff with a "local network attorney" who would provide "full representation".

88.     This representation was false. As evidenced by Veritas providing Plaintiff with Lohman, a law firm with no attorneys licensed to practice in Missouri.

89.     Lohman, instead of informing Plaintiff that it could not represent Plaintiff, instead began to actively solicit business from Plaintiff.

90.     Lohman made representations that it could help Plaintiff with her debt issues.

91.     Lohman never informed Plaintiff that it was not licensed in Missouri, instead it deceived Plaintiff into believing that its attorneys were able to practice law in Missouri.

92.     Lohman repeatedly gave advice to Plaintiff and actively sought to pursue TCPA cases on Plaintiff's behalf.

93.     Plaintiff received no benefit for these services and could not receive benefit for these services, as no one at Lohman could practice law in Missouri.

94.     Plaintiff paid for legal services through Burlington to Veritas and Lohman for which Plaintiff received virtually no value.  Plaintiff was worse off than before she agreed to deal with Defendants.

95.     Upon information and belief, Veritas took no action to verify that Lohman was licensed to practice in Missouri.

96.     Veritas deceived Plaintiff by failing to advise her that Lohman was unable to give her legal advice or otherwise assist in "preparation of all court filings: Answers, motions, demands, interrogatories, counterclaims" and "court appearances- until case is closed."

11

97.     Plaintiff would never have paid for Veritas's services if she had known that Veritas would provide her an attorney who was not licensed to practice in Missouri.

98.     Defendants' conduct occurred in connection with the sale of the the Plan to Plaintiff.

99.     Because of the representations, omissions, and actions of Defendants, Plaintiff paid for the Plan and, as a result, suffered monetary loss and actual damages in excess of the minimum jurisdictional amount of this Court.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants for:

A.     Actual damages in an amount greater than the minimum jurisdictional amount of this Court to be determined at trial;

B.     Punitive damages pursuant to RSMo. § 407.025(1) in the largest amount allowed by law;

C.     Reasonable attorney's fees pursuant to RSMo. § 407.025(1); and

D.     For such other and further relief as the Court deems proper.

## COUNT II: VIOLATION OF THE CROA - LOHMAN

100.     Plaintiff incorporates all prior paragraphs as if fully stated herein.

101.     Lohman's services were supposed to help Plaintiff deal with her creditors with the ultimate goal of repairing her credit in exchange for regular monthly payments from Plaintiff.

102.     In its attempts to offer credit repair services to Plaintiff, Lohman has committed violations of the CROA, 15 U.S.C. § 1679 et seq., including, but not limited to, the following:

a.     Making or using an untrue or misleading representation of its services, 15 U.S.C. § 1679b(a)(3);

b.     Engaging, directly or indirectly, in an act, practice, or course of business that constitutes or results in the commission of, or an attempt to commit, a fraud or deception on any person in connection with the offer or sale of its services, 15 U.S.C. § 1679b(a)(4); and

c.     Charging any money or other valuable consideration for the performance of a service which Lohman has agreed to perform for any consumer before such service is fully performed, 15 U.S.C. § 1679b(b).

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants for:

A.     Judgment that Lohman's conduct violated the CROA;

B.     Actual damages;

C.     Punitive damages pursuant to 15 U.S.C. § 1679g(2);

D.     Costs and reasonable attorney's fees pursuant to 15 U.S.C. § 1679g(3); and

E.     For such other relief as the Court may deem just and proper.

### **COUNT III: VIOLATION OF THE CSO STATUTES - LOHMAN**

103.     Plaintiff incorporates all prior paragraphs as if fully stated herein.

104.     Plaintiff is an individual who purchased the services of a credit services organization from Lohman.

105.     Lohman, who functions with respect to the extension of credit by others and in return for the payment of money or other valuable consideration, provided or represented to Plaintiff that it could or would (1) improve Plaintiff's credit record, history, or rating, (2) obtain

13

an extension of credit for Plaintiff, or (3) provide advice or assistance to Plaintiff with regard to those services.

106.    In its provision of the services of a credit services organization to Plaintiff, Lohman committed violations of the CSO Statutes, RSMo. 407.635 et seq., including, but not limited to, the following:

a.    Charging Plaintiff money or other valuable consideration before completing performance of all services Lohman had agreed to perform for Plaintiff, RSMo. § 407.638(1); and

b.    Making and using false and misleading representations to Plaintiff in the offer and sale of the services of a credit services organization, RSMo. § 407.638(3).

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Defendants for:

A.    Judgment that Lohman's conduct violated the CSO Statutes;

B.    Actual damages in an amount no less than the amount Plaintiff paid to Lohman through Burlington pursuant to 407.644.1(1);

C.    Punitive damages pursuant to pursuant to 407.644.1(2);

D.    Costs and reasonable attorney's fees pursuant to pursuant to 407.644.1(1); and

E.    For such other relief as the Court may deem just and proper.

**COUNT IV: UNAUTHORIZED PRACTICE OF LAW - LOHMAN**

107.    Plaintiff incorporates all prior paragraphs as if fully stated herein.

14

108.    Throughout their course of dealing with Plaintiff, Lohman routinely gave advice to Plaintiff about how to deal with her creditors, solicited legal representation from Plaintiff, and otherwise treated Plaintiff as a client for whom it was providing legal services.

109.    Lohman provided counsel to Plaintiff to cease paying her creditors and instead pay Burlington, and indirectly itself.

110.    No attorneys at Lohman nor any of its agents that dealt with Plaintiff are, or ever were, authorized to practice law in Missouri.

111.    Lohman acted in a representative capacity on behalf of Plaintiff by preparing documents and instruments, and by providing advice and recommendations, that affected the secular rights of Plaintiff.

112.    Lohman advised Plaintiff that its attorneys possessed expertise with the FDCPA, among other consumer protection laws, and would apply these laws to validate Plaintiff's debts and stop collection activities directed at Plaintiff.

113.    Lohman actively sought to pursue TCPA cases for Plaintiff and told her how to proceed with these cases.

114.    Plaintiff paid substantial fees to Burlington, and indirectly to Lohman, for and in connection with the counsel they provided.

115.    Because of the actions of Lohman, Plaintiff suffered monetary loss and actual damages in excess of the minimum jurisdictional amount of this Court.

WHEREFORE, Plaintiff respectfully requests that judgment be entered against Lohman for:

A.    Judgment that Lohman's conduct constituted the unauthorized practice of law;

15

B.      Actual damages;

C.      Punitive damages;

D.      Treble damages pursuant to RSMo. § 484.020(2).

E.      Costs and reasonable attorney's fees; and

F.      For such other relief as the Court may deem just and proper.

16

Respectfully submitted,

**ROSS & VOYTAS, LLC**

By: /s/ Ethan W. Gee.
Richard A. Voytas, Jr., #52046
rick@rossvoytas.com
Ethan W. Gee, #70075
ethan@rossvoytas.com
Erika V. Dopuch, #70031
erika@rossvoytas.com
12444 Powerscourt Drive, Ste 370
St. Louis, MO 63131
Phone: (314) 394-0605
Fax:     (636) 333-1212

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing was served on all counsel of record via the Court's Case.Net system this 7th day of November, 2018 on:

| Parties | Counsel |
|---|---|
| Law Offices of Jeffrey Lohman, P.C. | Gary T. Eastman<br>The Eastman Law Firm<br>12288 S. Mullen Rd.<br>Olathe, KS 66062<br>gary@eastmanlawfirm.com |

By: /s/ Ethan W. Gee