**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:19-cv-461 (LMB/TCB) |
| ) | |
| THE LAW OFFICES OF JEFFREY ) | |
| LOHMAN, P.C., *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on the Honorable Judge Brinkema's order (Dkt. 154) remanding Defendants The Law Offices of Jeffrey Lohman, P.C. and Jeffrey Lohman's (collectively, "Lohman") objection (Dkt. 136) to the undersigned, as well as Lohman's Motion to Strike Letter Not in Compliance with Local Rules (Dkt. 175). Because of this matter's procedural posture and Judge Brinkema's order, the undersigned construes Lohman's objection as a motion for reconsideration and will therefore rule on the issues raised before Judge Brinkema in the first instance. For the reasons articulated below, both motions are denied.

I. RELEVANT BACKGROUND AND PROCEDURAL POSTURE

### A. The Litigation Generally

Plaintiff Navient Solutions, LLC ("Plaintiff"), a federal loan servicer, originally brought this action in April of 2019. (*See* Dkt. 1.) On December 13, 2019, Plaintiff filed a Second Amended Complaint bringing claims against eighteen defendants pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") and other common-law causes of action. (Dkt. 100.)

In short, Plaintiff alleges that the defendants operated a fraudulent scheme via mail and wire fraud to manufacture federal lawsuits under the Telephone Consumer Protection Act ("TCPA"). Defendants allegedly recruited student-debtors into signing up for a sham "debt-relief" program and told them to stop making loan payments to Plaintiff (despite the detrimental impact on their credit scores), pay the defendants instead, and follow a script to induce telephone calls from Plaintiff that would—and ultimately did—form the basis for claims under the TCPA. The attorney defendants within the scheme would ultimately file federal lawsuits or initiate arbitration proceedings to recover statutory penalties under the TCPA. In other words, Plaintiff alleges that the defendants manufactured lawsuits via a sham consumer-protection scheme to make money and fraudulently get student-debtors "out" of paying back their loans to Plaintiff. Defendants, on the other hand, assert they brought valid claims and represented student-debtor clients to remedy Plaintiff's TCPA violations.

Out of the named defendants, five are relevant here: (1) The Law Offices of Jeffrey Lohman, P.C., (2) Jeffrey Lohman; (3) Jeremy Branch; (4) Alyson Dykes, and (5) Ibrahim Muhtaseb.[1] As the name suggests, The Law Offices of Jeffrey Lohman, P.C. is a law firm. At the times relevant to this litigation, Jeffrey Lohman was the managing attorney at the firm. Defendant Branch is an attorney and a current employee (as far as the Court is aware) of Lohman's law firm. (*See* Dkt. 119 at 1.) Dykes and Muhtaseb are also attorneys and former

---

[1] Throughout this litigation, these five defendants have been referred to collectively as "the Lohman Defendants." As this grouping of defendants no longer shares the same counsel or litigation strategy in terms of discovery disputes, the Court will only use this reference—specifically, the "collective Lohman Defendants"—when discussing past matters and the relevant procedural posture. For the sake of clarity and concision going forward, the Court will refer to The Law Offices of Jeffrey Lohman, P.C. and Jeffrey Lohman as "Lohman," and the remaining individual defendants—Jeremy Branch, Alyson Dykes, and Ibrahim Muhtaseb—by their individual last names.

employees of the law firm. (*See id.* at 2.) These attorney-defendants allegedly worked on or supervised the underlying TCPA matters giving rise to this litigation. (Dkt. 100 ¶¶ 13-16.)

Originally, the law firm of Woods, Smith, Henning & Berman LLP ("WSHB") represented these five defendants. Upon deciding there could be a conflict of interest between the law firm, Jeffrey Lohman, and the firm's other attorney-employees (Branch, Dykes, and Muhtaseb), the five Lohman Defendants decided to obtain separate counsel "on substantive matters." (Dkt. 166 at 7.) However, "for purposes of economic efficiency," WSHB would continue to represent the collective Lohman Defendants on discovery matters. (*Id.*) The parties apparently entered a "joint defense agreement" to this effect. (*Id.* at 8.) Accordingly, on November 21, 2019, Lohman's new counsel on substantive matters—Thomas F. Urban and Jeffrey Ernest Grell—entered a notice of appearance and *pro hac vice* motion, respectively. (Dkts. 72-73.) The Court granted Mr. Grell's *pro hac vice* motion and WSHB's motion to withdraw as counsel for Lohman. (Dkts. 74-76.)

### B. Briefing, Arguments, and Procedural Background Regarding Plaintiff's Motion to Compel

*Plaintiff's Motion.* On December 13, 2019, Plaintiff filed a motion pursuant to Federal Rule of Civil Procedure 37, requesting that the Court enter an order "compelling production of all documents withheld by Defendants The Law Offices of Jeffrey Lohman, P.C., Jeffrey Lohman, Alyson Dykes, and Ibrahim Muhtaseb on the basis of the attorney-client privilege" ("AC privilege").[2] (Dkt. 90.) In discovery, Plaintiff requested that the collective Lohman Defendants produce communications and other documents that they exchanged with existing,

---

[2] Despite Plaintiff not explicitly including Jeremy Branch in this sentence, the Court understands that it also intended to include Branch in this motion as a "Lohman Defendant." Furthermore, Defendant Branch opposed the motion. (*See* Dkt. 106.)

former, or potential student-debtor clients broadly regarding:

- the consequences of defaulting on student loans serviced by Plaintiff;
- resolutions of debt-relief matters or TCPA claims; and
- the student-debtor client's satisfaction with the resolution of debt-relief matters or TCPA claims.

(*See* Dkt. 92 at 6.)

