IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NAVIENT SOLUTIONS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 1:19-cv-461 (LMB/TCB) |
| ) | |
| THE LAW OFFICES OF JEFFREY LOHMAN, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM OPINION

Before the Court is defendants The Law Offices of Jeffrey Lohman's and Jeffrey Lohman's (collectively, "LOJL") Objection to the Magistrate Judge's Order Dated March 11, 2020 ("Objection").[1] In that Order, the magistrate judge denied LOJL's Motion for Reconsideration and imposed sanctions jointly on LOJL and its counsel.[2] For the following reasons, LOJL's Objection will be overruled in part and sustained in part.

I. BACKGROUND

A. **Plaintiff's Complaint**[3]

In this civil action, plaintiff Navient Solutions, LLC ("plaintiff" or "Navient") generally alleges that the defendants, who are largely debt counseling companies and law firms, as well as various individuals affiliated with them, conspired together to defraud plaintiff out of millions of dollars in outstanding student loan debt in part by manufacturing federal lawsuits and arbitration

---

[1] LOJL's Objection is joined only by defendant Jeremy Branch.

[2] The magistrate judge also denied LOJL's Motion to Strike.

[3] The allegations in this section are drawn from plaintiff's Second Amended Complaint. [See Dkt. 100].

claims against plaintiff for purported violations of the Telephone Consumer Protection Act ("TCPA"). In short, the alleged scheme operated as follows. The debt-counseling companies would advertise debt-relief programs to student loan debtors, offering to consolidate, reduce, or eliminate their student loans. When the student loan debtors inquired about these debt-relief programs, they would be persuaded to sign a letter of engagement with the law firms, such as LOJL. After the student loan debtors had signed on as clients of the law firms, they would be instructed to stop submitting their loan payments to plaintiff and to start submitting payments to a different entity. Although the student loan debtors often believed that these payments were being directed towards their student loans, the payments would in fact be split between the debt-counseling companies, the law firms, and others involved in the scheme.

The student loan debtors' failure to submit their loan payments to plaintiff would cause them to default on their loans. In accordance with its debt collection practices, these defaults would trigger calls from plaintiff to the student loans debtors about their arrearages. Around the same time, the law firms would instruct the student loan debtors to call plaintiff, using a script provided by the law firms, to revoke their consent to receive calls from plaintiff about their loans. The law firms would then instruct the student loan debtors not to answer any calls from plaintiff, and instead to tally the number of calls they received. The law firms operated under the belief that every one of these calls was a TCPA violation because it was made via an automated telephone dialing system, the use of which the TCPA prohibits in certain circumstances, including when the recipient has revoked his or her consent to receive such calls.

Eventually, the law firms would determine that plaintiff had made a sufficient number of calls, which was often enough calls that the statutory damages available under the TCPA would exceed each student loan debtor's outstanding debt. The law firms would then initiate TCPA

2

actions against plaintiff in the form of federal lawsuits and arbitration claims. At times, the student loan debtors, on whose behalf the law firms were purportedly litigating, had no knowledge of and did not consent to, the actions being brought. These actions caused plaintiff to expend significant litigation costs, enter into substantial settlement agreements, and otherwise forego student loan payments to which it was entitled. These actions also did nothing to resolve the significant and lasting damage to the student loan debtors' credit caused by their having defaulted, often unknowingly, on their student loans.

## B. The Motions at Issue

On December 13, 2019, plaintiff filed a Motion to Compel seeking the production of "all documents withheld by [LOJL] on the basis of the attorney-client privilege," including documents withheld by LOJL's former and current employees, which encompassed defendants Jeremy Branch, Alyson Dykes, and Ibrahim Muhtaseb. [See Dkt. 90]. Specifically, plaintiff narrowed its request to defendants' communications with the student loan debtors who had been referred to them as clients. [See Dkt. 91]. Plaintiff argued that the communications were discoverable under the crime-fraud exception to the attorney-client privilege. Id. In response, the defendants argued that the crime-fraud exception was inapplicable where only the attorney had purportedly committed a crime or fraud. [See Dkt. 108].

