### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| NAVIENT SOLUTIONS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>THE LAW OFFICES OF JEFFREY LOHMAN, et al.,<br><br>Defendants. | Civil Action No. 1:19-cv-00461 |

### DEFENDANTS' JOINT STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT

Defendants The Law Offices of Jeffrey Lohman ("LOJL"), Jeffrey Lohman ("Lohman"), Jeremy Branch ("Branch"), Gregory Trimarche ("Trimarch"), Rick Graff ("Graff"), and GST Factoring, Inc. ("GST") hereby submit the following joint statement of undisputed material facts.[1] This statement is submitted pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, which authorizes the court to grant "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." This statement does not constitute an admission or stipulation as to any fact stated herein for purposes of trial. The rule governing cross-motions for summary judgment is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion. *Sherwood v. Washington Post*, 871 F.2d 1144, 1148 (D.C. Cir. 1989); *see also Cram v. Sun Ins. Office, Ltd.*,

---

[1] Pursuant to this Court's Order of September 17, 2020 (*ECF 313*), Defendants' Joint Statement of Undisputed Facts does not count against the briefing page number limit.  (*Id.* at 2.)

375 F.2d 670, 674 (4th Cir. 1967) (when parties bring cross-motions for summary judgment "[n]either party … concedes the truth of the allegations of his adversary other than for purposes of [its] own motion").

**NSL'S Purported RICO Enterprise**

1.      The association-in-fact enterprise relied upon by NSL consists of all Defendants, i.e.: Freda, CMS, Trimarche, Graff, Sievers, GST, RJ Marshal, Manny Kashto, Bill Carlson, David Sklar, Wes Sabri, David Mize, David Mize Law, PLLC, LOJL, Lohman, Branch, Alyson Dykes, and Ibrahim Muhtaseb. (*ECF 100 – Second Amended Complaint* (*"SAC"*) at ¶¶ 12-29, 297, 316, 338; *ECF 4 – First Amended Complaint* ("*FAC*") at ¶¶ 258, 272, 283; *ECF 1 – Complaint* at ¶¶ 258, 272, 283; *Declaration of Jeffrey E. Grell* (Nov. 3, 2020) ("*JEG Dec.*") - *Ex. 1 – NSL Irog. Res.* at ¶ 29.

2.      The term "Mize" refers to David Mize and David Mize Law, PLLC.

3.      For purposes of efficiency, the last names of other individuals are used to refer to that individual person.

4.      Amanda Johanson and Jacob Slaughter have never been named as defendants in any version of NSL's complaint. (*ECF 100 – SAC* at ¶¶ 12-29; *ECF 4 – FAC* at ¶¶ 12-20; *ECF 1 – Complaint* at ¶¶ 12-20.)

5.      NSL's complaint alleges that "Defendants Lohman [and] Branch … have participated [only] in the affairs of the Law Offices of Jeffrey Lohman," that Lohman and Branch were only "employed by or associated" with LOJL, and that Lohman only "principally directed" LOJL. (*ECF 100 – SAC* at ¶¶ 307, 329, 298, 317.)

6.      NSL's complaint alleges that "[i]n furtherance of the fraudulent Scheme, [the Lohman Defendants] utilized [only] the resources of the Law Offices of Jeffrey Lohman," and

the other members of the enterprise utilized only their respective resources in furtherance of the scheme. (*ECF 100 - SAC* at ¶¶ 308, 330, 306, 326, 328.)

**The Debt-Relief Group**

7.    The term "Debt-Relief Group" refers to Freda, CMS, Trimarche, Graff, Sievers, GST, Marshal, Kashto, Carlson, Sklar, Sabri, and Mize.

8.    According to NSL:

a.  The Debt-Relief Group "lured unsuspecting borrowers into a debt relief scam, induced them to stop paying their loans and ruin their credit." (*ECF 331* ("*NSL Memo*") at 1.)

b.  Beginning in 2015, the Debt-Relief Group sent "deceptive promotional materials" that "flat-out lie[d]" to student borrowers in an effort to defraud the student borrowers of fees. (*Id.* at 22, 7.)

c.  The Debt-Relief Group provided "limited or non-existent legal services" to its clients. (*Id.* at 10-11.)

d.  The Debt-Relief Group stole fees that were equivalent to 40% of the students' loan balance, which effectively "redirect[ed] loan payments away from NSL." (*Id.* at 3, 15.)

e.  These fees were then distributed by GST to the other members of the Debt-Relief Group. (*Id.* at 4.)

f.  Until early 2016, no one in the Debt-Relief Group had any knowledge or awareness of the Telephone Consumer Protection Act ("TCPA"). (*Id.* at 6, 18.)

g.  Between 2015 and 2019, the Debt-Relief Group disbursed approximately

$10,436,285 in funds to its members. Those funds all came from borrowers.

(*Id.* at 15.)

9.  The Debt-Relief Group's marketing materials did not mention NSL. (*ECF 325 –*

*Joint Stip.*, Ex. 22-26; *ECF 335-1 – NSL Dec.*, Ex. 8-14.)

10.  The Debt-Relief Group never sent any marketing materials to NSL. (*JEG Dec. -*

*Ex. 2 –NSL Depo. (Standish)* at 153-54.)

11.  GST had no knowledge of and did not control the Lohman Defendants' litigation

against NSL. (*JEG Dec. - Ex. 3 - Trimarche Depo.* at 158-59.)

12.  The CFPB has also taken action on behalf of the borrowers purportedly injured by

the Debt-Relief Group. (*ECF 336*-2 - *NSL Dec.,* Exs. 54 and 55.)

13.  The CFPB judgments do not indicate that the Debt-Relief Group harmed NSL in

any way. (*Id.*)

14.  Student borrowers brought lawsuits against some of the Defendants based on the

very actions that serve as the basis for NSL's claims. (*ECF 100 – SAC* at ¶ 94, 107.)

