1

```
                UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF VIRGINIA
                      ALEXANDRIA DIVISION

NAVIENT SOLUTIONS, LLC,         .   Civil Action No. 1:19cv461
                                .
          Plaintiff,            .
                                .
   vs.                          .   Alexandria, Virginia
                                .   December 1, 2020
THE LAW OFFICES OF JEFFREY      .   11:07 a.m.
LOHMAN, et al.,                 .
                                .
          Defendants.           .
                                .
 .  .  .  .  .  .  .  .  .  .  .

                 TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE LEONIE M. BRINKEMA
                   UNITED STATES DISTRICT JUDGE
                        (Via Teleconference)

APPEARANCES:

FOR THE PLAINTIFF:              GEORGE R. CALHOUN, ESQ.
                                WHITNEY A. FORE, ESQ.
                                Ifrah PLLC
                                1717 Pennsylvania Avenue, N.W.
                                Suite 650
                                Washington, D.C. 20006

FOR THE LOHMAN DEFENDANTS:      JEFFREY E. GRELL, ESQ.
                                Grell Feist PLC
                                825 Nicollet Mall, Suite 625
                                Minneapolis, MN 55402
                                  and
                                THOMAS F. URBAN, II, ESQ.
                                Fletcher, Heald & Hildreth, PLC
                                1300 N. 17th Street, Suite 1100
                                Arlington, VA 22209

FOR DEFENDANTS GST              MIKHAEL D. CHARNOFF, ESQ.
    FACTORING, INC.;            Perry Charnoff PLLC
    GREGORY TRIMARCHE; AND      1010 N. Glebe Road, Suite 310
    RICK GRAFF:                 Arlington, VA 22201


                       (Pages 1 - 20)

       COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES
```

| | | |
|---|---|---|
| 1 | OFFICIAL COURT REPORTER: | ANNELIESE J. THOMSON, RDR, CRR |
| 2 | | U.S. District Court, Third Floor |
| | | 401 Courthouse Square |
| 3 | | Alexandria, VA 22314 |
| | | (703)299-8595 |

3

1       P R O C E E D I N G S
2             THE COURT: All right, counsel, I hope you're all
3    there on the phone. This is Navient Solutions, LLC, versus The
4    Law Offices of Jeffrey Lohman, et al., Civil Action 94cv461
5    (sic). I want counsel, the attorney who is speaking for the
6    plaintiff to address -- to introduce him- or herself.
7             MR. CALHOUN: Good morning, Judge. This is George
8    Calhoun and Whitney Fore, Ifrah PLLC, for Navient Solutions,
9    LLC. I'll be speaking for the plaintiff today.
10            THE COURT: All right, Mr. Calhoun.
11            And for The Law Offices of Jeffrey Lohman and as well
12   as, as I understand it, Jeffrey Lohman and Jeremy Branch?
13            MR. GRELL: Yes, Your Honor. This is Jeff Grell,
14   yes, and I am representing The Law Offices of Jeffrey Lohman,
15   Jeffrey Lohman, and Jeremy Branch, along with Tom Urban, who is
16   also on the line today.
17            THE COURT: All right. But you'll be the
18   spokesperson, Mr. Grell?
19            MR. GRELL: Correct.
20            THE COURT: All right. And then the attorney for GST
21   Factoring, Inc., Gregory Trimarche, and Rick Graff?
22            MR. CHARNOFF: Yes, good morning, Your Honor. This
23   is Mike Charnoff, and I am representing GST Factoring, Gregory
24   Trimarche, and Rick Graff.
25            THE COURT: All right. That should be all three