Lohman objected to these various discovery requests by stating: "These documents are protected by the attorney-client privilege and will not be produced."[3] (*See, e.g.*, Dkt. 93-1 at 106-08 (Exhibit H, The Law Offices of Jeffrey Lohman, P.C.'s Responses to Plaintiff's Requests for Production of Documents); Dkt. 93-1 at 122-24 (Exhibit I, Jeffrey Lohman's Responses to Plaintiff's Requests for Production of Documents).) Of relevance here, Plaintiff argued that the documents were discoverable and that the Court should compel their production under the crime-fraud exception to the AC privilege.

*Defendants' Opposition*. On December 18, 2019, Branch, Dykes, and Muhtaseb filed an opposition to Plaintiff's motion to compel. (Dkt. 106.) Apparently, because the collective Lohman Defendants believed this to be a discovery motion, WSHB—counsel for Branch, Dykes, and Muhtaseb on all matters, and then-counsel for Lohman on *only* discovery matters—was primarily responsible for opposing Plaintiff's motion to compel. The opposition brief included the following footnote: "Defendants Jeffrey Lohman and The Law Offices of Jeffrey Lohman join in this opposition. All defendants are collectively referred [to] as the 'Lohman Defendants.'" (*Id.* at 2 n.1.)

---

[3] As Plaintiff points out, Lohman never objected to these various discovery requests on the basis of the work-product doctrine. Accordingly, under Local Civil Rule 26(C), Lohman waived any objection on these grounds. Notably, in Lohman's January 6 supplemental brief, when outlining purported "categories of privileged documents," Lohman states that two kinds of documents are protected not only under the AC privilege, but also the work-product doctrine. (Dkt. 120 at 6.) The Court understands these objections to have already been waived.

In responding to Plaintiff's crime-fraud exception argument, the collective Lohman Defendants argued that the crime-fraud exception to the AC privilege could not apply because Plaintiff had not alleged that the firm's *clients* gave information to the attorneys in furtherance of a crime or fraud. They also asserted that Plaintiff had not met its *prima facie* evidentiary burden to establish a crime or fraud. In sum, the collective Lohman Defendants argued that the crime-fraud exception did not apply because (1) the exception was legally inapplicable and (2) Plaintiff did not demonstrate sufficient facts to surpass its evidentiary burden.

*The First Hearing and Order.* After briefing, the parties appeared for a hearing before the undersigned on December 20, 2019. (*See* Dkt. 108.) On the same day, the undersigned entered an order (1) continuing the motion to compel until Friday, January 10, 2020; (2) requiring the parties to submit supplemental briefing by January 6, 2020; (3) ordering the collective Lohman Defendants to produce a finalized privilege log by December 30, 2019; and (4) requiring the collective Lohman Defendants to "submit a copy of the privilege log, a declaration as to why the documents are privileged, and the documents themselves for *in camera* review to the undersigned's chambers by Monday, January 6, 2020." (Dkt. 109.)

*The Collective Lohman Defendants' Conflict.* According to Lohman's latest filing before this Court, on December 27, 2019, "a substantial conflict arose between Lohman and WSHB." (Dkt. 166 at 8.) Purportedly, the collective Lohman Defendants terminated their joint defense agreement and responsibility for handling Lohman's *discovery* issues shifted from WSHB to Lohman's counsel, Mr. Urban and Mr. Grell.

*Subsequent Communications with Counsel and Supplemental Briefing.* In early January, through communications with counsel, the Court was made aware that Lohman's "new" counsel (for discovery matters) planned on producing a substantial number of documents that WSHB had

previously withheld on the basis of the AC privilege. Lohman's counsel indicated they needed time to produce the documents, but that the scope of Plaintiff's motion to compel would be significantly narrowed. After discussions with counsel for Lohman and Plaintiff, the Court postponed the January 10 hearing until January 17 in the interest of narrowing the dispute.

On January 6, pursuant to the Court's order, the parties submitted supplemental briefs updating the Court on the progress of document production and the motion to compel. The parties filed three briefs. (Dkts. 118-20.) First, Plaintiff's supplemental brief largely reiterated the arguments regarding the crime-fraud exception. Plaintiff further argued that because Lohman's privilege log was inadequate and contained documents that were not privileged at all, the Court should immediately order production of all relevant documents.[4] Plaintiff lastly informed the Court that despite producing a privilege log, Lohman had yet to produce most of the promised documents. Second, Lohman's brief—after describing the collective Lohman Defendants' previous discovery production as unacceptable—informed the Court that Lohman was trying to produce documents as quickly as possible. (Dkt. 120.)[5] Lohman's brief also reiterated the above argument that the crime-fraud exception did not apply. Finally, Branch, Dykes, and Muhtaseb's supplemental brief simply stated that as current or former employees of The Law Offices of Jeffrey Lohman, P.C., they "lack[ed] control over the documents" and therefore the Court could not compel them to produce the documents. (Dkt. 119 at 1-2.) Accordingly, Branch, Dykes, and

---

[4] Because the Court is denying the instant motion for reconsideration and therefore (again) granting Plaintiff's motion to compel on the basis of the crime-fraud exception, the Court finds no reason to delve into the details of Lohman's privilege log or render a decision based on these alleged inadequacies.

[5] Regarding this brief, Lohman later stated: "Because [the] supplemental memorandum was essentially a reply memorandum and was intended to focus on the document production efforts, Lohman's new counsel could not present new arguments in its January 6, 2020 memorandum." (Dkt. 166 at 10.)

Muhtaseb argued that the Court should deny Plaintiff's motion to compel as to them.

After filing the supplemental briefs, Lohman apparently produced "over 25,500 pages of documents and over 275 audio files." (Dkt. 166 at 10-11; *see also* Dkt. 153 at 9.)