The briefing of the Motion to Compel overlapped with a change of counsel for some of these defendants. [See Dkt. 166]. Originally, the law firm of Woods, Smith, Henning & Berman LLP ("WHSB") represented both LOJL and its former and current employees; however, sometime before November 21, 2019, the defendants decided that potential conflicts of interest warranted separate counsel on substantive matters. Id. Accordingly, on November 21, 2019, Thomas F. Urban II and Jeffrey E. Grell (collectively, "LOJL's new counsel") filed a notice of

appearance and motion to appear <u>pro hac vice</u>, respectively, as counsel for LOJL, and on November 26, 2019, WHSB filed a motion to withdraw as counsel for LOJL. [See Dkt. 72–73, 75]. Both motions were granted. [See Dkt. 74, 76]. LOJL's new counsel and WHSB then entered into a joint defense agreement confirming that WHSB would continue to handle all of the defendants' discovery-related matters. [See Dkt. 166].

On December 27, 2019, a substantial, actual conflict arose between LOJL and WHSB. <u>Id.</u> As a result of this conflict, the joint defense agreement between LOJL's new counsel and WHSB was terminated and responsibility for handling LOJL's discovery-related matters shifted to LOJL's new counsel. <u>Id.</u> From that date onward, it appears that LOJL's new counsel worked closely with plaintiff's counsel and the magistrate judge to narrow the issues presented by plaintiff's Motion to Compel. <u>Id.</u> For example, whereas approximately 300 pages of documents were produced by WHSB in the first seven months of this litigation, Lohman's new counsel produced approximately 25,000 pages of documents within two weeks of taking over LOJL's discovery-related matters. <u>Id.</u> This production was due in part to LOJL's new counsel having obtained attorney-client privilege waivers from some of the student loan debtors who had been referred to LOJL. <u>Id.</u> Additionally, on January 6, 2020, LOJL's new counsel, as opposed to WHSB, filed LOJL's supplemental brief in opposition to plaintiff's Motion to Compel, in which LOJL continued to argue that the crime-fraud exception was inapplicable where only the attorney had purportedly committed a crime or fraud. [See Dkt. 120]. On January 17, 2020, the magistrate judge granted the Motion to Compel, and ordered the defendants to "produce all responsive documents currently being withheld pursuant to the attorney-client privilege." [See Dkt. 126].

On January 30, 2020, LOJL filed an objection to that decision. [See Dkt. 136]. In that objection, LOJL raised two arguments neither of which had been raised before the magistrate judge: (1) that plaintiff had not made the requisite prima facie showing that LOJL had committed a crime or fraud; and (2) that LOJL was immune from liability under the Noerr-Pennington doctrine. Id. Both of these new arguments centered on LOJL's assertion that the only purportedly criminal or fraudulent conduct in which they had engaged was litigation activity, such as advising clients and filing federal lawsuits. Id. In its objection, LOJL did not inform the Court of the change of counsel that had occurred during the briefing on the Motion to Compel. See id.

On February 18, 2020, the Court remanded LOJL's objection both "to have the magistrate judge address [LOJL's] new arguments in the first instance" and to consider LOJL's "explanation as to why these new arguments were not raised initially." [See Dkt. 154]. The Court explained:

> A magistrate's decision should not be disturbed on the basis of arguments not presented to him or her. The purpose of the Magistrates Act is to allow the magistrates to assume some of the burden imposed on the district courts and to relieve the courts of unnecessary work. Allowing parties to raise new issues or arguments at any point in the life of the case would frustrate this purpose and result in a needless complication of litigation. Instead, parties should fully plead their claims, and fully advance their arguments, at all stages of litigation, unless they are prepared to waive them. Thus, the court is not obligated to consider new arguments raised by parties for the first time in objections to the magistrate's order.

Id. (quotations, citations, and alterations omitted). The Court further explained that, on remand, "[t]he magistrate judge may also consider whether monetary sanctions should be imposed on [LOJL] and/or [its] counsel for causing unnecessary litigation costs." Id.

On February 19, 2020, the magistrate judge gave plaintiff and LOJL one week to file a second round of supplemental briefing, explaining that LOJL's objection would be construed as a Motion for Reconsideration and that, in accordance with the remand order, the consideration of

5

sanctions against LOJL and its counsel had been authorized. [See Dkt. 156]. Both parties filed supplemental briefing addressing LOJL's new arguments. As relevant here, plaintiff also argued that "sanctions [were] warranted" due to LOJL's "belated assertion" of arguments which it "had months to raise." [See Dkt. 165]. LOJL responded that neither it nor its counsel "should be sanctioned for any argument made in [its] objection" because both had worked diligently to avoid unnecessary litigation costs. [See Dkt. 166].[4]