15.  Trimarche testified that GST never had any interaction with Lohman. (*JEG Dec. -*

*Ex. 3 - Trimarche Depo.* at 249.) Trimarche further testified:

> We had no right to know about that [i.e., the situation that Mize had developed with
> Lohman]. We didn't really know about it, and had no involvement in it. He – [Mize] was
> handing his caseload the way he wanted to, and he was entering into side agreements,
> apparently, that we had no knowledge of and no control over whatsoever.

(*Id.* at 267; *see also id.* at 155 ("we had nothing to do with Jeff Lohman or his practice).) Prior to

the above-captioned litigation, Lohman had never spoken with any of the GST Defendants (GST,

Trimarche, or Graff), never worked with any of the GST Defendants, and never entered into any

agreements with the GST Defendants. *Declaration of Jeffrey Lohman* (Nov. 3, 2020) ("*JL Dec.*")
at ¶ 6.)

16.     Carlson never met or spoke with any Lohman Defendant. (*ECF 336*-2 – *NSL
Dec.*, Ex. 62 - *Carlson Irog. Res.* at 11.)

17.     Kashto "never had any type of a conversation or discussion with Lohman about
anything" and never heard of Branch. (*JEG Dec. - Ex. 4 - Kashto Depo.* at 95, 98.)

18.     Marshall has no knowledge of Lohman "outside of this lawsuit." (*JEG Dec. - Ex.
5 - Marshall Depo.* at 53.)

19.     Graff never communicated with anyone at LOJL, the Lohman Defendants never
directed him to do anything, and he never knew anything about Mize's relationship with
Lohman. (*JEG Dec. - Ex. 6 - Graff Depo.* at 113-14, 145-46.)

20.     GST entered into factoring agreements with and shared fees with Mize, Johanson
and Slaughter.  (*ECF 325 – Joint Stip.* at ¶ 53.)

21.     The Lohman Defendants never entered into a factoring agreement with GST.
(*JEG Dec. - Ex. 7 - GST Irog. Res.* at ¶ 4(B); *ECF 325 - Joint Stip.* at ¶ 100; *JL Dec.* at ¶ 6).)
Prior to the above-captioned litigation, Lohman had never worked with or spoken with Carlson,
Marshall, Kashto, or their companies and never entered any agreements with Carlson, Marshall,
Kashto, or their companies. (*Id.* at ¶ 7.)

22.     Lohman refused to enter a formal relationship with Johanson. (*JEG Dec. - Ex. 8 -
Lohman Depo.* at 144, 209.)

**GST and Trimarche**

23.     The affidavit of Greg D. Trimarche, a principal of GST, establishes that GST's
limited role was outsourced marketing services and outsourced accounting services for debt

relief attorneys who entered factoring agreements with GST. (*Affidavit of Gregory D. Trimarche* (Nov. 2, 2020) at ¶ 3.)

24.     In the context of this case, Mize was a debt relief attorney. Johanson and Slaughter were also debt relief attorneys. The term "debt relief attorneys" does not include Lohman, Branch or any other attorney employed by LOJL. (*Id.* at ¶ 2.)

25.     Trimarche further establishes that GST:

a.  had no ability to accept or reject student debtor clients. (*Id.* at ¶ 4.)

b.  had no specific knowledge over what advice lawyers provided. (*Id.* at ¶ 5.

c.  had no knowledge of any purported illegal activity or wrongful conduct by any Defendant named in this action. (*Id.* at ¶ 6.)

d.  remains unaware of any purported illegal activity or wrongful conduct by any Defendant named in this action. (*Id.* at ¶ 7.)

e.  encouraged and facilitated the engagement of debt relief attorneys by student debtors in need of legal representation, but GST never had any student debtors sign LOJL engagement letters. (*Id.* at ¶ 8.)

f.  provided accounting support services to the debt relief attorneys. (*Id.* at ¶ 9.)

g.  was only servicing the accounts for the debt relief attorneys, processing payments, and accounting, and facilitating third party client referrals to the debt relief attorneys and, in particular, had no involvement whatsoever in any attorneys' evaluation or pursuit of TCPA claims. (*Id.* at ¶ 10-11.)

h.  did not even have knowledge of the existence of the TCPA statute until after some of the debt relief attorneys began pursuing such claims in some of their client matters (and mentioned it anecdotally to GST). (*Id.* at ¶ 12.)

i.   maintained a "no unhappy client motto;" pursuant to this motto, the clients could cancel and/or ask for a refund at any time, and refunds were very liberally given. GST and the debt relief attorneys with whom it worked followed this "no unhappy client" motto so carefully that one of the reasons the business had to wind down was due to the number of cancellations and refunds. (*Id.* at ¶¶ 13-15.)

j.   would not tell any attorney how to handle their cases or give legal advice and never had the right or the opportunity to do so. (*Id.* at ¶¶ 16-17.)

k.   had no involvement in those legal services provided by any law firm to the clients. (*Id.* at ¶ 18.)

l.   had no communications with any of the debt relief attorneys' clients. (*Id.* at ¶ 19.)

m.   received none of the clients' loan documents or other information pertaining to their cases. (*Id.* at ¶ 20.)

n.   had no contact with any of the lenders or loan servicers involved in the clients' cases. (*Id.* at ¶ 21.)

o.   was provided with no information as to how any given individual client matter is handled. (*Id.* at ¶ 22.)

p.   had no notice or knowledge of, or involvement in, any specific settlement or other resolution reached by any law firms on behalf of their clients. (*Id.* at ¶ 23.)