1  counsel then who are going to be the speakers.  Because we are
2  on the record but obviously cannot see you, it's important that
3  before you say anything, just say your last name so my court
4  reporter knows who's speaking, and then we will avoid a lot of
5  problems.
6          I have before me the plaintiff's motion for partial
7  summary judgment and the defendants' motions for summary
8  judgment, and we've gone through this very voluminous record,
9  and I think in my mind, the key question I would like Navient
10 to answer for me is the argument the defendants are making that
11 there is -- you are unable to show that any of the conduct by
12 any of the defendants proximately caused the damages which
13 you're seeking, because as I understand it, Mr. Calhoun, the
14 only damages that your client is seeking in this case consists
15 of, one, the attorneys' fees that your client incurred in
16 having to defend these various TCPA actions that were either
17 brought at arbitration proceedings or court proceedings, and
18 also the loss of some of the loans that were cancelled as a
19 result of your -- the alleged scheme.
20         First of all, is that a correct description of the
21 two types of damages you're seeking in this case?
22         Mr. Calhoun, can you hear me?
23         MR. CALHOUN:  I'm sorry, Your Honor, I put you on
24 mute so that my shuffling around wouldn't make any noise.
25         THE COURT:  Okay.

1          MR. CALHOUN:  This is George Calhoun for Navient.
2     The categories of damage that we're taking on are the
3     attorneys' fees, the losses on some of the loans, and the
4     settlement -- some of the settlement payments that were made in
5     connection with these cases.
6          THE COURT:  Right.  So that all of your damages are a
7     result of these TCPA actions that were brought against your
8     client.
9          MR. CALHOUN:  The loans would, would qualify under
10    any theory, you know, so one of -- you know, we have alleged
11    that we were harmed when these borrowers were advised not to
12    pay their loans.  That's a very difficult issue to quantify,
13    but we do have for these ones that ended up filing lawsuits, we
14    were able to quantify it because we were able to identify them
15    and tie them to the program, so those would fall and we would
16    say those are damages under any theory regardless of whether
17    there's a TCPA case --
18         THE COURT:  Yeah.
19         MR. CALHOUN:  -- as a result of the instructions not
20    to pay the loans.
21         THE COURT:  No, but the reality of it is you've just
22    sort of admitted you have -- other than the individuals who
23    brought the TCPA claims, and in those cases, you did various
24    compromises, so you lost revenue from those loans, and you may
25    have had to also pay attorneys' fees to get to that point,

6

1  you're telling me that you don't have any actual evidence as to
2  other loans that you may have lost revenue from as a result of
3  the actions of, say, the GST people?
4          MR. CALHOUN:  Yeah.  We know that it happened, but we
5  haven't been able to quantify it.
6          THE COURT:  All right.  But so the answer basically
7  is if you can't quantify it, then it would be, I think,
8  impossible at court and at trial to get anything.  That would
9  be considered inchoate.  So your damages result from what I'll
10 call the TSP end of the case, right?
11         MR. CALHOUN:  That's correct, Your Honor.
12         THE COURT:  Okay.  So then the question is -- and I'm
13 surprised that that TSP issue is really only addressed in
14 basically a paragraph of your pleadings as far as we can tell,
15 but if, in fact, Navient was violating the statute, then how in
16 the world can you argue that you're entitled to any damages?
17         MR. CALHOUN:  Well, that's a, that's a big if, number
18 one, Your Honor.  Again, this is George Calhoun for Navient.
19 So we fundamentally disagree that we were violating the statute
20 I think is where I would like to start, and -- but in any case,
21 the, the reason that we -- that this harmed us is because if
22 one were to conclude that our systems violated the TCPA,
23 Navient Systems violated TCPA, there wouldn't be any phone
24 calls whatsoever if they hadn't advised these borrowers not to
25 pay Navient, not to pick up the phone, to try to increase the