*The Second Hearing and Order*. On January 17, 2020, the parties appeared for a second hearing on Plaintiff's motion to compel. (*See* Dkt. 125.) After the hearing, the undersigned entered an order granting Plaintiff's motion to compel in its entirety on the basis that the crime-fraud exception applied. (Dkt. 126.) The undersigned ordered Lohman to "produce all responsive documents currently being withheld pursuant to the attorney-client privilege." (*Id.*) Based on counsel's oral request at the hearing, the undersigned stayed Lohman's production of documents "until any objection before Judge Brinkema [was] resolved." (*Id.*)

## C. Lohman's Objection

On January 30, 2020, Lohman filed an objection before Judge Brinkema. (Dkt. 136.) In the objection, Lohman raised arguments before Judge Brinkema that neither Lohman, Branch, Dykes, or Muhtaseb raised in any pleadings before the undersigned. Plaintiff filed a timely response on February 13, 2020. (Dkt. 153.)

Judge Brinkema entered an order on February 18, 2020. (Dkt. 154.) In that order, Judge Brinkema stated:

> In [Lohman's] 34-page Objection, [they] dedicate approximately three pages to their unsuccessful argument that . . . the crime-fraud exception is inapplicable in cases where the attorney, as opposed to the client, is alleged to have committed the crime or fraud. Instead, the Lohman defendants primarily advance two brand new arguments. First, they argue that plaintiff has not made a *prima facie* showing that anyone engaged in or planned a criminal or fraudulent scheme because a RICO conspiracy cannot be predicated on litigation activity. Second, they argue that even if a RICO conspiracy can be predicated on litigation activity, they are nevertheless immune from civil or criminal liability pursuant to the *Noerr-Pennington* doctrine.

(*Id.* at 2 (internal quotation marks and citations omitted).) Judge Brinkema's order noted that "it

seems prudent to have the magistrate judge address the Lohman defendants' new arguments in the first instance." (*Id.* at 3-4.) Therefore, Judge Brinkema remanded the objection to the undersigned for consideration of Lohman's new arguments raised on objection and Lohman's explanation "as to why these new arguments were not raised initially." (*Id.* at 4.) Further, Judge Brinkema's order stated: "The magistrate judge may also consider whether monetary sanctions should be imposed on the Lohman defendants and/or their counsel for causing unnecessary litigation costs." (*Id.*)

### D.  The Motion for Reconsideration

On February 19, 2020, following Judge Brinkema's order, the undersigned issued a third order. (Dkt. 156.) The order directed the parties to file any additional briefing "to supplement the pleadings before Judge Brinkema," and stated that the undersigned would "construe the pleadings filed before Judge Brinkema as a motion for reconsideration."[6] (*Id.*) Plaintiff and Lohman filed supplemental briefs on February 26, 2020. (Dkts. 165-66.)

### E.  Plaintiff's Motion to Strike

The following day, on February 27, WSHB (counsel for Branch, Dykes, and Muhtaseb) filed a letter on the docket (the "Letter") (Dkt. 171). Counsel filed the Letter to address "misstatements" in Lohman's February 26 supplemental brief. The Letter reiterates the timing regarding Lohman's change in counsel, noting that WSHB did not represent Lohman with respect to the objection before Judge Brinkema and any subsequent briefing. WSHB then stated:

> Accordingly, we respectfully request that this Court disregard the misstatements made in [Lohman's February 26 supplemental brief] about this firm's role in discovery and motion practice which is irrelevant to this Court's consideration of

---

[6] Even though Lohman did not raise the new arguments before the undersigned in the initial briefing on Plaintiff's motion to compel, at the direction of Judge Brinkema's Order, the undersigned will consider each argument on the merits.

the Plaintiff's motion. To the extent the statements raised in yesterday's filing are being considered by the Court *against the undersigned*, we would respectfully request the opportunity to provide supplemental briefing regarding the same.

(Dkt. 171 at 1 (emphasis added).)

The following day, Lohman filed a "Motion to Strike Letter Not in Compliance With Local Rules." (Dkt. 175.) Lohman argues that because counsel failed to abide by Local Civil Rule 83.1, the Court should strike the Letter and disregard it.

## II. ANALYSIS

### A. The Crime-Fraud Exception

Lohman first argues that the crime-fraud exception is inapplicable because Plaintiff has failed to demonstrate that the student-debtor clients *or* Lohman were engaged in or planning a criminal or fraudulent scheme. In other words, Lohman argues that the exception cannot apply because Plaintiff (1) did not allege that Lohman's *clients* in the underlying TCPA cases gave information to Lohman for purposes of committing or furthering a crime or fraud; and (2) failed to meet its *prima facie* burden—both legally and factually—demonstrating that *Lohman* committed fraud.

The crime-fraud exception to the AC privilege provides that otherwise privileged communications "made for, or in furtherance of, the purpose of committing a crime or fraud will not be privileged or protected." *Rambus, Inc. v. Infineon Technologies AG*, 222 F.R.D. 280, 287 (E.D. Va. 2004); *see also, e.g., In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 175 n.15 (4th Cir. 2019) (explaining that claims of AC privilege "can sometimes be defeated by the crime-fraud exception," such as when the attorney-client communications are "for the purpose of committing or furthering a crime or fraud" (internal citations omitted)).

For the crime-fraud exception to apply, the moving party must make a *prima facie*

9

showing that the privileged communications fall within the exception. *In re Grand Jury Proceedings #5 Empaneled Jan. 28, 2004*, 401 F.3d 247, 251 (4th Cir. 2005) (citing *Chaudhry v. Gallerizzo*, 174 F.3d 394, 403 (4th Cir. 1999)). Specifically, the moving party must demonstrate that (1) "the client was engaged in or planning a criminal or fraudulent scheme when he sought the advice of counsel to further the scheme"; and (2) the documents "bear a close relationship" to the criminal or fraudulent scheme. *Chaudhry*, 174 F.3d at 403 (citations omitted); *In re Grand Jury Proceedings #5*, 401 F.3d at 251. The Court will consider each element in turn.