On March 11, 2020, the magistrate judge issued the Memorandum Opinion and Order to which LOJL now objects. The magistrate judge first denied LOJL's Motion for Reconsideration, and once again ordered that LOJL "produce all responsive documents withheld on the basis of the attorney-client privilege." [See Dkt. 187]. In doing so, the magistrate judge rejected both of LOJL's new arguments by holding that plaintiff had made the requisite prima facie showing that LOJL had committed a crime or fraud and that LOJL's invocation of the Noerr-Pennington doctrine at this stage of the litigation was premature. Id. The magistrate judge next imposed sanctions jointly on LOJL and its new counsel, Thomas F. Urban II and Jeffrey E. Grell, on the ground that they "needlessly increased litigation costs." Id. Sanctions were imposed in the amount of plaintiff's attorneys' fees and costs incurred in preparing its response to LOJL's objection and its second supplemental brief, which plaintiff subsequently asserted, in an

---

[4] On February 27, 2020, following the second round of supplemental briefing, WHSB submitted a letter which purported to address "misstatements" contained in LOJL's second supplemental brief, but merely confirmed that WHSB "had no role" in the filing of LOJL's objection. [See Dkt. 171]. WHSB stated that "[t]o the extent [LOJL's supplemental brief] is being considered by the Court against [WHSB], [WHSB] would respectfully request the opportunity to provide supplemental briefing regarding the same." Id. The next day, LOJL filed a Motion to Strike WHSB's letter as noncompliant with Eastern District of Virginia Local Rule 83.1(D)(3) because it was not signed by an attorney licensed to practice in this court, but rather was signed only by attorneys admitted pro hac vice. [See Dkt. 175].

6

Application for Attorneys' Fees, totaled $19,650. [See Dkt. 187, 192].[5] On March 25, 2020, LOJL filed its Objection to the magistrate judge's Order, which is now before the Court. [See Dkt. 197].

## II. DISCUSSION

### A. Standard of Review

"Upon a timely objection to a magistrate judge's non-dispositive ruling," a district court must "modify or set aside any part of the [ruling] that is clearly erroneous or contrary to law." Harrison v. Shanahan, 2019 WL 2216474, at *4 (E.D. Va. May 4, 2019). "The deferential clear-error standard provides that factual portions of the magistrate's ruling" may only be modified or set aside where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Id. Legal portions of the magistrate's ruling, "on the other hand, are reviewed under the contrary-to-law standard, which is essentially synonymous with de novo review." Id. "The court is entitled to affirm on any ground appearing in the record, including theories not relied upon or rejected by the magistrate judge." Id.

### B. Analysis

In its Objection, LOJL challenges both the denial of its Motion for Reconsideration and the imposition of sanctions against it and its counsel.[6] Each will be addressed in turn. Although LOJL's arguments regarding the former are without merit, its arguments regarding the latter are meritorious.

---

[5] The magistrate judge also denied LOJL's Motion to Strike, explaining that it was "unnecessary" to consider the WHSB letter in resolving the sanctions issue. Id.

[6] LOJL also challenges the denial of its Motion to Strike.

7

1. **Motion for Reconsideration**

The crime-fraud exception to the attorney-client privilege provides that otherwise privileged attorney-client communications made "for the purpose of committing or furthering a crime or fraud" are not protected. In re Search Warrant Issued June 13, 2019, 942 F.3d 159, 175 n.15 (4th Cir. 2019); see also Rambus, Inc. v. Infineon Techs. AG, 222 F.R.D. 280, 287 (E.D. Va. 2004). The party invoking the exception "must make a prima facie showing that the privileged communications fall within the exception," which requires showing that the party asserting the privilege "was engaging in or planning a criminal or fraudulent scheme," and that the communications sought "bear a close relationship" to that scheme. In re Grand Jury Subpoena, 870 F.3d 312, 319 (4th Cir. 2017). The prima facie standard does not require "proof either by a preponderance or beyond a reasonable doubt;" "[r]ather, the proof must be such as to subject the opposing party to the risk of non-persuasion if the evidence . . . is left unrebutted." In re Grand Jury Proceedings #5 Empanelled January 28, 2004, 401 F.3d 247, 251 (4th Cir. 2005).