26.   Although GST had no access to, or knowledge or notice of, any individual settlements reached by any of the law firms on behalf of their clients, GST has been provided

various anecdotes, estimates and statistics by the debt relief attorneys concerning the "aggregate" or overall results they have been obtaining for their clients (without individual client names or other confidential information provided to GST), which led GST to understand and believe that the debt relief attorneys generally were proving valuable and effective legal services to their clients. (*Id.* at ¶ 24.)

27.     With regard to the Lohman Defendants:

a.  GST never entered into a factoring agreement or any other contract or agreement with any Lohman Defendants, and the Lohman Defendants did not share revenue with GST. (*Id.* at ¶ 25.)

b.  GST had no other business arrangements or dealings with any Lohman Defendant, and LOJL did not provide any legal services to Trimarche personally. (*Id.* at ¶ 26.)

c.  GST has no record of ever having any communications whatsoever with any Lohman Defendant. (*Id.* at ¶ 27.)

d.  None of the GST Defendants even know the Lohman Defendants. (*Id.* at ¶ 29.)

28.     GST had no control over any affiliate's marketing or advertising activities. (*Id.* at ¶ 28.)

29.     When GST entered into this business with Affiliates and student debt relief attorneys, GST had never even heard of Navient.  (*Id.* at ¶ 30.)

30.     Very few debtors ended up paying the full amount provided as the initially agreed "fixed fee" in the attorney-client agreements.  Debtors rarely reached the "ceiling" of 33% or 40% of the total debt. (*Id.* at ¶ 34.)

31.     GST could not and did not tell debt relief attorneys what legal strategies to pursue, prioritize, or rule out.

32.     The debt relief attorneys and Affiliates created their own materials and sometimes sent them to GST for comment.  Trimarche generally offered comments focused on making sure disclosures to potential clients were accurate and complete, and making sure that the debt relief attorneys' ethical obligations were unhindered. (*Id.* at ¶¶ 47-48.)

33.     Trimarche sometimes provided debt relief attorneys with materials he obtained from other attorneys -- e.g., samples or exemplars of attorney client agreements, etc.  However, attorneys drafted and approved their own attorney-client agreements, their own FAQs, and other materials. (*Id.* at ¶¶ 49-50.)

34.     Trimarche is not a debt relief lawyer, GST is not a law firm, and it was never its role to provide legal advice or legal strategies to anyone. (*Id.* at ¶ 51.)

35.     No one at GST "prepared" or "approved" scripts. (*Id.* at ¶ 53.) At most, GST offered comments focused on the two primary issues that were always a concern: (1) making sure any materials accurately disclosed/described the terms of the engagement to the clients, and (2) ensuring that there wasn't anything that was problematic from the standpoint of the debt relief attorneys' ethical obligations.  (*Id.* at ¶¶ 53-54.)

36.     GST never wrote, prepared, distributed, or approved any deceptive marketing which made misstatements of law. (*Id.* at ¶ 55.)

37.     No member of GST ever counseled borrowers to stop paying their loans. (*Id.* at ¶ 58.)

**Mize**

38.     Mize is the only member of the Debt-Relief Group who referred potential TCPA clients to LOJL. (*ECF 325 – Joint Stip.* at ¶ 122.) CMS performed customer service work on behalf of Mize. (*Id.* at ¶¶ 17, 85.)

39.     None of the Lohman Defendants had a contractual relationship with CMS, and CMS was never retained by LOJL to perform any customer service work on its behalf. (*JEG Dec. - Ex. 8 - Lohman Depo.* at 38, 52, 55, 58, 154, 192.) Lohman has never worked with CMS, never entered into any agreements with CMS, and has never hired CMS to provide any services for himself or LOJL. (*JL Dec.* at ¶ 8.)

40.     Lohman introduced himself to Mize; Mize and Lohman were not brought together by any member of the Debt-Relief Group. (*Id.* at 192; *JEG Dec. - Ex.9 – Mize Depo.* at 52; *ECF 335-2 – Mize Dec.* at ¶ 29; *ECF 325 - Joint Stip.* at ¶ 117.)

41.     Mize "didn't [even] know what the TCPA was until [he] spoke to [Lohman]." (*JEG Dec. - Ex.9 – Mize Depo.* at 53.)

42.     Mize did not start referring potential TCPA matters to LOJL until April 11, 2016 – more than a year after the purported debt-relief scheme began. (*ECF 325 - Joint Stip.* at ¶¶ 41, 124.)

43.     Mize testifies that he "enrolled 279 people with NSL loans into" the Debt-Relief Group's purportedly fraudulent debt-relief program, and 162 of those people were referred to LOJL for a possible TCPA claim. (*ECF 335-2 - Mize Dec.* at ¶ 46.)

44.     After Mize referred a potential TCPA claimant to LOJL, Mize was thereafter only "loosely" involved in the case. (*JEG Dec. - Ex.9 – Mize Depo.* at 55.)

45.     Mize never attended a deposition, hearing, or proceeding in any TCPA case he referred to LOJL; once the matter was referred, LOJL handled the litigation side of it. (*Id.* at 59.)

46.     "Lohman insisted that LOJL employees be the only individuals that handled revocation calls…." (*ECF 331 – NSL Memo* at 12; *ECF 335-2 - Mize Dec.* at ¶ 59.)

47.     With the exception of Mize, the Lohman Defendants did not share their TCPA contingency fees with anyone in the Debt-Relief Group. (*ECF 335-2 - DM Dec.* at ¶ 61; *JEG Dec. - Ex. 8 - Lohman Depo.* at 71; *JL Dec.* at 2.)

48.     When LOJL settled a matter, Mize communicated "nothing" to GST. (*JEG Dec. - Ex.9 – Mize Depo.* at 67.)

**The Lohman Defendants**

49.     The term "Lohman Defendants" refers to LOJL, Lohman, Branch, Dykes, and Muhtaseb. (*ECF 100 - SAC* at ¶ 30.)

50.     The Lohman Defendants never received a penny paid by the student borrowers to GST. (*JL Dec.* at ¶ 4; *JEG Dec. - Ex. 8 - Lohman Depo.* at 71.)