1   number of calls to inflate the, you know, these claims.
2           THE COURT: Yeah, but the, but the problem -- wait.
3   But the problem is I don't disagree with you. I mean, it's
4   sort of an entrapment kind of theory, you know. But for the
5   conduct of these folks, you wouldn't have been involved in
6   making the robocalls or the improper calls to these people in
7   the first place, but the problem is if, in fact -- and I
8   understand the Supreme Court is going to be hearing a case
9   involving whether the type of system you use qualifies.
10          Is that correct?
11          MR. CALHOUN: There is a case that's been before the
12  Supreme Court that will clarify the scope or the definition of
13  an autodialer under the TCPA; that's correct, Your Honor.
14          THE COURT: Now, is Navient actually a party in that
15  lawsuit?
16          MR. CALHOUN: I don't believe so, no, Your Honor.
17          THE COURT: But my understanding is the district
18  court decision that came out of the Western District of
19  Pennsylvania that, as I understand it, found that Navient's
20  system does not violate the statute, that that is on appeal,
21  and the appeal has been stayed pending how the Supreme Court
22  resolves the issue. So Navient's system, I assume, is
23  definitely at stake in that Supreme Court decision.
24          Is that correct, Mr. Calhoun?
25          MR. CALHOUN: I think the Supreme Court decision -- I

8

1 think the Supreme Court decision would certainly provide
2 clarity on what is and what is not an autodialer, and that
3 would likely apply to Navient.
4       THE COURT: Okay. Now, if the Supreme Court were to
5 find that the system that Navient is using violates the
6 statute, how could you then argue that you're entitled to any
7 damages in this case?
8       MR. CALHOUN: Well, Your Honor, so the first part of
9 that would be I don't think that does anything with the
10 tortious interference where they have instructed these -- they
11 recruited these borrowers to fraudulently, instructed them not
12 to pay, caused them not to pay.
13       THE COURT: Well, I might be -- okay. Let me -- I
14 might agree with you on that, but if that were the case, that
15 would possibly put the GST group still on the hook, but how
16 would the Lohman folks be liable for that?
17       As I understand it, the only thing the Lohman
18 people -- the Lohman lawyers or the Lohman group gets involved
19 here is in getting these debtors to notify Navient to stop --
20 not to call them, and then, you know, basically setting them up
21 to call because they're in default, and triggering the TSP
22 violation.
23       MR. CALHOUN: Your Honor, but it's more than that
24 because what they also did was they told everyone, hey, we're
25 not going to take any of these cases unless they're not paying,

1  so -- and the -- this entire program was set up to allegedly
2  resolve these loans through what they called violations, and as
3  Mr. Mize testified, the only violation they ever considered was
4  a TCPA.  He didn't do litigation himself, and he's told by
5  Lohman that we can only take cases where they're not paying.
6        So the instructions to have them stop paying really
7  can't be separated from the Lohman firm because for them to get
8  a case to the Lohman firm, they have to tell them to stop
9  paying.  They have to get them to stop paying so they can get
10 the possibility of phone calls.
11       So it's not separable like that.  The defendants
12 would like it to be, but it just doesn't work that way because
13 of how these defendants interconnect.
14       THE COURT:  All right.  Mr. Grell?
15       MR. GRELL:  Yes, Your Honor.  This is Jeff Grell.
16 First of all, I, I have to question this argument that there
17 wouldn't have been any ATDS calls in the absence of what the
18 defendants purportedly did.  These were just distressed
19 borrowers.  That's, that's what these marketing materials were
20 targeting, not that my clients had anything to do with the
21 marketing materials, but that's who they were targeting.
22       There's no way to prove how many ATDS calls would
23 have been made with or without the intervention of the
24 defendants.  First of all, there's no evidence of that
25 whatsoever, so this argument is total speculation by Navient.

1        Second, as far as the Lohman defendants advising
2   people to stop paying, assuming that's true, over and over
3   again, Navient refutes this claim that this is somehow unlawful
4   or tortious.  There's no case that they cite in support of this
5   argument.
6        And people are often advised by their lawyers to
7   breach contracts for various reasons.  If anybody's been
8   through a divorce, there are certain debts that you don't pay
9   because there's advantages in the divorce to make them mutual
10  between the spouses and not pay them off on your own.
11       The case I was thinking of that's probably most
12  relatable to people, especially sports fans, you know, if
13  you're a sports agent and you've got a star quarterback and
14  he's got a bad contract, you say:  Hey, don't play in the
15  preseason.  Sit out, and make these people renegotiate your
16  contract.
17       You never hear of an NFL team suing that agent for
18  tortious interference with contract.  It's not tortious.  It's
19  justified under all of the case law that we have cited because
20  you could always respond by requesting good advice, which is
21  what the Lohman defendants did here.
22       And yeah, the Lohman defendants were well aware of
23  Navient's propensity to violate the TCPA, and they said:  Hey,
24  if you quit paying, it's likely that Navient will call you
25  eight times a day, and within five days, we'll probably have