1.     Prima Facie *Showing of Engagement in a Criminal or Fraudulent Scheme*

The first element to the crime-fraud exception is satisfied upon a "*prima facie* showing of evidence that, if believed by a trier of fact, would establish the elements of some violation that was ongoing or about to be committed." *In re Grand Jury #5*, 401 F.3d at 251 (citations omitted). Lohman raises several subpoints here.

**i.     The Client's Privilege**

The Court will first address Lohman's argument that the crime-fraud exception cannot apply because Plaintiff never alleged that Lohman's *clients* were involved in a criminal or fraudulent scheme.

The Court is aware that there are relatively few cases discussing the application of the crime-fraud exception when the *attorney* is allegedly committing the crime or fraud, as opposed to the client.[7] The Fourth Circuit has only addressed this issue in the context of the opinion work-product doctrine. *See id.* at 252. In *In re Grand Jury Proceedings #5*, the Fourth Circuit held that the opinion work-product privilege—which typically receives even stronger protection than the AC privilege—is overcome when the attorney is involved in the alleged fraud. *Id.* ("We have

---

[7] For the sake of the legal profession, this is a positive reality.

explicitly held that the crime-fraud exception applies to opinion work product." (citing *In re Doe*, 662 F.2d 1073, 1079 (4th Cir. 1981))).

Other circuits have also addressed this issue. As Plaintiff points out, the Eleventh, Third, and District of Columbia Courts of Appeals have held that when the attorney *alone* is engaged in the criminal or fraudulent conduct (as opposed to the client), the crime-fraud exception overcomes either the AC privilege, work-product privilege, or both. *See Drummond Co. v. Conrad & Scherer, LLP*, 885 F.3d 1324, 1337 (11th Cir. 2018) ("We hold that the . . . illegal or fraudulent conduct by an attorney alone may suffice to overcome attorney work product protection."); *In re Impounded Case (Law Firm)*, 879 F.2d 1211, 1213-14 (3d Cir. 1989) (holding that the *attorney's* crime or fraud overcomes the *client's* AC privilege and the work-product privilege); *Moody v. IRS*, 654 F.2d 795, 800 (D.C. Cir. 1981) ("An attorney should not be able to exploit the [work product] privilege for ends outside of and antithetical to the adversary system any more than a client who attempts to use the privilege to advance criminal or fraudulent ends.").

The Third Circuit's guidance is particularly useful here. In *In re Impounded Case (Law Firm)*, the court considered "the application of the crime-fraud exception to a situation where the attorney-client privilege and the privilege derived from the work product doctrine are asserted when the alleged criminality being investigated is *solely that of [a] law firm*." 879 F.2d at 1213 (emphasis added). In that case, a law firm argued that the crime-fraud exception could not "defeat the *client's* privilege where the pertinent alleged criminality is solely that of the law firm." *Id.* (emphasis added). The Third Circuit explicitly rejected the law firm's argument. *Id.* Even after recognizing that the client solely held the AC privilege, the court stated: "It is not apparent to us what interest is truly served by permitting an attorney to prevent this type of

investigation of his own alleged criminal conduct by asserting an innocent client's privilege with respect to documents tending to show criminal activity by the lawyer." *Id.* In other words, the Third Circuit did not allow a law firm to use its client's AC privilege as a shield to hide its allegedly criminal conduct. *See id.*

As a matter of law and policy, this Court agrees. It is well accepted that the AC privilege is not absolute and that a party's claim of privilege "is to be strictly confined within the narrowest possible limits consistent with the logic of its principle." *Solis v. Food Emp'rs Labor Relations Ass'n*, 644 F.3d 221, 226 (4th Cir. 2001). Here, allowing the clients' AC privilege to shield information about the attorney-defendants' conduct would expand the privilege beyond its logical principle. Despite the client possessing the privilege, an attorney cannot hide behind his client's assertion of the AC privilege when there is evidence showing that the attorney was involved in a criminal or fraudulent scheme. For these reasons, even Lohman's clients' assertion of the AC privilege must fall.

In any event, there is also some evidence that Lohman's clients were engaged in the fraudulent scheme, or at the very least, were aware of it and knowingly participated in it. For example, in an email, one client wrote to Lohman's co-defendant regarding concerns for her co-signer on the loans. (*See* Dkt. 153-1 at 18-21 (Ex. B).) Relevant excerpts from conversation are as follows:

- Student-debtor client: If my lenders are not able to release my grandmother/co-signer, does that mean we are at a dead end? She banks with Key Bank and my Great Lakes loans are through Key Bank. Per our conversation last week, [I] let you know about this because she was worried Key Bank could come after her because she banks with them, so you told me to keep paying all my loans (Great [L]akes, [D]iscover[,] and [N]avient) until we find out if they will release her. If they do not release her, where do we go from there? *If [I] am supposed to not pay the loans in order for the lenders to keep calling me and the co-signer to going against the cease and desist, won't that jeopardize her bank account?*

- Co-Defendant (Champion Marketing Solutions, LLC): "If we cannot get you[r] co-signer removed then we will need to have a conversation about what we should do with the accounts. My thoughts so far is that if we cannot remove her from the KeyBank Loan we will un-enroll that account from the program and you will need to continue to make payments on that one in particular.

- Student-debtor client: That all sounds good. How often are you able to get co-signers removed? I know it is all case by case, just curious if it is common they will release them or not.