LOJL argues that the magistrate judge erred in applying the crime-fraud exception to its privileged communications with the student loan debtors for three reasons. First, LOJL argues that the crime-fraud exception is inapplicable where the attorney alone purportedly committed a crime or fraud. Second, LOJL argues that plaintiff has failed to make a prima facie showing either that it engaged in criminal or fraudulent conduct or that the communications at issue bear a close relationship to that conduct. Third, LOJL argues that the Noerr-Pennington doctrine bars application of the crime-fraud exception.

i. **Crime or Fraud Committed by the Attorney Alone**

Whether the crime-fraud exception to the attorney-client privilege is applicable where the attorney alone purportedly committed a crime or fraud is a question of first impression in the

8

Fourth Circuit; however, at least two other circuits, and numerous district courts in other circuits, have held that the crime-fraud exception can apply in such circumstances. See, e.g., In re Sealed Case, 107 F.3d 46, 49 n.2 (D.C. Cir. 1997); In re Impounded Case (Law Firm), 879 F.2d 1211, 1213–14 (3d Cir. 1989).[7] The Court finds these cases persuasive.

The Third Circuit's decision in In re Impounded Case is particularly instructive. In that case, the court explained:

> It is not apparent to us what interest is truly served by permitting an attorney to prevent [an] investigation of his own alleged criminal [or fraudulent] conduct by asserting an innocent client's privilege with respect to documents tending to show criminal [or fraudulent] activity by the lawyer. On the contrary, the values implicated, particularly the search for the truth, weigh heavily in favor of denying the privilege in these circumstances.

879 F.2d at 1213–14. Courts in this circuit have subsequently cited In re Impounded Case favorably on this precise issue. For example, in CSX Transp., Inc. v. Robert V. Gilkison, 2009 WL 1528190, at *7 (N.D.W. Va. May 29, 2009), the court held that "a lawyer or law firm may not engage in fraudulent or criminal activity and then hide behind any privilege to protect the firm's or the individual lawyer's interests."

Nevertheless, at least one circuit has held that the crime-fraud exception is inapplicable in these circumstances. See In re Grand Jury Proceedings, 417 F.3d 18, 23 (1st Cir. 2005). In that case, the court stated that the crime-fraud exception does not apply, and the attorney-client privilege "is not lost," "solely because the client's lawyer is corrupt;" rather, "[t]he crime-fraud exception requires the client's engagement in criminal or fraudulent activity." Id. The court

---

[7] See also Drummond v. Collingsworth, Inc., 2015 WL 13768169, at *7 (N.D. Ala. Dec. 7, 2015); Chevron Corp. v. Salazar, 275 F.R.D. 437, 452 (S.D.N.Y. Aug. 3, 2011); United States v. Cooper, 1997 WL 129306, at *2 (D. Colo. Mar. 19, 1997); United States v. $1.5 Million Letter of Credit, 1992 WL 204357, at *5 (S.D.N.Y. Aug. 7, 1992) (explaining that courts "have regularly applied the crime-fraud exception where only the attorney is accused" of having committed a crime or fraud).

9

reasoned that a "contrary view" would not "comport with the modern view of the privilege's nature and purpose as explained in Upjohn v. United States, 449 U.S. 383 (1981)." Id. One district court in another circuit appears to have held similarly, albeit only because the court was unaware of any cases holding otherwise.[8]

The Court finds the First Circuit's decision in In re Grand Jury Proceedings unconvincing because application of the crime-fraud exception where the attorney alone purportedly committed a crime of fraud is entirely consistent with the purpose of the attorney-client privilege. In Upjohn, the Supreme Court explained that the purpose of the attorney-client privilege is "to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." 449 U.S. at 389. The attorney-client privilege therefore "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends on the lawyer's being fully informed by the client . . . if the [lawyer's] professional mission is to be carried out." Id. It almost goes without saying that allowing attorneys who have engaged in criminal or fraudulent conduct to shield themselves from accountability for that conduct by hiding behind their innocent clients' privilege would work to the detriment of "the observance of law and administration of justice," the provision of "sound legal advice or advocacy," and the "professional mission" with which lawyers are charged.