51.     The Lohman Defendants played no role in creating or distributing the purportedly fraudulent promotional materials to students and had no knowledge of the Debt-Relief Group's purportedly fraudulent marketing or business techniques. (*JEG Dec. - Ex. 8 - Lohman Depo.* at 38, 43-46, 152, 192; *Id.*, Ex. 11 – *Dykes Depo.* at 32-33; *Id.*, Ex. 13 – *Branch Depo.* at 20-21, 36, 41-42; *Id.*, Ex. 14 – *Muhtaseb Depo.* at 35-36, 96.)

52.     The Lohman Defendants did not share an "automatic billing system" with any other Defendant and did not utilize joint email accounts or attorney-client retainer agreements. (*JL Dec.* at ¶ 5.)

53.     None of the Lohman Defendants was ever sued by the CFPB. (*ECF 331 - NSL Memo* at 15.)

54.     LOJL is a "TCPA litigation firm." (*JEG Dec. - Ex. 8 - Lohman Depo*. at 107.)

55.     NSL is well-known for ignoring TCPA protections, and its robocalling practices have always been scrutinized by TCPA lawyers. (*JL Dec.* at ¶ 12.)  NSL also leads the industry when it comes to borrower complaints about the debt collection practices of student loan servicing companies. (*JEG Dec. - Ex. 20 – CFPB Report* at 9.)

56.     According to NSL policy, NSL may robocall a borrower's cell phone as much as eight times per day. (*JEG Dec. - Ex. 2 - NSL Depo*. (*Standish*) at 69-70.)

57.     In the TCPA claim brought by M.I., NSL stipulated: "… NSL's telephone equipment and software used to place two hundred and twenty-six (226) calls to [claimant's cell phone number] … were made in Predictive Mode, [which] qualifies under FCC regulations as an 'automatic telephone dialing system' ('ATDS')…." (*ECF 228-16 – Arbitration Award* at ¶ 10.) The arbitrator awarded substantial damages to M.I. (*Id.* at 21.) The arbitrator concluded that "Navient ha[d not] established its affirmative defenses of unclean hands or lack of standing." (*Id.* at ¶ 53.)

58.     Arbitrators also repeatedly found that NSL robocalled borrowers' cell phones. (*ECF 228-16 – Arbitration Award* at ¶ 58 (finding that "226 ATDS calls [were] made by Navient"); (*ECF 326 – Joint Stip.*, Ex. 66 at 2 ("the TCPA was violated by the actions of [NSL] in placing 235 phone calls to the Claimant's cell phone"); *Id. – Arbitration Award*, Ex. 80 at 1 ("Navient made 163 calls by an auto-dialer to [claimant]"); *Id. – Arbitration Award*, Ex. 87 at 1 (NSL "continued to call Claimant on his cell phone utilizing an ATDS after he withdrew consent

to receive such calls"); *Id. – Arbitration Award*, Ex. 98 at 2 (finding that NSL made 126 robocalls).)

59.     NSL also stipulates that it made each and every call that served as the basis for a TCPA claim filed by LOJL. (*JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 235-236.)

60.     In discussing reasons why private student loan borrowers' default, the CFPB has noted that servicers, such as NSL, "will provide options only after the loan is in default." (*JEG Dec. - Ex. 20 – CFPB Report* at 13.) According to comments on NSL's Facebook page, borrowers have been told by NSL's customer service: "don't pay it and then we can work with you." (*Id.*, Ex. 21 at 4.)

**LOJL TCPA Referrals**

61.     LOJL primarily helps clients end creditor phone calls; only about 4% of the cases referred to LOJL turn into TCPA cases. (*Id.* at 85; *Id.*, Ex. 14 – *Muhtaseb Depo.* at 35-36, 96.) The Lohman Defendants advise their clients:

> There's a law that says no one can use an auto-dialer to call your cellphone without permission. And that if you ask them to stop calling, they're probably going to stop calling. But if they continue, it's likely that they're violating a law. And we'll deal with that if they continue to call you and we'll take a look at it.

(*Id., Ex. 8 - Lohman Depo.* at 135-136.)  Most creditors stop calling after revocation. (*Id.* at 84.)

62.     LOJL received TCPA referrals from several sources – not just Mize – and continues to receive referrals from those other sources. (*Id.* at 34-36, 164, 206-207; *JL Dec.* at ¶¶ 9-11.)

63.     Only 65 of the TCPA claims listed on NSL's damage chart were referred by Mize.  The other 18 TCPA claims appearing on NSL's damage chart were referred by the Veritas

Legal Plan, Slaughter, and Johanson.[2] The Lohman Defendants have never had a referral agreement with Veritas Legal Plan, Slaughter, or Johanson and have never shared contingency fees with those entities. (*Id.* at ¶ 9.)

64.     LOJL's other referral relationships continue to refer TCPA claims against NSL, and the Lohman Defendants continue to litigate TCPA claims. (*Id.* at ¶ 11.) LOJL continues to receive TCPA referrals from the Veritas Legal Plan and Brownstone Law. (*Id.*)

65.     On the TCPA cases referred by Mize to LOJL, LOJL received a contingency fee only if it was successful against NSL. The borrowers never paid fees to LOJL, and LOJL never received any money that originated from the borrowers. If a matter was dismissed or settled for no exchange of consideration, LOJL received nothing for its services. If a matter settled for only debt forgiveness, LOJL received nothing for its services. (*ECF 325 – Joint Stip.* at ¶ 118; *ECF 331 - NSL Memo* at 5; *JEG Dec. - Ex. 8 - Lohman Depo.* at 71; *JL Dec.* at ¶¶ 2-3.)