1   enough for a TCPA case, because that's what Navient does, and
2   they're well known for doing it.  That's just a lawyer being a
3   lawyer in my opinion.
4               And finally, go and look at their record if you have
5   any questions.  There's, there's really no evidence that, that
6   the Lohman defendants advised people to stop calling.  And
7   Mr. Calhoun's arguments, well, they wouldn't take any clients
8   unless -- I mean, excuse me, stop paying.  The argument is they
9   wouldn't take any clients who were still paying on their loan.
10  That's -- there is much testimony that it's not -- I will say
11  it's at a minimum disputed, so that doesn't really get us
12  anywhere on summary judgment.
13              But it's not -- the Lohman defendants take TCPA
14  claims.  Whether you're paying your debt or not doesn't matter.
15  What matters is whether you're dealing with a, with a creditor
16  who, who violates the TCPA, which Navient has a reputation for
17  doing, and that's undisputed.  So that's my response to that
18  point.
19              The main thing is just there's no, there's no law,
20  there's no even logical argument that telling people not to pay
21  a loan is somehow tortious.  It's certainly not racketeering
22  activity.  That's just crazy.
23              THE COURT:  All right.  Mr. Charnoff, do you want to
24  speak on the issue of damages?
25                           (No response.)

1         THE COURT:  Mr. Charnoff, are you there?

2              (No response.)

3         THE COURT:  Mr. Calhoun, can you still hear me?

4         MR. CALHOUN:  We can hear you, Your Honor.

5         THE COURT:  All right.  Mr. Grell, can you still hear
6    me?

7         MR. GRELL:  Yeah, I can hear you.  There were a
8    couple of beeps, I don't know if he got disconnected or what,
9    just as I stopped talking.

10        THE COURT:  Well, I'm going to -- I'm going to
11   shorten the agony here.  I, you know, I think, Mr. Grell, you
12   actually fairly pointed to the fact that the evidence in this
13   case is all over the place.  I think that there are some
14   serious problems for both sides.

15             I think that the RICO claims could probably be
16   sustained at a trial.  I think there's enough evidence that a
17   reasonable jury could find the RICO violation.  I also think
18   there's enough evidence that they could find that there is not
19   a RICO violation.

20             In terms of the biggest concern I have, frankly, is
21   the issue about whether or not the plaintiff can really show
22   that any of the conduct here proximately caused the damages,
23   and I think that the fact that the Supreme Court may resolve a
24   significant issue in this case, which is whether the, the way
25   in which Navient makes these automated calls violates the

1   federal statute, would have a huge material difference in my
2   view on the outcome of this case.
3           So what I'm going to do is I'm going to deny both
4   motions, all motions for summary judgment.  I'm finding that
5   there's sufficient material facts at issue in this case such
6   that the case can't be resolved on summary judgment.
7           I also notice and it's sort of interesting, I had my
8   law clerk look at the cases that the plaintiff was citing for
9   many of its arguments, and I did not find any that involved
10  summary judgment decisions.  They were -- most of them were
11  decisions made after a trial, where the court had a fully
12  developed evidentiary record and could then opine upon whether
13  there was an adequate RICO case or a non-adequate RICO case.
14  There were a couple of motions to dismiss as well that were
15  cited, but in terms of just the procedural posture, summary
16  judgment is a very different animal, and there's enough
17  evidence on both sides that I think at this point summary
18  judgment is not appropriate.
19          Now, having said that, I think everybody ought to
20  give some serious thought to thinking about whether you can
21  settle.  I notice that some of the original defendants in this
22  case, there have been settlements worked out.  I have no idea
23  what was involved in those settlements, but in this case, Judge
24  Buchanan, I don't know how many -- you have had, I think, some
25  fair discovery disputes with her.  She's the magistrate judge