- Co-Defendant (Champion Marketing Solutions, LLC): *Remember this is an experiment you are the 3rd client I have spoken to about this so far and the first to submit all of the documents back. So you will be the first to see if this works.*

- Student-Debtor Client: If they do not release her will it still be [possible] to have her be put on the do not call list, and does that guarantee that they will leave her alone? Where do the cease and desist forms come into play if they do not release her from the loans, *are those basically to tell the lender to stop calling her and every time they call her after receiving those forms they rack up their own bill of fines?* (trying to wrap my brain around the process).

- Co-Defendant (Champion Marketing Solutions, LLC): If they do not release her yes we can have her or you to complete the Do-not-call letter and send it in to them. The C&D when sent out those advise the servicer to stop contacting you and your co-signer but it is up to them as to whether or not they will adhere or violate the C&D.

*Id.* (emphasis added).) Plaintiff also submitted an email demonstrating that another student-debtor client declined to participate in the scheme upon realizing what it was. The email states:

I would like to immediately terminate my contract with you . . . . The reason for termination is the conflicting information that I have been given with discussing this case. In my first conversations, *I was informed that there would be no damage to my credit, however, in subsequent conversations, I was told that there would most likely be credit damage, but over time it would "resolve itself." This is not satisfactory to me, nor is it the information that I was verbally given when I signed your contract.* Knowing that there is a high probability of credit damage makes it impossible to continue because I have co-signers to protect. I have been discussing this situation with your representative and made it clear that no letter should be sent on my behalf without my approval. After discussing with my co-signers, it is apparent that I should not continue with this. As I have not given approval to any action from your office, please refund my entire initial payment and do not proceed with any work on my account.

(Dkt. 94-2 at 1-9 (Ex. U).)

13

While Plaintiff "believes that most borrowers were innocently duped into the scheme, some of them undoubtedly knew of the [s]cheme." (Dkt. 118 at 2.) While not necessary for the Court's decision, upon review of these submissions, the Court is satisfied that at least some clients knowingly participated in the fraudulent scheme and sought the attorney-defendants' advice in furtherance of the scheme.

### ii.    *Prima Facie* Burden

Here, Lohman argues that Plaintiff cannot establish that *either* Lohman or the firm's student-debtor clients were engaged in or planning a criminal or fraudulent scheme. To satisfy this standard, the moving party need not prove the crime or fraud by a preponderance of the evidence or beyond a reasonable doubt; rather, the proof "must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." *In re Grand Jury Proceedings #5*, 401 F.3d at 251 (internal quotation marks omitted) (quoting *Duplan Corp. v. Deering Milliken, Inc.*, 540 F.2d 1215, 1220 (4th Cir. 1976)). In other words, if left unrebutted, *prima facie* evidence establishes the elements of the crime or fraud at issue "if believed by the trier of fact." *United States v. Ruhbayan*, 201 F. Supp. 2d 682, 686 (E.D. Va. 2002). Lohman's arguments encompass both the factual and legal insufficiency of Plaintiff's *prima facie* showing.

*Factual Sufficiency*. The Court is satisfied that Plaintiff has produced sufficient evidence to surpass its *prima facie* burden showing that Lohman committed mail/wire fraud in perpetuation of the alleged scheme. *See* 18 U.S.C. §§ 1341, 1343. Mail and wire fraud are both considered "racketeering activity" and are therefore predicate acts to support a RICO claim. 18 U.S.C. § 1961(1). The mail fraud and wire fraud statutes use the same relevant language, so courts analyze the elements in the same way. *United States v. Binday*, 804 F.3d 558, 569 (2d Cir.

2015) (citation omitted). The "essential elements" of both offenses are (1) the defendant engaged in a scheme to defraud, (2) the object of the scheme was money or property, and (3) the defendant used the mails or wires to further the scheme. *Id.*; *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012) (citation omitted); *see also* 18 U.S.C. §§ 1341, 1343.

Plaintiff outlined defendants' scheme in depth in its Second Amended Complaint and its motion to compel, and further submitted copious exhibits in support of its arguments. Upon review of the evidence and documentation Plaintiff submitted with its motion to compel, Plaintiff surpasses the standard outlined above. *See In re Grand Jury Proceeding #5*, 401 F.3d at 251 ("In satisfying this prima facie standard, proof either by a preponderance or beyond a reasonable doubt of the crime or fraud is not required.") The Court will briefly overview the alleged scheme with an emphasis on Lohman's involvement, which is particularly relevant here.

Plaintiff's Amended Complaint alleges multiple counts against Lohman for violations of RICO and related state-law claims for fraud and tortious interference with a contract. Plaintiff alleges that Lohman and the other defendants operated as a scheme to defraud Plaintiff out of millions of dollars it was owed in outstanding student debt. (Dkt. 100 ¶ 2.) The defendants allegedly executed this scheme through a network of referrals and fee-sharing agreements. (*Id.*) Some defendants, operating as so-called "debt-relief counseling" companies, called or sent mailings to student-debtors regarding their student loans. (*Id.* ¶ 4.) These mailings and calls offered services including consolidation, reducing the amount of the loan, or eliminating the loan altogether. (*Id.*) Apparently, many borrowers believed these services to be affiliated with the federal government. (*Id.*) When student-debtors responded to these calls or mailings and agreed to utilize the services, "he or she was charged exorbitant sums to consolidate or lower his or her federal student loan payments—something that the consumer could have accomplished for free

under existing federal student loan programs." (*Id.*) When loan consolidation was unavailable, the purported debt-counseling company would refer borrowers to law firms, including The Law Offices of Jeffrey Lohman, P.C., among others. (*Id.* ¶¶ 4, 6.)