Moreover, the Fourth Circuit's explanation of the contours of the attorney-client privilege accords with this conclusion. For example, in Solis v. Food Employers Labor Relations Ass'n,

---

[8] See Murray Energy Corp. v. Cassidy, Cogan, Chappell & Voegelin, L.C., 2019 WL 2240245, at *7 (S.D. Ohio May 24, 2019) ("The crime-fraud exception attaches when the client and lawyer work in tandem to facilitate a wrongdoing. The Court is unaware of any case where allegations of the attorney's conduct alone shook privileged materials loose.").

the court stated that the attorney-client privilege "is to be strictly confined within the narrowest possible limits consistent with the logic of its principle," as set forth in Upjohn. 644 F.3d 221, 226 (4th Cir. 2011). Similarly, in In re Grand Jury Subpoena, the court stated that "because [the attorney-client privilege] impedes the full and free discovery of truth, it must be narrowly construed and recognized only to the very limited extent that excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth." 341 F.3d 331, 335 (4th Cir. 2003).[9]

At bottom, it is clear that discovery of the communications at issue, which concern an allegedly sweeping scheme to defraud one of the country's largest loan servicers at the expense of student loan debtors, is consistent with the principles underlying the attorney-client privilege and would both serve the public good and advance the search for truth. Accordingly, the crime-fraud exception can apply where, as here, the attorney alone purportedly committed a crime or fraud of which the client was a victim. The magistrate judge, relying on many of the same cases, reached the same conclusion. Therefore, the magistrate judge's ruling on this issue was not clearly erroneous or contrary to law.[10]

---

[9] Although the Fourth Circuit has also stated that "[w]hen applying the crime-fraud exception to the attorney-client privilege, . . . the client's knowledge and intentions are of paramount concern because the client is the holder of the privilege," that statement was made in the distinct context of analyzing whether an attorney must be aware of a client's purportedly criminal or fraudulent conduct for the crime-fraud exception to apply, and therefore is of limited relevance here. In re Grand Jury Proceedings # 5, 401 F.3d at 251. Moreover, the court in that case recognized that "the attorney-client privilege exists for the benefit of the client," supporting application of the crime-fraud exception where, as here, it is alleged that the lawyers victimized their own clients. Id. at 250.

[10] The magistrate judge stated that even if the crime-fraud exception requires the client's engagement in criminal or fraudulent activity, "there is also some evidence that [the student loan debtors] were engaged in the fraudulent scheme, or at the very least, were aware of it and knowingly participated in it." [See Dkt. 187]. The Court expressly declines to address this alternative ground, and as a result need not address LOJL's argument that a more individualized

11

### ii. Prima Facia Showing

LOJL argues that plaintiff has failed to make a prima facie showing either that LOJL has engaged in criminal or fraudulent conduct or that the privileged communications sought bear a close relationship to that conduct. As to the former, LOJL argues that the evidence cited by the magistrate judge "merely indicate[s] that [it] [was] being a zealous advocate for [its] clients." LOJL's Objection at 22. As to the latter, LOJL argues that the evidence cited by the magistrate judge "do[es] nothing to establish a direct link" between the purportedly criminal or fraudulent conduct and the communications sought. Id. at 26.

As previously discussed, plaintiff generally asserts that all of the debt counseling companies and law firms, as well as the individuals affiliated with them, conspired together to defraud plaintiff out of millions of dollars in outstanding student loan debt in part by manufacturing federal lawsuits and arbitration claims against plaintiff for purported violations of the TCPA. [See Dkt. 91, 100]. With regard to LOJL specifically, plaintiff asserts that, once student loan debtors were referred to LOJL as clients, they would be instructed to stop submitting their loan payments to plaintiff and to start submitting payments to a different entity, and that although they often believed that these payments were being directed towards their student loans, the payments would in fact be split between the debt-counseling companies, LOJL, and others involved in the scheme. Id. This course of action would cause the student loan debtors' loans to go into default, which in turn would trigger calls from plaintiff about the defaults. Id.

---

assessment of the communications at issue, such as in camera review, is necessary to affirm this alternative ground.

Plaintiff further asserts that, around the same time, LOJL would instruct the student loan debtors to call plaintiff, using a script provided by LOJL, to revoke their consent to receive calls from plaintiff about their loans. Id. LOJL would then instruct the student loan debtors not to answer any calls from plaintiff, and instead to document the number of calls they received, operating under the belief that every call was a TCPA violation for which it could seek statutory damages. Id. Eventually, LOJL would initiate TCPA actions against plaintiff in the form of federal lawsuits and arbitration claims, at times without the student loan debtors' knowledge or consent. Id. These actions in turn caused plaintiff to expend significant litigation costs, enter into substantial settlement agreements, and otherwise forego student loan payments to which it was entitled. Id. These actions also left the student loan debtors' with significant credit damage caused by their having defaulted on their student loans. Id.