**The Lohman Defendants' TCPA Claims Against NSL**

66.     LOJL would always contact clients referred by Mize. (*JEG Dec. - Ex. 8 - Lohman Depo.* at 58.)

67.     Pursuant to the terms of LOJL's standard representation agreement, clients agreed that LOJL "will represent you in your consumer law matter and related claims under the … [TCPA] against – Navient…." (*JL Dec.*, Ex. 4.) Clients further agreed that LOJL "will handle your matter" and that "we may file a Complaint at Law …." (*Id.*)

68.     The entities who own the loans serviced by NSL are merely unsecured creditors of the student borrowers. (*Id.*, Ex. 5.) NSL is merely the loan servicer. (*Id.* at ¶¶ 19-20; *JS* at ¶

---

[2] The following 18 claims were not referred by Mize to LOJL: A.F., A.J., C.D., C.D., M.G., D.I., A.M., A.S., K.W., M.B., K.B., C.B., D.D., T.J., K.K., B.L., D.S., and L.W.

21.) In J.M.'s TCPA case, which is listed on NSL's damage chart (*ECF 333*, Ex. A at 2), the

arbitrator denied NSL's "counterclaim for the outstanding principal" on J.M.'s loan, stating NSL

"is not the real party in interest and therefore, lacks standing to assert such claims." (*ECF 326-1*,

- *Joint Stip.*, Ex. 87.)

      69.    NSL's service contracts with the owners of the loans anticipates that borrowers

will default on loans serviced by NSL. A borrower's default does not terminate the servicing

contract or interfere with NSL's relationship with the trust; it just causes a change in the flow of

money under the servicing contract. (*JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 66-68.)

      70.    NSL's Rule 30(b)(6) witness was unable to explain its TCPA litigation tactics:

Q:  … it's always an issue in TCPA litigation whether ATDS is being used, correct?
A:  … I guess where I'm going it it's not in every case that you have to argue the ATDS issue…. [I]t could also be whether or not there's a – a revocation or there is permission in the first place, and that's the only fact that's being argued. So I guess that is the piece. So I – not every complaint is – do we have experts testifying on ATDS.
Q:  … Because … you've got other defenses that are – that are more easily – easy to prove; is that correct?
A:  I mean, I don't know necessarily always the legal strategy on which defenses and things of that nature. I guess it's not every time that – that the – whether or not we're using an ATDS is, you know, being argued… Like I said, I don't – I don't necessarily direct individual legal strategy as far as which defenses….
              * * * *
A:  I didn't get involved – I didn't get involved in legal strategy for who to depose and who not or what arguments to use. Just whether or not, you know, we would actually pay the settlement or not.
              * * * *
Q:  … what information were adjudicators deprived of to make a fully informed decision?
A:  And that gets back to the – I'm not really privy to that. I wasn't necessarily privy to the legal strategy, which defenses could or couldn't be used. So, it's really kind of out of my realm of understanding.

(*Id.* at 58-60, 125-126, 140-141.)

**TCPA Awards in Favor of LOJL Clients**

71.     On February 26, 2018, the arbitrator in M.I.'s matter rejected NSL's "unclean hands" defense, concluding:

> The evidence presented does not demonstrate that [M.I.] or his counsel created or provoked a violation of the TCPA by Navient. Yes, there are instances discussed in various cases where professional plaintiffs seek to exploit the TCPA. This case does not present that kind of fact pattern. [M.I.] asked Navient to stop placing phone calls; Navient continued; [M.I.], at his attorney's direction, documented Navient's conduct. While it is likely true that [M.I.]'s counsel knew that Navient's conduct constituted a violation of the TCPA, Navient engaged in that conduct knowingly.

(*ECF 228-16 – Arbitration Award* at ¶¶ 53-54.)

72.     NSL claims substantial damages arising from TCPA claims that resulted in awards favorable to the Lohman Defendants' clients: S.D., M.I., and J.M. (*See ECF 333 – NSL Damage Chart*, Ex. G.)

73.     NSL asserted Defendants' allegedly fraudulent conduct as an "unclean" hands defense in every arbitration that resulted in an award to the Lohman Defendants' clients. (*ECF 326 – Joint Stip.*, Ex. 70 at 7-9, Ex. 72 at 8-12, Ex. 86 at 6-10, Ex. 95 at 8-10, Ex. 96 at 10-12.)

74.     No arbitrator ever found in favor of NSL's "unclean hands" defense and sometimes expressly rejected such claims. (*ECF 326 – Joint Stip.*, Ex. 73 at ¶¶ 24-26; *id.*, Ex. 87 - *Arbitration Award* at 1, Ex. 98 – *Arbitration Award* at 4; *ECF 228-16 – Arbitration Award* at ¶¶ 53-54.)

75.     NSL has never vacated any judgments obtained by the Lohman Defendants in a TCPA matter. (*ECF 325 – Joint Stip.* at ¶ 442.)

**TCPA Claims Settled by NSL**

76.     Since 2017, NSL has repeatedly settled TCPA claims brought by the Lohman Defendants. (*ECF 333 – NSL Damage Chart*, Ex. A.)

77.     NSL's Rule 30(b)(6) deponent described the factors considered by NSL when

deciding to settle a TCPA claim:

A: … it's going to be cheaper to settle than it is to defend … and there's a variety of
   factors that go into that…. [E]very arbitrator is a little different and has a little bit
   different ruling, … it's one of the many factors that go into whether or not we
   settle….
Q: … [I]t depends on the facts of each case, correct?
A: It does.
Q: …. [Like] the number of phone calls that were allegedly made in relation to the
   TCPA, correct?
A: Correct.
Q: It depends on how vigorous the Lohman firm decides to prosecute a TCPA claim,
   correct?
A: I'm not sure what "vigorous" means, but how much they're asking for as far as
   settlement is a factor.
Q: …[I]t depends on how vigorously Navient chooses to defend the case. You know,
   maybe Navient pays whatever they demand or maybe they fight back, correct?
A: Correct.
Q: And it may depend on who the arbitrator is or whether it's in federal court, correct?
A: Yeah, I would say.
Q: … [A]ll of these factors on an individual case impact the … settlement strategy…?
A: Correct.