1  who knows this case pretty well.  If you would want to try a
2  chance at mediating with her, that's fine.  There are plenty of
3  private mediators.  And if you don't want to try to settle,
4  that's also fine.
5           At this point, the problem that we have from a
6  logistical standpoint, we have two issues.  The first is we're
7  not scheduling civil jury trials for the foreseeable future.
8  We have -- you've probably seen our latest order from the chief
9  judge has postponed all criminal jury trials, and we probably
10 had close to a dozen in the hopper to be tried in November and
11 December.  They've been put off now to the earliest, I believe,
12 would be January 19, and even then, depending upon the COVID
13 situation, I'm not sure that they'll start up again, but the
14 criminal trials will have to take -- they take priority, and we
15 cannot conduct at this point more than two trials at a time,
16 and so things are very slow.
17          There are also civil cases that have been in the
18 pipeline for some time awaiting a trial which would have
19 priority over, over this one.
20          So at this point, given the fact that the Supreme
21 Court decision would be very valuable in having a full picture
22 of the legal issues in this case and the Supreme Court clearly
23 will issue an opinion by no later than June 30, my proposal is
24 that I'll give you a trial date in late July, which would allow
25 you enough time to, number one, if you're going to settle,

1  settle.  If the Supreme Court's ruling comes out even before
2  June 30, that gives you-all time to absorb it and possibly to
3  re-brief the issue of causality, because I think that that in
4  my view is a critical issue for the issue of damages.
5        So I don't know if you have your calendars in front
6  of you.  We can just set a date in July now, but that would be
7  the earliest that I could conceive of this case going to trial
8  even if we weren't waiting for the Supreme Court, because we
9  have to get all the criminal cases out of the hopper first and
10 then those civil cases that have been waiting to be tried.
11       MR. CHARNOFF:  Your Honor, this is Mike Charnoff.  I
12 want to apologize.  When you asked me if I wanted to weigh in
13 on the last question --
14       THE COURT:  Yeah.
15       MR. CHARNOFF:  -- I went to turn off my mute, and I
16 believe I disconnected myself.
17       THE COURT:  Okay.
18       MR. CHARNOFF:  I have been back in for a few minutes,
19 and I have been listening to your reasoning.
20       I'm going to volunteer immediately that I already
21 have a two-week jury trial set for July 19 through July 30,
22 which has been, like many trial dates, heavily contested and
23 moved around several times already.
24       THE COURT:  Yeah, yeah.
25       MR. CHARNOFF:  I don't expect that one is going to

1  get moved again, but other than that, afterwards, I'm available
2  again until December.
3         THE COURT:  Is there any chance that case would not
4  be done before August 2?
5         MR. CHARNOFF:  No.  Unfortunately, that one is going
6  to go the full way.  It's multiple parties and --
7         THE COURT:  All right.
8         MR. CHARNOFF:  -- has a ton of fact witnesses and
9  experts in that case.
10        THE COURT:  So the week of August 9 then would be
11 definitely safe?
12        MR. CHARNOFF:  Yes.  Yes, Your Honor.
13        THE COURT:  How about for the other counsel?
14 Mr. Calhoun?
15        MR. CALHOUN:  Your Honor, I hoped -- this is
16 Mr. Calhoun.  I would have hoped it would have been last
17 August, but August 9 works for me.
18        THE COURT:  All right.  And how about, Mr. Grell, how
19 about for you?
20        MR. GRELL:  That's open for me, thanks.
21        THE COURT:  All right.  So look, I'll --
22        MR. URBAN:  Your Honor, this is Tom Urban.
23 Unfortunately, I've got a trial starting August 17.  I imagine
24 this is going to be more than a one-week trial.
25        THE COURT:  Not necessarily.  We try things pretty