Once referred to these law firms, borrowers were instructed to stop paying their student loans. (*Id.* ¶ 5.) When Plaintiff called the student-debtors regarding their delinquent loans, the attorney-defendants gave some clients a "script" to revoke their consent to be contacted by telephone for purposes of the TCPA. (*Id.* ¶ 6.) According to Plaintiff, "the script was designed to—and did—generate calls prohibited under the TCPA." (Dkt. 91 at 11; Dkt. 100 ¶ 6.) For other clients, the attorney-defendants mailed letters to Plaintiff on their clients' behalf, requesting any communications to be directed to them. (Dkt. 100 ¶ 7.) Either way, when student-debtors had received a "sufficient" number of calls from Plaintiff regarding their student-loan delinquency, the attorney-defendants would initiate legal actions in federal court or arbitration proceedings to attempt to recover any statutory penalties under the TCPA. (*Id.* ¶ 8.) This scheme resulted in substantial monetary losses to Plaintiff because customers stopped paying their student loans, and Plaintiff was required to defend and settle numerous TCPA lawsuits, cancel hundreds of thousands of dollars in student loan debt, and pay the attorneys' fees and costs incurred in defending these underlying TCPA lawsuits. (*Id.* ¶ 9.)

Plaintiff's submissions demonstrate that the collective Lohman Defendants were engaged in the scheme. *See, e.g.*, Dkt. 94-2 at 10-11 (Exhibit V, email from David Mize to Jeremy Branch containing the "script" to "revoke" consent); Dkt. 93-1 at 259-60 (Exhibit Q, email from David Mize to Jeffrey Lohman discussing Lohman's "of counsel" designation, fee sharing, and "work[ing] the [Navient] files in preparation for litigation"); Dkt. 94-2 at 49-61 (Exhibit Z, deposition from a student-debtor client demonstrating that the collective Lohman Defendants

initiated a lawsuit without the knowledge or consent of their client); Dkt. 153-1 at 65-66 (Exhibit N, email from Jeffrey Lohman telling a borrower; "Remember, every call is a violation and worth money to you" while discussing revocation of consent and recording any calls with Plaintiff (emphasis in original)). Plaintiff also alleges that Lohman carried out their part of the scheme by using phone calls and emails with clients. For example, the attorneys would communicate with the student-debtor clients via telephone when instructing them to "revoke" consent to be contacted by telephone. *See, e.g.*, Dkt 153-1 at 47-60 (Exhibit L, deposition of a client stating that Lohman's law firm told him on a call to contact Plaintiff and revoke consent).

Upon review of the record and Plaintiff's submissions, Plaintiff has surpassed its *prima facie* burden demonstrating that (1) Lohman was involved in a scheme to defraud; (2) the purpose was to obtain money or property from the student-debtor clients; and (3) Lohman used the mails and/or wires in pursuit of the scheme to defraud.[8]

*Legal Sufficiency*. As an initial matter, in the briefing before Judge Brinkema, Lohman stated: "For purposes of this objection, Lohman does not contest the factual assertions made in [Plaintiff's] complaint." (Dkt. 136 at 16 n.5.) Indeed, Lohman never gave any substantive response to the evidentiary record submitted by Plaintiff in the extensive briefing on the motion to compel. The Court understands Lohman's argument to mean he is contesting the legal sufficiency of Plaintiff's allegations that Lohman, in concert with the other defendants, committed mail/wire fraud in perpetuation of the scheme.

In this matter, Lohman, Branch, Dykes, and Muhtaseb filed an amended motion to dismiss and/or transfer venue (Dkt. 27). In that Motion, Lohman moved to dismiss the RICO

---

[8] Further, as discussed *infra*, the Court also finds there is sufficient *prima facie* evidence showing that at least some of the student-debtor clients knew about and willingly participated in the defendants' fraudulent scheme.

counts under 18 U.S.C. § 1962(c) (the substantive provision of RICO) and (d) (RICO conspiracy) under Federal Rule of Civil Procedure 12(b)(6). Specifically, Lohman argued that Plaintiff failed to sufficiently allege (1) the conducting of an "enterprise" for purposes of RICO and (2) a "pattern of racketeering activity" based on mail and wire fraud. (*See* Dkt. 28 at 19-22.) As to the latter argument which is relevant here, Plaintiff stated in its opposition: "NSL has alleged adequately that the Defendants violated RICO by committing multiple predicate acts of mail fraud, wire fraud, and witness tampering. Among other things, NSL provided multiple, detail-filled examples concerning the nature of the [defendants'] fraudulent statements and omissions." (Dkt. 31 at 24 (internal citations omitted).)

On August 23, 2019, after holding a hearing on the matter, Judge Brinkema denied without prejudice the collective Lohman Defendants' motion to dismiss. (Dkt. 38.) While Judge Brinkema's order only cites her reasons from the bench, in denying the motion, the district court held that Plaintiff plausibly alleged a pattern of racketeering activity based on mail and wire fraud. Accordingly, the RICO claims are still part of Plaintiff's case against Lohman, and discovery is appropriate as to these claims. The undersigned therefore finds that Lohman is essentially rearguing the legal sufficiency of Plaintiff's claims and asking this Court to revisit a previous ruling. The Court declines to do so.