The magistrate judge properly concluded that plaintiff has made a prima facie showing that LOJL engaged in criminal or fraudulent conduct, namely mail fraud and wire fraud. [See Dkt. 187]. The magistrate judge explained that plaintiff has presented emails and deposition testimony corroborating both the existence of the scheme and LOJL's involvement in it. Id. This evidence includes, for example, emails containing the "script" LOJL provided to the student loan debtors to revoke their consent to receive calls from plaintiff about their loans; emails discussing LOJL's cooperation and proposed "fee sharing" agreements with another law firm involved in the scheme; emails in which LOJL told the student loan debtors that "every call [from plaintiff] is a [TCPA] violation worth money to you," and deposition testimony in which a student loan debtor confirmed that LOJL initiated a federal lawsuit without that debtor's "knowledge or

13

consent."[11] Id. This evidence constitutes "a prima facie showing of evidence that, if believed by a trier of fact, would establish the elements of some [criminal or fraudulent conduct] that was ongoing or about to be committed." In re Grand Jury Proceedings #5, 401 F.3d at 251.

The magistrate judge also properly concluded that there is a close relationship between the privileged communications sought and the purported criminal or fraudulent conduct. [See Dkt. 187]. As the magistrate judge explained, plaintiff "seeks [LOJL's] communications with [the student loan debtors] regarding (1) the consequences of defaulting on student loans, (2) resolution of debt-relief matters or TCPA claims, and (3) [the student loan debtors'] satisfaction with the resolution of debt-relief matters or TCPA claims," all of which "constitute the core" of the purported criminal or fraudulent conduct. Id. Indeed, such communications are "the building blocks of the scheme and [of] [p]laintiff's case." Id. Therefore, the same evidence previously discussed also constitutes "a showing of a close relationship between the attorney-client communications and the possible criminal or fraudulent activity." In re Grand Jury Proceedings #5, 401 F.3d at 251. Accordingly, the magistrate judge's ruling on these issues was not clearly erroneous or contrary to law.

---

[11] Additionally, although not specifically referenced by the magistrate judge, plaintiff has also presented disposition testimony in which Lohman confirmed both that student loan debtors were instructed not to answer calls from plaintiff and instead to document the number of calls they received, and that he sought to ensure that the statutory damages available under the TCPA would exceed each student loan debtor's outstanding debt. Plaintiff has also presented emails from student loan debtors to LOJL or another law firm involved in the scheme in which they complain about damage to their credit as a result of their defaults, as well as emails between LOJL and another law firm involved in the scheme reflecting that their goal was to increase the number of calls from plaintiff to the student loan debtors to drive up the statutory damages available under the TCPA. [See, e.g., Dkt. 93-2, at 57–58, 63, 71; Dkt. 94-2, at 2–9; Dkt. 153-1, at 37, 39, 41].

14

### iii. Noerr-Pennington Doctrine

The Noerr-Pennington doctrine "safeguards the First Amendment right to petition the government for a redress of grievances . . . by immunizing citizens from the liability that may attend the exercise of that right." Waugh Chapel South, LLC v. United Food & Commercial Workers Union Local 27, 728 F.3d 354, 362 (4th Cir. 2013). "However, the First Amendment offers no protection when petitioning activity . . . is a mere sham to cover [up] an attempt to violate federal law." Id. LOJL argues that the Noerr-Pennington doctrine bars application of the crime-fraud exception.

The Fourth Circuit has unequivocally held that the Noerr Pennington doctrine "is by definition an exemption from . . . liability, and not a bar to discovery of evidence," and as such "does not apply to discovery" disputes. N.C. Elec. Membership Corp. v. Carolina Power & Light Co., 666 F.2d 50, 52–53 (4th Cir. 1981); see also Marfork Coal Co., Inc. v. Smith, 2011 WL 111880, at *11 (S.D.W. Va. Jan. 13, 2011). Moreover, plaintiff's allegations appear to invoke the sham litigation exception to the Noerr-Pennington doctrine, which further supports its inapplicability at this stage of the litigation. See, e.g., Cloverleaf Ents., Inc. v. Md. Thoroughbred, Horsemen's Ass'n, Inc., 730 F. Supp. 2d 451, 466 (D. Md. 2010) (explaining that because the plaintiff's allegations "suggest[ed] a sham in the filing of petitions" at issue, "[w]hether [the defendants] [could] invoke the Noerr-Pennington doctrine depend[ed] upon a factual record which must await discovery"). The magistrate judge recognized as much; accordingly, the ruling on this issue was not clearly erroneous or contrary to law.[12]