(*JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 162, 179-80; *see also ECF 325 – Joint Stip.* at

¶ 440.)

78.     At some point, NSL decided it had no better than a 50-50 chance of winning the

TCPA claims and decided that "the RICO claim against the Lohman firm [was] a better gamble."

(*JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 179.)

79.     NSL acknowledges that it paid "inflated settlements" for TCPA claims brought by

the Lohman Defendants.  (*ECF 331 – NSL Memo* at 15-16).

80.     The Lohman Defendants' most recent settlement of a TCPA claim against NSL

occurred on June 1, 2020, when the C.D. case was settled. (*ECF 325 – Joint Stip.* at ¶ 237; *ECF

333*, Ex. A at 1.)

81.     J.R. accepted a settlement of the TCPA claim brought by the Lohman Defendants, agreed to pay LOJL its contingency fee, and has never disavowed the arrangement. (*JL Dec.* at ¶ 22.)

82.     NSL's TCPA violations resulted in NSL paying substantial damages to LOJL's clients. (*ECF 333 – NSL Damage Chart*, Ex. A at 3.)

83.     NSL's standard TCPA settlement agreement states: "The Parties acknowledge and agree the disputes between them, whether asserted in the Action or not, have been settled and compromised pursuant to the terms of this Agreement…." (*ECF 326 – Joint Stip.*, Ex. 103 at Agreement ¶ 2; *see also id.*, Exs. 103-155.)

84.     The settlement agreements explicitly state that they are "binding upon" and "inure to the benefit of" the "the Parties hereto and their respective … attorneys…." (*Id.*, Agreement ¶ 15.)

85.     As a defined "Party" under the settlement agreements, NSL agreed to bear its "own costs and attorneys' fees in connection with the Action[s]." (*Id.,* Agreement ¶ 10.)

86.     NSL required a Lohman Defendant to sign each and every settlement agreement. (*ECF 326* and *327 - Joint Stip.*, Exs. 103-155; *JL Dec.* at ¶ 24.)

87.     Whenever NSL agreed to voluntarily dismiss a TCPA case, they never conditioned dismissal on the payment of costs and attorneys' fees and never brought a motion for costs and attorneys' fees in an action that was voluntarily dismissed. (*JL Dec.* at ¶ 25; *id.*, Ex. 7.)

**The Purported Scheme to "Manufacture" TCPA Cases**

88.     NSL asserts that it was injured by a chain of causation that began with the Debt-Relief Group's purportedly fraudulent promotional materials, which induced student borrowers to enroll in debt-relief programs, and ended with NSL paying judgments, settlements and

attorneys' fees to resolve TCPA claims brought by the Lohman Defendants. (*ECF 331 – NSL Memo.* at 1-16.) This chain of causation necessarily includes the following events:

- NSL's unilateral decision to repeatedly robocall borrowers after the borrowers had revoked consent to receive robocalls on their cell phones;

- NSL's robocall policies that caused borrowers to receive up to eight robocalls per day;

- the borrowers' decisions to bring a TCPA claim against NSL (not all borrowers referred to the Lohman Defendants filed claims);

- the adjudicators' repeated rejection of NSL's "unclean hands" / lack of standing defenses; and

- NSL's decision to settle TCPA claims brought by the Lohman Defendants rather than continue to litigate their defenses or seek immediate relief from the purported scheme in the underlying TCPA case(s).

(*Id.* at 5-14; *JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 76-79, 89, 95-99, 107, 232-233; *ECF 333*, Ex. A; *ECF 326* and *327 – Settlement Agreements*, Exs. 103-155.)

89.     NSL acknowledges that "the entire [purported] scheme would fall apart if borrowers did not receive calls." (*ECF 331 – NSL Memo.* at 14.)

90.     Neither NSL's loan agreements nor any other agreement obligated callers to answer NSL's phone calls. (*JL Dec.*, Ex. 5; *id.* at ¶ 19.)

91.     NSL is unaware of any TCPA regulation or any other law that requires a consumer to answer their phone when called by NSL or any creditor. (*JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 95.)

92.     Rather than robocalling borrowers' cell phones, NSL could have manually dialed borrowers' cell phones, robocalled or manually dialed borrowers' land lines, communicated by U.S. Mail or email. (*ECF 325 – Joint Stip.* at ¶¶ 28, 31.)

93.     NSL does not claim that Defendants somehow hacked into NSL's dialing system, somehow acquired control over that system, and surreptitiously caused NSL to robocall borrower cell phones. (*JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 168-169.)

94.     NSL's Rule 30(b)(6) witness testified:

Q: And the TCPA gives the borrower the right to revoke consent at any time for any reason or no reason at all regardless of whether Navient is calling them or not, correct?...
A: Yes, I think I already answered that one, but yes.
Q: … [A]nd that's the whole point of the TCPA is that if a consumer does not want to receive autodialed calls on their cell phone, … they have the right to stop those calls with or without a reason, correct?
A: Correct.
Q: Before or after those calls start, correct?
A: Correct.

*(Id.* at 94-95.)

95.     NSL's website allows borrowers to access and change their account contact information. Borrowers also specify the nature of a phone number they provide to NSL. ((*JEG Dec. - Ex. 18 - NSL Edit Your Contact Information Webpage.*) NSL also uses an external vendor to scrub its account records and determine which phone numbers are cell phones versus land lines. *JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 70.)