1  quickly here.
2           Are you -- you're cocounsel on this case, or are you
3  local counsel?
4           MR. URBAN:  I'm local counsel, Your Honor.
5           THE COURT:  Well, I can have you here the first week,
6  and if the case went into the second week, we could excuse you
7  at that point.
8           MR. URBAN:  Thank you.
9           THE COURT:  Yeah.  Local counsel are of most value in
10 terms of getting the jury settled and making sure that, you
11 know, outside counsel really knows how things operate, so
12 that's not a problem, Mr. Urban.
13          MR. URBAN:  Thank you, Your Honor.
14          THE COURT:  All right?  We'll issue an order today
15 that sets the case for trial by jury starting on Monday,
16 August 9.  When I do jury trials in civil cases, my juries are
17 eight people.  The minimum number for a civil case is six.
18 They're not alternates.  The jury is eight, but should we lose
19 one or two people along the way, we'd still have enough to try
20 the case.
21          Depending upon where we are with vaccinations and
22 COVID and assuming the case goes to trial, it's possible I
23 might increase the jury to ten just to have a few extra folks
24 because one of the things that courts around the country are
25 seeing is that jurors either themselves or family members

1  either get sick or get exposed, and it creates problems, they
2  have to drop out.  The few trials we've had here, that actually
3  happened in one of them.  So I want to have enough, so I might
4  very well have a ten-person, but it would be eight to ten
5  people, depending upon where we are.
6          And obviously, we'll be in touch with you in mid-July
7  assuming that that date holds to work out any motions in limine
8  or pretrial matters.
9          But that's, that's the lay of the land.  As I've
10 said, I really recommend both sides might want to think about
11 trying to see if you can work out a resolution since other
12 members of this case have done so, but if not, we'll see you
13 sometime hopefully in the summer, all right?
14         MR. CALHOUN:  Thank you, Your Honor.
15         THE COURT:  All right, thank you.
16         MR. URBAN:  Yes, Your Honor.  Do you want to schedule
17 a pretrial before August 9?
18         THE COURT:  Who's speaking, please?
19         MR. URBAN:  That was Tom Urban.  Sorry.
20         THE COURT:  Mr. Urban.
21         Have we have not done the final pretrial in this case
22 yet?
23         A VOICE:  No, Your Honor.  We haven't.  If you
24 remember, it got pushed off for the motions for summary
25 judgment.

1        THE COURT:  That's right, all right.  Well, the final
2   pretrial would be the time at which you would file your witness
3   lists and exhibits and any uncontested or any stipulated facts,
4   and we should have that done in advance.  Let's make all of
5   that due -- hold on one second.
6        All right, the pretrials that I'm doing in, in June,
7   this does not have to be on that calendar.  How about Thursday,
8   July 8?
9        All right.  And we can do it -- we can see whether we
10  need an actual -- we don't normally need a pretrial conference
11  if I've already set the trial date, but I'll set July 8 at
12  10:00 for pretrial motions.  How's that?  Because that gives
13  you a few weeks before the trial.  So if you want to have any
14  motions in limine heard or anything else, that's the July 8
15  date.
16       And then in terms of filing your exhibits and your
17  witness lists, let's back that up to June 18.  So exhibit and
18  witness lists filed by June 18, and that gives enough time for
19  any objections to be filed such that we can hear the argument
20  of those at the pretrial -- final pretrial.
21       And my law clerk -- we'll get an order out to you
22  with those dates in it.  All right?
23       MR. URBAN:  Thank you, Your Honor.
24       THE COURT:  All right.
25       MR. CALHOUN:  Thanks, Your Honor.

```
 1         THE COURT:  And again, don't hesitate to call Judge
 2  Buchanan or a private mediator if you think that would be
 3  beneficial.
 4         All right, if there's nothing further then, we're
 5  going to sign off for our next case.  Thank you.
 6         MR. CALHOUN:  Thank you, Your Honor.
 7         THE COURT:  All right.
 8                    (Which were all the proceedings
 9                     had at this time.)
10
11               CERTIFICATE OF THE REPORTER
12    I certify that the foregoing is a correct transcript of
13  the record of proceedings in the above-entitled matter.
14
15
16                                      /s/
                                Anneliese J. Thomson
17
```