Lohman also raises two additional defenses arguing that Plaintiff cannot, as a matter of law, surpass its *prima facie* burden under the crime-fraud exception. First, Lohman argues that a RICO claim cannot be predicated on litigation activity. Second, Lohman argues that the *Noerr-Pennington* doctrine immunizes them from civil or criminal liability based on their petitioning conduct under the First Amendment.[9]

---

[9] The *Noerr-Pennington* doctrine generally grants First Amendment immunity from civil or

Essentially, Lohman argues that Plaintiff cannot meet its *prima facie* burden of a demonstrating a crime or fraud because the underlying actions are protected litigation activity. Lohman argues that their conduct in the allegedly fraudulent scheme consisted of only "lawful and ethical" actions. (Dkt. 136 at 17.) Lohman identifies actions—such as soliciting clients, accepting client referrals, and filing lawsuits—that, in isolation, are ethical. Lohman therefore argues that the Court cannot legally find any criminal or fraudulent scheme for purposes of the crime-fraud exception because the defendants' actions consisted of solely ethical litigation strategies. As the argument goes, because Lohman and the other co-defendants only took part in ethical litigation, their activities cannot constitute the predicate acts of mail and wire fraud for purposes of RICO and must constitute protected First Amendment activity under the *Noerr-Pennington* doctrine. The Court will address these arguments simultaneously because they fail for the same reason.

These arguments falter because Plaintiff has alleged that the defendants conducted a *scheme*—that is, a conglomeration of actions—that encompassed committing mail/wire fraud to further the scheme. Specifically, Plaintiff alleges that defendants' scheme "depended upon a series of false and misleading statements to consumers, courts and arbitrators, and NSL." (Dkt. 153 at 18.) Accordingly, "[s]ome of those false statements involve[d] litigation activities, and some d[id] not (including false statements during the recruitment of borrowers and in demands upon NSL when no client authority existed)." (*Id.*)

The scheme as alleged by Plaintiff started long before any attorney-defendant initiated

---

criminal liability to parties who engage in petitioning activity. *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 310 (4th Cir. 2003); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965); *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961). However, the doctrine does not protect sham litigation activity. *See IGEN Int'l*, 335 F.3d at 312.

litigation activity for any given client. The scheme started by recruiting student-debtors and convincing them to pay for sham "debt-relief" services before any borrower was referred to the attorney-defendants (such as Lohman) within the scheme. The attorney-defendants were ultimately part and parcel in this scheme to trick student debtors, take their money (that otherwise should have been used to pay off student loans), and advise clients to undertake affirmative actions to manufacture lawsuits in hopes that Plaintiff would have to cancel their student-loan debt. Even though Lohman accepted client referrals, gave legal advice, and litigated the underlying TCPA claims, they did so in furtherance of this overarching fraudulent scheme.[10] Therefore, Lohman's "protected activity" arguments fail for purposes of the crime-fraud exception because the scheme, taken as a whole, encompassed far more than just litigation activity.[11]

---

[10] Regardless, contrary to Lohman's assertion, litigation activity can be the basis for a RICO claim. *See, e.g., Crowe v. Smith*, 848 F. Supp. 1258, 1264 (W.D. La. 1994) (holding that an attorney and alleged principal in a fraudulent scheme that involved filing lawsuits could be found liable under RICO); *see also CSX Transp., Inc. v. Peirce*, 974 F. Supp. 2d 927 (N.D. W. Va. 2013) (upholding RICO verdict based on the predicate crime of mail fraud against law firm that allegedly inundated a railroad and other entities with lawsuits).

[11] For these reasons as well, Lohman's arguments about the underlying TCPA lawsuits not being "sham" litigation under the *Noerr-Pennington* doctrine are inapposite. Because this Court finds that the defendants' work within the overall scheme is sufficient to apply the crime-fraud exception, whether any *one* given TCPA litigation was a "sham" does not matter for purposes of Plaintiff's motion to compel.

The Court is also aware that Lohman has arguably asserted the *Noerr-Pennington* doctrine as an affirmative defense. (*See* Dkt. 113 at 25 ("Plaintiff's claims are barred in whole or in part because the conduct of the Lohman Defendants that Plaintiff complains of in the Second Amended Complaint was lawful and with legal justification.").) The Court expressly declines to rule on this potentially dispositive defense for purposes of Plaintiff's motion to compel and the crime-fraud exception.

## 2. *Close Relationship*

As mentioned above, the second element of the crime-fraud exception requires a showing that the documents "bear a close relationship" to the criminal or fraudulent activity. *Chaudhry*, 174 F.3d at 403; *In re Grand Jury Proceedings #5*, 401 F.3d at 251. This element is satisfied "with a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity." *In re Grand Jury Proceeding #5*, 401 F.3d at 251.

Here, there can be no doubt the documents Plaintiff seeks are closely related to Lohman's alleged criminal or fraudulent activity. As outlined in detail above, the crux of the alleged scheme is that the defendants defrauded consumers and manufactured lawsuits. Plaintiff therefore seeks communications and other documents from the underlying TCPA lawsuits that Lohman exchanged with past, present, or potential clients. Namely, Plaintiff seeks documents containing Lohman's discussions with clients regarding the (1) consequences of defaulting on student loans, (2) resolution of debt-relief matters or TCPA claims, and (3) client satisfaction with the resolution of debt-relief matters or TCPA claims.

These communications constitute the core of Lohman's alleged fraudulent and criminal conduct. In other words, the communications encompass Lohman's process of manufacturing lawsuits by communicating via mails and wires, convincing student-debtors to stop their payments in contravention of their promissory notes, and using the repercussions from delinquency to file a lawsuit or initiate arbitration proceedings. Because these documents would likely contain (among other things) Lohman's directions to the student-debtor clients on how to manufacture these lawsuits, as well as statements regarding outcomes and expectations for TCPA litigation, these documents are the building blocks of the scheme and Plaintiff's case. The Court therefore finds that these documents are "closely related" to the core allegations of the

21

litigation and the criminal and/or fraudulent scheme alleged here.

### 3. *Conclusion*

Ultimately, the Court finds that the crime-fraud exception to the AC privilege applies. Lohman must produce the responsive documents being withheld on the basis of the AC privilege.