---

[12] LOJL also appears to summarily argue that a civil RICO claim cannot be based on an attorney's litigation activity as a matter of law. This argument is incorrect. "[T]here exists no broad shield from RICO for attorney advocacy," including "in the litigation context." Garlock Sealing Techs., LLC v. Shein, 2015 WL 5155362, at *3 (W.D.N.C. Sept. 2, 2015).

15

## 2. **Imposition of Sanctions**

Federal Rule of Civil Procedure 11, pursuant to which the magistrate judge imposed sanctions on LOJL and its counsel, provides that "[b]y presenting to the court a pleading, written motion, or other paper . . . an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances[,] . . . it is not being presented for any improper purpose." Fed. R. Civ. P. 11(b)(1). One such improper purpose is to "needlessly increase the cost of litigation." Id. Rule 11 further provides that "[i]f, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1).

Rule 11 sanctions can be awarded upon a party's motion for sanctions or sua sponte by the court. "A motion for sanctions must be made separately from any other motion and must describe the specific conduct that allegedly violated Rule 11(b)." Fed. R. Civ. P. 11(c)(2). "On its own, the court may order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(3). Any sanction ultimately imposed under Rule 11 "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated," and "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed. R. Civ. P. 11(c)(4).

Here, sanctions were imposed jointly against LOJL and its counsel on the court's initiative pursuant to Rule 11(c)(3). In its remand order following LOJL's first objection, the Court stated that the magistrate judge should consider LOJL's "explanation as to why [its] new arguments were not raised initially," and "may also consider whether monetary sanctions should be imposed on [LOJL] and/or [its] counsel for causing unnecessary litigation costs." [See Dkt. 154]. In authorizing a second round of supplemental briefing on remand, the magistrate judge confirmed that consideration of such sanctions had been authorized. [See Dkt. 156]. Following that briefing, the magistrate judge imposed sanctions on the ground that LOJL and its counsel "needlessly increased litigation costs," reasoning that LOJL's new counsel could have raised its new arguments initially in a motion for reconsideration, but instead chose to raise them for the first time in LOJL's first objection. Id. Sanctions were imposed in the amount of plaintiff's attorneys' fees and costs incurred in preparing its response to LOJL's first objection and its supplemental briefing on remand. Id.

LOJL argues that the magistrate judge erred in imposing sanctions for three reasons. First, it argues that it never received a specific description of the potentially sanctionable conduct, in violation of Rule 11(c)(3). Second, it argues that it did not engage any sanctionable conduct under Rule 11(b)(1). Third, it argues that plaintiff's attorneys' fees and costs were awarded sua sponte, in violation of Rule 11(c)(4). Because LOJL's second and third arguments are persuasive, the Court need not address its first argument.

In determining whether a pleading was motivated by an improper purpose, such as needlessly increasing the cost of litigation, "a district court must judge the conduct of counsel under an objective standard of reasonableness rather than assessing subjective intent." Guidry v. Clare, 442 F. Supp. 2d 282, 289 (E.D. Va. 2006); see also In re Weiss, 111 F.3d 1159, 1170 (4th

17

Cir. 1997). "In other words, it is not enough that the injured party subjectively believes that a [pleading] was brought to harass or to focus negative publicity on the injured party; instead, such improper purposes must be ascertained from the lack of a factual or legal basis for the [pleading]." Guidry, 442 F. Supp. at 289. "Circumstantial facts surrounding the filing may also be considered as evidence of the signer's purpose." Id.