96.     NSL's counsel in this case advises its clients that "[p]reventing consumers from revoking their consent to receive calls would not be consistent with the purpose of the [TCPA]." (*ECF 166-2 – Ifrah Website Article*, Ex. C.)

## NSL Was On Notice of the Purported Scheme "Far Before" September 2017

97.     When NSL chose to settle TCPA cases with the Lohman Defendants, NSL admits that it was aware of many elements of what NSL characterizes as the Lohman Defendants' alleged scheme to defraud. (*ECF 325 - Joint Stip.* at ¶ 440.)

98.     In every TCPA case brought by LOJL against NSL, NSL argued that the claims were barred by "unclean hands" or that the claimant lacked standing. In doing so, NSL argued that LOJL fraudulently "manufactured" the TCPA claim and relied on the same circumstances that serve as the purported scheme to defraud in the above-captioned matter. (*JL Dec*. at ¶ 27.)

99.     NSL repeatedly asserted an "unclean hands" defense when answering the Lohman Defendants' TCPA claims; that defense was based on the same facts that constitute NSL's "scheme" to manufacture the TCPA claims asserted in this action. (*ECF 325 – Joint Stip.* at ¶¶ 163-405; *ECF 326 - Joint Stip.*, Exs. 53-102 (briefs and other materials reflecting NSL's unclean hands defense).)

100.     NSL's complaint states that it deposed A.C. on August 18, 2017. (*ECF 100 - SAC* at ¶ 276.) During that deposition, A.C. purportedly testified that she "had never given authorization to the Lohman Defendants" to file on her behalf. (*Id.*)

101.     Despite A.C.'s purported deposition testimony, NSL submitted an arbitration brief, which rhetorically asked: "Why did [A.C.] retain the services … of Jeffrey Lohman" and asserted that "current counsel initiated a flood of arbitration proceedings against NSL for alleged violations of the TCPA…" (*ECF 326 – Joint Stip.*, Ex. 56.)

102.     NSL entered into a settlement agreement with A.C. on March 19, 2018. (*ECF 325 – Joint Stip.* at ¶ 183.)

103.     NSL repeatedly settled with other TCPA claimants who purportedly described similar communication issues with the Lohman Defendants. (*ECF 100 – SAC* at ¶¶ 222, 242, 262; *ECF 325 – Joint Stip.* at ¶¶ 165-177.)

104.    NSL states that it "suspected" that the Lohman Defendants were engaged in a

scheme to "manufacture" TCPA claims "far before" September 2017. (*JEG Dec. - Ex. 2 - NSL*

*Depo.* (*Standish*) at 158.)

105.    Since September 22, 2017, every brief filed by NSL also argued that the TCPA

claimant, with the Lohman Defendants' assistance, "manufactured" the TCPA claim and had

"unclean hands." (*ECF 326 – Joint Stip.*, Exs. 53-102.) NSL's briefs in the TCPA cases rely on

the same purported scheme at issue in this case. (*Id.*)

106.    NSL's brief dated December 1, 2017 and opposing M.M.'s TCPA claim is

exemplary:

As the evidence will show, Mr. [M] (or at least his counsel [i.e., LOJL]) intended to set-up the instant lawsuit as a way in which Mr. [M] could lower his student loan debt. Mr. [M] … had essentially invited these calls in order to try to negotiate his student loan debt. … Therefore, Mr. [M] cannot establish an injury-in-fact as to each of NSL's purportedly impermissible calls - for which he seeks to recover a windfall of $168,000.00 in money damages – because each claim is premised upon a bare statutory violation that caused no actual harm but rather was manufactured by he and his counsel in bad faith.

Mr. [M] last made a private student loan payment in January 2016. Within days, he had signed a retainer agreement with attorney David Mize, and began directing monthly payments to Mize instead of NSL…. [Mize's retainer] agreement further required Mr. [M] to "maintain an accurate and complete log of any and all communications" to be "emailed or faxed to [Mize] on a weekly basis." … And this is exactly what Mr. [M] did. At his deposition, Mr. [M] testified that he was instructed to call NSL to revoke consent to receive calls to his cell phone and was told what to say on his telephone call with NSL. Most troubling was the revelation that an individual working at the Lohman firm surreptitiously participated in a recording of the May 25, 2016 telephone call at issue in this case. In following his attorneys' instructions to the letter, Mr. [M] logged telephone calls for months, and never answered the phone again after May 25, 2016…. Unbelievably, Mr. [M] contends that all this was purportedly done to allow Mize to "negotiate" his student loan debts.

While it is unclear whether Mr. [M] was himself aware of the TCPA when he retained Mr. Mize, there can be no doubt that Mr. Mize and Mr. [M]'s current counsel [i.e., LOJL] were certainly aware of the statute. Within a period of two months from January 2017 to March 2017, Mr. [M]'s current counsel initiated a flood of arbitration proceedings against NSL for alleged violations of the TCPA, all involving student loan debtors who were similarly initially "counseled" by Mr. Mize. The facts presented in this case are nearly

identical to those other claims, in that borrowers were induced into default with promises of loan "negotiation" by the very same attorneys representing Mr. [M] here.

(*ECF 326 – Joint Stip.,* Ex. 88; *see also id.*, Exs. 53-102.)

107.    NSL still chose to settle or voluntarily dismiss M.M.'s claim along with all of the others that were settled after NSL asserted an "unclean hands" defense. (*ECF 325 - Joint Stip.* at ¶ 352; *ECF 326 - Joint Stip.,* Exs. 53-155.)

108.    In every TCPA case brought by LOJL against NSL, NSL had full and fair opportunity to litigate any defense to the underlying TCPA claims. (*JEG Dec. - Ex. 2 - NSL Depo.* (*Standish*) at 122; *JEG Dec. – Ex. 10 – NSL Depo. (Reinhart)* at 190-91.)