### B. Attorneys' Fees and Costs

Federal Rule of Civil Procedure 11(b)(1) states that an attorney, by submitting a pleading to the court, certifies that the pleading "is not being presented . . . [to] needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1). Further, Rule 11 allows a court, on its own initiative, to "order an attorney, law firm, or party to show cause" why their conduct has not violated the Rule. Fed. R. Civ. P. 11(c)(3). Here, Judge Brinkema remanded this matter to the undersigned to "consider whether monetary sanctions should be imposed on the Lohman defendants and/or their counsel for causing unnecessary litigation costs." (Dkt. 154 at 4.) The undersigned further ordered the parties to submit supplemental briefing on this issue. (Dkt. 156.)

Here, the Court finds that Lohman needlessly increased litigation costs. Upon the undersigned's adverse ruling issued on January 17, 2020, Lohman could have filed a motion for reconsideration and raised the new substantive arguments before the undersigned.[12] Instead, Lohman filed an objection, thereby raising new arguments before Judge Brinkema. This objection resulted in wasted judicial resources and increased litigation costs for Plaintiff. Specifically, Judge Brinkema expended time deciding whether (1) to hear Lohman's new

---

[12] The Court is aware of the "regime change" in counsel for Lohman, which apparently complicated the original briefing on the motion to compel before the undersigned. However, by January 17, the "regime change" had already taken place and Lohman's current counsel oversaw discovery matters for Lohman. Accordingly, Lohman's current counsel decided to pursue the objection before Judge Brinkema instead of filing a motion for reconsideration before the undersigned.

arguments on objection or find that Lohman had waived the arguments, and (2) to remand the arguments to the undersigned for decision in the first instance. Judge Brinkema would not have needed to conduct a review of the record or issue an order had Lohman initially filed a motion for reconsideration before the undersigned. Further, Plaintiff had to file an additional brief and research issues that it would not have otherwise needed to. Upon Judge Brinkema's remand, the undersigned issued an order allowing both parties to submit supplemental briefing on the issue of waiver and the assessment of fees and costs. (Dkt. 156.) Both parties filed additional briefs on February 26, 2020. (Dkts. 165-66.) Again, had Lohman initially filed a motion for reconsideration before the undersigned, Plaintiff would never have needed to submit this additional brief. In any event, the arguments in Lohman's objection—which the undersigned has construed as a motion to reconsider—were ultimately meritless and further wasted judicial resources.

Accordingly, because Lohman wasted judicial resources and needlessly increased Plaintiff's litigations costs, it is appropriate to award the attorneys' fees and costs Plaintiff incurred in preparing and filing its (1) Response to Defendants' Objection to the Magistrate Judge's Order of January 17, 2020 (Dkt. 153) and (2) February 26 supplemental brief (Dkt. 165). Further, as Rule 11 allows a court to sanction an "attorney, law firm, or party," the Court assesses the attorneys' fees and costs jointly against The Law Offices of Jeffrey Lohman, P.C., Jeffrey Lohman, and their counsel, Thomas Francis Urban and Jeffrey Ernest Grell. Accordingly, Plaintiff shall submit the attorneys' fees and costs it incurred in preparing and filing the February 26 supplemental brief within ten (10) days of the date of this Memorandum Opinion and Order.

### C.    Lohman's Motion to Strike

Lastly, the Court will turn to Lohman's motion to strike. As explained above, WSHB filed a Letter on February 27, 2020, requesting that the Court disregard the "misstatements" Lohman made in its February 26 supplemental brief about WSHB. (Dkt. 171.) Further, WSHB requested an opportunity to provide briefing "[t]o the extent the statements . . . are being considered by the Court against the undersigned." (*Id.*) The next day, Lohman filed a motion to strike the Letter, arguing that it was not in compliance with Local Civil Rule 83.1 (Dkt. 175).

As discussed above, the Court does not find it appropriate to sanction WSHB or its clients (Branch, Dykes, and Muhtaseb) for any briefing—or lack thereof—before this Court. Accordingly, the Court did not consider any statements in Lohman's February 26 supplemental brief against WSHB. Without reaching the merits of Lohman's motion, the Court finds WSHB's letter and Lohman's subsequent motion unnecessary. It is therefore appropriate to deny the motion to strike.

III. Order

For the reasons outlined above, it is hereby **ORDERED** as follows:

(1)   The Law Offices of Jeffrey Lohman, P.C. and Jeffrey Lohman's Motion for Reconsideration (Dkts. 136, 166) is **DENIED**. As previously ordered by this Court, Plaintiff's Motion to Compel (Dkt. 90) is **GRANTED**. The Law Offices of Jeffrey Lohman, P.C. and Jeffrey Lohman shall produce all responsive documents withheld on the basis of the attorney-client privilege.

(2)   Plaintiff shall submit to the Court the reasonable attorneys' fees and costs it incurred in preparing and filing its (1) Response to Defendants' Objection to the Magistrate Judge's Order of January 17, 2020 (Dkt. 153) and (2) February 26 supplemental brief (Dkt. 165) within ten (10) days of the date of this Order. Upon further order of this Court, The Law Offices of Jeffrey Lohman, P.C., Jeffrey Lohman, Thomas Francis Urban and Jeffrey Ernest Grell are jointly and severally liable for Plaintiff's reasonable attorneys' fees and costs.

(3)   The Law Offices of Jeffrey Lohman, P.C. and Jeffrey Lohman's Motion to Strike Letter Not in Compliance with Local Rules (Dkt. 175) is **DENIED**.

/s/
Theresa Carroll Buchanan
United States Magistrate Judge

THERESA CARROLL BUCHANAN
UNITED STATES MAGISTRATE JUDGE

March 11, 2020
Alexandria, Virginia

25