When the Court issued its remand order following LOJL's first objection, it had not been made aware of the circumstances surrounding LOJL's change of counsel. Specifically, it was not made aware of LOJL's new counsel not being involved in discovery-related matters until at least December 27, 2019, over a week after WHSB filed LOJL's opposition to the Motion to Compel. [See Dkt. 166]. From that date onwards, it appears that LOJL's new counsel worked diligently to narrow the issues presented by plaintiff's Motion to Compel, including by seeking attorney-client privilege waivers from the student loan debtors and producing approximately 25,000 pages of documents within two weeks. Id. Had the Court been aware of these facts when it issued its remand order, it would not have suggested that the magistrate judge consider imposing sanctions on LOJL or its counsel. Additionally, although LOJL's new counsel had an opportunity to raise new arguments on January 6, 2020 when it submitted LOJL's supplemental brief in opposition to the Motion to Compel, they have asserted that the supplemental brief "was essentially a reply memorandum and was intended to focus on document production efforts," such that they "could not present new arguments," and the magistrate judge did not conclude otherwise. [See Dkt. 166, 187]. Because LOJL's new counsel did not act unreasonably under these unique circumstances,

this Court erred in suggesting to the magistrate judge that sanctions might be warranted. For these reasons, LOJL's Objection on this issue will be sustained.[13]

Notwithstanding this conclusion, the legal bases for arguments advanced by LOJL, as well as some of the other defendants in this action, have often been threadbare at best. For instance, many of defendants in this action, including LOJL, have repeatedly sought to invoke the Noerr-Pennington doctrine despite its clear inapplicability at this stage of the litigation. Given the seriousness of the misconduct which plaintiff has alleged, and in particular the alleged abuse of the legal process, all of the defendants are henceforth on notice that the Court will not hesitate to impose sanctions for the assertion of any frivolous arguments.[14]

---

[13] Even if LOJL's new counsel had acted unreasonably, "[s]everal courts, including [the Fourth Circuit], albeit in an unpublished opinion, interpret [Rule 11(c)(4)] to prevent a court from sua sponte imposing attorney fees as a sanction against one who contravenes Rule 11." Devine v. Am. Ben. Corp., 56 F. Supp. 2d 679, 684 (S.D.W. Va. 1999) (citing Duggan v. Everd, 1996 WL 145230, at *1 (4th Cir. Apr. 1, 1996)). For example, in UBS Fin. Servs., Inc. v. Childress, the court explained that "[b]ecause the Rule 11 sanctions here are imposed sua sponte, and not by a motion, [it] [was] not able to direct payment of the opposing party's attorney's fees." 2013 WL 5786444, at *4 (W.D. Va. Oct. 28, 2013). Although the Fourth Circuit stated, in an earlier unpublished opinion, that "[a] district court can . . . award attorneys' fees under Rule 11 upon its own initiative," Doster v. Harshbarger, 1990 WL 112118, at *5 n.6 (4th Cir. July 18, 1990), that statement has not been subsequently relied upon and appears to be at odds with the text of Rule 11. Because the sanctions imposed against LOJL and its counsel were imposed sua sponte, they could not have been based upon attorneys' fees. See, e.g., Hunter v. Earthgrains, 281 F.3d 144, 151 (4th Cir. 2002) ("Under Rule 11, the primary purpose of sanctions against counsel is not to compensate the prevailing party, but to deter future litigation abuse.").

[14] With regard to LOJL's Motion to Strike, Federal Rule of Civil Procedure 12(f) "permits the court . . . to strike from any pleading any insufficient defense or redundant, immaterial, impertinent, or scandalous matter." Int'l Longshoremen's Ass'n v. Va. Int'l Terminals, Inc., 904 F. Supp. 500, 504 (E.D. Va. 1995). LOJL's Motion to Strike was directed at WHSB's letter, in which WHSB purported to address "misstatements" contained in LOJL's second supplemental brief, but instead merely confirmed that WHSB "had no role" in the filing of LOJL's first objection. [See Dkt. 171]. WHSB ultimately stated that "[t]o the extent [LOJL's supplemental brief] is being considered by the Court against [WHSB], [WHSB] would respectfully request the opportunity to provide supplemental briefing regarding the same." Id. As the magistrate judge explained, it is "unnecessary" to consider, and the Court has not considered, the WHSB letter in resolving the sanctions issue. [See Dkt. 187]. As a result, any technical violation of Local Rule 83.1(D)(3) in WHSB's submission of the letter, even if properly established, does not warrant

## III. CONCLUSION

For the reasons set forth above, LOJL's Objection to the Magistrate Judge's Order Dated March 11, 2020 will be overruled in part and sustained in part by an Order to be issue with this Memorandum Opinion.

Entered this 20 day of April, 2020.

Alexandria, Virginia

/s/ _____
Leonie M. Brinkema
United States District Judge

---

striking the letter from the record of this action. Accordingly, the magistrate judge's ruling on this issue was not clearly erroneous or contrary to law.