109.    NSL began to consider a RICO claim against the Lohman Defendants in early-to-mid 2018. (*Id.*, Ex. 2 – *NSL Depo. (Standish)* at 46.)

110.    NSL never served the Lohman Defendants with notice of a Rule 11 motion or any motion claiming that the Lohman Defendants' TCPA claims were frivolous. (*JL Dec.* at ¶ 27; *JEG Dec. - Ex. 13 - Branch Depo.* at 116.)

**LOJL Testimony Outlines**

111.    The Lohman Defendants did not intend or attempt to script their clients' arbitration testimony. The documents that NSL calls "scripts" were outlines prepared by inexperienced attorneys, who were examining unsophisticated clients and who wanted to ensure that they did not skip anything important. (*JEG Dec. - Ex. 11 - Dykes Depo.* at 125-26.)

112.    The clients' expected answers were not fabricated by the attorney. (*Id.* at 141-42; *Id.*, Ex. 13 – *Branch Depo.* at 83, 93-95.) These outlines were based on a standard template that had no expected answers. (*Id.*, Ex. 12 - *Blank Template.*) The expected answers were filled in during phone calls and meetings with the client and as the client testified at depositions. (*Id.*, Ex. 11 - *Dykes Depo.* at 141; *Id.*, Ex. 15 – *Baldon Depo.* at 88-99, 112-14.)

113.    In reviewing these outlines with clients, the Lohman Defendants emphasized the

truth and accuracy of the client's testimony:

> … [a]ttached [are] … the questions I am going to be asking you and the answers that I am
> expecting based on our conversations and your deposition. As I have told you before I want
> to make sure everything you say at the hearing is ***truthful and accurate***. Please take some
> time to review this for accuracy. I have highlighted portions that I am not sure what the
> answer is, however ***it is important that all of the answers to all questions are <u>accurate</u>***. If
> you want to make corrections and send back to me that is fine, or you can call me and we can
> go over together.

(*ECF 337-1 – NSL Dec.*, Ex. 129 (emphasis added).)

114.    The Lohman Defendants lost four of the seven TCPA arbitrations (C.B., B. Ma.,

B. Mo. and L.W.) in which NSL claims that tampering occurred. (*ECF 325 – Joint Stip.* at

¶¶ 206, 341, 356, 427.)

115.    A.C.'s case was settled before the arbitrator issued an award. (*Id.* at ¶ 288.) Only

two resulted in adverse arbitration awards (D.S. and M.I.). (*ECF 325 – Joint Stip.* at ¶¶ 417, 278)

116.    Exhibit 137 (ending LOJL122181) to the Declaration of George R. Calhoun (*ECF

337-*2) was produced to NSL on April 28, 2020. (*JEG Dec.* at ¶ 18.)

**<u>NSL's Claim for Attorneys' Fees As Damages</u>**

117.    NSL's discovery efforts in the underlying TCPA cases were – to a great extent –

devoted to investigating the Lohman Defendants' actions that serve as the basis for NSL's

present RICO claim. (*ECF 326 – Joint Stip.*, Exs. 53-102.)

118.    On November 6, 2017, NSL went so far as to depose Lohman in a TCPA claim.

(*JL Dec., Ex. 8.*)

119.    The Lohman Defendants have obtained the expert report of Wayne G. Travell

dated July 3, 2020 regarding the reasonableness of NSL's damage claim for fees. (*JEG Dec. -

Ex. 19 – Travell Rpt.*)

DATED:  November 3, 2020                    Respectfully submitted,


                                            /s/ Thomas F. Urban II
                                            Thomas F. Urban II, VSB No. 40540
                                            FLETCHER, HEALD & HILDRETH, PLC  1300
                                            North 17th Street, Suite 1100
                                            Arlington, VA 22209
                                            (703) 861-5235 FAX (703) 812-0486
                                            Urban@fhhlaw.com


                                            Jeffrey E. Grell (pro hac vice)
                                            GRELL FEIST PLC
                                            825 Nicollet Mall, Suite 625
                                            Minneapolis, MN 55402
                                            (612) 353-5530 -Tel.
                                            jgrell@grellfeist.com

                                            *Counsel for The Law Offices of Jeffrey Lohman,*
                                            *P.C., Jeffrey Lohman, and Jeremy Branch*


                                            /s/ Mikhael D. Charnoff
                                            Mikhael D. Charnoff, VSB No. 43929
                                            PERRY CHARNOFF PLLC
                                            1010 Glebe Road, Suite 310
                                            Arlington, VA 22201
                                            Tel: (703) 291-6650
                                            Fax: (703) 563-6692
                                            mike@perrycharnoff.com

                                            *Counsel for GST Factoring, Inc., Gregory D.*
                                            *Trimarche, and Rick Graff*

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2020, I electronically filed Defendants' Joint Statement of Undisputed Facts in Support the Lohman Defendants' Motion for Summary Judgment, using the Court's CM/ECF system, which will send a notification of such filing (NEF) to the following counsel of record:

Jeffrey R. Hamlin
George R. Calhoun V
Whitney A. Fore
IFRAH PLLC
1717 Pennsylvania Avenue NW, Suite 650
Washington, DC 20006-2004
jhamlin@ifrahlaw.com
george@ifrahlaw.com
wfore@ifrahlaw.com

*Counsel for Plaintiff Navient Solutions, LLC*

Mikhael D. Charnoff
Perry Charnoff PLLC
1010 N. Glebe Road, Suite 310
Arlington, VA 22201
(703) 291-6650
mike@perrycharnoff.com

*Counsel for Defendants GST Factoring, Inc.,*
*Gregory Trimarche, and Rick Graff*

/s/ Thomas F. Urban II