1033

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

NAVIENT SOLUTIONS, LLC,          .       Civil Action No. 1:19cv461
                                 .
                Plaintiff,       .
                                 .
      vs.                        .       Alexandria, Virginia
                                 .       August 13, 2021
THE LAW OFFICES OF JEFFREY       .       11:03 a.m.
LOHMAN, et al.,                  .
                                 .
                Defendants.      .
                                 .
. . . . . . . . . . .            .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME V

APPEARANCES:

FOR THE PLAINTIFF:              GEORGE R. CALHOUN, ESQ.
                                JEFFREY R. HAMLIN, ESQ.
                                Ifrah PLLC
                                1717 Pennsylvania Avenue, N.W.
                                Suite 650
                                Washington, D.C. 20006
                                  and
                                LISA M. SIMONETTI, ESQ.
                                Greenberg Traurig LLP
                                1840 Century Park East
                                Suite 1900
                                Los Angeles, CA 90067


FOR THE LOHMAN DEFENDANTS:      JEFFREY E. GRELL, ESQ.
                                Grell Feist PLC
                                825 Nicollet Mall, Suite 625
                                Minneapolis, MN 55402


(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1033 - 1238)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1034

```
 1   APPEARANCES:  (Cont'd.)

 2   FOR THE LOHMAN DEFENDANTS:    THOMAS F. URBAN, II, ESQ.
                                   Fletcher, Heald & Hildreth, PLC
 3                                 1300 N. 17th Street, Suite 1100
                                   Arlington, VA 22209
 4

 5   FOR DEFENDANTS GST           MIKHAEL D. CHARNOFF, ESQ.
         FACTORING, INC.;         Perry Charnoff PLLC
 6       GREGORY TRIMARCHE; AND   1010 N. Glebe Road, Suite 310
         RICK GRAFF:              Arlington, VA 22201
 7

 8   ALSO PRESENT:                JEFFREY LOHMAN, ESQ.
                                   TROY STANDISH
 9                                 ROBERT TANENBAUM, ESQ.

10
     OFFICIAL COURT REPORTER:     ANNELIESE J. THOMSON, RDR, CRR
11                                 U.S. District Court, Third Floor
                                   401 Courthouse Square
12                                 Alexandria, VA 22314
                                   (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1035

1  I N D E X

2

3                         DIRECT   CROSS   REDIRECT   RECROSS   VOIR DIRE

4  WITNESSES ON BEHALF OF
   THE PLAINTIFF:

5

   Wayne Travell           1045     1064     1069                  1047
6                                                                  1048

7  Andrew Reinhart         1074     1080
     (Recalled)

8
   Philip J. Harvey        1135     1145     1156                  1136
9                                   1152                           1137

10

   WITNESS ON BEHALF OF
11 LOHMAN DEFENDANTS:

12 Jeffrey Edward Lohman    1085     1109     1117
     (Recalled)

13

14

15

16                              EXHIBITS

17                                   MARKED          RECEIVED

18 PLAINTIFF'S:

19
   No.   911                                          1136
20       915 to 922                                   1084
         926 to 930                                   1084
21       936 to 945                                   1084
         947 to 948                                   1084
22
         950                                          1084
23       952                                          1084
         954                                          1084
24       956 to 959                                   1084
         961 to 963                                   1084
25
         965                                          1084

1036

1   <u>EXHIBITS</u> (Cont'd.)

2                                         <u>MARKED</u>          <u>RECEIVED</u>

3   <u>PLAINTIFF'S</u>:

4   No. 967 to 979                                          1084
        982 to 987                                          1084
5       989 to 997                                          1084
        1002                                                1112
6

7   <u>LOHMAN DEFENDANTS'</u>:

8   No. 2033                                                1103
        2076                                                1087
9       2078                                                1090
        2082                                                1089
10      2222                                                1098

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1037

```
  1                    P R O C E E D I N G S

  2                      (Jury out.)

  3            THE CLERK:  Civil Action 19-461, Navient Solutions,

  4    LLC, versus the Law Offices of Jeffrey Lohman, et al.  Would

  5    counsel please note their appearances for the record.

  6            MR. CALHOUN:  Good morning.  George Calhoun and Jeff

  7    Hamlin with Ifrah PLLC and Lisa Simonetti of Greenberg Traurig

  8    for the plaintiff.

  9            THE COURT:  Good morning.

 10            MR. GRELL:  Jeff Grell and Tom Urban for the Lohman

 11    defendants.

 12            THE COURT:  Good morning, Mr. Grell.

 13            MR. CHARNOFF:  Good morning, Your Honor.  Mike

 14    Charnoff on behalf of GST Factoring, Inc.; Greg Trimarche; and

 15    Rick Graff.

 16            THE COURT:  All right.  All right, you wanted to talk

 17    to me before we get started?

 18            MR. CALHOUN:  We have a couple of issues, Your Honor.

 19            THE COURT:  All right.

 20            MR. CALHOUN:  We worked overnight to try to reduce

 21    the stipulation and made a lot of progress.  I don't think we

 22    came to a final agreement, but what we propose is to hand up a

 23    dramatically pared down stipulation and propose that you read

 24    that.

 25            THE COURT:  Well, all right.  I mean, is the one that
```

1038

1  you've handing up something to which the defendants have

2  agreed, or is this --

3        MR. CALHOUN:  It's not totally clear.

4        MR. URBAN:  No, Your Honor.

5        THE COURT:  All right.  Rather than take up the

6  jury's time, except that -- are any of the facts to which there

7  is not yet an agreement facts that you feel put you at a

8  disadvantage because you did not work to produce evidence to

9  support them during the trial because you were relying on the

10  stipulation coming in?

11       MR. CALHOUN:  Some of them are, Your Honor.

12       THE COURT:  I'm sorry?

13       MR. CALHOUN:  Some of them are, Your Honor.  We

14  can -- I mean, it's not long, and given your prior ruling, if

15  you think it makes sense, it's essentially a condensed version

16  of the admissions that you already recognized.

17       THE COURT:  All right.  Well, right now we want to

18  get Mr. Travell's testimony in.

19       MR. CALHOUN:  Yes.

20       THE COURT:  I mean, he's here.  There are timing

21  issues.

22       Or is it Mr. Harvey?  I see he's here.

23       MR. CALHOUN:  He's rebuttal, Your Honor.  I expect it

24  all to go today.

25       THE COURT:  All right.  You know, no one ever asked

1039

1    for a rule on witnesses, so we've been very lax about that, and

2    I think it's too late at this point to impose it, but I just

3    for the record want you to know that it could have been

4    requested, but it was not.

5            MR. CALHOUN:  Correct, Your Honor.

6            THE COURT:  All right.

7            MR. CALHOUN:  We do have one other issue.

8            THE COURT:  All right, so I'm passing on the

9    stipulations.  That's a matter we'll do outside the presence of

10   the jury, obviously, and I don't want to hold them up.  They're

11   all here.

12           Yes, Ms. Simonetti.

13           MS. SIMONETTI:  We have one further issue, Your

14   Honor, with the invoices that we talked about briefly with

15   Mr. Reinhart.  If you remember, we admitted the chart that's

16   Exhibit 910, but we did not move the invoices themselves into

17   evidence, and in part, this was because there was the proposal

18   to hear the directed verdict motion which was coupled with a

19   waiver, as we understood it, to at least to some extent, of a

20   challenge to the reasonableness of the fees, but now apparently

21   that's not the case.

22           So we would need to put Mr. Reinhart on very briefly

23   to discuss the invoices because they object to them.

24           THE COURT:  In other words, there's an objection from

25   defense counsel to the underlying data upon which the summary

1040

1    chart was produced?

2         MS. SIMONETTI:  Just the invoices, yes.

3         THE COURT:  The invoices for attorneys' fees from

4    what, Hinshaw?

5         MS. SIMONETTI:  Correct.

6         THE COURT:  What's the basis for the objection?

7         MR. URBAN:  My understanding is they're not actually

8    the invoices.  They're something that Navient created from the

9    invoices, but they're not the actual invoices from Mr. Lueck.

10        Our client -- the other problem is they didn't

11   introduce them when they had their witness on.  You know, I

12   just don't see -- I mean, they referred to them.  They had

13   every opportunity to introduce them, and they didn't.

14        So I just have a lot of problems with these invoices

15   because they're summaries created by Navient.  They are not the

16   actual invoices.

17        THE COURT:  All right.  I'm going to allow -- because

18   we did do things a little unusually yesterday in terms of, you

19   know, jumping in with the motions for directed verdict towards

20   the end of their case.  I'm going to let them reopen that

21   testimony.

22        MS. SIMONETTI:  Thank you, Your Honor.

23        THE COURT:  And you can cross-examine all you want

24   about it, all right?

25        MS. SIMONETTI:  Thank you, Your Honor.

1    THE COURT:  All right.  So let's have the -- are we

2    ready for the jury?  Wait, is there a defense issue?

3    MR. URBAN:  Oh, two other things, Your Honor.

4    THE COURT:  Yeah.

5    MR. URBAN:  The first thing is, how are you going to

6    address Mr. Branch being dismissed?

7    THE COURT:  I thought you might ask that question.  I

8    have multiple ways of doing it.  I can do it now or do it at

9    the end.

10    MR. URBAN:  We would like you to do it now.

11    THE COURT:  All right.  I'm just going to say, you

12    know, you may recall yesterday afternoon I let you go home

13    early because we've been streamlining the case.  It's been

14    streamlined.  We've been able to remove one defendant from the

15    case; that's all.  Draw no inferences one way or the other from

16    the fact that Mr. Branch is no longer part of this case.

17    MR. URBAN:  And the second thing is, Your Honor --

18    THE COURT:  Anybody have an objection to basically

19    that being said to the jury?

20    MR. CALHOUN:  Your Honor, we think that's fine.

21    MR. CHARNOFF:  No objection from GST.

22    THE COURT:  All right.

23    MR. URBAN:  No objection from us.

24    The second thing is Mr. Travell will be the first

25    witness.  We ask that Navient not be allowed to lead him.

1042

1    There's no established that he's an adverse witness.  As a

2    matter of fact, quite the contrary, I think Mr. Travell is a

3    straight shooter who will give honest answers to all the

4    questions he's asked, and I don't believe it's appropriate.

5             I also notice that if Ms. Simonetti is questioning,

6    she tends to lead every third question.

7             THE COURT:  Well, both sides have been leading, and I

8    don't like leading questions to begin with, and from talking

9    with jurors, they don't like it either because it really does

10   suggest that the attorney is trying to plant the answer.

11            I mean, I know why we all do it as lawyers, but

12   nonetheless, I think that's not -- that's it.  That's an

13   appropriate request.

14            Mr. Travell is known to the Court, as is Mr. Harvey.

15   I would not expect either of these witnesses to do anything but

16   to tell things as straight as they can, all right?

17            MR. URBAN:  So I may have some leeway to object if --

18            THE COURT:  Try to keep the objections to a minimum,

19   but I'll warn counsel who are calling a witness to make sure

20   you don't lead.  It should not be necessary.  All right?

21            MR. URBAN:  Thank you, Your Honor.

22            THE COURT:  All right.  Let's have the jury come in.

23            THE COURT SECURITY OFFICER:  Yes, Your Honor.

24            THE COURT:  Oh, sorry.  Was there something?

25            MR. CHARNOFF:  Yes.  Just very quickly, Your Honor,

1043

1    with respect to Mr. Travell.  Two other items:  One, I think

2    the Lohman defendants raised in motions in limine and then

3    again the other day, obviously, any questions would have to be

4    limited to the four corners of the expert designation for

5    Mr. Travell.  So I'm just reminding the Court of that issue.

6              Second, I just want to be sure that we're going to

7    have a very brief opportunity to voir dire qualifications

8    before we get to any substantive testimony.

9              THE COURT:  The qualifications for Mr. Travell?

10             MR. CHARNOFF:  Correct.

11             THE COURT:  He was your witness.

12             MR. URBAN:  No, he wasn't theirs.

13             MR. CHARNOFF:  He wasn't my witness.

14             THE COURT:  Oh, all right.

15             MR. CHARNOFF:  And I'm going to be quite candid with

16   the Court.  He's only licensed in three jurisdictions, and I

17   just want to establish that he's not licensed to testify about

18   the reasonableness of attorneys' fees in 47 states where he's

19   not licensed.  So I need to -- I want to do that at the

20   beginning, when we're discussing qualifications.

21             THE COURT:  All right, I'll permit it.

22             MR. CHARNOFF:  Thank you, Your Honor.

23             THE COURT:  We don't -- we tend to not spend a lot of

24   time in this court on expert qualifications.  You move the CV

25   in, and that's it.

1044

1    MR. CHARNOFF:  I understand, Your Honor, but it's a

2  scope issue.

3    THE COURT:  All right.  Okay.

4    MR. URBAN:  Would you like a copy of his report?

5  It's the four corners of his designation.

6    THE COURT:  All right, let's bring the jury in.

7    THE COURT SECURITY OFFICER:  Yes, Judge.

8    MR. CALHOUN:  Your Honor, we don't mind giving it to

9  the Court, but just to be clear, we're not moving it into

10  evidence.

11    THE COURT:  What, this?

12    MR. CALHOUN:  Yes.

13    THE COURT:  No.

14                  (Jury present.)

15    THE COURT:  Once again, good morning, ladies and

16  gentlemen.  Again, you've all been here on time.  We really

17  appreciate that.

18    And I want you to know that we actually made a great

19  deal of progress yesterday afternoon while you were away.  We

20  have been able to streamline the case.

21    I want you to know that there is now one fewer

22  defendant.  Mr. Branch is no longer involved in this case.

23  You're to draw no inference one way or the other as to the fact

24  that he's no longer a defendant in the case.

25    We have also streamlined a fair amount of the

Travell - Direct                                                          1045

1    evidence.  I'm reasonably optimistic, I think we are going to

2    get close to finishing the evidence today, possibly a little

3    bit Monday, but we've been able to shorten this trial.

4            All right, we're going to begin now with a recall of

5    one of the plaintiff's witnesses, correct?

6            MR. CALHOUN:  We're going to do Mr. Travell first,

7    Your Honor.

8            THE COURT:  Oh, you're going to do Mr. Travell first?

9    All right.  So, Mr. Travell, if you'll come up?

10           WAYNE TRAVELL, PLAINTIFF'S WITNESS, AFFIRMED

11                       DIRECT EXAMINATION

12   BY MR. CALHOUN:

13   Q.   Good morning, Mr. Travell.  Can you state your name for

14   the record, please.

15   A.   My name is Wayne Travell.

16   Q.   And, Mr. Travell, you're an attorney?

17   A.   I am.

18   Q.   All right.  And have you been hired to provide expert

19   testimony in this case?

20   A.   I am.

21   Q.   All right.  And what were you hired to provide expert

22   testimony concerning?

23   A.   I was hired to express an opinion about the reasonableness

24   of attorneys' fees as an element of damages in this case.

25   Q.   All right.  Can you tell the Court your background in this

Travell - Direct                                                    1046

1    field?

2    A.   I was -- I've been an attorney since 1982.  That's not

3    quite 40 years but almost.  I'm admitted to practice in the

4    Commonwealth of Virginia 1982, as a member of this court at

5    about the same time.  I'm also admitted to the practice of law

6    in Maryland and in the District of Columbia and have been

7    members of the Maryland -- I've been a member of the Maryland

8    Bar since 1983 and the Virginia Bar -- the D.C. Bar since 1984.

9    Q.   All right.  And have you done any professional writing on

10   the subject of attorney fee reasonableness?

11   A.    No.  I did participate in the presentation of a CLE,

12   continuing legal education course, recently in this court, the

13   Federal Bar Association that's associated with this court.  The

14   materials were written by Craig Reilly, who's another lawyer in

15   this court -- courthouse.

16   Q.   And have you been named before as an expert witness with

17   regard to the reasonableness of attorneys' fees?

18   A.   I have.

19   Q.   All right.  And in what courts have you been recognized as

20   an expert in that area?

21   A.   In this court, in a case called *Salim v. Dahlberg*.  I

22   believe that was in 2016.  And in the Western District of

23   Virginia, the federal court in Harrisonburg, in Roanoke, I

24   believe.  One case was called *Stultz v. The Department of Motor

25   Vehicles*, and the other case was *Doe v. Alger*.

Travell - Voir Dire                                                    1047

1              In addition to that, I've been named and qualified as

2    an expert in the Circuit Court for Fairfax County as an expert

3    witness.  There may be others, but those are the ones that come

4    to mind.

5              MR. CALHOUN:  Your Honor, we would submit that

6    Mr. Travell is qualified to testify as an expert.

7              THE COURT:  All right, I think there wants to be a

8    little bit of voir dire.

9              MR. CHARNOFF:  Very briefly, Your Honor.

10             THE COURT:  Mr. Charnoff?

11                      VOIR DIRE EXAMINATION

12   BY MR. CHARNOFF:

13   Q.   Good morning, Mr. Travell.

14   A.   Good morning.

15   Q.   I just want to articulate something with respect to your

16   background.  Is it correct that you are not licensed and have

17   never been licensed to practice law in the 48 states other than

18   Virginia and Maryland and then, obviously, the District of

19   Columbia?

20   A.   That's correct.

21             MR. CHARNOFF:  I have no further questions, Your

22   Honor.

23             THE COURT:  Was there any voir dire from the Lohman

24   defendants?  Mr. Urban?

25             MR. URBAN:  No, Your Honor.

```
Travell - Direct                                              1048
```

1    THE COURT:  No?  All right, you may proceed.

2    MR. URBAN:  Actually, one question, Your Honor.

3    THE COURT:  Yes.

4                      VOIR EXAMINATION

5    BY MR. URBAN:

6    Q.   Mr. Travell, who were you hired by in this case to opine

7    on the reasonableness of attorneys' fees?

8    A.   By defendant the Law Offices of Jeffrey Lohman and two

9    other individuals in addition to Mr. Lohman himself.

10    MR. URBAN:  Thank you, Your Honor.  That's all.

11                  END OF VOIR DIRE EXAMINATION

12                  DIRECT EXAMINATION (Cont'd.)

13    BY MR. CALHOUN:

14    Q.   Mr. Travell, what is the rate that you're charging in

15    connection with your work in this case?

16    A.   $595 an hour.

17    Q.   Okay.  And as part of your work, did you review the

18    electronic attorney billing records provided through the

19    discovery by the plaintiff, Navient?

20    A.   Yes.  What I reviewed, I believe, were computer summaries

21    that were a software program that was maintained by your

22    client, Navient.  I never was provided with actual copies of

23    invoices that were submitted by law firms to the client,

24    Navient.

25    Q.   All right.  And through your review of those invoices, did

Travell - Direct                                                      1049

1   you identify a principal attorney who worked on behalf of

2   Navient?

3   A.    I believe so.

4   Q.    And who was that?

5   A.    George Lueck, I think.  I'm not sure how you pronounce his

6   last name.  It's --

7   Q.    Dennis Lueck?

8   A.    Dennis Lueck?  Okay.

9   Q.    Okay.  And what was the hourly rate charged by Mr. Lueck?

10  A.    I believe it was $305 an hour.

11  Q.    And if Mr. Lueck were billing time in the Eastern District

12  of Virginia, do you have an opinion as to whether that rate

13  would be a reasonable rate for Mr. Lueck in the Eastern

14  District of Virginia?

15        MR. CHARNOFF:  Your Honor, I'm going to object to the

16  foundation.  There's no foundation for any work done in the

17  Eastern District of Virginia.

18        THE COURT:  No, it's a hypothetical question.  It's

19  not inappropriate, but you need more of a foundation than that.

20        MR. CALHOUN:  Okay.

21        THE COURT:  The hourly rates are connected to other

22  factors.

23        MR. CALHOUN:  All right.

24  Q.    And in your work, did you observe how many years Mr. Lueck

25  had been in practice?

1    A.    I wasn't asked to opine about whether or not his rate was

2    reasonable in Virginia.  There was no evidence that I saw in

3    the record as to any evidence of what the reasonable rates

4    would have been in the communities in which his services were

5    performed.  As I understand the applicable standard --

6               THE COURT:  Wait.  I'm sorry, Mr. Travell, just

7    answer the specific question, all right?

8               THE WITNESS:  All right.  Can you tell me what the

9    question was again?

10   BY MR. CALHOUN:

11   Q.    I asked if you had looked at how long Mr. Lueck had

12   practiced.

13   A.    I don't recall how long he'd been practicing.

14   Q.    And do you recall that he was with any particular law

15   firms?

16   A.    Pardon me?

17   Q.    Do you recall which law firms he practiced at in the

18   invoices you reviewed?

19   A.    I think in the early cases, it was with Akerman

20   Senterfitt, which is a national law firm out of, based in

21   Florida; and then later, he was in, like, Denver, someplace in

22   the Mountain States; and then he was with a firm out of

23   Chicago, Hinshaw, in their New York and San Francisco offices.

24   Q.    Okay.  And was Mr. Lueck a partner?

25   A.    I believe so.  I'm not certain, but I believe so.

Travell - Direct                                                          1051

1    Q.   All right.  I'm going to go back to my prior question.

2    Based on your understanding of Mr. Lueck and his practice from

3    your review of the invoices, if the services had been rendered

4    by Mr. Lueck in this district, do you agree that his rate would

5    be reasonable?

6               THE COURT:  Wait.

7               MR. URBAN:  I object, Your Honor.  That's outside the

8    scope of his designation.  Nowhere in his designation does it

9    talk about the reasonableness of the attorneys' fees on an

10   hourly basis.

11              MR. CHARNOFF:  I join in the objection on behalf of

12   GST.

13              THE COURT:  If it's not -- if it's not within the

14   four corners of the report, it's not proper.  I'll sustain the

15   objection.

16   BY MR. CALHOUN:

17   Q.   All right.  Part of your work, did you review -- with

18   respect to the electronic attorney billing records that you

19   reviewed, you expressed an opinion that you couldn't determine

20   the reasonableness of some redacted invoices; is that right?

21   A.   I did.

22              MR. CHARNOFF:  Objection.  Leading.

23              THE COURT:  All right.  You're not supposed to lead,

24   remember?  Sustained.

25   BY MR. CALHOUN:

Travell - Direct                                                           1052

1    Q.   With respect to the invoices that you reviewed, did you

2    make any determinations as -- could you make any determinations

3    as to the reasonableness of any of those time entries?

4             MR. CHARNOFF:  Objection.  Foundation.  We've not

5    established any work was done in any --

6             THE COURT:  Yeah, it should be to the materials that

7    were evaluated.

8             MR. CALHOUN:  That's what I asked him about.

9             THE COURT:  You used the word -- you used the word

10   "invoice."  That's become an issue in the case.

11   BY MR. CALHOUN:

12   Q.   The materials you evaluated, were you able to draw an

13   opinion as to any of the time entries that you reviewed?

14            MR. CHARNOFF:  Objection.  Foundation.  There's no

15   foundation as to entries in the limited jurisdictions this

16   witness is licensed to practice law.

17            THE COURT:  Can you go just more directly to his

18   various opinions that are in the report?

19   BY MR. CALHOUN:

20   Q.   All right.  Mr. Travell, did you express any opinions

21   about redacted invoices?

22   A.   I did.

23   Q.   All right.  And what was the opinion you expressed as to

24   redacted invoices?

25   A.   My opinion is that if the redactions of time entries, and

Travell - Direct                                                            1053

1    what that means that to the extent that a lawyer enters time

2    for a particular task, the lawyer will then add a description

3    of what he or she has done for the client.  So, for example,

4    for today's entry, it would be on August 13 of 2012 (sic), you

5    express the amount of time as -- the amount of actual time

6    elapsed on a particular topic.

7          So if an entry said 0.3, typically the points are

8    six-minute increments, so that would be 18 minutes.  0.3, and

9    then there's a description that might say something to the

10   effect of studied case law regarding reasonableness of

11   attorneys' fees in the Fourth Circuit.

12         Oftentimes, lawyers will redact, meaning edit out,

13   certain elements of the description so that the actual -- the

14   actual task that was being performed by the lawyer is not

15   visible to the opposing counsel.  So in looking at

16   reasonableness of attorneys' fees, one has to determine whether

17   or not the entry adequately describes what the work was done.

18         So if there's a redaction that eliminates from the

19   reviewer's perspective what actually happened, I've expressed

20   an opinion at least with regard to some of the entries that I

21   saw, I was not able to determine the reasonableness of whether

22   the task was necessary for that particular, that particular

23   client, for that particular matter.

24   Q.   Mr. Travell, who gets to decide whether a time entry is

25   reasonable?

Travell - Direct                                                    1054

1   A.    I was asked to make the determination as to whether it was

2   reasonable.

3   Q.    You were asked to give an opinion on that?

4   A.    I was.

5   Q.    All right.  And was it your opinion that the fact finder

6   gets to make that decision?

7              MR. URBAN:  Objection, Your Honor.

8              THE COURT:  I'm going to sustain the objection.  But

9   I'll tell the jury right now we normally don't let witnesses

10  testify as to their opinion about a fact in the case.  We make

11  an exception for people who are deemed to be experts, and an

12  expert is basically somebody who by experience or specialized

13  training developed some expertise in an area in which the

14  average juror would have no true knowledge about.

15             You should evaluate the testimony of an expert

16  witness the way you evaluate any other witness.  It's --

17  ultimately, you-all as the finders of fact make the factual

18  determination, but you are permitted to accept an expert's

19  opinion if you're satisfied that it's based on a good

20  foundation, or you can reject it, or you can accept part of it

21  and reject part of it.  It's ultimately up to you.

22             But Mr. Travell will be permitted to give an opinion

23  about the reasonableness of the attorneys' fees, but you need

24  to make sure you've laid a proper foundation.

25  BY MR. CALHOUN:

1    Q.   Mr. Travell, can you look at Exhibit 924, please?

2    A.   Is that my expert witness report?

3    Q.   It's not your report.

4            THE COURT:  Plaintiff's Exhibit 924.  What volume is

5    that?

6            MR. CALHOUN:  Your Honor, I'm sorry, that is Exhibit

7    16 -- Binder 16.

8            THE COURT:  Binder 16.

9            THE WITNESS:  Okay.

10           THE COURT:  Is that in evidence yet?

11           MR. CALHOUN:  No, Your Honor.  That will be the

12   subject of the next witness.

13           THE COURT:  So you're not moving it in?

14           MR. CALHOUN:  I will, Your Honor, but --

15           THE COURT:  I'm sorry, are you moving it in with this

16   witness or somebody else?

17           MR. CALHOUN:  We're going to move it in with the next

18   witness, but I'm going to move this one in just so the jury can

19   see what I'm talking about.

20   Q.   Mr. Travell, is this --

21           THE COURT:  Hold on.  Is there going to be an

22   objection to 924?

23           MR. URBAN:  With this witness, yes, Your Honor.

24           THE COURT:  All right.  It's going to be hard for the

25   jury, I think, to understand what he's talking about without

```
Travell - Direct                                                    1056
```

1    their ability to see it.

2              MR. CALHOUN:  I have a very, very short question.

3              THE COURT:  All right.  Let me hear the question, all

4    right.

5    BY MR. CALHOUN:

6    Q.    Can you look at page 18, please, Mr. Travell?

7    A.    18?

8    Q.    It will be -- it will bear a label 924.0018.

9              THE COURT:  Lower right-hand corner.  It's a Bates

10   stamp.

11             THE WITNESS:  Yes, I see it.

12   BY MR. CALHOUN:

13   Q.    All right.  Do you see a redaction on this page?

14   A.    I do.

15   Q.    Okay.  And this is a time entry that reads "Teleconference

16   with Navient regarding benefits of remaining in federal court,

17   nature of discovery to conduct, and other issues with," and

18   then there's a redaction.  That's how it reads.

19   A.    Yes.

20   Q.    All right.  And is it your opinion that one cannot

21   determine the reasonableness of this time entry due to this

22   redaction?

23   A.    Yes.

24   Q.    All right.  And if the period -- if there had been a

25   period that stopped after "issues" -- and how much time was

Travell - Direct                                                          1057

1    billed on that task?

2    A.   I believe it's .2 hours, which would be 12 minutes.

3    Q.   All right.  And if there was a period after "issues,"

4    would you have any dispute that that time entry would have been

5    reasonable?

6                MR. CHARNOFF:  Your Honor, I'm going to object to the

7    hypothetical.

8                THE COURT:  Overruled.

9                MR. URBAN:  Well, Your Honor, I'm going to object to

10   it because Mr. --

11               THE COURT:  The question he's -- what counsel is

12   trying to get at is whether or not the redaction makes a

13   material difference.  It's a fair question.  I've overruled the

14   objection.  Go ahead.

15               THE WITNESS:  It, it might, and the reason I hesitate

16   is because one of the issues is whether or not the time is

17   properly recorded to this matter for this client, and to the

18   extent that the redacted part shows that this is an improper

19   entry, I would -- in my opinion, you're not able to determine

20   whether it's reasonable or not.

21   BY MR. CALHOUN:

22   Q.   Did you --

23   A.   But the question is, you know, if there was a period after

24   "issues," would that come to my attention?  Probably not.  We

25   looked at thousands of lines of entries.  I probably wouldn't

Travell - Direct                                                      1058

1    have been drawn to it if there had not been a redaction.

2    Q.   Let, let me clarify it so we can maybe take of that

3    concern.  If what you assumed, that the entry were properly

4    billed on this matter and that it was a period after "issues,"

5    would this strike you as something you could not determine the

6    reasonableness of?

7    A.   It would not have come to my notice.

8    Q.   And you mentioned that you reviewed thousands of lines of

9    text.  You did not express an opinion as to improper block

10   billing -- did you express an opinion as to improper block

11   billing in this time entry?

12          MR. URBAN:  Objection.  Outside of the scope.  I

13   mean, the question itself --

14          THE COURT:  Well, the question was leading, and then

15   it got, it got improved.  It was not a leading question.

16          MR. URBAN:  But he doesn't talk about block billing

17   in the report, so it's outside of the scope of the report

18   itself.

19          MR. CALHOUN:  It's not outside the scope of his work,

20   Your Honor, because he, he reviewed all of these entries and

21   came up with just the --

22          THE COURT:  You can ask him what are the -- what are

23   the bases for which he determines that these are not sufficient

24   or that they're inadequate, but -- and I'll let the witness

25   explain his bases, all right?  So one is there was redacting.

Travell - Direct                                                    1059

1           MR. CALHOUN:  I want to establish from him that he

2   didn't --

3           THE COURT:  So don't lead, in other words.

4           MR. CALHOUN:  I'm trying not to lead, but I'm trying

5   to establish, Your Honor, that -- as far as the time entries

6   themselves, in your review, did you find any other issues with

7   how these time entries were billed?

8           MR. URBAN:  And I'm going to object for foundation.

9   Nowhere in the report does it say that he looked at the time

10  entries substantively, and it hasn't been established by

11  Mr. Calhoun that he looked at them substantively.

12          THE COURT:  Well, ask the question, how did you go

13  about doing this report?

14  BY MR. CALHOUN:

15  Q.   Well, Mr. Travell, you, you reviewed the -- as part of

16  your work, the electronic billing materials, you testified

17  earlier.  Did you review the electronic billing materials in

18  connection with your work?

19  A.   Yes.

20  Q.   And did you review all of them to --

21          THE COURT:  That's going to be leading.

22          MR. CALHOUN:  It's going to be, so I was stopping,

23  Your Honor.

24  Q.   Did you mark --

25          THE COURT:  What did you do in your review?  How did

Travell - Direct                                                      1060

1   you conduct your review?

2            THE WITNESS:  Well, again, I used the criteria that I

3   understand are applicable to a determination of reasonableness

4   fees -- reasonableness of fees in this circuit, which starts

5   with the lodestar analysis.  I looked at --

6            THE COURT:  Can you explain "lodestar"?  The jury

7   won't know that.

8            THE WITNESS:  I will, Your Honor, thank you.

9            What happens in an application for fees, the finder

10  of fact, in this case the jury, has to make a determination as

11  to whether the overall hours expended on a particular matter

12  were -- was reasonable given the tasks that were asked to be

13  done, and once one determines that the number of hours spent

14  were reasonable, then you multiply that times a reasonable

15  hourly rate for each of the lawyers or timekeepers that

16  recorded time to that matter.

17           Once that is done -- and that's a mathematical

18  process.  Once you get a reasonable number of fees and a

19  reasonable hourly rate, you make that mathematical

20  determination, and then you apply about a dozen different

21  factors that are recognized in this circuit, Johnson/Barber

22  factors, and those are things such as whether or not the party

23  looking for fees was successful in the underlying action, what

24  was the degree of success, and there are other factors like

25  that.

Travell - Direct                                                          1061

1              Not every factor applies in every case, and in this

2     particular case, I tried to focus on the factors that were

3     relevant here.

4     BY MR. CALHOUN:

5     Q.   Mr. Travell, did you see evidence in your review of the

6     billing records that Navient had reviewed the invoices and made

7     any changes?

8     A.   I saw notes from time to time that there appeared to be

9     comments.  I wasn't sure who those people were, but yes, I did

10    see notes.

11    Q.   All right.  And did those comments involve reductions in

12    the amount of those invoices?

13              THE COURT:  Wait.

14              MR. URBAN:  Leading again, Your Honor.

15              THE COURT:  What?

16    BY MR. CALHOUN:

17    Q.   What did those comments involve?

18    A.   I, frankly, don't recall specifically what they said, but

19    if -- they were generally in the nature of requests for

20    reductions in the amount of time entered.

21    Q.   All right.  And did the invoices demonstrate billing

22    discipline?

23              MR. CHARNOFF:  Objection.  Foundation.  So the

24    foundation is did he actually review any else.

25              MR. CALHOUN:  He said it three times.

Travell - Direct                                                          1062

1              THE COURT:  Wait.

2              MR. URBAN:  He said he reviewed the substance.  If

3    you look at his report, he talked about redacted entries, but

4    he never talked about any of the substance of the entries.

5              THE COURT:  I'm not going to sit here and take the

6    jury's time to read a five- or six-page single-spaced report.

7    You-all need to stop objecting to every single question.  On

8    cross-examination, you can probe whether the testimony is

9    adequate.

10             But, Mr. Travell, in your own words, would you just

11   go into some detail as to exactly how you went about doing the

12   evaluation, any problems you saw with the report -- or with

13   the, with the data that you were working with, and how you came

14   to your conclusion?  All right?

15             THE WITNESS:  Thank you, Your Honor.

16             In looking at these fees, again, the first thing I

17   noticed, that there was some redactions of the time entries.  I

18   looked at those and made a determination as to whether or not I

19   thought I could express an opinion as to whether they were

20   reasonable given the, given the fact that there was some black

21   parts marked out, and determined I thought they were not.

22             Beyond that, I did not make any further determination

23   as to whether or not the time spent on a particular matter was

24   excessive or not.

25   BY MR. CALHOUN:

Travell - Direct                                                    1063

1    Q.   All right.  Do you recall your deposition, Mr. Travell,

2    when we talked about -- I'm going to back up and ask another

3    question first.

4            So when you looked at the redactions, did you look at

5    every single invoice?

6    A.   Yes.  I looked at all the records that were provided to

7    me, which I believe were all of the records that supported the

8    claim for fees in this case.

9    Q.   All right.  And that was, that was the records provided to

10   you with respect to every single borrower that was listed in

11   Navient's damages?

12           MR. URBAN:  Objection.  Foundation.  And moreover, at

13   the time of his report, there was other borrowers.

14           THE COURT:  Has this report been adjusted because

15   things changed during the course of discovery?

16           MR. CALHOUN:  It has not, Your Honor.

17           THE COURT:  Well, that's problematic in itself.

18   BY MR. CALHOUN:

19   Q.   Did you -- in reviewing these invoices for redactions,

20   regardless of what borrower it's with respect to, you

21   reviewed -- did you review all of them or just select ones?

22   A.   I read every entry on every invoice.

23   Q.   All right.  And did you express any opinion as to those

24   entries other than the redactions as to the nature of those

25   entries?

Travell - Cross                                                      1064

1    A.    I don't believe so.

2              MR. CALHOUN:  All right.  Your Honor, no further

3    questions.

4              THE COURT:  All right.  Mr. Urban, I assume you're

5    going to cross?

6              MR. URBAN:  I'll let Mr. Charnoff go first.

7              THE COURT:  All right.  Mr. Charnoff?

8              MR. CHARNOFF:  Your Honor, at this time, I have no

9    cross.

10             THE COURT:  All right.  Mr. Urban?

11                          CROSS-EXAMINATION

12   BY MR. URBAN:

13   Q.    Good morning, Mr. Travell.  How are you, sir?

14   A.    Mr. Urban, good morning.

15   Q.    You testified earlier that you were hired by the Lohman

16   defendants.  Do you know why you were hired by the Lohman

17   defendants?

18   A.    I was hired to express a fee -- I'm sorry, an opinion as

19   to the reasonableness of attorneys' fees in this case.

20   Q.    Okay.  And prior to today, have you ever met me face to

21   face in person?

22   A.    No.

23   Q.    Okay.  Did plaintiff, Navient, timely designate an expert

24   on attorneys' fees in this case for their case-in-chief?

25             MR. CALHOUN:  Objection, Your Honor.

Travell - Cross                                                    1065

1              THE COURT:  Sustained.

2              MR. URBAN:  Well, it goes to whether he had an

3       ability to --

4              THE COURT:  That's not -- but that's not a proper

5       question.

6              MR. URBAN:  Okay.

7       Q.    Did you have an opportunity to rebut any testimony of

8       Navient's regarding the reasonableness of attorneys' fees?

9       A.    No.  In the -- one of the opinions that I expressed in the

10      report is that I looked in the record for any evidence of

11      reasonableness of attorneys' fees, which I believe to be

12      plaintiff's burden in a case like this.  There was no such

13      evidence.  There was no evidence as to whether or not these

14      fees are reasonable.

15             I also understand that the reasonableness of fees has

16      to be proved as to every jurisdiction in which the services

17      were rendered.  So to the extent that, you know, I practice law

18      in Virginia, Maryland, and D.C., I'm very familiar with hourly

19      rates and reasonableness standards in these jurisdictions.

20             I don't know what the standards are in Texas, I'm not

21      admitted to practice there, or in California, or in the dozens

22      of other jurisdictions in which these litigations actually took

23      place.

24             So because there was no evidence that I saw in the

25      record as to the reasonableness of the rates in those

Travell - Cross                                                          1066

1    jurisdictions, there was nothing for me to opine about, and

2    frankly, I wouldn't have been competent to talk about

3    reasonableness of rates in jurisdictions other than in places

4    where I practice law.

5    Q.   In your review of these cases, were any of the cases from

6    D.C., Maryland, or Virginia?

7    A.   I don't believe so.

8    Q.   Okay.  Did you review the substance of the entries in the

9    Navient summaries of attorneys' fees?

10   A.   No.  I was looking more for things like the redactions,

11   obvious things that would have drawn my attention to things

12   that we are regular about.  I didn't see any -- nothing like

13   that jumped out at me other than the, the redactions.

14   Q.   So if an attorney spent 60 hours on a two-page brief, did

15   you review and opine on that information?

16   A.   No.

17   Q.   Now, if you could look at Navient Exhibit 924 that

18   Mr. Calhoun showed you earlier?

19        Sorry, I should have told you to keep that up there.

20   A.   Okay.

21   Q.   Did most of the redacted time entries involve just the

22   redaction of one word, or were these redactions usually more --

23   of more substantial portions of the time entries?

24   A.   Well, again, it varies, and whether it's -- the redaction

25   is, you know, it's just essentially like a Magic Marker was

Travell - Cross                                                    1067

1   used to blank out a portion of a line of description.  So

2   whether there's one word -- one really long word or four kind

3   of short words, you know, I couldn't tell, but most of them

4   appeared to be more than a word or two.

5   Q.    Okay.  And if you look at page 25 of Exhibit 924, on

6   December 18, 2018, do you see an entry for Mr. Lueck that's

7   been redacted?

8   A.    I do.

9   Q.    Would you say that that redacted a significant portion of

10  whatever was done by Mr. Lueck?

11  A.    Well, again, just looking at the entry, it covers

12  one-and-a-half, one-and-a-half lines.  Half of the first line

13  and all of the second line is redacted.  So it appears that,

14  you know, probably two-thirds of the entry there is unavailable

15  to look at to see what the -- description of what was being

16  done.

17  Q.    If you could turn to page 28 on that same exhibit?

18  A.    Yes, sir.

19  Q.    Do you see an entry on December 24, 2018, by Mr. Lueck?

20  A.    Yes.

21  Q.    And what percentage generally do you believe was redacted

22  of that entry?

23  A.    Similar to the entry we looked at, it's, you know, a line

24  and two-thirds or a line and a half, and what I can read is:

25  "Analyze known" -- and then several words appear to be blanked

Travell - Cross                                                        1068

1    out -- "to determine whether," and then the rest of the entry

2    is blanked out.

3              So I know they're analyzing and determining, but I

4    don't know what's being analyzed or what's being determined.

5    Q.   Okay.  And how long was that entry total?  You said

6    one-and-a-half lines were blocked out.  How long was that entry

7    total?

8    A.   It's three-tenths of an hour, which would be 18 minutes.

9    Q.   Oh, no, no, no.  The number of lines.

10   A.   The number of lines in the description?

11   Q.   Yeah.

12   A.   It's about one and three-quarters, one and a half.

13   Q.   Okay.  So you'd say most of the entry is blocked out?

14   A.   More than, more than half of it is, like two-thirds of

15   that particular line entry.

16   Q.   Okay.  Do you believe that those two time entries are

17   emblematic of the kinds of redactions you saw throughout the

18   various invoices?

19   A.   Yes.

20   Q.   And have you been presented sufficient evidence to opine

21   that the attorneys' fees paid by Navient were reasonable?

22   A.   No.

23   Q.   Are you testifying today that the attorneys' fees paid by

24   Navient are reasonable?

25   A.   No, they're not in my opinion.

Travell - Redirect                                                    1069

```
 1              MR. URBAN:  That's all the questions I have, Your

 2    Honor --

 3              THE COURT:  All right.  Redirect?

 4              MR. URBAN:  -- at this time.

 5                       REDIRECT EXAMINATION

 6    BY MR. CALHOUN:

 7    Q.   Mr. Travell, just keeping you on Exhibit 924, on page 25,

 8    the time entry you referenced there says "Analyze plaintiff's

 9    responses to written discovery for," and then there's a blank

10    out.  And how long was that time entry?

11    A.   Mr. Calhoun, can you tell me what page again?

12    Q.   Exhibit 924, page 25.

13    A.   I'm sorry.  And your question again is how much time

14    was --

15    Q.   How long was that time entry?

16    A.   It says 0.5, which is 30 minutes.

17    Q.   So that would be half an hour?

18    A.   Yes.

19    Q.   If that entry had ended after discovery, would it be your

20    view that a half-an-hour review of discovery responses would be

21    unreasonable?

22    A.   I, I can't tell based on this entry whether it's

23    reasonable or not.

24    Q.   I'm asking you a hypothetical.  If it just ended.

25    A.   Yeah, I can't express an opinion on that.
```

1    Q.    You don't have an opinion?

2    A.    No.

3    Q.    Have you ever reviewed written discovery responses for

4    half an hour?

5            MR. URBAN:  Objection, Your Honor.

6            THE COURT:  No, I'll sustain that -- I'll overrule

7    that, rather.  I think he's an experienced lawyer.  He can say

8    what he's done in his past.

9            THE WITNESS:  Yes.

10   BY MR. CALHOUN:

11   Q.    You have?

12           MR. URBAN:  Well, my objection is in the overall

13   context of all the time sheets, that there's no foundation.

14           THE COURT:  I'm going to allow -- I'm going to allow

15   this.

16   BY MR. CALHOUN:

17   Q.    You have?

18   A.    So I have reviewed discovery, written discovery certainly.

19   Q.    And you've spent half an hour on that?

20   A.    Maybe.

21   Q.    Maybe more?

22   A.    Maybe more, maybe less.

23   Q.    All right.  Mr. Urban asked you whether you reviewed this

24   and saw anything like 60 hours for a two-page memo or something

25   like that.  Do you recall that testimony?

Travell - Redirect                                                    1071

1   A.    I recall the question.

2   Q.    Okay.  And did you see anything like that?

3   A.    I really wasn't looking for that, and again, I was -- when

4   I looked at the record, I was looking for evidence of

5   reasonableness of the hourly rates in particular markets.  I

6   saw none of that.

7          So when it came time to look at the invoices, what I

8   was looking at was not so much the substance of what was being

9   performed as whether there was anything in addition to the lack

10  of proof of reasonableness that jumped out at me.  Things that

11  jumped out at me were the redactions to, to the records.

12  Q.   All right.  And, in fact, when you reviewed these

13  invoices, do you recall your deposition testimony when you

14  talked about the nature of the time entries?

15         MR. CHARNOFF:  Objection to form.  This is

16  referencing deposition testimony.  There's been no testimony to

17  compare it to.

18         THE COURT:  Well, I'm not sure about that.  I need to

19  hear the question and see whether, whether there's any problem

20  here.

21  BY MR. CALHOUN:

22  Q.   All right.  So in your deposition, we talked a little bit

23  about the invoices and your review of them, and do you recall

24  testifying that the invoices involved a fair amount of

25  discipline?

Travell - Redirect                                                      1072

1              MR. URBAN:  Objection, Your Honor.  If he hasn't

2   asked that question, you can't refresh recollection if you

3   haven't asked the question in the first place.

4              THE COURT:  And this is also -- this is also

5   redirect, so I think that's a proper objection at this point.

6              MR. URBAN:  Right.

7              MR. CALHOUN:  Your Honor, just because the question

8   they asked went to questions like excessive time, but he

9   actually expressed an opinion on that in his deposition, which

10  I think I'm entitled to elicit.

11             THE COURT:  If, in fact, he did, let's get the

12  deposition.  Let me see what page you're looking at, all right?

13  Do you have a copy?

14             MR. URBAN:  And again, it's not within the four

15  corners of the report.

16             THE COURT:  But it may not be but you-all -- if he

17  was deposed, then everybody had a chance to develop it further.

18  You were not present at his deposition?

19             MR. URBAN:  No, I was, but, Your Honor, you can ask

20  anything in a deposition well outside of the four corners of

21  the designation.  Just because you ask something in a

22  deposition doesn't bring it within the four corners of the

23  designation.

24             THE COURT:  Nobody ever is stuck literally within the

25  four corners of an expert report.  Depositions are used to

Travell - Redirect                                                    1073

1    further develop an understanding.  I've overruled the

2    objection.

3                But let me see the page first of all.

4                MR. CALHOUN:  67, Your Honor, 18 to 25.

5                THE COURT:  Hold on a second.

6                MR. CHARNOFF:  Your Honor, just for the completeness

7    of the record, on behalf of GST, I'm also going to object to

8    attempting to impeach your own witness.

9                THE COURT:  All right, let me take a look.  I'm

10   sorry, page 67, what line?

11               MR. CALHOUN:  18 to 25, Your Honor.

12               THE COURT:  I think out of context, this doesn't

13   help.  I'm going to sustain the objection.

14   BY MR. CALHOUN:

15   Q.   Mr. Travell, did you observe any block billing in the, in

16   the materials you reviewed?

17               THE COURT:  That was already asked previously, and

18   there was an objection.

19               MR. CALHOUN:  He's now established that he's reviewed

20   all of these time entries.

21               MR. URBAN:  It's beyond the scope.

22               THE COURT:  It was asked in direct.  I sustained an

23   objection.

24               MR. CALHOUN:  Okay.  Thank you, Your Honor.

25               THE COURT:  I assume there's no recross?

Reinhart - Direct                                                    1074

1              MR. URBAN:  No, Your Honor.

2              THE COURT:  All right.  Mr. Travell, thank you for

3    your testimony.  You're excused at this time.

4              THE WITNESS:  Thank you, Your Honor.

5                          (Witness excused.)

6              MR. CHARNOFF:  Your Honor, I just want to re-raise --

7              THE COURT:  I'm sorry, were you going to use this

8    witness again?

9              MR. CHARNOFF:  No.

10             THE COURT:  Oh, all right.  Okay.

11             MR. CHARNOFF:  Your Honor, at this point, again, for

12   clarity of the record, I would move to strike 910 as without

13   foundation under 402 and 403.

14             THE COURT:  All right.  I'm not going to rule on that

15   at this time, all right?

16             All right.  So we're going back now to which witness?

17             MS. SIMONETTI:  Mr. Reinhart.

18             THE COURT:  All right.  Mr. Reinhart, you're going to

19   be back on the stand.  You're still under your affirmation to

20   tell the truth.

21                 ANDREW REINHART, PLAINTIFF'S WITNESS,

22                     PREVIOUSLY AFFIRMED, RECALLED

23                        DIRECT EXAMINATION

24   BY MS. SIMONETTI:

25   Q.   Good morning, Mr. Reinhart.

Reinhart - Direct                                                           1075

1    A.    Good morning.

2    Q.    I think it's still morning.    Yep.

3              Can you remind us of your job responsibilities at

4    Navient?

5    A.    Yes.    Part of my job responsibilities, I work within the

6    legal department.    We're tasked with reviewing legal complaints

7    and gathering documents, putting together, like, a fact-based

8    summary and opinion and providing that to in-house counsel.

9    Q.    Okay.    Can you look back at Exhibit 916?    That's in

10   Volume 15.

11   A.    You said Exhibit 916?

12   Q.    916.

13             THE COURT:    I don't think 916 is in yet, or is it?

14             MR. URBAN:    No, it is not.

15             THE COURT:    No, all right.

16             MR. CHARNOFF:    Absolutely not, Your Honor.

17             MS. SIMONETTI:    It is.    I have it right here.

18             MR. URBAN:    It is not in evidence.

19             MS. SIMONETTI:    Oh, no, it's not in evidence.

20             THE COURT:    No.

21             MS. SIMONETTI:    I'm sorry, it's not in evidence.    I

22   misheard you.

23   Q.    Do you have it?

24   A.    Yes.

25   Q.    Okay.    What is this document?

Reinhart - Direct                                                    1076

1    A.   This is a copy or a PDF screenshot of an invoice within

2    Legal Tracker.

3    Q.   And where did this document come from?

4    A.   It came from Legal Tracker.

5    Q.   Okay.  And can you remind me what that system is?

6    A.   Yes.  It's a third-party web-based program that Navient

7    utilizes for billing purposes.

8    Q.   Does Navient having billing guidelines for outside

9    counsel?

10   A.   Yes, of course.

11   Q.   Have you ever seen those?

12   A.   Yes, I have.

13   Q.   Can you describe them for us generally, what they contain?

14   A.   Just general guidelines on how to enter time into --

15            MR. URBAN:  Your Honor, I'm going to object to all

16   this because the problem is this witness has already testified.

17   I thought he was just here to introduce these.

18            THE COURT:  Look, either -- I'm going to allow the

19   plaintiff to try to show the foundation for their damage claim.

20   It's not improper.  I sort of did an unusual cutting of their

21   case yesterday to try to accommodate some scheduling issues.

22   I'm allowing this.

23            You can cross-examine about it, all right?

24            MR. URBAN:  Very well.

25            THE COURT:  The objection is overruled.

Reinhart - Direct                                                      1077

1              MR. URBAN:  Thank you.

2      BY MS. SIMONETTI:

3      Q.    Mr. Reinhart, could you start over?

4      A.    I'm sorry, could you ask the question again?

5      Q.    Can you describe for us generally what the billing

6      guidelines provide?

7      A.    Yes.  Generally, they're guidelines about how to enter the

8      time into the system that we utilize.  Things like, for

9      instance, when entering, you want, like, a description of what

10     the time is.  You have to enter the attorney's name, the amount

11     of time billed.  We generally want the invoices in every month.

12     I think I mentioned that earlier.  But just general guidelines

13     like that.

14     Q.    Okay.  Let's look at Exhibit 916, and can you identify

15     some of the information that's reflected in there?

16     A.    Yes.  So in 916, this is again a copy of an invoice.  We

17     can see, you know, the invoice information up top, who the firm

18     was, the vendor, in this case Hinshaw, and it just goes

19     through, we could see the office, the particular invoice number

20     that's assigned to every invoice, the billing period, the

21     amount approved.

22             And if we page forward to really the, you know, kind

23     of meat and potatoes of it, at the end, you can see a

24     line-by-line, like, line items of what the attorney did, what

25     the date was, who the timekeeper was, the units, the rate, and

Reinhart - Direct                                                      1078

1    then the amount in the right-hand, the right-hand column.

2    Q.   And can you explain how Legal Tracker is used to input

3    this information?

4    A.   Of course.  So again, it's a third-party, sorry,

5    third-party web-based program that all of our vendors use, all

6    of our firms that we utilize, not only Hinshaw, Akerman was

7    mentioned, but all of our firms.  So it's uniform across the

8    board.

9           They log into the system.  There's a specific format

10   that they're using.  There's drop-down menus, and then

11   ultimately, like I said, you get down to the line item.  They

12   free form and type out what they did, drop down for, you know,

13   the units and so forth, and then they submit it.

14          And electronically it comes to Navient.  That shows

15   up into the inbox of whatever in-house counsel is assigned as

16   an action item.  They then have to log into Legal Tracker,

17   click into the invoice, review it, make any adjustments that

18   they deem necessary, and then approve.

19   Q.   Does Navient accept legal billing in any other manner?

20   A.   We do not, no.  We utilize this program because it makes

21   it easy to track.

22   Q.   Once the invoices are approved, does Navient pay them?

23   A.   Yes.

24   Q.   What's the process for that?

25   A.   So once they're submitted, the actual tool goes through --

```
                                                                     Reinhart - Direct                                             1079
```

| | |
|---|---|
| 1 | goes to our finance department.  They actually wire the money |
| 2 | to the firms. |
| 3 | Q.   Did Navient pay the invoices at issue in this case? |
| 4 | A.    Of course, yeah.  Otherwise, they wouldn't have |
| 5 | represented us any longer. |
| 6 |          MS. SIMONETTI:  Nothing further. |
| 7 |          THE COURT:  All right. |
| 8 |          MR. URBAN:  I do have some questions, Your Honor. |
| 9 |          THE COURT:  All right. |
| 10 |          MS. SIMONETTI:  I'm sorry, I -- |
| 11 |          THE COURT:  Yes. |
| 12 |          MS. SIMONETTI:  Do you want me to move the exhibits |
| 13 | in after the, the further questioning, the list of exhibit |
| 14 | numbers? |
| 15 |          THE COURT:  It's your case.  Decide what you want to |
| 16 | do. |
| 17 |          MS. SIMONETTI:  Okay.  Well, I would ask to move the |
| 18 | exhibits into evidence. |
| 19 |          THE COURT:  Which exhibit is that?  916? |
| 20 |          MS. SIMONETTI:  No, it's a list.  Are you ready? |
| 21 | These are all the same. |
| 22 |          THE COURT:  They're all the same? |
| 23 |          MS. SIMONETTI:  They're all in the same format, but |
| 24 | I'm going to give you the numbers. |
| 25 |          THE COURT:  Just give me the numbers. |

Reinhart - Cross                                                          1080

1              MS. SIMONETTI:  Okay.  915 to 922, 926 to 930, 936 to

2       945 --

3              THE COURT:  Wait.  Hold on.  Wait one second.

4              MS. SIMONETTI:  Sure.

5              MR. URBAN:  Could she go back two?

6              THE COURT:  915 to 922, 926 to 930.

7              MS. SIMONETTI:  Correct.

8              THE COURT:  936 to 945 so far.

9              MS. SIMONETTI:  So far.  947, 948, 950, 952, 954, 956

10      to 959, 961 to 963, 965, 967 to 979.

11             THE COURT:  I'm sorry, 967 to 979?

12             MS. SIMONETTI:  Correct.  982 to 987, 989 to 993, and

13      994 to 997.  That's it.

14             THE COURT:  I'm sorry, 994 to 997?

15             MS. SIMONETTI:  Yes.

16             THE COURT:  All right.  Before I admit them, I'll let

17      you-all cross-examine.

18             MR. URBAN:  Thank you, Your Honor.

19             THE COURT:  Mr. Urban?

20                         CROSS-EXAMINATION

21      BY MR. URBAN:

22      Q.   Mr. Reinhart, good morning.

23      A.   Good morning.

24      Q.   Now, this is a document that once there's any entries put

25      into it by a law firm can be edited by Navient; is that

Reinhart - Cross                                                              1081

1    correct?

2    A.    The 916 that we were looking at?

3    Q.    Yes.

4    A.    There's no edits that can be made except for the line

5    items where we actually, say, if, like, an attorney deemed that

6    something was too many hours.  They can actually go in and

7    reduce it and provide a reason for it.

8    Q.    All right.  But you said in your testimony that Navient

9    can make adjustments, correct?

10   A.    To the amount of time we can reduce.  So not for the

11   sections of the bills, but if we go to, like, the actual line

12   items, they can go line item by line item, and if they need to

13   reduce something or they feel that there was block billing,

14   which just basically means that an attorney grouped all their

15   activities together instead of listing them out one by one,

16   they can make those type of reductions.

17   Q.    Okay.  There's a lot of information on here that is not

18   put in by the law firm, correct?

19   A.    Some of the information comes from, from Navient.

20   Q.    Right.  As a matter of fact, it says "Final Approver" --

21              THE COURT:  Can you refer to a page?

22              MR. URBAN:  It's the first page.  I'm sorry, Your

23   Honor.  It's maybe the middle of the page "Final Approver,

24   Patrick Chaing."

25              THE COURT:  All right.

Reinhart - Cross                                                          1082

1              THE WITNESS:  Yes.  So as I stated before, when we

2    receive these invoices, they go through an approval process, so

3    the approval -- or, I'm sorry, the invoice doesn't become final

4    until the final approver approved it.

5    BY MR. URBAN:

6    Q.    Okay.  And if you can reduce time, you can also increase

7    time, correct?

8    A.    I don't see why we would.

9    Q.    No, the question is can you?  Is it possible?

10   A.    I'm not sure because I've never seen that.

11   Q.    Okay.  Have you -- well -- now, so if there's a refund

12   back to Navient for any of the costs or fees, is that reflected

13   in this document?

14   A.    For refunds?

15   Q.    Yes.

16   A.    I've never seen that, like, a refund or an adjustment --

17   Q.    Well, are you aware that the American Arbitration

18   Association, when there's a dismissal of a case, sometimes

19   refunds the fee that is paid by Navient?

20   A.    Correct.  Yes.

21   Q.    Okay.  And where would that be shown on here?

22   A.    That would be listed under the fees.  It would be a line

23   item.

24   Q.    And did you specifically in this case see any refunds of

25   fees from AAA in any of the invoices that you reviewed?

Reinhart - Cross                                                      1083

1   A.   I'm not sure.  I reviewed -- as I just said yesterday, it

2   took days to review all these.

3   Q.   Well, you actually did say that you reviewed every single

4   invoice, correct?

5   A.   I did.  As I said, there was a lot of them, so I'm unsure

6   if I saw that or not.

7   Q.   Well, you just testified that you never saw an increase in

8   time.  Did you ever see a refund in any of these invoices from

9   the American Arbitration Association?

10  A.   I'm unsure.

11  Q.   Okay.  And when you pay the American Arbitration

12  Association fees for an arbitration, it can be 2-, 3,000

13  dollars, correct, or even more?

14  A.   Yeah, even more.

15  Q.   Okay.  So if you get a refund of that, then that would be

16  2-, 3-, 4,000 dollars back to Navient, correct?

17  A.   That's correct.

18  Q.   And if it was left out, then that would be money that you

19  were trying to charge the Lohman firm that they weren't getting

20  credit for, correct?

21  A.   Theoretically.

22          MR. URBAN:  Okay.  That's all I have, Your Honor.

23          THE COURT:  All right.  Any redirect?

24          MS. SIMONETTI:  No, Your Honor.

25                  (Witness excused.)

1084

1    THE COURT:  All right.  Then there's still the motion

2    to admit these exhibits into evidence.  Mr. Charnoff, come up

3    to the lectern if you're going to make an argument.

4    MR. CHARNOFF:  Your Honor, I'm going to be very

5    brief.  I don't think there's an adequate foundation, and we

6    also have a bridge and 403 problem because there is no

7    testimony from the prior witness that could ever connect --

8    could ever establish reasonableness of the fees.  It's more

9    prejudicial than probative for the jury to look at bills that

10   no one's opined that they're reasonable.

11   THE COURT:  Well, I'm going to allow it in -- allow

12   them in, and you can argue to the jury the degree to which they

13   want to rely on those documents.  But I think there's enough

14   evidence to let them in.  All right.

15   (Plaintiff's Exhibit Nos. 915 to 922, 926 to 930, 936

16   to 945, 947, 948, 950, 952, 954, 956 to 959, 961 to 963, 965,

17   967 to 979, 982 to 987, 989 to 997 were received in evidence.)

18   MR. CHARNOFF:  Thank you, Your Honor.

19   THE COURT:  All right?  Does the plaintiff have any

20   further evidence?

21   MS. SIMONETTI:  No, Your Honor.  We rest.

22   THE COURT:  All right, that's fine.  I don't want to

23   take up the jury's time unnecessarily with long breaks, so I

24   want to start the defense -- do you have any witnesses you're

25   planning to present?

Lohman - Direct                                                          1085

1            MR. GRELL:  Lohman defendants will call Jeffrey

2   Lohman.

3            THE COURT:  All right.  All right, Mr. Lohman, you're

4   still under your oath from yesterday.

5            THE WITNESS:  Thank you, Your Honor.

6        JEFFREY EDWARD LOHMAN, LOHMAN DEFENDANTS' WITNESS,

7                   PREVIOUSLY AFFIRMED, RECALLED

8                        DIRECT EXAMINATION

9   BY MR. GRELL:

10  Q.   Good morning, Mr. Lohman.

11  A.   Good morning.

12  Q.   Having just heard Mr. Reinhart's testimony about refunded

13  AAA fees, what is your understanding of whether there were any

14  refunded AAA fees among the arbitrations that were dismissed?

15  A.   I'm aware of at least two.  There could have been more,

16  but I know for sure there were at least two refunds.

17  Q.   And is that a common practice by the AAA, to refund those

18  fees when, when matters are dismissed?

19  A.   I would think it would depend on how long the case went on

20  before it was dismissed, but I know of, of quite a few that

21  were dismissed very early on.

22  Q.   And why is it that fees are less likely to be dismiss if

23  the case lasts longer before the AAA?

24  A.   I'm not sure of AAA's policies on it, but I would just

25  think it's because they've done an adequate amount of work to

Lohman - Direct                                                      1086

1    justify their fees.

2    Q.    Okay.  Now, we, we already talked about your arbitration

3    wins, yours meaning the Lohman firm's along with your clients,

4    in *Ibarra* and *McClogan*, right?

5    A.    That is correct.

6    Q.    And did you have any other arbitration wins?

7    A.    Yes.

8    Q.    What were they?

9    A.    We won in *Shawn Deffenbaugh v. Navient*.  We won in *Heidi*

10   *Lewis v. Navient*.  We won in *Dallas Stringham v. Navient*.  We

11   won in *Angela* -- well, that was an appeal.  We won in *Katherine*

12   *Moreno v. Navient* as well.  There might be one or two.  That's,

13   that's just off the top of my head.

14   Q.    What was in?

15   A.    I said that was -- there might be one or two more, but

16   that's kind of the --

17   Q.    Okay.  I'd like to have you take a look at Exhibit 276

18   (sic).

19            THE COURT:  All right, Defense 276.

20            THE COURT SECURITY OFFICER:  Which binder?

21            MR. GRELL:  It would be in -- what did I tell you?

22   3?  3 or 4.

23            2076.

24            Binder No. 2.

25            THE COURT:  Binder 2.

Lohman - Direct                                                    1087

1          All right.  Is there any objection to 2076?

2          MR. CALHOUN:  I'm having trouble with asking

3    questions on it.  I think just admitting a series of old

4    arbitration awards becomes cumulative and is not beneficial.

5          THE COURT:  No, I'll overrule that objection.  So

6    2076 is in.

7          (Lohman Defendants' Exhibit No. 2076 was received in

8    evidence.)

9          MR. GRELL:  All right, Your Honor.  We would also

10   offer 20- --

11         THE COURT:  Well, are you discussing it at all with

12   the jury or not?

13         MR. GRELL:  I'm going to move in a bunch of these

14   exhibits, and then we can come back and discuss them.  I think

15   it makes more sense to discuss them as a group for cutting down

16   on time.

17         THE COURT:  All right.

18         MR. GRELL:  But I can discuss it individually if

19   that's what you'd like.

20         THE COURT:  I think the jury will understand the case

21   better if you spend a little bit of time talking to them about

22   what you're moving in.  Just dumping a whole bunch of documents

23   doesn't help.

24         MR. GRELL:  It's only, it's only three --

25         THE COURT:  All right.

Lohman - Direct                                                          1088

1           MR. GRELL:  -- but we can do it one at a time.

2   That's fine.

3   Q.   The *Deffenbaugh* case, that was a win for you, correct?

4   A.   Yes, it was.

5   Q.   And looking at this document, can you tell what the

6   overall result was that was returned to -- that was awarded to

7   Mr. Deffenbaugh in this case?

8   A.   On the first paragraph on the third page, it says, "The

9   total award to the claimant is therefore $35,250."

10  Q.   All right.  And the date on this award is what?

11  A.   November 9, 2017.

12  Q.   So when you received this award, how did that impact your,

13  your determination as to whether there was a reasonable basis

14  to bring TCPA claims against Navient going forward?

15  A.   You know, this was, I think, exactly a week after the

16  *McClogan* award, so at the time, we had won *McClogan* and

17  *Deffenbaugh*.  We did lose *Moore*, but winning two of three, we

18  thought, you know, our cases were pretty solid and they were

19  worth litigating.

20  Q.   And you filed additional cases against -- TCPA cases

21  against Navient after the *Deffenbaugh* win, correct?

22          THE COURT:  That's leading.  I'm sustaining the

23  objection.  Let's not lead.

24  BY MR. GRELL:

25  Q.   Were you, were you -- what was your intent to go forward

Lohman - Direct                                                          1089

1    with regard to additional Navient lawsuits?

2    A.    Well, it would be to continue to, you know -- what's the

3    word? -- like, uphold our clients' rights.

4    Q.    Okay.  And taking a look at Exhibit 2082, it should be in

5    that same binder.

6              THE COURT:  Any other objection to that, Mr. Calhoun,

7    than what you've said before?

8              MR. CALHOUN:  No, Your Honor.

9              THE COURT:  All right, then it's in.

10             (Lohman Defendants' Exhibit No. 2082 was received in

11   evidence.)

12   BY MR. GRELL:

13   Q.    Can you describe for the jury what that is?

14   A.    This is the arbitration award in favor of our client

15   Dallas Stringham.

16             THE COURT:  Wait, 282?  2082.

17             MR. GRELL:  2082.

18             THE COURT:  That's not the one that I have.

19             THE WITNESS:  Oh, I'm sorry.

20             THE COURT:  Oh, I'm sorry.  Yes, it is.  Yes, it is.

21   Stringham?  Yep.

22   BY MR. GRELL:

23   Q.    And what is the date of that arbitration award?

24   A.    July 5, 2018.

25   Q.    And what was the award that was received by Mr. Stringham

Lohman - Direct                                                          1090

1   pursuant to this decision?

2   A.   The award of the arbitrator was, I believe, 63,000.  It

3   was offset by the amount that Mr. Stringham had owed to Navient

4   at the time based on their counterclaim.

5   Q.   And that was, it looks like, about $20,477?

6   A.   That's correct.

7   Q.   And what impact, if any, did this have on your, on your

8   strategy of suing Navient under the TCPA?

9   A.   I mean, it didn't really change much to our strategy, but

10  we, we felt, you know, that our cases were justified.

11  Q.   And take a look at Exhibit 2078.

12            THE COURT:  Again, any objection to 2078?

13            MR. CALHOUN:  None other than we've already listed.

14            THE COURT:  All right, it's in.

15            (Lohman Defendants' Exhibit No. 2078 was received in

16  evidence.)

17  BY MR. GRELL:

18  Q.   What is Exhibit 2078?

19  A.   It's the arbitration award in favor of our client, Heidi

20  Lewis.

21  Q.   And what was the result of, of that proceeding?

22  A.   The arbitrator awarded Ms. Lewis $81,500.  There was no

23  counterclaim in that case because Heidi Lewis had paid off her

24  loans.

25  Q.   And what is the date of that award?

Lohman - Direct                                                      1091

1   A.    It appears to be January 9, 2018.

2   Q.    And what impact, if any, did this award have on your

3   intentions to continue to bring TCPA claims against Navient?

4   A.    Again, it just kind of I don't want to say emboldened us,

5   but it made it -- you know, we were justified in these cases.

6   We were, you know, litigating the cases and winning the cases.

7   Q.    And you continued -- do you recall the date of your last

8   claim against Navient under the TCPA?

9   A.    I know we have some still currently going with them.  I

10  think the last case we filed was probably in 2019.

11  Q.    Okay.  Now, yesterday you were here when Mr. Standish was

12  testifying, and we talked about the unclean hands defense that

13  was asserted by Navient in these arbitration proceedings?

14  A.    Yes.

15  Q.    And Mr. Standish testified that arbitration did not give

16  them an opportunity to litigate this unclean hands defense?

17  A.    Yes.

18  Q.    What is your opinion of Mr. Standish's opinion about the

19  ability to litigate the unclean hands defense?

20  A.    So I understand what he was saying, but at the same

21  hand -- at the same time, we were always, I mean, from, like,

22  the second or third case, fighting with -- or defending

23  ourselves to their unclean hands defense.  So if they ever had

24  an opportunity to argue anything in front of an arbitrator,

25  they almost always took that opportunity to basically make the

Lohman - Direct                                                          1092

1    same claims they're making in this case, that we had unclean

2    hands in bringing, in bringing these cases, so our client

3    shouldn't recover anything because somehow we were bad

4    attorneys.

5    Q.   And to the best of your recollection, what was -- what

6    were the specific facts that they relied upon in asserting this

7    unclean hands defense?

8    A.   I know a lot of it revolved around David Mize and that we

9    were this big, bad plaintiff's firm, you know, just making

10   these TCPA claims.  I don't remember the specifics of it, but,

11   but that was essentially it.

12   Q.   And to the best of your recollection, when was the first

13   time that Navient began asserting this defense?

14   A.   It was within the second or third, like -- I don't know if

15   it was all of them, but definitely by the second or third case

16   where we were submitting briefing, they were making this

17   argument.

18   Q.   Can you take a look at Exhibit 2090?

19            THE COURT:  Any objection to 2090?

20            MR. GRELL:  It's already in, I believe.

21            THE COURT:  That is in, all right.

22   BY MR. GRELL:

23   Q.   Page 6 of 2090.  Are you there?

24   A.   Yes.

25   Q.   What is the caption of Section C on page 6 of Navient's

Lohman - Direct                                                         1093

1    brief in this *McClogan* case?

2    A.   It says "McColgan Lacks Standing or Otherwise Suffers from

3    Unclean Hands."

4    Q.   And what is the date of this brief?  Turn to the last

5    page.

6    A.   September 22, 2017.

7    Q.   To the best of your recollection, is that about the time

8    when they started to assert this defense?

9    A.   I know *McClogan* was one of our first cases, so yeah, that

10   would have been around the time.

11   Q.   And yesterday, when Mr. Standish reviewed the, the

12   arbitration brief in *Salazar*, do you recall what date *Salazar*

13   was being litigated, the time period?

14   A.   I, I don't for sure.  I actually think Mr. Salazar is a

15   California client, but I think *Salazar* was one of our later

16   cases, so I would say 2018 or 2019.

17   Q.   Well, why don't you take a look at Exhibit 2128.

18            THE COURT:  That's in a different volume, isn't it?

19            MR. GRELL:  It's in the next volume, 3, Your Honor.

20            THE WITNESS:  I'm sorry, did you say 2021?

21            MR. GRELL:  2128.

22            THE COURT:  2128.

23            Is that in?

24            MR. GRELL:  That's in.

25            THE COURT:  It's in already?

Lohman - Direct                                                        1094

1              THE WITNESS:  Okay.  I'm there.

2    BY MR. GRELL:

3    Q.   So what is Exhibit 2128?

4    A.    It looks like another arbitration brief, which, you know,

5    before -- in arbitration, it's not exactly like court.  So you

6    still get some limited discovery.  You exchange documents.

7    Everyone is supposed to be nice.  And then you prepare your

8    case, and before you go in front of an arbitrator, you give

9    them a brief that explains your arguments that you're going to

10   be arguing at that arbitration hearing.

11             The hearings usually only last a day.  And then after

12   you present your, your evidence to the arbitrator, then there's

13   a post-arbitration brief to summarize what your -- the facts

14   that you put on in the arbitration.

15             So this, yeah, it says "in advance of the mediation."

16   So I don't know if this was a federal court case or -- in fact,

17   it looks like it was a federal court case, but this was

18   preparing to go to a mediation in federal court.

19   Q.   And what is the date of that brief?

20   A.   June 14, 2019.

21   Q.   And is there an unclean hands defense asserted there by

22   Navient?

23   A.    Well, I can tell you section B is titled "Mr. Salazar

24   Defaults and He and His Counsel Manufacture His TCPA Claim."

25   So I would assume that's probably towards an unclean hands

Lohman - Direct                                                                    1095

1    argument.

2    Q.   So between September -- now, earlier today, you had an

3    opportunity to review the record of all the arbitration briefs

4    that Navient filed in your cases against them?

5    A.   Yes, briefly.

6    Q.   And between September 2017 and January 2019, including

7    both pre- and post-arbitration briefs, how many times did

8    Navient make this unclean hands argument?

9    A.   It was somewhere around 40.

10   Q.   Forty times?

11   A.   Around 40 times, yes.

12   Q.   How many times did that argument prevail?

13   A.   They never won that one time.

14   Q.   And they made -- was the argument they made substantially

15   similar from beginning to end?

16   A.   You mean from 2017 until today?

17   Q.   Until 2019, the last brief.

18   A.   Yes.

19   Q.   And the *Salazar* brief was filed after they filed the

20   complaint in this action, correct?

21   A.   That's correct.  I'll say they're still making the

22   argument today in the arbitrations we have ongoing.

23           MR. GRELL:  Okay.  So, Your Honor, let's -- I would

24   like to give Exhibit 2222 to both you and Mr. Lohman for

25   purposes of identification.

Lohman - Direct                                                    1096

1    THE COURT:  Does opposing counsel have that?

2    MR. GRELL:  Yes, they do.

3    MR. CALHOUN:  I don't have it.

4    MR. GRELL:  What?  I gave it to you this morning.

5    MR. CALHOUN:  You showed it to me this morning.

6    MR. GRELL:  I gave it to you this morning.

7    THE COURT:  All right, wait, wait.  We don't --

8    MR. CALHOUN:  Thank you.

9    BY MR. GRELL:

10   Q.    Mr. Lohman, do you recognize Exhibit 2222?

11   A.    Yes.

12   Q.    What is it?

13   A.    It's, it's our comments or notes on Navient's damages list

14   that they presented.

15   Q.    When you made -- who, who created that document?

16   A.    I think for the most part, I did.  I mean, other than

17   taking Navient's chart and adding to it, I made the additions.

18   Q.    Okay.  And so how did you create this document?

19   A.    By looking through records for the law firm and records of

20   cases.

21   Q.    And you mentioned -- what, what did you do with Navient's

22   damage chart versus the documents you're looking at through the

23   law firm?

24   A.    So, so in this chart, I was looking for two specific

25   things.  I was looking for the comparison in their damages

1    chart for what they're claiming the loan balance was that was

2    forgiven, right, what they're claiming in their damages chart,

3    compared to the actual amount listed in the settlement

4    agreement, and so they changed the verbiage on the vast

5    majority of the settlement agreements, but on three of them, it

6    lists specifically what the balance was of the loan when they

7    were forgiving it as part of a settlement.

8                 MR. GRELL:  Can you put that up?

9                 THE COURT:  Now, wait a minute.

10                MR. GRELL:  Oh, it's not in yet.

11                THE COURT:  It's not in evidence.

12                MR. GRELL:  Right, right.

13   Q.   So in particular, you're, you're comparing Navient's

14   damage chart to the amount forgiven of debt versus the

15   settlement agreements?

16   A.   That's correct.  I was comparing it to the settlement

17   agreements.

18   Q.   And then under the column "Reason for Dismissal," what

19   does that reflect?

20   A.   It's -- because it came up yesterday as far as, you know,

21   these dismissals we had and the reasons for dismissals and I

22   thought it came across like we were just dismissing clients

23   that weren't responsive, so I wanted to go through and look for

24   the reasons for dismissals, and so those -- these are my notes

25   as to the reasons we had for dismissing the client.

Lohman - Direct                                                        1098

1   Q.   So this chart summarizes your, your personal recollection

2   of why cases were dismissed and discrepancies you noticed

3   between the damage chart loan amounts forgiven and the

4   settlement agreement loan amounts forgiven?

5   A.   Correct.

6          MR. GRELL:  Lohman defendants offer Exhibit 2222.

7          MR. CALHOUN:  No objection, Your Honor.

8          MR. CHARNOFF:  No objection.

9          THE COURT:  All right, then it's in.

10         (Lohman Defendants' Exhibit No. 2222 was received in

11  evidence.)

12  BY MR. GRELL:

13  Q.   So, Mr. Lohman, did you notice any discrepancies between

14  the amounts -- the amount of debt claimed as forgiven on

15  Navient's damage chart versus the amount of debt that was

16  actually stated in the settlement agreements?

17  A.   So -- yes.  I noticed it on, on, I think, three of the --

18  four.  Some of the more significant ones were Daniel Centrella,

19  where the settlement agreement stated that the debt that was

20  being written off or forgiven was $69,264.33, whereas Navient

21  lists on its damages charts that it was damaged to the tune of

22  $77,793.39.

23         I also note -- again, the few that had the debt

24  actually listed, Breana Givens, it was off just a little bit,

25  but they list their damages at $14,865.50, whereas the

Lohman - Direct                                                      1099

1    settlement agreement says $14,746.15.

2            There's a couple of more.  There was one more that

3    was kind of significant, Victoria Smith.  The settlement

4    agreement said $60,783.33, whereas they claimed damages in the

5    amount of $64,091.69.

6    Q.    All right.  Then moving on to the "Reasons for Dismissal"

7    column, what recollection do you have as to why the *Acevedo*

8    case was dismissed?

9    A.    Well, as you can see, there's a lot of question marks.  It

10   appears that there was not an arbitration clause, but I'm not

11   quite certain if it was just because there was not an

12   arbitration clause or because she asked us not to move forward.

13   I know through the e-mails we had with Navient's counsel, it

14   appears that we had trouble locating an arbitration clause.

15   Q.    And how about the *Allen* case?  Why was that dismissed?

16   A.    He had reconsented.  We've talked about this a lot, about,

17   you know, advising clients not to go log in, because if you log

18   into their website, I know they say you don't have to agree,

19   but if you log in, it's reconsenting.

20   Q.    Hold on a second.  And when a client consents to receive

21   robocalls, there's no TCPA violation, correct?

22   A.    Yeah, correct.

23   Q.    So you gotta drop them.

24   A.    Correct.  You know, a lot of these dismissals are

25   sometimes -- I don't have in here the date it was filed, but

Lohman - Direct                                                        1100

1    this was filed 2019.  So a lot of times when we dismiss a case,

2    it's because we got evidence, you know, part of that evidence

3    exchange, and it shows that there weren't violations.  So we

4    dismissed the case because there's not violations.  We're not

5    trying to litigate cases that are, are frivolous or unfounded.

6    There's no point in that.

7    Q.   And as, as an attorney, when discovery reveals that you --

8    that what you reasonably believed before you brought the action

9    isn't true, is that sanctionable conduct?

10   A.   Yes.  Well, not in the AAA, but yes, it is sanctionable

11   conduct.  Yes.

12          MR. CALHOUN:  I was trying to impose an objection.

13   He just continues to lead.

14          THE COURT:  Yes.  I'll sustain the objection.  You

15   can say "object" as you stand so you get my attention if I'm

16   writing my notes.

17   BY MR. GRELL:

18   Q.   Was, was your firm ever sanctioned in any of these cases?

19   A.   No.  We've never even had the request made.

20   Q.   All right.  And are there any other -- I mean, the jury

21   will be able to review this as an exhibit, but are there any

22   other dismissals that you want to highlight?

23   A.   A lot of our early cases were dismissed because it was

24   Sallie Mae making the phone calls, and I'll tell you, still to

25   this day, I don't know the difference between Sallie Mae and

1  Navient, and so we had assumed it was Navient who does the

2  collections for Sallie Mae, but it turned out Sallie Mae was

3  doing the calls.  So when that was brought to our attention, we

4  would dismiss those.

5          And we brought the case against Sallie Mae.  We

6  didn't say there weren't cases.  We brought the case against

7  Sallie Mae.

8          And there were a couple like, like *Carlos Johnson*

9  where the law had changed.  And again, there's no point in

10  fighting a case if there's no foundation for the case, so we

11  didn't proceed with that one or *Kashimawo*.

12  Q.   And I notice that there's the *Helvey* case.  There was a

13  lot of -- I notice the *Helvey* case.  Why was that dismissed?

14  A.   That one was one where we literally, she fell off the face

15  of the earth.  I mean, she retained us, she was participating

16  at the beginning and then just stopped responding altogether.

17  Q.   Would you take a look at Exhibit 2033?

18          THE COURT:  I don't have that up here.

19          THE WITNESS:  Yes, I'm there.

20  BY MR. GRELL:

21  Q.   And this -- what did you say about whether she retained

22  you?

23  A.   I said she retained us.

24  Q.   And that meant she agreed to the terms of your engagement

25  letter?

1   A.   Yes, of course.

2   Q.   Okay.  And was that engagement letter similar to the one

3   that was admitted earlier, the one with Brandy Mayer through

4   Mr. Muhtaseb?

5   A.   Yes.  They were -- they've always been the same for the

6   most part.

7   Q.   Okay.

8            THE COURT:  Was 2033 already in?

9            MR. GRELL:  No, Your Honor, it was not.

10           THE COURT:  Was there any -- are you moving it in?

11           MR. GRELL:  Defendants will move 2033.

12           THE COURT:  Any objection to 2033?

13           MR. CHARNOFF:  No objection.

14           THE COURT:  No?  All right, then it's in.

15           (Lohman Defendants' Exhibit No. 2033 was received in

16   evidence.)

17   BY MR. GRELL:

18   Q.   What is Exhibit 2033?

19   A.   This is a notice of voluntary dismissal in federal court.

20   Q.   And in what matter was this filed?

21   A.   This was the *Shanna Helvey v. Navient Solutions, LLC.*

22   Q.   And can you explain the voluntary dismissal process, what

23   has to occur for a voluntary dismissal to take place?

24   A.   I believe at this point, in -- so when you file a case in

25   federal court, up to a certain point, as a plaintiff, you could

Lohman - Direct                                                                    1103

1    just dismiss without getting permission from the defendant, but

2    after a certain point, and off the top of my head I don't

3    remember where that is, but at a certain point, you need the

4    defendant's permission to be able to dismiss a case, because

5    otherwise, if they believe you brought the case frivolously,

6    they could go after you for sanctions in federal court for, you

7    know, all the time and costs that they spent in trying to

8    defend a matter that they would have believed was brought

9    frivolously.

10   Q.   And by looking at Exhibit 2033, can you determine whether

11   Navient consented to this dismissal?

12   A.   Yeah, we both agreed.  So it says "The parties" -- meaning

13   both of us -- well, meaning Shanna Helvey and Navient

14   Solutions -- "through their undersigned attorneys, stipulate to

15   dismissal."

16   Q.   And Navient's lawyers signed that dismissal?

17   A.   Yes, they did.

18   Q.   And their language in that states that the dismissal is

19   without prejudice.  What does that mean?

20   A.   It means -- so if you -- if it's -- if something is done

21   with prejudice, it means that someone cannot bring the case

22   again.  Without prejudice means that you could at a later time

23   bring it.

24   Q.   So if she resurfaced at some point, you could represent

25   her again and bring it later, correct?

Lohman - Direct                                                          1104

1    A.    She could go hire another attorney and bring it again.

2    Q.    Or hire another one?

3    A.    Yeah.

4    Q.    Is there any -- what does the document indicate about

5    recovering costs and fees against you by Navient?

6    A.    I mean, this document itself doesn't, doesn't discuss

7    the -- any terms or anything like that for agreeing to dismiss.

8    Q.    Do you recall whether Navient made a request for fees

9    after you dismissed this *Helvey* case?

10   A.    No, I don't believe they've ever requested fees.  Anytime

11   we've dismissed a case, it's always been with both parties

12   handling their own attorneys' fees or covering the costs of

13   their attorneys.

14   Q.    All right, thank you.

15          Do you have any understanding of what causes a

16   person's credit core -- credit score to drop?

17   A.    I practice in FCRA, but it's like all algorithms.  It's

18   all -- I don't know much more than the average person, I guess

19   is what I'm trying to say, as far as what causes a person's

20   credit score to drop.

21   Q.    But what is your understanding of what causes a score to

22   drop?

23   A.    Late notices on, on the credit report, you know,

24   charge-off notices on a credit report, stuff like that.

25   Q.    Who, who informs the credit bureaus of those late

Lohman - Direct                                                          1105

1   payments, defaults, whatever?

2   A.   I think the term is "furnishers," but that would be just

3   anyone who reports to the credit reporting agency.  So

4   Discover, Capital One, Navient, anyone that reports to the

5   credit reporting agencies.

6   Q.   Okay.  I may be paraphrasing Mr. Calhoun, but he asked

7   during your cross yesterday if you cared about the reputation

8   of your referral sources.  Do you recall that?

9   A.   Yes.

10  Q.   And could you expound upon the relationship between you

11  and your clients and referral sources?

12  A.   Yeah.  I mean, going off of what Mr. Calhoun was asking

13  yesterday, I mean, I do care to a certain extent who my

14  referral sources are.  As I mentioned, Amanda Johanson, I made

15  the decision very early on -- made a decision very early on to

16  not work with Ms. Johanson, and there's been others in the past

17  as well, but once a client retains an attorney, the attorney

18  has a duty to represent the client.

19          So my duty is not to any marketing source or any

20  other attorney that referred me the source.  I have an ethical

21  duty to the client that, you know, if things come up through

22  discovery, you know, if things come up where -- even if the

23  client testified that David Mize told her to stop making

24  payments, that doesn't change the case.  It doesn't change my

25  duty to my client.  My duty to, to my client is to represent

1    them.

2            And I think under most ethical rules, at least the

3    ones I'm aware of, I'm not allowed to just walk away from a

4    client because I don't like the client or I don't like a

5    referral source.  I have a duty to that client to, you know,

6    see it all the way through.

7            So yeah, you know, stuff came up through discovery,

8    but our duty at the end of the day was always to the client,

9    and unless the client told us to withdraw and go away, our duty

10   always remains to the client.

11   Q.   And when looking at, at the basis for a TCPA claim, what

12   is the primary fact that you're looking at with regard to

13   potential clients?

14   A.   We're only looking at two things:  did the, did the caller

15   have permission to use an autodialer, and does the call

16   behavior look like it's coming from an autodialer.  That's it.

17   Q.   Okay.  Again, I don't want to misstate Mr. Calhoun, but I

18   believe yesterday he asked if you considered your clients

19   people or leads.  Do you recall that question?

20   A.   He was saying something about the leads coming over.  Yes,

21   I remember the conversation.  Yes, I do remember.

22   Q.   Do you consider your clients simply leads?

23   A.   So what I explained to Mr. Calhoun is we get a lot of

24   leads, right?  You know, at some point, we were getting 2,500 a

25   month.  But once a client retains us, then it, then it becomes

1   really personal.

2            So, you know, we get 2,000 people, but only 50 retain

3   us.  So then it's personal.  Then we're interacting with them.

4   We're talking to them.  We're getting them through the case and

5   going through discovery and showing up with them at

6   depositions, and there's a lot to it.  It gets very personal

7   with clients once, once a client retains us and we're taking

8   their case and moving forward with the case.

9   Q.   And how do most of your clients feel about going up

10  against a company like Navient?

11           MR. CALHOUN:  Objection, Your Honor.

12           THE COURT:  I'm going to sustain that.  You can lay

13  a -- express a question differently for which he might have a

14  foundation.

15  BY MR. GRELL:

16  Q.   What is your perception as a, as a lawyer -- well, let's

17  ask it -- what is your perception as a lawyer of your -- do

18  your clients want to sue Navient?

19  A.   I mean, they do --

20           THE COURT:  Wait, wait, wait.  There's still an

21  objection.

22           MR. CALHOUN:  Same objection.  He's asking what other

23  people think.

24           THE COURT:  Yeah.  You can't ask what other people

25  think.  You can ask what they may have told you about if it's

Lohman - Direct                                                    1108

1    not being offered for the truth of its contents.

2    BY MR. GRELL:

3    Q.   Does your clients' -- what have your clients told you they

4    think about suing Navient?

5            THE COURT:  Well, I think that's too broad a

6    question.

7            MR. CALHOUN:  And it calls for hearsay.

8            MR. GRELL:  It goes to his --

9            THE COURT:  Not if it's -- not if it's offered for

10   the truth -- if it's not being offered for the truth of its

11   contents, but I think you have to make it less general.  Make

12   it more specific.

13   BY MR. GRELL:

14   Q.   What level of enthusiasm do your clients have in terms of

15   what they've expressed to you in suing Navient?

16   A.   So I don't think anyone, at least my clients, are thrilled

17   about the idea of going into a lawsuit, but they want to

18   vindicate their rights, and they feel harassed.

19           And I, I think it was Amanda Fine who used the word

20   "bullied" when she was getting deposed, and Cynthia Baldon

21   talked about just the overwhelming anxiety she had, where she

22   couldn't even go outside of the house.

23           So, you know, all of these clients, it was their very

24   first case they had ever, like, litigated and moved forward

25   with, and so there was a lot of anxiety over it, a lot of, you

Lohman - Cross                                                          1109

1    know, just worry, I guess.  But that's -- being a consumer

2    protection plaintiff's attorney, these are the people that,

3    that we help.

4            So, so yeah.  I mean, they wanted to vindicate

5    themselves.  They wanted, they wanted to, you know, someone to

6    say that what Navient was doing was wrong in the harassment,

7    and they moved forward with it, and I was very proud of them to

8    go through that.

9    BY MR. GRELL:

10   Q.   And how has your clients' experience against Navient

11   affected you in terms of defending this litigation?

12   A.   I wouldn't settle because, because I couldn't ask them to

13   fight Navient and not do it myself.

14           MR. GRELL:  Okay.  I have nothing further.

15           THE COURT:  All right.  Mr. Calhoun?

16           Mr. Charnoff, did you have any questions for

17   Mr. Lohman?

18           MR. CHARNOFF:  I do not, Your Honor.

19           THE COURT:  All right.

20                        CROSS-EXAMINATION

21   BY MR. CALHOUN:

22   Q.   Mr. Lohman, you mentioned during your direct examination

23   that you'd seen things come up in discovery concerning some of

24   your referral sources.  Do I recall that testimony correctly?

25   A.   Yes.

Lohman - Cross                                                        1110

1    Q.   All right.  And that you -- you mentioned that you still

2    had a duty to the clients in those cases; is that right?

3    A.   Yes.

4    Q.   All right.  But, for example, you continued to accept --

5    did you see some of those things come up with Mr. Mize?

6    A.   Through -- again, through discovery, you know, we, we

7    saw -- we saw everything that was discovered through discovery.

8    Q.   All right.  And you kept accepting referrals from

9    Mr. Mize, didn't you?

10   A.   That's a good question.  I don't actually know when I

11   stopped accepting referrals from David Mize.  I, I think he

12   stopped getting clients in, like, 2018, and most of the stuff

13   was litigated late 2017-2018.

14   Q.   And you continued to work with Mr. Mize, right?

15   A.   I didn't see anything that would cause concern for me to

16   not accept referrals from Mr. Mize.

17   Q.   And you continued to accept referrals from Jacob Slaughter

18   when he was practicing, correct?

19   A.   When he had -- we had very few from Jacob Slaughter, but

20   yes, we did accept referrals from him.

21   Q.   Can you look at Exhibit 44, please?

22            THE COURT:  Plaintiff's 44 is what volume?

23            MR. CALHOUN:  I'm sorry, Your Honor, it is

24   Exhibit 3 -- Binder 3.

25            THE COURT:  Okay.

Lohman - Cross                                                          1111

1           MR. CALHOUN:  It's in evidence.

2           THE COURT:  So you can put it on the screen.  You can

3    put it on the screen so the jury can see it.

4    BY MR. CALHOUN:

5    Q.   I think you should -- I think it's Interrogatory 3 where

6    you list the referrals from Jacob Slaughter.

7    A.   Sorry, give me one moment.

8           THE COURT:  It starts on page 7.

9           THE WITNESS:  Yes.

10   BY MR. CALHOUN:

11   Q.   All right.  This is what you're referring to as a few

12   referrals?

13   A.   Yes.

14   Q.   And it's how many pages?

15   A.   One, two, three, four, five.  One, two, three, four, five.

16          So there's about 40 per page and there's 5 pages'

17   worth, so that would be about 200 referrals.  But again, at

18   that time, I was getting about 2,500 a month.

19   Q.   Can you look at Exhibit 1002, please?

20          THE COURT SECURITY OFFICER:  Which binder is that?

21          MR. CALHOUN:  It's the last one, which is 23.

22          THE WITNESS:  Am I looking at an arbitration award?

23   BY MR. CALHOUN:

24   Q.   You are.  Do you recognize this award?

25   A.   Yes, I do.

Lohman - Cross                                                          1112

1               MR. CALHOUN:  All right.  We'd offer Exhibit 1002.

2               THE COURT:  Any objection to 1002?

3               MR. GRELL:  No, Your Honor.

4               THE COURT:  All right, it's in.

5               (Plaintiff's Exhibit No. 1002 was received in

6    evidence.)

7    BY MR. CALHOUN:

8    Q.   Can you turn to the third page, please?

9    A.   Yes.

10   Q.   Can you read the last -- first full sentence of the last

11   paragraph for us, please?

12   A.   The one that says "The authorities"?

13   Q.   Correct.

14   A.   "The authorities cited by Navient and the reasoning

15   therein are compelling in this case, and a preponderance of the

16   credible evidence confirms the Navient system, as used, did not

17   have the capacity to store or produce telephone numbers to be

18   called using a random or sequential number generator."

19   Q.   And the arbitrator in this case decided that Navient was

20   not using an ATDS, correct?

21   A.   That's correct.

22   Q.   And this decision didn't dissuade you from bringing other

23   cases against Navient?

24   A.   What date was this?  2018.

25               So just as Mr. Standish testified to yesterday, it's

Lohman - Cross                                                            1113

1   very jurisdictional.  It's very -- there's a lot of competing

2   case law.  So in Texas at this time, in fact, up until

3   recently, Texas never had really an authority of what ATDS was.

4   So Navient and us went and fought it, and the arbitrator chose

5   to follow case law out of the Third Circuit, whereas we were

6   arguing case law out of the Ninth Circuit.

7   Q.   All right.  And there's no longer any dispute about that,

8   is there?

9   A.   Yes, there is.

10          MR. GRELL:  Objection.

11          THE COURT:  Sustained.

12          MR. GRELL:  And, Your Honor, this is the third time

13  they've tried to go around --

14          THE COURT:  Look, the law -- the purpose of this case

15  was that the law as to the TCPA was unclear as to whether or

16  not Navient did, in fact, violate that statute in that time

17  period.  We shouldn't be arguing about this at this point.

18          MR. GRELL:  Well --

19          THE COURT:  No, that's enough.

20  BY MR. CALHOUN:

21  Q.   Mr. Lohman, you have testified about your -- about some of

22  the dismissals and the, and the settlements.  Do you recall

23  discussing with Navient the possibility of including mutual

24  releases in the settlement agreements?

25  A.   If I understand your question correctly, it would have

Lohman - Cross                                                          1114

1  only been a recent settlement in which Navient changed the

2  terms in their form agreements, and it would have been a

3  California case which Mr. Branch was discussing with Navient's

4  counsel.

5           MR. URBAN:  Your Honor, I'm going to object that this

6  is well beyond the scope of direct.  We didn't talk about the

7  releases.

8           THE COURT:  Well, we talked about the settlements.  I

9  think it's sufficiently within, I'll permit it, but this

10  question was somewhat vague.  I'm not sure anybody understood

11  where we were going with that.

12  BY MR. CALHOUN:

13  Q.  So I don't recall your answer exactly.  You don't remember

14  discussing --

15  A.  I said if I understand your question correctly, it was a

16  recent settlement, like, last year, in which Navient changed

17  some of the terms in its release, and we asked for the mutual

18  release to be put back in.

19           MR. URBAN:  And I'd further object this is beyond the

20  time period that this lawsuit falls.

21           THE COURT:  Well, that's -- do we have a time -- what

22  time period are you talking about?

23           MR. CALHOUN:  Your Honor, I'm going to bring it back.

24           THE COURT:  All right, let me hear.

25  BY MR. CALHOUN:

Lohman - Cross                                                          1115

1   Q.   What time period did Ms. Dykes work at your law firm?

2   A.   2017-2018.

3   Q.   All right.  And do you remember having a discussion with

4   her about the possibility of including mutual releases and

5   settlements with Navient?

6   A.   Not as I sit here today, no.

7   Q.   All right.  Can you take a look at page 183 of your

8   deposition, please?

9   A.   Is it in this binder?

10          THE COURT:  No.  We have to get it back to you.

11          MR. CALHOUN:  Do you still have it, Your Honor?

12          THE COURT:  Which volume is it in?

13          MR. CALHOUN:  It's in the --

14          THE COURT:  There were two different dates, aren't

15   there?

16          MR. CALHOUN:  Yeah.  It's the June 1, 2020,

17   deposition.

18          THE COURT:  June 1?

19          MR. CALHOUN:  It's the really big one.

20          THE COURT:  What page?

21          MR. CALHOUN:  It's 183 on to 184.

22          THE COURT:  I'm sorry?

23          MR. CALHOUN:  183 and then over on to 184.  We were

24   discussing an e-mail at the time.

25   Q.   You may recall this, Mr. Lohman.

Lohman - Cross                                                          1116

1              THE COURT:  Wait, wait.  Just ask the question.  What

2    line are we looking at?

3    BY MR. CALHOUN:

4    Q.  All right.  First, if you look at the question that begins

5    on line 24 of 183, Your Honor -- or Mr. Lohman -- and I asked

6    you, "And did you do anything in response to this e-mail in

7    particular?"

8              How did you respond?

9              MR. GRELL:  Objection, Your Honor.  There's no

10   context.  What is this e-mail?

11             THE COURT:  Yeah, there's no context, so you need to

12   have -- why don't you ask a foundation question.  Maybe he can

13   testify without needing the deposition.

14   BY MR. CALHOUN:

15   Q.  So do you recall an e-mail discussion with Ms. Dykes where

16   she had discussed whether or not you should ask Navient to

17   destroy transcripts after arbitrations?

18   A.  I mean, that sounds like a conversation I would have had

19   with her.  Do I remember the specific conversation?  I don't

20   remember the specific conversation.

21   Q.  All right.  In the context of that discussion, do you

22   recall saying anything about modifying Navient's settlement

23   agreement to include mutual releases?

24   A.  Again, I don't remember the specific conversation, so it

25   sounds -- I mean, if you want me to read the -- in this, I say

Lohman - Redirect                                                                1117

1    I do, but --

2    Q.   And do you recall --

3    A.   So -- and even in my comment here, it doesn't say that I

4    discussed it regarding that e-mail.  It just -- I added that to

5    the conversation, saying we've discussed, like, I've discussed

6    with my firm modifying Navient settlement agreements.

7    Q.   And did Navient agree to do that?

8    A.   Well, they have, I mean, but they modified it, but not in

9    the way we were looking for, no.

10            MR. CALHOUN:  No further questions, Your Honor.

11            THE COURT:  All right.  Is there any redirect?

12                          REDIRECT EXAMINATION

13   BY MR. GRELL:

14   Q.   Do you recall the settlement agreement in which this

15   mutual -- do you have any recollection of a settlement

16   agreement in which this mutual release discussion occurred?

17   A.   Yeah.  The settlement agreements we've been discussing,

18   yes.

19   Q.   No, the particular one that I believe you mentioned,

20   Charla --

21   A.   I don't.  Again, it was a California case, and I have to

22   disconnect myself because I'm not licensed in California, but I

23   live in California, so --

24   Q.   Well --

25            THE COURT:  Wait.  Once again, we're using a quasi-

Lohman - Redirect                                                      1118

1    legal term which the jury may not understand.  What do you

2    understand as a lawyer mutual releases are?

3            THE WITNESS:  So it, it kind of goes back to what

4    our -- a mutual release is a clause that releases liability

5    with all the parties or at least, at least two parties to the

6    agreement, so that there's no longer liability, to the best of

7    my understanding.

8    BY MR. GRELL:

9    Q.   And you said that Navient made some changes to their

10   settlement agreements over the course of time?

11   A.   Again, I remember --

12           MR. CALHOUN:  Objection, Your Honor.

13           THE COURT:  Wait.

14           MR. CALHOUN:  I believe that the objection heard

15   before, that this -- what he's talking about now occurred after

16   the case.

17           THE COURT:  Well, we want to have it within the

18   proper time frame.  That was your objection before.  All right.

19           MR. GRELL:  Okay.  We don't have any further

20   questions.

21           THE COURT:  All right.  Again, anything from you,

22   Mr. Charnoff?  Anything further?

23           MR. CHARNOFF:  Thank you, Your Honor.  I don't think

24   I have any questions.

25           THE COURT:  All right.  Mr. Lohman, you may step

1119

1    down.

2              THE WITNESS:  Thank you

3                        (Witness excused.)

4              MR. GRELL:  The Lohman defendants rest.

5              THE COURT:  All right.  And, Mr. Charnoff, is there

6    any further evidence you want to put on?

7              MR. CHARNOFF:  No, Your Honor.  We will not be

8    putting on evidence.

9              THE COURT:  All right, defense is resting.

10             Mr. Calhoun, is there a rebuttal case that you plan

11   to put on?

12             MR. CALHOUN:  We would call Mr. Harvey, Your Honor.

13             THE COURT:  All right.  How, how long do you

14   anticipate Mr. Harvey would take?

15             MR. CALHOUN:  Fifteen minutes.

16             MR. CHARNOFF:  Your Honor?

17             THE COURT:  Yes.

18             MR. CHARNOFF:  To be clear, Mr. Harvey would be an

19   expert witness.  No expert witness was put on in the defense

20   case.  There's nothing to rebut.  And Your Honor already ruled

21   on the motion in limine he's not going to testify.

22             THE COURT:  He's going to be rebutting what, the

23   testimony of Mr. Travell?

24             MR. CALHOUN:  Correct, Your Honor.

25             MR. CHARNOFF:  It's his witness.

1120

```
1        MR. URBAN:  Your Honor, they can't rebut themselves.
2   They are the ones who put on Mr. Travell.  We did not.  So --
3        THE COURT:  Counsel, one at a time at the lectern.  I
4   don't want two people at the lectern at the same time.
5        MR. URBAN:  I just want to make clear our objection.
6   How can they rebut something that never happened?  We did not
7   bring Mr. Travell in our case.  They chose to bring him in
8   their case.  So they're rebutting their own evidence.
9        THE COURT:  All right.
10       MR. URBAN:  We did not bring him in our case.
11       MR. CALHOUN:  Your Honor, I don't know if we should
12  approach on this, but this was all the subject of a motion in
13  limine, and originally, we were going to bring them both in our
14  case, and at the end, you said -- you first said you can bring
15  them both, and then at the end, you said you'd have to bring
16  them in in rebuttal.  So --
17       THE COURT:  I did say that.  They could have called
18  Mr. -- they could have called this witness in their
19  case-in-chief.
20       MR. URBAN:  Your Honor --
21       THE COURT:  Although your objection at the motion in
22  limine -- and I may have to go over the transcript on how we
23  ruled on that one.
24       MR. URBAN:  I think you may.
25       THE COURT:  In the motion in limine discussion, I
```

1121

1    think the jury doesn't need to sit here and hear this.

2              MR. URBAN:  Yes, Your Honor, absolutely.

3              THE COURT:  Folks, why don't I let you go for your

4    lunch break, and I'll ask you to come back at two o'clock, all

5    right?  But I don't want you to start discussing or thinking

6    about the case because, again, you haven't gotten the Court's

7    instructions, you haven't heard the closing arguments of

8    counsel.  So just, again, continue to follow my earlier

9    instructions.  See you back here at two o'clock.

10                        (Jury out.)

11             THE COURT:  All right.  Now, remind me, because I've

12   had a million cases since we did the motions in limine, was

13   Mr. Harvey, was he during the discovery process, was he

14   designated as a plaintiff's expert?

15             MR. CALHOUN:  We designated him as a rebuttal expert

16   in the discovery process well over a year ago.

17             THE COURT:  All right.  Was he deposed?

18             MR. CALHOUN:  He was not by their choice.

19             THE COURT:  All right.  And the rebuttal that he did

20   involves reviewing Mr. Travell's report?

21             MR. CALHOUN:  It does.  He primarily responds, Your

22   Honor, to the idea that in order to prove reasonableness, we

23   must go to every jurisdiction and have a different expert

24   testify about the rates in every jurisdiction in which one of

25   these arbitrations took place.

1122

1    THE COURT:  And that's the total scope of his

2  testimony?

3    MR. CALHOUN:  No.  He does testify, Your Honor -- he

4  does state that he believes the rates are reasonable under

5  *Vienna Metro* and the other matrices used in this district.

6    THE COURT:  All right.

7    MR. URBAN:  It says right in his report, very -- the

8  third sentence:  "I have been asked to rebut where appropriate

9  the opinions of Wayne Travell."

10    That's all he was designated for, Your Honor, nothing

11  else.  So I don't know what opinion that they brought up,

12  because we didn't bring up any opinions other than in cross,

13  but they're the ones who brought up the opinions, and now

14  they're going to bring in an expert to rebut the expert that

15  they brought in?

16    I've never seen that before, Your Honor.

17    THE COURT:  Well, it may be a first, but, I mean, it

18  can't come as any surprise.  We discussed this at the motion in

19  limine.

20    MR. URBAN:  Right.  And the understanding was that

21  all the experts were going to be limited to the scope of their

22  report.  Mr. Harvey's report is to rebut the testimony of

23  Mr. Travell.

24    THE COURT:  And in his report, that's what was

25  produced in discovery, which everybody knew about, is there a

1123

1   statement in that report in which he addresses this issue about

2   you don't need to have an expert from each jurisdiction talk

3   about what the hourly -- reasonable hourly rate would be?

4                MR. URBAN:  Oh, yes, he does say that.  I'm fine -- I

5   mean, again, I don't know that that's anything that Mr. Travell

6   brought up other -- but if that's the limit of what they're

7   going to talk about, I think I'd have a hard time, but they're

8   also saying they're going to bring up whether the fees were

9   reasonable.

10               Mr. Travell specifically did not opine on that, so

11  how can Mr. Harvey rebut something that Mr. Travell didn't say?

12               THE COURT:  Actually, I'm trying to recall, because

13  he just testified, but I've been on the bench since nine this

14  morning.  Did he actually draw the final conclusion that they

15  were not reasonable?  I think he just said --

16               MR. CALHOUN:  He testified that he could not.

17               THE COURT:  -- that he could not.

18               MR. URBAN:  He could not do that.

19               MR. CALHOUN:  But someone else looking at those same

20  things can.  And, Your Honor, this is little bit of sandbagging

21  because we had this out in a motion in limine.  Your Honor

22  ruled that we could do it this way and --

23               THE COURT:  Yeah, I'm permitting it.  I don't think

24  it -- I don't think it's unfair.  I don't think it takes anyone

25  by surprise.  As long as it was there in the discovery, as long

1124

1    as everybody was on notice as to what it was, I'm going to

2    permit it.

3                MR. URBAN:  This --

4                MR. CALHOUN:  And we will not go beyond the four

5    corners of the document, Your Honor.

6                THE COURT:  I'm going to permit it.

7                MR. CHARNOFF:  Your Honor, can I finish making my

8    record, please?

9                THE COURT:  Yes, make your record.

10               MR. URBAN:  Yeah.  Let me just say I state my

11   original objection to any of this coming in just because they

12   had made the decision not to designate an expert in the first

13   place.  It seems like we're being punished for actually

14   designating an expert in our case.

15               THE COURT:  All right.  That's just litigation and --

16   anyway.

17               All right, Mr. Charnoff, for the record?

18               MR. CHARNOFF:  Very briefly, Your Honor.  Again, I

19   just want to reincorporate all the authorities and the

20   arguments made in the motion in limine.  This plaintiff never

21   designated an expert witness for their case-in-chief.

22               In the motion in limine hearing, you decided to let

23   the plaintiff call the defense expert in their case-in-chief,

24   over my objection certainly.

25               THE COURT:  Right.

1    MR. CHARNOFF:  You allowed them to do it.  He's

2  testified.  They have no evidence of reasonableness in their

3  case.

4         The defense made a choice to not put on any expert

5  testimony as to fees in the defense case.  If I would have

6  named an expert and brought him here today, I would have told

7  him to go home before lunch because there's nothing to rebut,

8  and now they're going to put a rebuttal case on.

9         THE COURT:  But the expert whom you did choose,

10  Mr. Travell, right, in discovery, he was your expert in

11  discovery.

12         MR. CHARNOFF:  He was not my expert, Your Honor.  I

13  made the correct decision to not name an expert witness on the

14  reasonableness of attorneys' fees because I had no one to

15  oppose.  When they -- it's -- Judge, I mean --

16         THE COURT:  Okay.  But an expert was designated by

17  the defense side.

18         MR. CHARNOFF:  But not by me.  And we didn't choose

19  to put him on.

20         MR. CALHOUN:  Your Honor, this is rehash.  We had

21  this out --

22         THE COURT:  All right.

23         MR. CHARNOFF:  Let me just make my record and I'll

24  sit down, Judge.  We are not required to put anybody on the

25  stand.  I have made a decision, for example, factually to not

1126

1    put forward any further evidence in the case because I don't

2    think I need to.

3              If we would -- if they would have done it the right

4    way, if Navient names an expert witness on fees, I name an

5    opposition expert, and then they name a rebuttal expert, that's

6    how we normally do things.  That's following the rules of

7    federal evidence.  That's following all the orders in this

8    case, including the specific orders that we fashioned for this

9    case.

10             If they put on an expert witness that they put on as

11   evidence and I elect for tactical other reasons to not put on

12   an opposing expert, because I don't think they met their burden

13   in any number of ways and I don't need anything else in the

14   record, how can then they put a rebuttal expert on to rebut an

15   opposition expert I didn't put on?

16             I can't begin to wrap my mind around it, Your Honor,

17   and it's fundamentally unfair to the defense.  And I, I made

18   the decision a year ago, expecting this Court to follow the

19   rules.

20             So on behalf of my clients, I want to make it very

21   clear on the record I object to Mr. Harvey taking the stand and

22   saying a single word.  Thank you.

23             THE COURT:  All right.

24             MR. CALHOUN:  Your Honor, it's, it's almost comical.

25   They repeat objections in the hope that if they say them often

1127

1    enough, you will accept them.

2          They have had Mr. Harvey's report for well over a

3    year.  If they had concerns about the contents of that report,

4    they could have come to you and said, we need more time to

5    depose him.  They had time to depose him.  They could have

6    asked for even more.

7          They had our witness list.  We had a motion in -- he

8    was on our case-in-chief witness list.  We had a motion in

9    limine about this.  We asked to call him.  They could have

10   asked to depose him.  They still didn't want to.

11         Your Honor, I think just it is -- we ought to just

12   stick with the decisions that have already been made.  We would

13   have preferred to call him in our case-in-chief given the

14   awkwardness of calling an opposing expert in our case-in-chief,

15   but we're going to have him on for 15 minutes.  We should get

16   the testimony in and get back to the, you know, the rest of the

17   case.

18         THE COURT:  All right.  Mr. Urban?

19         MR. URBAN:  And I just wanted to -- this Court always

20   has the opportunity to change its mind, especially given -- I

21   don't think it's funny, Mr. Calhoun.  I don't know what you're

22   laughing about.

23         But this Court has the opportunity at any point to

24   change its mind, especially in the context of the trial as the

25   evidence is presented.

1128

1    In this case, we designated an expert because they
2  might have come up somehow with some evidence of
3  reasonableness.  I don't know how they would have done it
4  without an expert, but they could have.
5    They didn't.  So that's why we chose not to call
6  Mr. Travell, because there was no evidence of reasonableness.
7    So now on the rebuttal case, for the very first time,
8  they're going to introduce evidence of reasonableness.  That's
9  not appropriate.  The rebuttal case is not to clean up the
10 things you didn't do in your case-in-chief.  It's to rebut the
11 evidence that is put on by the defendant in their case.
12    THE COURT:  Well, it is true that, I mean, your
13 expert did not say they were unreasonable.  He said he could
14 not determine whether they were reasonable.
15    MR. URBAN:  But we didn't call him.  I would agree
16 with you, if we called him in our case, you would be dead right
17 that they would have the opportunity to make that
18 determination.  We would not have called Mr. Travell based on
19 the evidence that they presented in their case-in-chief other
20 than Mr. Travell himself, but they called him.  We would not
21 have brought him, period.
22    And now they're trying to fix something that they
23 didn't do in their case-in-chief, and I just think that's
24 wholly inappropriate.
25    Now, the first part -- well, I don't think any of it

1    is appropriate, but I can see allowing them -- him to talk

2    about he thinks that, you know, every jurisdiction is the same

3    on attorneys' fees and, you know, South Dakota has the same

4    reasonableness as Virginia, if that's what they want to put on,

5    but the question of reasonableness of attorneys' fees is

6    something they should have established, and we were not going

7    to bring it up if they didn't establish it in their

8    case-in-chief.

9         They brought Mr. Travell in.  So I don't think it's

10   appropriate that they be able to clean up their mistakes for

11   not designating an expert for their case-in-chief.

12        MR. CALHOUN:  Your Honor, a couple things here.  One,

13   they didn't need to call him because they crossed him and

14   elicited the testimony that they wanted.  He made statements

15   that are subject to rebuttal.

16        Your Honor, frankly, like I said, he was on our

17   case-in-chief list.  There was -- there's a standard for

18   dealing with that issue.  Your Honor has already addressed it.

19   There's no surprise or unfairness to them.

20        There's evidence also in the record on reasonableness

21   from, from Navient's witnesses about their billing practices

22   and how these bills were reviewed.  The jury is entitled to

23   make the decision as to reasonableness.

24        You know, we raised the issue of whether you would

25   hear this separately and we'd do the normal fee review process,

1130

1    but when you send it to a jury, the jury gets to make that

2    decision, and we think this would be helpful to the jury to

3    have Mr. Harvey explain how national counsel work and why

4    that's a good decision and actually reduces the overall amount

5    of fees.

6                You know, as much as they want to talk about -- you

7    know, we raised this.  This was raised at the motions in limine

8    hearing.

9                THE COURT:  Yeah, I know.

10               MR. CALHOUN:  And it's, you know, the last witness.

11   To change it now would be manifestly unfair.

12               MR. URBAN:  Your Honor, now they're going to add a

13   new thing.  They're going to talk about national counsel.

14   That's nothing we talked about in our case -- in defendants'

15   case-in-chief, so how are they rebutting anything?  Again, he's

16   a rebuttal witness.

17               MR. CALHOUN:  That's exactly what -- that's what he

18   is.

19               THE COURT:  Well, the problem is "to rebut" means

20   you're -- something was said in the other party's case and you

21   are presenting evidence that differs with that, that rebuts it,

22   and the problem is the way this case has gone in is that the

23   evidence as to reasonableness of the attorneys' fees has

24   actually not really been rebutted by Mr. Travell at all because

25   he didn't say they were unreasonable.

1131

```
 1              MR. URBAN:  Right.

 2              THE COURT:  He was just saying, I can't figure out

 3    anything about them.

 4              MR. CALHOUN:  And the reason he said that is because

 5    he doesn't know the rates in all these jurisdictions.

 6              THE COURT:  Well, that's not the only reason, no.  He

 7    said he couldn't figure out what the, what the --

 8              MR. URBAN:  -- redactions were.

 9              THE COURT:  What the redactions were.

10              So you actually have no evidence in this case whether

11    they're reasonable or unreasonable.

12              MR. URBAN:  Right.

13              MR. CALHOUN:  We have evidence of the reasonableness

14    through the --

15              THE COURT:  Well, you can argue that the method in

16    which you went about looking at them and handling them is

17    reasonable, and there's evidence of that in the record right

18    now.

19              MR. URBAN:  They can argue it to the jury, sure.

20              THE COURT:  The question is, though, from

21    Mr. Charnoff, I think it was his comment earlier on, that he's

22    going to try to make an argument that Mr. Travell -- or that

23    any, any statement about the reasonableness of attorneys' --

24    well, again, the word "reasonable" was never used.  The issue

25    about attorneys' fees, that Mr. Travell was only licensed in
```

1132

1    Virginia, Maryland, and D.C., but he didn't opine about --

2    yeah.

3                   There's nothing to rebut.

4                   MR. CALHOUN:  Your Honor --

5                   THE COURT:  There's -- it doesn't hurt you.  It

6    doesn't help you.  There's nothing to rebut.

7                   MR. CALHOUN:  It does, Your Honor.  It very much

8    does, and I think we ought to be allowed to present our case as

9    we were informed in the motions in limine.  We asked to call

10   him in our case-in-chief, which would have been the way to do

11   it.

12                  THE COURT:  But you had an objection there because he

13   was only designated as a rebuttal.

14                  MR. CALHOUN:  That's correct, Your Honor, but the law

15   is very clear that they have to show prejudice in order to keep

16   him out.  They've known about his opinions that are set forth

17   in his report for well over a year, well over a year.

18                  There's no -- the cases where an expert's been not

19   allowed to testify because he was designated rebuttal or

20   something is when they're designated at trial or during a trial

21   or a week before trial, not 14 months before trial.

22                  THE COURT:  All right.  Well, I'm going to make the

23   call because I will make the call.  If it's wrong, it's wrong.

24   I'm going to let him testify, and I'll allow defense counsel to

25   vigorously cross-examine.

1133

1    Do you want to do -- well, we have to wait until the

2    jury comes back.  So you're going to get your -- a shortened

3    lunch break because I want to get the jury back in at two.

4    MR. URBAN:  Can I just address one fact regarding

5    that last argument?

6    THE COURT:  Yeah.

7    MR. URBAN:  Because I've heard it before and I

8    haven't had a chance to address it.  We did know Mr. Harvey's

9    opinions a year before, but we only knew for the very first

10   time that they were going to call Mr. Harvey in their

11   case-in-chief when they put him on as a -- their witness list a

12   month before.

13   We always understood that he was only a rebuttal

14   witness.  Even his own report said he was a rebuttal witness.

15   So I just want to clarify.

16   THE COURT:  I appreciate that.  All right, all right.

17   MR. CHARNOFF:  Your Honor, just again a few seconds.

18   THE COURT:  Yeah.

19   MR. CHARNOFF:  Consistent with Mr. Urban's comment,

20   which I adopt, to be clear, this issue came up in the motion in

21   limine stage.  The plaintiff keeps saying that we've known

22   about it for 14 months.

23   The plaintiff had that entire time to file a motion

24   with this Court seeking leave to untimely designate someone for

25   their case-in-chief.  They never did it.

1134

1    THE COURT:  All right.  Then there's a problem in the

2    case.  There's a problem in the record.  I've made my judgment

3    call, and we'll go after --

4    MR. CHARNOFF:  Thank you, Judge.

5    THE COURT:  We told them to be back at two?

6    THE COURT SECURITY OFFICER:  Yes, ma'am.

7    THE COURT:  All right.  So you'll have a shortened

8    lunch break.  Two o'clock.

9    Oh, but while you're doing that, just to give you

10   something more to think about at lunch, I've been going through

11   the jury instructions.  I think the charging conference is

12   going to take some time, but the one thing is I am striking

13   from the jury instructions the tampering with witnesses.  I

14   don't find there's sufficient evidence for that.

15   MR. CALHOUN:  We have no objection, Your Honor.

16   THE COURT:  All right.  So just so you-all know, I've

17   taken those instructions out of the package.

18   All right, we'll recess until two.

19   (Recess from 1:12 p.m., until 2:00 p.m.)

20

21

22

23

24

25

Harvey - Direct                                                        1135

 1                    A F T E R N O O N   S E S S I O N

 2                              (Jury present.)

 3              THE COURT:  All right, Mr. Calhoun?

 4              MR. CALHOUN:  Your Honor, plaintiff would call Philip

 5    Harvey.

 6              THE COURT:  All right, Mr. Harvey.

 7         PHILIP J. HARVEY, PLAINTIFF'S WITNESS, AFFIRMED

 8                         DIRECT EXAMINATION

 9    BY MR. CALHOUN:

10    Q.   Good afternoon, Mr. Harvey.  Mr. Harvey, were you retained

11    as an expert in this case?

12    A.   Yes.

13    Q.   Can you explain to the Court your educational background?

14    A.   Yeah.  I graduated from Purdue University in 1975, and I

15    graduated from Harvard Law School in 1978, and I've been

16    practicing law -- I've been licensed somewhere since December

17    of 1978.  So that's 42 years plus.

18    Q.   And, Mr. Harvey, have you ever been qualified to testify

19    as an expert on attorneys' fees?

20    A.   I have submitted a series of affidavits in cases about

21    attorneys' fees which have been relied upon by judges.  I think

22    this is the first time I have ever testified live about

23    attorneys' fees.

24    Q.   Approximately how many cases have you offered affidavits

25    concerning attorneys' fees?

Harvey - Voir Dire                                                    1136

1   A.   Oh, probably half a dozen.

2   Q.   Can you take a look at Exhibit 911, please?

3              THE COURT SECURITY OFFICER:  What volume?

4              MR. CALHOUN:  911 is in 15.

5              THE WITNESS:  911?

6              MR. CALHOUN:  Correct, 911.

7              THE WITNESS:  Yes, I have it.

8   BY MR. CALHOUN:

9   Q.   All right.  Do you recognize that as a copy of your CV?

10  A.   Yes, I do.

11             MR. CALHOUN:  Your Honor, we'd move 911 into

12  evidence.

13             THE COURT:  Any objection?

14                      (No response.)

15             THE COURT:  No objection heard, it's in.

16             (Plaintiff's Exhibit No. 911 was received in

17  evidence.)

18             MR. CALHOUN:  All right.  And we would request the

19  Court recognize Mr. Harvey as an expert on attorneys' fees.

20             THE COURT:  Is there any objection to that?

21  Mr. Charnoff, did you want to voir dire?

22             MR. CHARNOFF:  Yes, Your Honor.

23             THE COURT:  Go ahead.

24                    VOIR DIRE EXAMINATION

25  BY MR. CHARNOFF:

Harvey - Voir Dire                                                    1137

1   Q.   Good afternoon, Mr. Harvey.

2   A.   Good afternoon.

3   Q.   Would you please tell us in what jurisdictions you're

4   currently licensed to practice law?

5   A.   Virginia and the District of Columbia.

6   Q.   Okay.  So is it a true statement that you are not licensed

7   in any of the other 49 states?

8   A.   Yes.

9            MR. CHARNOFF:  I have no further questions.  Thank

10  you, Your Honor.

11           THE COURT:  All right, thank you.

12           Mr. Urban, any questions?

13                   VOIR DIRE EXAMINATION

14  BY MR. URBAN:

15  Q.   Mr. Harvey, my name is Tom Urban.  I represent the Lohman

16  defendants.

17           You were designated by Navient to rebut the opinions

18  of Wayne Travell, correct?

19  A.   That's my understanding, yes.

20  Q.   Okay.  And you were not designated to testify in Navient's

21  case-in-chief, correct?

22  A.   That's my understanding.  Subject to whatever rulings the

23  Court's made of which I'm not aware.

24  Q.   Okay.  But you were -- you understand that you were

25  designated as a rebuttal witness, correct?

Harvey - Direct                                                    1138

1   A.   Yes.

2              MR. URBAN:  No further questions.

3                   END OF VOIR DIRE EXAMINATION

4              THE COURT:  All right.  Mr. Calhoun?

5              MR. CALHOUN:  We renew our motion to -- or request to

6   be recognized as an expert on the issue of attorneys' fees,

7   Your Honor.

8              THE COURT:  I'm going to permit that, yes.

9                   DIRECT EXAMINATION (Cont'd.)

10  BY MR. CALHOUN:

11  Q.   Mr. Harvey, did you review the report of Mr. Travell?

12  A.   I did.

13  Q.   All right.  And did you observe his testimony here today?

14  A.   I did.

15  Q.   All right.  And did you -- do you have any understanding

16  concerning -- are you aware of Mr. Travell's testimony in

17  pending concerning the requirement of the use of rates from

18  every jurisdiction in which an arbitration took place?

19  A.   Yeah, as I understood his testimony, it was that absent

20  evidence of prevailing rates in each of the localities where

21  the underlying actions or arbitrations were pending, it's

22  impossible to determine whether the rates and the fees charged

23  were reasonable or not.

24  Q.   All right.  Do you agree with that opinion?

25  A.   No.

Harvey - Direct                                                      1139

1              MR. CHARNOFF:  Objection, Your Honor.  That is a

2      matter of law.  It's a pure conclusion of law.

3              THE COURT:  He's an expert.  I'm going to allow him

4      to give his view as to whether or not that particular opinion

5      is reasonable.  We have a conflict of the experts.  The jury

6      will sort that out.

7              MR. CHARNOFF:  I understand.

8              I'll be very brief.  I did not introduce any

9      testimony, I don't believe the other defendants did, and to be

10     very clear, I'm objecting to offering conclusions of law, which

11     there was no inverse or converse objection that I heard.

12             THE COURT:  All right.  It's overruled.

13             MR. CHARNOFF:  Thank you.

14     BY MR. CALHOUN:

15     Q.   All right.  Did you agree with Mr. Harvey's opinion --

16     excuse me, Mr. Travell's opinion?

17     A.   No, I did not.

18     Q.   All right.  And can you explain why not?

19     A.   Sure.  Part of the analysis of whether legal fees charged

20     in a lawsuit are reasonable is based on a determination of the

21     number of hours billed by the attorneys or other timekeepers,

22     like legal assistants, and the hourly rates they charge,

23     because a lot of lawyers bill by the hour.  Some bill on a

24     contingency, some take flat fees, but for purposes of analysis

25     of reasonable attorneys' fees in this case, we're looking at

Harvey - Direct                                                      1140

1    hourly charges.

2          The -- you have to assess the actual hours worked and

3    then the reasonable rate to be charged.  To determine that, the

4    first thing you do is you look at the actual rate that was

5    charged, and then you have to figure out whether that's

6    reasonable.

7          There are a number of factors to determine whether

8    rates are reasonable.  One of them and the one that's used, I

9    think, predominantly is to look at prevailing rates in the

10   locality where the case is pending.  Rates in Peoria, Illinois,

11   are less than rates in Manhattan, New York.

12         But that's not the only consideration.  Sometimes you

13   have to look at the subject matter of the cases.  In very

14   technical cases, such as a complex patent case, the hourly

15   rates for lawyers is a higher rate and a reasonably higher rate

16   than it would be for, say, a much simpler traffic accident

17   case.

18         And in this case particularly, there were initially,

19   I think, some 80 or 85 -- 83 underlying actions, arbitrations,

20   lawsuits; and in that case, litigants like Navient frequently

21   will retain and hire a national counsel to oversee the cases

22   because if you don't, every time you end up in a new town or a

23   new city or a new court, you've got to go find a new lawyer,

24   and you've got to go explain what the cases are about and go

25   through the technical law and the Telephone Communications

Harvey - Direct                                                      1141

1    Privacy Act and all that stuff and what's a dialer; and so

2    companies, litigants -- frequent litigants find it --

3    frequently find it cheaper and reasonable to hire one person, a

4    man or a woman, to be the overall architect of the cases, the

5    quarterback for everything; and then that person will

6    frequently go try individual cases that need to be tried or

7    oversee the litigation everywhere.

8            And so when something like that happens, I don't

9    think it's necessary to find, say, the local rate in, you know,

10   Brooklyn and the local rate in Topeka and the local rate in

11   Fresno and the local rates in Baton Rouge.  You find one lawyer

12   you like who's good who can do it, and you hire them, and then

13   you start looking at that lawyer's rate and assess whether that

14   in that context is reasonable.

15           In this case, this man was Dennis Lueck, I think it's

16   pronounced, L-u-e-c-k, and he was with one firm, Akerman

17   Senterfitt, that has, I think it's got 23 offices around the

18   world, and then with the Hinshaw Culbertson firm, which has got

19   a dozen offices throughout the country, and his hourly rate is

20   305 bucks an hour.

21           He was a partner -- a graduate of law school in 2006.

22   That's a good rate for somebody who's a 2006 graduate and a

23   partner.  I mean, that's a deal.  And they hired him to oversee

24   these cases, with generally people of lesser hourly rates,

25   associates, younger colleagues, to help him, with the stray

Harvey - Direct                                                        1142

1  bill by, you know, some senior guy who's got to weigh in for 20

2  minutes to just opine about wisdom and age, but that's not

3  really particularly pertinent.

4         And so he goes into all those cases, and I think

5  under those circumstances, the reasonable analysis, it would be

6  wrong to confine it to, you know, prove to me that the local

7  rate in Topeka was what you charged, as opposed to the rates

8  for this national firm you picked to oversee all the

9  litigation, was that a reasonable thing to do.

10        When you try to assess the reasonable rate, you don't

11 have to get the cheapest lawyer because there's always a

12 cheaper lawyer.  You've got to find a reasonable rate and a

13 reasonable lawyer, and I think with Dennis Lueck at 305 bucks

14 an hour, that is reasonable everywhere.

15 Q.   What rate are you charging for your work in connection

16 with this work?

17 A.   I'm charging $500 an hour.

18 Q.   All right.  And I believe you said you've practiced for

19 40-something years?

20 A.   Yes, since 1978.

21 Q.   And in your experience, would $305 be a reasonable rate

22 for a national counsel?

23 A.   Yes.

24        MR. CHARNOFF:  Objection, Your Honor.  Scope of the

25 question, foundation.

Harvey - Direct                                                          1143

1          THE COURT:  Objection overruled.

2    BY MR. CALHOUN:

3    Q.   All right.  And did you also hear Mr. Travell opine

4    concerning whether he could determine whether the fees are

5    reasonable from reviewing the invoices?

6    A.   Yes.

7          MR. URBAN:  Objection, Your Honor.  That

8    mischaracterizes Mr. Travell's testimony.

9          THE COURT:  He said he could not make a

10   determination.

11         MR. URBAN:  Oh, I'm sorry, I misheard the question.

12         THE COURT:  That's what I thought you said.

13         THE WITNESS:  Yeah.

14         THE COURT:  Yeah.

15         MR. URBAN:  Okay.  I thought he said the opposite.

16   BY MR. CALHOUN:

17   Q.   Did you, did you also review the invoices?

18   A.   Yes.

19   Q.   Did you experience -- in your review of those invoices,

20   did you encounter any impediments from determining whether or

21   not the billing entries were appropriately done?

22   A.   No.

23   Q.   Did you find anything else that would prevent someone from

24   determining whether those rates were reasonable -- or the

25   entries were reasonable?

Harvey - Direct                                                        1144

1   A.   No.  I mean, you look at the entries, and there are some

2   redactions, because there are always redactions.  When lawyers

3   fill out their time sheets, you can say, you know, "trial," and

4   put eight hours for today.  Sometimes you say "conference with

5   client re," you know, "a suit tie to wear at trial."  Those are

6   innocuous.

7            But if you have an entry that says "discuss with

8   client reason fingerprints on murder weapon," that's not

9   something you want to disclose to anybody else.  So when you

10  take that and you apply for attorneys' fees, you block out.

11  You say "conference with client re," and you take out

12  the "fingerprints on murder weapon" part, because you don't

13  want to disclose attorney-client privileged communications.

14           You also don't want to disclose any confidential

15  information that you don't otherwise need to disclose in the

16  case, and you don't want to disclose the mental impressions and

17  conclusions and theories of counsel any more than you have to.

18  Those are all protected in various ways.  And so you redact

19  them.

20           Now, some people will redact just whole pages, and

21  that's kind of useless then.  You really can't figure out.  But

22  when you redact, you know, half a line or a line and a half, I

23  don't think that's, frankly, an impediment at all.  It wasn't

24  to me looking at the bills, looking at the lines.

25           And based on Mr. Travell's report, if I could talk

Harvey - Cross                                                              1145

1    about his report --

2                MR. URBAN:  Objection, Your Honor.  The limitation is

3    what he testified in the trial, not his report.

4                THE COURT:  That's how we're going to do it today,

5    yes.

6                MR. CALHOUN:  Yeah.

7                THE COURT:  You can stop at that, Mr. Harvey.

8                THE WITNESS:  Yes.

9    BY MR. CALHOUN:

10   Q.   So from your review of those redactions and invoices,

11   could you conclude that those invoices are reasonable?

12   A.   Yes.

13               MR. CALHOUN:  No further questions.

14               THE COURT:  All right.  Is there any recross?

15   Mr. Charnoff, do you want to recross -- I'm sorry, to cross?

16               MR. CHARNOFF:  We don't have any cross.

17               THE COURT:  All right, that's fine.  You have no

18   questions.

19               MR. CHARNOFF:  Just very briefly.

20                           CROSS-EXAMINATION

21   BY MR. CHARNOFF:

22   Q.   Mr. Harvey, you've served as an expert witness at least

23   half a dozen times although you didn't testify live in court;

24   am I correct?

25   A.   It's in my CV.  I've been retained as an expert it looks

Harvey - Cross                                                        1146

1    like about a dozen times, and testimony in court, you know, I

2    think this is maybe the second or third, because most of the

3    cases are resolved either by the court or they're settled

4    first.

5    Q.   Okay.  And in your experience, have you been designated

6    both to support a fee award and to also critique and oppose a

7    fee award?

8    A.   Yes.

9    Q.   Okay.  Are you familiar with the case law involving

10   redactions and block billing?

11   A.   I'm familiar with case law.  I'm not sure that I'm

12   familiar with whatever case law you're talking about.

13   Q.   Fair enough.

14   A.   But I have seen case law that criticizes block billing,

15   sure.

16            THE COURT:  All right.  Now, let's explain "block

17   billing."  The jury will not know what that term means.

18            THE WITNESS:  Okay.  Block billing.  When you work in

19   a day, you do a bunch of different things.  You have, like, you

20   know, telephone call with opposing counsel, .2; or draft

21   interrogatories to defendant, .4; or, you know, meeting with

22   client re deposition, .6; or testimony of -- testimony at

23   trial, 2.4.

24            Those are pretty good, and the -- pretty good billing

25   discipline in the invoices or computer-generated things, or

Harvey - Cross                                                          1147

1    whatever that stack was I looked at.

2              Sometimes lawyers get lazy, frankly, and they will

3    say, you know, work on case, 7.2 hours.  Well, you can't figure

4    out what they did.

5              And there's a tension between how much time lawyers

6    want to spend on filling out their time sheets, how much time

7    clients want the lawyers to spend and charge them filling out

8    time sheets, and then when you get to court and you want to

9    apply for fees, the court or the jury, the trier of fact

10   looking at it will say, well, 7.2 hours, I don't know what you

11   did.

12             You could have been extremely busy.  That all could

13   be completely legitimate, or it could be, you know, part

14   good/part bad.  You can't tell.

15             So if you get a block, a big block of time with a

16   description with a big number after it, that's block billing,

17   and some judges have criticized it to some degree.  It depends

18   on the amount of the block billing and how bad it is, and with

19   human behavior, there are sort of infinite gradations of

20   offenses on block billing.

21   BY MR. CHARNOFF:

22   Q.   Thank you, Mr. Harvey.

23             And to the extent you're familiar with case law and

24   especially where judges as opposed to juries are making

25   determination as to reasonableness of attorneys' fees, do you

Harvey - Cross                                                              1148

1    agree with me that courts have regularly significantly

2    discounted both redacted invoices and block billing invoices,

3    correct?

4    A.    No, I don't think I'd agree with you that courts regularly

5    significantly discount it.  I mean, there are discounts for

6    block billing, and there are discounts for redactions if

7    they're ridiculous, but, I mean, I've submitted redacted

8    attorneys' fees bills and had the court approve them without

9    blinking an eye as a litigant, not as an expert.  It's just --

10   it's a rule of reason.  It's a rule of reasonableness.

11   Q.    Do you agree with me that many litigants will simply

12   choose not to seek fees for any entries that are redacted to

13   avoid exactly this dispute?

14   A.    You know, that happens sometimes because what can be the

15   case in cases in which a jury doesn't decide the reasonableness

16   of attorneys' fees but the court does, the court can without a

17   waiver of the attorney-client privilege look at the unredacted

18   bill.  The court could ask, let me see the whole thing.

19            And there's sometimes something in those bills that

20   you don't even want the judge to see.  So sometimes people

21   forego asking for fees if there's something in there that's,

22   you know, like, you know, conference with client re

23   fingerprints on murder weapon.  That's not something you want

24   to send to the judge, no matter what.

25            But yeah, I mean, that happens, sure.  I mean, it's

Harvey - Cross                                                          1149

1   again, there are, there are thousands of cases tried every year

2   and probably millions over my career in various places, and I'm

3   sure somebody somewhere has said, I'm not going to go seek

4   attorneys' fees, or I'm going to cut out the redactions because

5   I don't want to have the fight we're having right here.

6   Q.    Fair enough, Mr. Harvey.

7         Do you agree with me that I think the universe of

8   original claims that you just looked at were 83?  Does that

9   sound right?

10  A.    I think there were 83 total, yes.

11  Q.    Okay.  Do you agree with respect to that universe of 83

12  cases, that that involved cases that were litigated or

13  arbitrated in almost two dozen states?

14  A.    I think that's right, yes.

15  Q.    And were you present in the courtroom during Mr. Travell's

16  testimony?

17  A.    I was.

18  Q.    Okay.  And did you hear him testify that to the best of

19  his recollection, none of that universe of 83 cases was

20  anything litigated in Virginia, D.C., or Maryland?

21  A.    Yes.

22  Q.    Okay.  And do you agree with that?

23  A.    I, I have no reason to disagree with it.  I haven't looked

24  through that stack -- it's, like, about this -- recently enough

25  to be able to confirm that there is nothing in D.C. or

Harvey - Cross                                                          1150

1   Virginia, where I'm, where I'm admitted to the bar, which I

2   guess is the point of your question, but if Wayne Travell says

3   there's nothing in there that's from Maryland, D.C., or

4   Virginia, he's a straight shooter.  Unless he made a mistake,

5   he's right, I'm sure.

6   Q.    Okay.  Mr. Harvey, I thought I heard you use the

7   expression, perhaps you're responding to the way it was phrased

8   by plaintiff's counsel, but I thought you used the

9   expression "national rate" when you were testifying earlier.

10  Do you agree with me, consistent with your other testimony,

11  that there are market rates in various markets of the United

12  States based on state population and area of the states, such

13  as a big city versus a rural area?

14  A.    If you're talking about geographic markets, sure.

15  Q.    Okay.

16  A.    There are different kinds of markets.

17  Q.    Exactly.  Do you agree with me that by definition, because

18  rates vary by geographic market and whether you're in federal

19  court or state court, in a big city or a rural area, that there

20  is no such thing as a national rate?

21  A.    Oh, no, I think that there is for -- for, you know,

22  enormous bankruptcy cases, for very large patent cases, there

23  are national rates, and I think what I was trying -- the point

24  I was trying to get across was that in this case, you pick a

25  national counsel who has the rate that he charges or she

Harvey - Cross                                                              1151

1    charges, and if that rate is reasonable, even if not the lowest

2    rate available in Topeka, Kansas, and Missoula, Montana, that

3    that's still -- the market is a market for people who are

4    capable of managing or quarterbacking 83 of these TCPA cases,

5    and that's the market of lawyers.  It's not geographic.  It's

6    sort of by subject matter, talent, ability, and, you know,

7    staffing.  You've got the manpower.  You've got the oomph to do

8    it.

9           Yeah, then I think that the rate applied nation- --

10   you know, a $305 rate applied nationwide is reasonable.

11   Q.   Do you agree with me that even a large firm that has

12   multiple offices across the United States, they charge

13   different rates based on what city they're in?  Manhattan rates

14   are different from Peoria rates?

15   A.   Yes, that's frequently the case.

16   Q.   Even within the same firm?

17   A.   Yes, that's frequently the case.

18   Q.   And that's true for partners, and that's true for

19   associates?

20   A.   Yes.

21          MR. CHARNOFF:  No further questions.  Thank you, Your

22   Honor.

23          THE COURT:  All right.  Mr. Urban, do you have any

24   questions?

25          MR. URBAN:  Yes, ma'am.

Harvey - Cross                                                          1152

1                              CROSS-EXAMINATION

2    BY MR. URBAN:

3    Q.    Hello again, Mr. Harvey.

4    A.    Hello.

5    Q.    Dennis Lueck practices in Los Angeles, correct?

6    A.    I don't know.

7    Q.    You don't?

8    A.    I Googled him and couldn't find him, so I don't know where

9    he's practicing at the moment.

10   Q.    Okay.  Assuming that Dennis Lueck practices in Los

11   Angeles -- and the jury can remember where they saw letters

12   from -- isn't that one of the higher-priced jurisdictions in

13   the country?

14   A.    Probably, yeah.

15   Q.    Okay.  And an attorney who practices in Los Angeles like

16   Dennis Lueck could charge different rates, depending on which

17   jurisdiction a case was pending, correct?

18   A.    Well, yeah.  A lawyer can charge different -- I mean,

19   whatever he and the client agree upon, he can charge or she can

20   charge, sure.

21   Q.    Okay.  Now, did you review the Navient summaries -- well,

22   let me back up.  You understand the invoices that have been

23   produced in this case were not actual invoices that probably

24   you prepare for your clients, correct?

25                MR. CALHOUN:  Objection.

Harvey - Cross                                                          1153

1                    THE COURT:  What's the basis for the objection?

2                    MR. CALHOUN:  I think he's mischaracterizing what has

3      been introduced.

4                    MR. URBAN:  We've already had testimony that they're

5      summaries.

6                    THE COURT:  Yeah.  I mean, they have the

7      title "Invoice" on them, but they're not the traditional

8      invoice of a letterhead letter from the law firm directly to

9      the client.  They're done -- they're submitted in a different

10     way.  But ask your question.

11                   THE WITNESS:  What I understand is that Navient has

12     this uplink system.

13     BY MR. URBAN:

14     Q.   All right.  That was my question, sir.  Their summaries

15     are not the kinds of invoices that you send to your clients,

16     correct?

17     A.   Oh, they're pretty close.

18     Q.   Don't you prepare an actual invoice that's prepared by

19     your firm and mailed to the client?

20     A.   Yes.

21     Q.   Okay.  And you don't upload that to some website somewhere

22     and then allow the client to make changes to it, correct?

23     A.   I have on occasion had a client who had a system where I

24     would enter my time into their system.

25     Q.   But generally, that's not how you do it?

1   A.   No.

2   Q.   Okay.

3   A.   I practice law in Alexandria.  I send out paper bills.

4   Sometimes I e-mail them if I'm feeling, you know --

5   Q.   I'm in Arlington.  Same thing.

6            Do you review the -- did you review the Navient

7   summaries to see if the amount of time spent on specific

8   motions were reasonable?

9   A.   No.

10  Q.   Okay.  So you don't specifically know how many hours

11  Dennis Lueck's firm spent on pre-arbitration briefs for Indra

12  Hernandez, correct?

13  A.   Oh, no.  I couldn't -- I mean, I could find it in the

14  sheets, but I didn't look for it, and I can't sit here off the

15  top of my head and tell you.

16  Q.   Okay.  And not for Jennifer Anicete either?

17  A.   Who?

18  Q.   Jennifer Anicete.

19  A.   No.

20  Q.   You don't even remember that name?

21  A.   I vaguely remember the name, but, I mean, literally the

22  stack was like this high, and I looked through it.  A year ago

23  I read it, and then I glanced at it again, but mostly I glanced

24  at it to offer the opinions I have.  I didn't really need, I

25  didn't think, to digest and remember every line item in all the

Harvey - Cross                                                          1155

1    bills.

2    Q.   Well, I'm not asking -- but did you actually review to

3    make sure that they didn't spend 40 hours on a motion for a

4    pre-arbitration brief?

5    A.   Yes.  I looked at it that closely.

6    Q.   But you don't remember any of those?

7    A.   I do not.  Not sitting here today, no.

8    Q.   So how can you today opine that they're reasonable if you

9    can't even remember how much time was spent on these various

10   pre-arbitration briefs?

11   A.   Well, the thrust of my opinion is about the rates and the

12   hours, and if you look at the rates and the hours and the

13   totals for each of the cases, I think it was a reasonable

14   number.  The, the amount of legal fees spent on each case was

15   about $70,000.

16        It's all in my report.  I can't regurgitate the

17   numbers off the top of my head, but that's the basis for the

18   reasonableness.

19        Whether somebody spent too much time on a motion in

20   Case X or Case Y, I don't know.  Navient actually paid these

21   bills, and somebody in Navient who was reasonably sophisticated

22   was looking at the bills and making comments about them, which

23   is a factor you take into account when you're looking at

24   reasonableness.

25   Q.   Are you aware that Navient as early as mid-2018 knew that

Harvey - Redirect                                                      1156

1    they were going to bring a RICO case against Jeff Lohman?

2    A.   No, I didn't know that.

3    Q.   Okay.  Well, if Navient knew that they were going to bring

4    a RICO case against Jeff Lohman, wouldn't they have an

5    incentive to increase the amount of attorneys' fees that they

6    would be suing Mr. Lohman for?

7    A.   No.

8    Q.   Why not?

9    A.   Well, because you pay the money out now, and you hope to

10   get it back later?  I'd rather pay less now and get less later.

11   Q.   Okay.  But if you really believe that you're going to get

12   it back later, you're really not as worried as if you didn't

13   think you were ever going to recover it, correct?

14   A.   If you're asking me what I would think in Navient's shoes,

15   the answer is no.  I wouldn't think like that at all.

16   Q.   Okay.  But you can't speak to the reasonableness of any

17   specific motions or anything that were done in any of the

18   cases, correct?

19   A.   I was not retained to do that, no.

20            MR. URBAN:  Okay.  No further questions, Your Honor.

21            THE COURT:  All right.  Any redirect?

22            MR. CALHOUN:  Just very briefly.

23                      REDIRECT EXAMINATION

24   BY MR. CALHOUN:

25   Q.   Mr. Charnoff asked you if you're aware of case law on

Harvey - Redirect                                                1157

1   block billing and things like that.  Did you see any of that in

2   the Navient invoices?

3   A.   You know, it really didn't look like any that I can recall

4   as I sit here today.  I thought the billing discipline was

5   pretty good.  I mean, it wasn't a big, you know, lump of

6   amorphous time that they just slid through.

7           When you're uploading it to the client system, you

8   tend to be a little more careful.  I thought it was pretty good

9   bills.

10  Q.   And you saw -- did you see any evidence that Navient

11  stopped reviewing the bills after any point in time and stopped

12  making reductions or comments in those bills?

13  A.   No.

14          MR. CALHOUN:  No further questions.

15          THE COURT:  Any recross?  No?

16          MR. CHARNOFF:  No from GST, Your Honor.

17          THE COURT:  Mr. Urban?

18          MR. URBAN:  Not for the Lohman defendants.

19          THE COURT:  All right.  Mr. Harvey, thank you for

20  your testimony.  You're free to go.

21          THE WITNESS:  You're welcome.  Am I free to go or

22  subject to recall?

23          THE COURT:  No, no subject to recall.  You're free to

24  go.

25          THE WITNESS:  Thank you.

1158

1           THE COURT:  Thank you.

2                          (Witness excused.)

3           THE COURT:  All right.  Mr. Calhoun, is there any

4    other evidence that the plaintiff wants to put on?

5           MR. CALHOUN:  No, Your Honor.  We would make a Rule

6    50 motion, but I think that's -- probably should be later.

7           THE COURT:  All right, we can do that later.  All

8    right.

9           I'm going to ask the jurors to just step out for a

10   minute into the jury room.  I don't think we need to even send

11   you across the hall.  Just keep your masks on if you're going

12   to chat with each other, all right?  Just keep a little

13   distance if you can.

14          So we're going to take a five-minute recess for the

15   jury.  I want to talk to counsel for a second.

16                          (Jury out.)

17          THE COURT:  All right.  Since I don't want to waste

18   the jury's -- have a seat, please.  I don't want waste the

19   jury's time, and we're all getting paid to be here, so I can

20   waste your time.

21          My plan is to release the jury for today because

22   making sure that we've gone through the jury charge, the

23   verdict forms, we need to do some work on both, and to take

24   care of any housekeeping matters, make sure that we've cleaned

25   up everything, will take a good chunk of the afternoon, and I

1159

1    want to do it right.

2            I'm planning -- here's what I'm planning to do.

3    We're going to stay in court this afternoon, and we're going to

4    work through the jury instructions.

5            I am then going to have my law clerk type up a clean

6    set.  I mean, obviously, they need editing.  We have to, among

7    other things, get Mr. Branch's name out of the instructions,

8    because it's one of the names throughout them.  The verdict

9    forms have to be changed.  So there's stuff that has to be

10   done.  That's why we have you submit them in Word so that we

11   can work with them.

12           I also have some of my standard instructions that I

13   think totally capture what you have, but I'm more comfortable

14   with them, and they've been through the Fourth Circuit a

15   million times, so I know that they fly.

16           My practice is always to send to counsel ahead of

17   time the final written package of instructions.  I then give

18   you time to look at them one last time, catch any typos,

19   because my practice is I orally instruct and then I give them a

20   written copy of the instructions, so if there's a typo or

21   something, I put the burden on you-all to make sure you've

22   caught it.

23           So my plan would be to tell the jury to go home

24   tonight, take a good break, say, you know, I got you-all to

25   move the case quickly, so we've cut back on time, warn them

1160

1  again not to start any deliberation, and have them come back

2  in, I want to say probably ten o'clock Monday morning.

3          At that point, what I will have done ahead of time is

4  you'll have the instructions sometime tonight.  You've got the

5  whole weekend to go back over them.

6          I'll have -- ask you to first of all e-mail us any

7  objections you have to that charge, and that e-mail has got to

8  get to my chambers by 7:30 Monday morning.  We will fine-tune

9  any issues, if any, that have come up.

10          You should plan to be here at 9:30 so that if we have

11  to argue anything, we have time, and then at ten o'clock, the

12  jury would be here, and we will have closing arguments, and

13  then I will instruct the jury, which means they will get the

14  jury -- the jury will get the case to deliberate starting

15  Monday.

16          Does anyone have a problem with that schedule?

17          MR. CHARNOFF:  On behalf of GST, I just have a

18  question.

19          THE COURT:  Sure.

20          MR. CHARNOFF:  Which is -- and I know different

21  judges do it differently.  Do you instruct before we --

22          THE COURT:  I instruct last.  The last they hear is

23  from me, but because you have the written instructions ahead of

24  time --

25          MR. CHARNOFF:  Okay.

1161

1      THE COURT:  -- lawyers like to be able to argue from

2  the mouth of the Court, yes.

3      That's why we do it that way.

4      MR. CHARNOFF:  Thank you, Judge.

5      THE COURT:  Okay?  Mr. Calhoun?

6      MR. CALHOUN:  He took my question, but I was just

7  wondering if you had any time limits on closing for purposes of

8  our plan.

9      THE COURT:  I'm going to let you do that.  So

10  everyone is agreeable we let the jury go today and have them

11  come back at ten tomorrow morning -- Monday morning?  Yes, I'm

12  not coming in on Saturday.

13      MR. CHARNOFF:  (Nodding head.)

14      MR. CALHOUN:  Yes, Judge.

15      THE COURT:  All right, let's bring the jury back in.

16      THE COURT SECURITY OFFICER:  Yes, ma'am.

17          (Jury present.)

18      THE COURT:  All right, folks.  The good news is all

19  the evidence is in now.  The even better news is that means I

20  can let you go home for today, because it's going to take us

21  some time to, number one, get all of the exhibits organized,

22  the ones that have been admitted, so that they'll be available

23  for you on Monday; and number two, the lawyers -- you-all can

24  have a seat -- the lawyers are going to need to work with me on

25  making sure that the jury instructions are as clear as they can

1162

1    possibly be.  There are some complex legal issues in this case.

2    We're going to try to make it as easy for you as possible.

3         So again, it's extremely important that you not try

4    to think about this case -- really, I recommend just get it out

5    of your minds.  You'll get plenty of refreshment about the case

6    on Monday.  Continue to abide by my cautions.

7         But obviously, all the lawyers should be commended

8    because we tailored this case -- remember I told you-all it was

9    probably going to take two weeks.  I mean, it may take you a

10   couple of days next week, but you will be getting this case for

11   deliberation on Monday.

12        I'm going to have you come back at ten o'clock on

13   Monday just to make sure, again, I don't want to waste your

14   time, and you've been so good about being here on time, and at

15   ten o'clock, what you can be expecting is the closing arguments

16   of counsel.  So the lawyers are going to again directly address

17   you to talk about the case that you've heard and to urge you to

18   reach certain conclusions about the case, and then after the

19   lawyers have made their arguments to you, I'm going to give you

20   the legal instructions.

21        So it's -- I'm not sure if we'll finish all that

22   quite by the lunch hour, but certainly by very early afternoon

23   Monday, you will get the case.

24        And just so you know because I want you to feel

25   comfortable, and I know we've had to split you up, but we are

1163

1    going to have you do your deliberation downstairs on the third

2    floor in our very large -- some of you may have been down there

3    in the jury deliberation room for your lunch breaks.  We're

4    going to make sure the tables are set up so that you can, you

5    know, have plenty of distance, have your water, and, frankly,

6    I'll let you bring coffee and food in there as well, and you'll

7    have the exhibits and be able to work on the case down there,

8    all right?

9            So that is the plan.  Again, I want to thank you for

10    having been such a great jury this week, and we'll be looking

11    forward to seeing you on Monday.  But you-all can just leave

12    your stuff, you know, as you've been doing.

13            Is that going to work for everybody, ten o'clock on

14    Monday?

15                        (Jurors nodding heads.)

16            THE COURT:  Great.  Then we'll see you then.  Thank

17    you.

18            We'll stay in session.

19                        (Jury out.)

20            THE COURT:  All right.  So I think the first -- we

21    have a couple of housekeeping matters, not the least of which

22    is the stipulation exhibit; I haven't forgotten that; but in

23    terms of time, Mr. Calhoun, let me hear what -- I always ask

24    lawyers -- I open it up.  You tell me how much time you think

25    you want, and then I'll tell you how much I'm going to give

1164

1    you.  I always can judge the reasonableness of counsel by what

2    the request is.

3              MR. CALHOUN:  Mr. Grell and I were joshing each other

4    a little while ago because yesterday when he said 15 minutes,

5    it took 30, which I think is all too typical of us lawyers.

6              I think that 30 minutes is a good target.

7              THE COURT:  Now, you're the plaintiff.

8              MR. CALHOUN:  I'd like longer, Your Honor.

9              THE COURT:  You get -- well, you get a rebuttal.

10             MR. CALHOUN:  Yeah, I know.

11             THE COURT:  So, I mean, when you tell me 30 minutes,

12   that's 20 and 10? 15 and 15?

13             MR. CALHOUN:  No, I was thinking 30 and 10.

14             THE COURT:  Thirty and 10?  That's what you want, 40?

15             MR. CALHOUN:  I'd take an hour, but 30 and 10 -- it's

16   going to get too long if I do that, so 30 and 10.

17             THE COURT:  Well, it's funny, I have never in all the

18   years I've been on the bench seen an effective closing argument

19   that went that long.  I mean, I think it puts the jurors to

20   sleep.

21             MR. CALHOUN:  That's why I --

22             THE COURT:  All right, 30 and 10 for the plaintiff.

23             Mr. Grell?

24             MR. GRELL:  Well, unlike yesterday, I will rehearse.

25   Even with my bad voice, I think my opening was 20.  So I will

1165

1    get it in with whatever period you give us.  If they get 40,

2    we'd obviously want 40.  But hopefully we would use less than

3    that.

4         THE COURT:  All right.  I'll give you -- I think it's

5    fair in this case to give each side 40, all right?  And I

6    actually, because there are two defendants -- and I suspect

7    Mr. Charnoff will not take 40, but if you think --

8         MR. CHARNOFF:  Your Honor suspects correctly.

9         THE COURT:  All right, that's great.

10        But that's the max, all right?  So 40 and 40 and 40,

11   that's two hours, right?  So that would be, assuming we start

12   on time Monday at ten, that would probably be the morning.

13        What I might do then is do the -- well, we can split

14   up the instructions probably.  It would make it easier for the

15   jury.  Because the instructions, I think, are going to take an

16   hour to an hour and a half.  But that means the jury gets the

17   case relatively early Monday afternoon, assuming we don't go

18   over Monday morning, which I hope we don't do.  All right, so

19   that's that.

20        I'm going to have Ms. Guyton go through the exhibits.

21   So only the exhibits that have been admitted are going to go

22   into evidence -- go into the jury room.  And it's my practice

23   to send the, the exhibits with the jury.  They don't have to

24   ask to see specific exhibits.

25        MR. CHARNOFF:  Your Honor, I don't mean to interrupt

1166

1    your flow.

2         THE COURT:  Yeah.

3         MR. CHARNOFF:  I want to be clear that --

4         THE COURT:  I know you have a good voice, but it

5    still should be at the lectern.

6         MR. CHARNOFF:  Of course, Your Honor.

7         THE COURT:  Yeah.

8         MR. CHARNOFF:  Obviously, we're doing a lot of

9    housekeeping this afternoon.  That's great.  I'm looking

10   forward to all of that.  I just want to be clear that, you

11   know, at some point, even however briefly, we'd like to renew

12   our Rule 50 motions.

13        THE COURT:  I'm going to give you time for that too.

14        MR. CHARNOFF:  Fair enough.  Thank you, Judge.

15        THE COURT:  Yeah.  But the next issue that I think we

16   have to resolve is the stipulation.  Have you been able to work

17   any more of that out?

18        MR. CALHOUN:  Your Honor, we haven't had any time to

19   talk about that particular issue, no.

20        MR. CHARNOFF:  Your Honor, on behalf of GST

21   defendants, there were a series of e-mails that went back and

22   forth last night, and when we addressed it very briefly this

23   morning, I believe you asked plaintiff's counsel to identify

24   what in particular in the stipulations they actually needed,

25   that they actually had foregone some witness testimony to have

1167

1    in there, so that you could make a decision based on that.

2             So I have not heard that yet, but based on that, I'm

3    prepared to be reasonable.

4             THE COURT:  Well, you've all been reasonable, you

5    know.  Within the confines of what a good advocate can do, yes,

6    that's fine.

7             I mean, if you had 10 or 15 minutes, do you think you

8    could sort it out, or is it going to take longer than that?

9             MR. CALHOUN:  Your Honor, unfortunately, everything

10   has taken longer than that, but I'm certainly willing to give

11   it a try.  We have cut, I think it was 44 pages.  It is now

12   down to 10-1/2.  So, you know, we've done enormous amounts of

13   cutting.

14            There's not agreement on what goes in and out

15   entirely.  So I certainly think it makes sense for us to take

16   ten minutes and try to talk it through.

17            THE COURT:  All right.  Mr. Grell?

18            MR. GRELL:  Yes.  I mean, some guidance would be

19   helpful --

20            THE COURT:  All right.

21            MR. GRELL:  -- because my issue is from my

22   perspective, it's what did you not -- what were you not able to

23   get in that you thought you otherwise would have gotten in

24   without the stipulation?

25            Everything that relates to my clients is in.  I can't

1168

1    see anything that isn't already in, and I just think it would

2    confuse the jury.

3            So if you, if you could give us clear guidance on

4    that issue, if it's already in, then it's not in the

5    stipulation, is that correct, or are we going to be redundant

6    and stuff like that?

7            THE COURT:  The bigger concern I had about the

8    stipulation was what you-all properly brought to my attention,

9    which is that there were certain agreed-to facts for purposes

10   of summary judgment that are now inconsistent with the evidence

11   that's in the record.  That would be a problem, and that should

12   come out of the stipulation --

13           MR. GRELL:  And with my clients --

14           THE COURT:  -- clearly.

15           MR. GRELL:  -- I don't think we -- we got rid of all

16   of the individual -- we were going to do a chart, we were going

17   to do all this stuff.  We just said, forget it, we don't need

18   it.

19           So -- actually, Mr. Calhoun takes credit for reducing

20   the size of this.  I should get most of the credit because it

21   was, like, 300 paragraphs of mine.

22           MR. CALHOUN:  We did the chart.

23           MR. GRELL:  You did the chart.

24           So we come to that.  And we're not even going to use

25   any of those facts.  But I literally, I'm not -- I just don't

1   see -- there's -- we're not even arguing the facts that are in

2   there, so I think it's mostly with the GST people.  I don't

3   know anything about the GST folks --

4            THE COURT:  All right.

5            MR. GRELL:  -- but I think they cut more of their

6   case to save on deposition reading but not ours.

7            MR. CHARNOFF:  Just very briefly, Your Honor, to

8   follow Mr. Grell's point on behalf of GST, much of what is in

9   here at this point is cumulative.  For example, you know,

10  paragraph what's now 64, 69, it's all items about Mr. Mize, who

11  he already testified for two days, and it's just repeating

12  stuff that Mr. Mize said or did, and so I think it unfairly

13  reemphasizes or repeats things the jury has already heard

14  repeatedly.

15           THE COURT:  That would be the problem that we have

16  here.  So again, what I remember myself saying the other day

17  was, because I had ruled at the -- based upon what we did at

18  the earlier hearing and based upon Mr. Calhoun's representation

19  that the case could be shortened by introducing the

20  stipulations, but to the extent that the facts are already in

21  the record, there is no need and it could arguably be

22  inappropriate to put them in as stipulations because that's

23  almost like taking facts away from the jury, so to speak.

24           I mean, we wasted our time putting them in, and one

25  way or the other, it's a problem, but to the extent there are

1  facts in that stipulation for which the plaintiff chose not to

2  put on evidence, we don't need it because we've stipulated to

3  it, that, to be fair, should go in as a stipulation, but only

4  that.

5          MR. CHARNOFF:  And I won't -- and I don't object to

6  that.

7          MR. CALHOUN:  All right, Your Honor.  Some of it you

8  need to hang -- there has to be some context or it's just, you

9  know, a random fact.

10         THE COURT:  Well, no.  I mean, it's just a random

11  fact.  So I think the best thing is for you to circle the ones

12  that you feel should still be in, all right?  And I'll need to

13  take -- we'll need to look at that, but I think -- I want to

14  give you a few minutes to work on that, yeah.

15         MR. GRELL:  Another issue is that there's all this

16  information on people who are no longer parties, including just

17  a ton of people that are just, Jeremy Branch and -- I mean, we

18  list in there -- I have no problems saying they're employees of

19  the Lohman law firm, but there's all of these other defendants

20  and parties that have been dismissed, and it's just --

21         THE COURT:  Well, it doesn't help the plaintiff's

22  case to get the jury confused.

23         MR. CALHOUN:  No, I agree, Your Honor.

24         THE COURT:  All right.

25         MR. CALHOUN:  Most of them are out.  Some of them are

1171

1  in there for context, but understanding Your Honor's direction

2  here, rather than circle and hand up, let us take it back, cut

3  it down to a clean Word document, and e-mail it to you tonight

4  or tomorrow.

5        Would that -- I think that -- I mean, I'll obviously

6  share it with counsel first, but I think that makes more sense

7  than circling and trying to give it to you.

8        THE COURT:  All right, that's fine.  That's fine.

9  All right.

10       I think then the last thing is since, since you're

11  still here before I give you a little bit of a break, we don't

12  need a break quite yet, I'm looking at these verdict forms, and

13  I really -- well, actually, Mr. Calhoun, I want you back at the

14  lectern.

15       In terms of the structure of your case, I am really

16  concerned about juror confusion.  Can you explain to me why you

17  have both Counts I and II in your complaint and how they

18  differ, how they differ?

19       MR. CALHOUN:  Your Honor, we hammered through on how

20  they differ.  Frankly, I think if we combined them, it wouldn't

21  make a material difference.

22       THE COURT:  That's been my impression from the very

23  beginning.  Do defense counsel have any objection to that?

24       MR. GRELL:  Just having one 1962 claim?

25       THE COURT:  One 1962 claim.  Now, except, though, I

1172

1    thought that with Count I, not all the defendants were in it.

2    Isn't GST only in Count II?

3              MR. CHARNOFF:  Correct, Your Honor.

4              MR. CALHOUN:  Correct.

5              MR. CHARNOFF:  We're only in Counts II, III --

6              MR. CALHOUN:  But if there's just one count, it

7    doesn't make a difference.

8              THE COURT:  So why don't -- I mean, dismiss Count I

9    and just go with Count II.

10             MR. CALHOUN:  I think --

11             MR. GRELL:  No, no, no.  Your Honor, I disagree with

12   that.

13             THE COURT:  All right.

14             MR. GRELL:  Again, this goes to the nature of the

15   conspiracy.  They have to prove that someone violated 19- --

16   committed a substantive offense, and without a 1962(c) claim --

17             THE COURT:  They're both, they're both -- both Counts

18   I and II are 1962(c) complaint counts.

19             MR. GRELL:  No, they're not.  Oh, this is the GST --

20   okay.  I thought it was the conspiracy.

21             THE COURT:  No, no.  Conspiracy is, is (d).

22             MR. GRELL:  Right, right.

23             THE COURT:  No, I know the difference between (c) and

24   (d), but I couldn't tell the real difference between Counts I

25   and II other than GST is named as a party in Count II.

1173

1          MR. GRELL:  Okay.

2          THE COURT:  So I could see -- I can tell you, our

3    juries are incredibly perceptive, and I used to do what Judge

4    Bryan did, and I would give the jury instructions orally in

5    court and tape them and then give them a cassette player that

6    they could play them if they didn't get them.  That was

7    never -- then they'd still ask for the written ones.

8          The problem with the written instructions, I will

9    tell you this, is some of them read them like lawyers, and we

10   get brilliant questions, but it shows you how carefully they

11   look at stuff, and I was looking at those two counts and

12   thinking they're going to go crazy trying to figure out what's

13   the difference with Count I and Count II.

14         MR. CALHOUN:  Your Honor, we had a basis for it.

15   Frankly, I was starting to work on my closing, and I had the

16   same thought.  If we dismiss I and stick with II, I think

17   that's fine.

18         THE COURT:  All right.  So it's going to be Count II,

19   III, IV, and V.  Four counts.  Branch is out.  Witness

20   tampering is out.  So far, that will reduce some of the

21   instructions a bit, all right?  And that again means I have to

22   redo these verdict forms.

23         But -- so going to the verdict forms, excuse me, you

24   want -- because we have individual defendants, I have normally

25   done verdict forms -- you can do them by count, or you can do

1174

1    them by defendant.  I think it's really important in a case

2    from, from a sense of fairness to make sure the jury is

3    focusing on each individual defendant, and so my preference,

4    but I'll let you-all tell me how you feel about it, is to do it

5    defendant by defendant.

6           So verdict as to Lohman law firm, and then we have

7    the counts.  As to Mr. Lohman the counts.  We can do it either

8    way, but I'd like to know, you know, what your sense is of

9    that.

10          Mr. Calhoun?

11          MR. CALHOUN:  We don't have any objection to that

12   approach, Your Honor.  We did it the other way in our, in our

13   proposal, but we don't have any objection to doing it that way.

14          THE COURT:  All right.  What's the defense counsel's

15   view?

16          MR. GRELL:  Well, now that Mr. Branch is out, I mean,

17   I think -- now that Mr. Branch is out, I think it makes sense

18   to do that.  And for practical purposes, I don't think there's

19   a distinction now between Mr. Lohman and the law firm, so

20   that's what's giving me pause right now, I think.

21          THE COURT:  Well, that's another legitimate issue to

22   raise, again, to try to simplify this case to some degree, but

23   I think that might have ramifications down the road.

24          MR. GRELL:  Well, it might have insurance --

25          THE COURT:  Yeah.

1175

1          MR. GRELL:  So I might have to -- we'll probably just

2    keep those separate, because there is insurance coverage in

3    this case, and they've been treated separately so far, so I'll

4    just keep it that way.

5          THE COURT:  All right.  So I will have a separate

6    verdict form for the Lohman law firm and a separate verdict

7    form for Mr. Lohman.

8          MR. GRELL:  Right.

9          THE COURT:  And then the same thing with GST and each

10   of the GST defendants?

11         MR. CHARNOFF:  That will be great, Your Honor.

12         THE COURT:  Okay.  All right.  All right.

13         So I think for -- and then I'm going to do it by

14   count rather than by the name of the offense.  So it would be

15   Count I -- sorry, Count II, RICO.  It has to be done that way

16   to make it clean for the, for the Clerk's Office.

17         So I will tell the jury that we've compressed Count I

18   into Count II so they understand why we're going to say -- the

19   verdict form will be Count II, III, IV, and V.  So it will say

20   Count II, you know, RICO violation.  You both seem to like

21   having a heading there.  So participating in the affairs of an

22   enterprise through a pattern of racketeering activity, or just

23   RICO, whatever.

24         I'm a little concerned about the damages.  In the --

25   let me see.  The first set of -- the verdict form on page 106

1176

1    is whose, plaintiff's or defendants'?  Because you didn't put a

2    title on it.  Who did, who did the first one, do we know?

3                MR. GRELL:  Mr. Calhoun.

4                MR. CALHOUN:  I think the first one is plaintiff's.

5                THE COURT:  All right.  So the plaintiff's is 106,

6    page 106?

7                MR. CALHOUN:  Yes, Your Honor.

8                THE COURT:  Okay.  The damages -- yeah, I'll have to

9    look at -- a bit more time on this.  I want to make sure we

10   don't get into this problem of the jury awarding duplicative

11   damages.  That's a problem the way I think the forms are set up

12   right now.  It's just one number.  There's no cap on any of the

13   damages.  I treble the RICO if there's any RICO damages.

14               MR. GRELL:  Right.  That's my -- there does need to

15   be a separation between the tortious interference damages,

16   fraud damages, and the RICO damages just --

17               THE COURT:  Because of the trebling, right.

18               MR. GRELL:  So there has to be at least -- well, and

19   then there's -- then only the Lohman defendants are, are under

20   the fraud count, so that's where things get complicated.

21               THE COURT:  Yeah.

22               MR. GRELL:  Because it, it --

23               MR. CALHOUN:  There's a separate entry for each

24   claim.  We didn't do a separate entry for each defendant.  If

25   the way -- we're going to restructure it the way you suggested,

1177

1    I think there would be a separate entry for each defendant for

2    each claim?  I understand --

3              THE COURT:  Well, yeah, because, I mean, had

4    Mr. Branch stayed in this case, for example, I could easily see

5    if they found him liable that they might not be awarding nearly

6    as much money as to Mr. Branch as there is to Mr. Lohman.  I

7    mean, they have to consider with damages the culpability of

8    each individual defendant.

9              MR. GRELL:  Right.

10             THE COURT:  And it would be joint and several.  I

11   think one of you indicated --

12             MR. GRELL:  Well, if they -- on the RICO -- I would

13   have to defer to my Virginia colleagues.  On the RICO

14   colleagues, yes, it would be joint and several if RICO damages

15   are awarded.

16             So my main concern on that is -- and that's why I'm

17   very -- I'm fascinated by the verdict forms.  That's why I

18   split it up into three forms.

19             THE COURT:  Yeah.

20             MR. GRELL:  So they were on different headers.

21             And then for space limitations, I don't object to

22   Mr. Calhoun's decision.  He kind of all put them together, but

23   I had three separate verdict forms because I wanted the jury to

24   focus on RICO first, award those, and then, and then come to

25   the state law claims, and then basically there's an instruction

1178

1    that says, do not include what you've already awarded under

2    RICO in this one.  How much additional damages would you award

3    under state law claims?  Basically, that's the philosophy.

4           And then there's a mitigation defense in our, in our

5    affirmative defenses, which they would have to reduce the

6    damages, which gets really confusing.

7           But that, that was my thought in having three

8    separate firms -- or forms, to get them to focus kind of on

9    these individual sets and blocks rather than just everything's

10   one big thing, and then have them move from one to one to one

11   hopefully.  I mean, they can do whatever they want --

12          THE COURT:  Yeah.

13          MR. GRELL:  -- but you'd at least give them a

14   structure to move from one to one to one.

15          THE COURT:  It's such a complicated case.  All right,

16   I'll have to think about that, and we'll work on verdict forms,

17   and there may need -- I may want you here at 8:45 Monday

18   morning.  I'm beginning to think that that might be an issue.

19          Okay.  Well, that's that.

20          All right.  In terms of the jury instructions, do you

21   want a break, or do you want to start talking about them?

22          MR. GRELL:  I would just as soon keep going.

23          THE COURT:  All right.  You did a really good job on

24   agreeing to a fair number of them, but obviously, there are

25   disputes as to several, and we need to get those resolved.  So

1179

1   let me sort of walk you through.

2          Again, the boilerplate ones there's not going to be

3   any issues about.  I've got slightly different ones.  I have a

4   much fuller note-taking instruction, for example, that's closer

5   to what I said at the beginning.

6          Yeah.

7          MR. GRELL:  Do you -- I've seen a lot of courts use

8   an instruction, and I thought about suggesting this to

9   Mr. Calhoun, but I thought it would just be your practice

10  anyway, do you give an instruction where the party with the

11  burden of proof, a yes vote on the verdict form is the party

12  that -- it has to be proven by a preponderance of the evidence

13  to vote yes on the verdict form?

14         THE COURT:  What I actually do if there are not a ton

15  of questions, has the plaintiff proven by a preponderance of

16  the evidence X, and I -- but we can look about just doing a

17  general.  Yes, I normally put the burden, because on the fraud

18  count, it's clear and convincing, right?  So there are

19  different burdens.

20         And you have the burden, though, on some of these

21  affirmative defenses if you're going to go that route.

22         MR. GRELL:  What's that?

23         THE COURT:  You have the burden on some of the

24  affirmative defenses if you want to go that route.

25         MR. GRELL:  Yeah, yeah, yeah.  So that's why -- and

1    that was another reason why I put it on separate verdict forms,

2    because the yes votes should all be the preponderance votes.

3            THE COURT:  Yeah.

4            MR. GRELL:  And, and that makes it easier for the

5    jury to understand.

6            THE COURT:  It may in this case.  I'll have to think

7    about that.  Because it's a long verdict form.  It's going to

8    take them a while to fill this out, and I'm sure this will be a

9    conscientious jury, all right?

10            That's the other thing.  Since we were just talking

11    about damages, I always put my damage discussion at the end in

12    one section rather than splitting it up.  I noticed the way

13    these were submitted, there was a discussion of damages as to

14    the fraud count after you talk about fraud damages.  I think

15    it's better because there's a general instruction that I

16    usually give at that section.

17            In other words, the fact that I'm instructing you on

18    damages doesn't mean that you necessarily are going to award

19    them, blah, blah, blah, and then we can -- I can break it out

20    so that, you know, as to this count, fraud, here's how you look

21    at the damages; as to this count, you know.  So that's why I'm

22    going to reshuffle the order in which you gave them to me,

23    because I thought the order was out.

24            I also always put the burden of proof at the end of

25    the instructions before the final charge to the jury.  That's

1181

1    just how I've always done it in the past, and I think it works

2    better that way.

3         But in any case, the -- there's not much of a

4    disagreement about any what I call the standard ones.  I do

5    think it's fair to say, "The plaintiff called several

6    defendants as adverse witnesses," rather than "an adverse

7    witness" or "the defendant."  I mean, some of these were geared

8    towards individual defendants, and we have multiple defendants,

9    so I thought that that wording had to be changed.  That's on

10   18.

11        The first real dispute that I saw in the instructions

12   was No. 22 and 23.  It is traditional that some brief

13   description of the parties' theory of the case goes into

14   instructions, but quite frankly, Mr. Calhoun, I don't think the

15   way you've done it in your proposed 22 really helps the jury

16   because you've actually -- I mean, I'm not letting either side

17   argue their case entirely.

18        So I plan to shorten both versions, but I think it's

19   fair to have a very brief view just to remind the jury of what

20   the parties' positions is, all right?  So I will -- I'm going

21   to edit that significantly because it's not the purpose of the

22   jury instructions to argue the case for the parties.  It's to

23   spell out the law and only the law that's necessary to decide

24   the case.  Again, it's not to be a primer on the law.

25        So that's in dispute between you-all, but I'll have

1182

1    to rework that, and hopefully, you'll be satisfied with what I

2    give you.

3         So I think the first substantive, really significant

4    substantive disagreement was 26, which was the definition of

5    "enterprise."

6         MR. CHARNOFF:  Your Honor?

7         THE COURT:  Yeah.

8         MR. CHARNOFF:  Counsel for Lohman defendants just

9    pointed something out.  I didn't submit a separate, you know,

10   here's the defense version of the world, because I think it's

11   inappropriate for the Court to be instructing the jury at all

12   as to the narrative of the case.  That's what the openings and

13   closings are for.

14        And so just to be clear, if you are going to allow 22

15   at all, then it's going to prejudice my clients to the extent

16   that --

17        THE COURT:  You don't want to do it at all.

18        MR. CHARNOFF:  I don't want to do it at all.  I don't

19   think it's the Court's job to --

20        THE COURT:  It's less paper I have to send them, and

21   it's less work that I have to do.

22        MR. CHARNOFF:  So I object, I object to 22 at all,

23   which, you know, we have it in there and we object to that, but

24   I know the Lohman defendants provided you an alternative in

25   case you ruled against, but I just want to note my objections.

1183

```
 1              THE COURT:  All right.

 2              MR. CALHOUN:  Thank you, Your Honor.  We just thought

 3   it was important because this is a complicated case, and we're

 4   going to argue, and they're going to argue, and GST will argue.

 5              THE COURT:  Well --

 6              MR. CALHOUN:  A shortened version is fine, but we

 7   think there needs to be something just to orient them to what

 8   everything is.

 9              THE COURT:  I might just say to them the

10   plaintiff's -- there's four counts for you to consider in this

11   case.  Here's the four counts.  Defendants all are, you know,

12   say that, you know, plaintiff hasn't proved its case.

13              I'll, I'll do a very summary one then, all right?

14   That's great.

15              MR. CHARNOFF:  Thank you, Your Honor.

16              THE COURT:  That's easy.

17              MR. GRELL:  Your Honor, I mean, I trust your summary,

18   that it will include our affirmative defenses as well?

19              THE COURT:  Make clear for me what your affirmative

20   defenses are because I'm not convinced you actually clearly

21   articulated them in your opening statement.

22              MR. GRELL:  No, I didn't --

23              THE COURT:  Yeah.

24              MR. GRELL:  -- because I, I wanted to focus on their

25   issues --
```

1184

```
 1              THE COURT:  Okay.

 2              MR. GRELL:  -- that they had to prove.

 3          Noerr-Pennington, accord and satisfaction --

 4              THE COURT:  Do you -- you know, the -- well, all

 5     right.  If you use the term "Noerr-Pennington," you're going to

 6     confuse them.

 7              MR. GRELL:  I word it "First Amendment" in our

 8     instructions.  Yeah, I agree, that's -- and you'll see in the

 9     instructions I have mine captioned -- First Amendment,

10     Mr. Calhoun, is Noerr-Pennington.

11              MR. CHARNOFF:  I'll remind Mr. Grell, collateral

12     estoppel.

13              MR. GRELL:  Collateral estoppel, waiver, and failure

14     to mitigate.

15              So First Amendment, accord and satisfaction,

16     collateral estoppel, waiver, failure to mitigate.

17              THE COURT:  All right.  And is GST raising those same

18     four?  No, you wouldn't have the First Amendment issue.

19              MR. CHARNOFF:  No, we wouldn't have First Amendment,

20     Judge, but, you know, a lot of this is derivative.  I mean,

21     obviously, if the other half of this alleged conspiracy isn't

22     doing anything wrong or it was already released, in other

23     words, Navient had the opportunity to litigate and actually

24     litigated the manufactured defense, you know, in 80 of the 83

25     cases and they've already been ruled upon, why do they get a
```

1185

1    second bite at the apple here, and then --

2         THE COURT:  All right.  So I'll just say "the

3    defendants" as a group.

4         MR. CHARNOFF:  Thank you.

5         THE COURT:  Lump you-all together, okay?  All right.

6         All right.  So the next one that I think there was a

7    substantive dispute about was 26, which is the definition of

8    "enterprise," and I thought of the two instructions, the

9    plaintiff's was, was better.  First of all, it's right from

10   O'Malley, and I don't think there's a significant material

11   difference between what the defendants offered and the

12   plaintiff offered.

13        Mr. Grell, you're the RICO person.  I mean, is there

14   what you think a substantive mistake?

15        MR. GRELL:  Well, I thought it was important, the

16   main difference is on common purpose under the *Boyle* standard,

17   and given that in this case, that is -- that has been a huge

18   issue, I thought -- and given that there's controlling Fourth

19   Circuit authority on that in *Pinson*, the jury was entitled to

20   be instructed on *Pinson*, and it is directly applicable to the

21   arguments that we're making, and --

22        THE COURT:  But the word "purpose" is a word which I

23   think the jury can understand.  Venture starts to get

24   complicated, undertaking the project.

25        I mean, that extra verbiage I don't think helps, and

1186

1    I think that the -- I mean, O'Malley is a very solid,

2    well-established source, and this certainly tracks O'Malley.

3    And 90 percent of the plaintiff's instruction is consistent

4    with yours.

5            MR. GRELL:  No, I mean, I generally -- Mr. Calhoun

6    drafted these, and then I just -- we -- I didn't, I didn't

7    rewrite -- I don't think I rewrote anything really.

8            THE COURT:  Yeah.

9            MR. GRELL:  I just added in where I thought there was

10   direct Fourth Circuit case law, and if you -- you're the -- you

11   get to instruct the jury --

12           THE COURT:  Yeah.

13           MR. GRELL:  -- so I, I would maintain it's still

14   appropriate to instruct them on that standard in *Pinson*, but,

15   yeah, I can still argue it, but I think it is a directly

16   applicable --

17           THE COURT:  All right.  Well, I'm going to use -- I

18   will use the plaintiff's so -- all right.

19           MR. URBAN:  Your Honor, there was one sentence that

20   we wanted in there:  "Navient claims that defendants formed an

21   association-in-fact enterprise."  I do think that's important

22   because that's the enterprise they --

23           THE COURT:  It's here.  It says, "Navient has alleged

24   an association-in-fact enterprise."  It's in their first

25   paragraph.

1187

1    MR. URBAN:  No, no.  That claims the defendants.

2  That's the definition of who they said was in the

3  association-in-fact enterprise.

4    MR. CALHOUN:  That's asking the Court just to adopt

5  their argument, Your Honor.

6    THE COURT:  No, wait, I'm sorry.  The sentence that

7  they have at the end of their first paragraph is, "Navient has

8  alleged an association-in-fact enterprise."  You want me to add

9  the words, "Navient has alleged that the defendants formed an

10  association-in-fact"?

11    MR. URBAN:  Exactly, Your Honor.

12    MR. CHARNOFF:  Because that's how they pled it.

13    MR. URBAN:  That's how they pled it.

14    MR. CHARNOFF:  Otherwise --

15    MR. CALHOUN:  This is, this is their issue, that they

16  were trying to say that to the extent we have unindicted

17  coconspirators, which I'll use in the sense that we don't get

18  to argue about them.  That's, that's what this is about.  And

19  then so they want to -- you know, the statute is the statute.

20  We've alleged an association-in-fact enterprise.  That's what

21  it requires.

22    What they're trying to do is through the back door

23  have you limit what we can -- the parties can argue about.

24    THE COURT:  Oh, you can argue about Mize up to the

25  end of the earth.  I mean, he's part of this case.

1188

1    MR. GRELL:  Yeah, he's part of the enterprise --

2    THE COURT:  Yeah.

3    MR. GRELL:  -- but it's all these, Slaughter and

4    Johanson.

5         Look, every -- I know when U.S. attorneys plead RICO

6    claims, they always plead these gigantic association-in-fact

7    enterprises.  They include everybody from here to the moon.

8         Civil lawyers cannot get away with that because it's

9    the particularity standard, and when you -- you have to plead a

10   common purpose.  Number one issue on a motion to dismiss is how

11   do you -- how do you plead a common purpose when there are 50

12   John Does in your enterprise?  How do you plead that these

13   no-name people share a purpose with you or are related to you?

14        And in this situation, you've got -- they have to

15   prove who is in their enterprise, who shares the common

16   purpose.  They can't keep moving the ball like this.

17        They -- in 316 of their second amended complaint,

18   they say defendants have formed an association-in-fact

19   enterprise, and this is again, Your Honor --

20        THE COURT:  All right, but, but in the original

21   complaint, the defendants were all those other people.

22        MR. CHARNOFF:  No.

23        MR. GRELL:  Johanson and Slaughter have never

24   been defendants in this case.

25        THE COURT:  All right, but, I mean, but Mize was

1189

1   there.  There were --

2           MR. GRELL:  That's not, that's not at issue.  They

3   need to define who their enterprise is.  That is not on you.

4   That's not on me.  That's not on the jury.  That's on them, and

5   they won't do it, and it's driving me crazy.

6           MR. CHARNOFF:  Your Honor, I don't know if it's

7   driving me crazy on behalf of GST, but it's close.  If

8   plaintiffs were entitled to craft the case however they wanted

9   to craft it, they filed a complaint, they filed an amended

10  complaint, they filed a second amended complaint, so I came

11  into this case maybe a year ago, a year and a half ago.

12          Of course, you can have unindicted coconspirators.

13  Yes, you can have people who are part of the enterprise who are

14  not party defendants.  It's just not true here.

15          They pled that everyone who's in the

16  association-in-fact enterprise were defendants, and now they're

17  trying to give themselves wiggle room so they can confuse the

18  jury and say people who were never named in the enterprise,

19  i.e., all the attorneys other than Mize, the debt relief

20  attorneys other than Mize, who were not named, that they're

21  somehow in these -- in this association enterprise and confuse

22  the jury.

23          We can't have that.

24          MR. GRELL:  I mean, literally, I will not know what

25  his enterprise is until he's done with his closing argument and

1190

1    I've got to stand up and give mine.  That's -- that is not

2    fair, and especially when there are such issues about common

3    purpose in this case.

4              MR. CALHOUN:  May I respond, Judge?

5              THE COURT:  Yes, go ahead.

6              MR. CALHOUN:  You know, this argument is one that I

7    find a little bit confusing.  We had summary -- we've had

8    motions to dismiss.  We've had summary judgments.  We've had

9    motions in limine.

10             Slaughter, Johanson, and Ruggiero are all in the

11   complaint.  There are numerous allegations about their

12   involvement in this enterprise.  The fact that we say

13   defendants formed an enterprise, we didn't say defendants and

14   only defendants were engaged in this enterprise.

15             It's just -- they're parsing words in a way to try to

16   take advantage of it.  It just doesn't make any sense.  I think

17   the instruction, it works, and we should move.

18             MR. GRELL:  This is exactly why you have Rule 9(b),

19   to prevent this argument that he just made.  Yeah, I'm parsing

20   words, especially in a fraud claim.

21             THE COURT:  All right, we're not going to --

22             MR. GRELL:  And he had the right to plead however he

23   wanted to.

24             MR. CALHOUN:  We're talking about jury instructions.

25             THE COURT:  Just a second.  Just a second.

1191

 1          MR. GRELL:  Yeah, by this time, you should know

 2     what --

 3          THE COURT:  I'm going -- I'm going to go back and

 4     double-check O'Malley to make sure this is absolutely verbatim

 5     from O'Malley.  If it's verbatim from O'Malley, I'm going to go

 6     with it, but it does not restrict anyone from arguing.

 7          So -- but, Mr. Calhoun, I would strongly suggest to

 8     you that getting into people who are not specifically named

 9     extensively in this case, who are not named defendants, you

10     don't have that much time, and I think this jury, the biggest

11     danger all sides have is confusion.  You know, you could wind

12     up with a, with a hung jury on this one, too.  It could easily

13     find we just can't figure it all out.

14          And so it doesn't, in my view, help the plaintiff to

15     be spending a whole lot of time on naming people who really

16     have not been in the course of the trial pivotal players, but

17     I'm going to -- as long as O'Malley gives this clear

18     instruction, "Navient has alleged an association-in-fact

19     enterprise," and I think I looked at Sand's last night as well,

20     and I think that's also how Sand's does it, that's all that's

21     necessary.

22          Sometimes jury instructions, you know, there are two

23     philosophies.  You give the jury the minimum amount they need,

24     just the skeleton.  Other times, you know, how much flesh do

25     you put on the skeleton?  There's always a danger when you

1192

1    start putting flesh on because you can put on too much.  Juries

2    can always come back and ask a question if they don't

3    understand.

4            MR. GRELL:  But, Your Honor, in this case, given

5    RICO, you have to -- you have to -- and I agree that this was

6    decided in motions to dismiss and such, but the plaintiff has

7    to define the enterprise because that's what everything is

8    built around.

9            The enterprise has to be sustained from the

10    defendant.  The enterprise has to be operated and managed by

11    the defendant.  The enterprise has to conduct the -- has to --

12    the acts of racketeering have to be conducted through the

13    enterprise.

14            It's, it's a -- I can't express how fundamental it

15    is, and I need to know what that is before I stand up to give

16    my closing argument.

17            I mean, I agree that, that he could do whatever he

18    wanted to do at the pleading stage, and even after your motion

19    in limine, if there had been a coherent theory that he

20    expressed in his opening statement or something, I was waiting

21    for it, there's just nothing.

22            He could literally stand up and say the Law Offices

23    of Jeffrey Lohman are an enterprise, which, okay, well, then

24    what happens to GST?  What do I -- and this whole big

25    enterprise?  I have no idea what he's got for an enterprise

1193

1    right now.

2              THE COURT:  All right.

3              MR. GRELL:  It's very unfair, and it's -- it is

4    just -- I've never heard of it.  This is -- and it's unique

5    about RICO.  They need to tell us what the enterprise is.

6              THE COURT:  All right.  Well, as I said, I'm doing

7    jury instructions right now, and the jury instructions are

8    going to be what I'm comfortable with, and right now,

9    O'Malley -- if O'Malley does it somewhat differently, I'll

10   double-check, but I don't think it does.

11             MR. GRELL:  But, but O'Malley will just -- it assumes

12   that the enterprise has already been defined by the defendant,

13   and it hasn't been.

14             THE COURT:  All right.

15             MR. URBAN:  Your Honor, and if I may --

16             MR. CALHOUN:  Could we just have one person per side,

17   Your Honor?

18             THE COURT:  Yeah, it should be one person per issue.

19             MR. URBAN:  We had divided certain issues, and this

20   sort of throws two issues together.  All I was going to say is

21   plaintiffs filed the complaint to put defendants on notice what

22   their allegations are.  If you look at the second cause of

23   action, it specifically in paragraph 316 says, "Defendants have

24   formed an association in fact that is an enterprise within the

25   meaning of 18 U.S.C. 1961(4), which enterprise has at all

1194

1    relevant times been engaged in activities," etc., etc.

2            If you look at the rest of the cause of action, none

3    of those people that they want to bring in -- Johanson,

4    Slaughter -- are mentioned anywhere in this count.  So what we

5    were put on notice of throughout this case was that it was the

6    defendants who were the enterprise, nobody else.

7            Now, they mentioned everyone else earlier in the

8    complaint, but once when they got to the point where they were

9    supposed to define who's who in the enterprise, they defined it

10   only as defendants, and we're fine including Mize in that

11   because he was a defendant at some point.

12           THE COURT:  All right.  Again, I'm going to take a

13   look at O'Malley, and I'll let you know, but look for it when

14   you get the instructions.

15           Okay.  The "association" definition was agreed to by

16   you-all.

17           And again, the next one, Jury Instruction 28, was the

18   definition "to participate in the conduct of the enterprise's

19   affairs."  On this one, again, there was not a major dispute.

20   It's just the defense does seem to add additional language.

21           So I think you actually were in agreement on the

22   first paragraph, as I understand your approach, and then you

23   wanted this extra language added, which all comes from various

24   cases from different districts.

25           MR. GRELL:  Well, when it comes to professionals,

1195

1    that's -- that all flows from the *Reves* case because those were

2    accountants in *Reves*, and they were held not to have operated

3    and managed the enterprise because they were operated pursuant

4    to the rules of accounting, standard practices.

5            And for professionals -- and there just doesn't

6    happen to be a Fourth Circuit case applicable, but it's

7    universally regarded that professionals are not operators and

8    managers simply by acting like professionals, and it comes

9    right from *Reves*.

10           THE COURT:  I understand that, but I think it adds

11   again more, more flesh on the bones than is necessary in a

12   jury -- in jury instructions.  But I do have one on attorneys

13   down the road that I think takes care of any concerns about

14   that.  So my plan is to use the Plaintiff's Proposed 28.

15           This is a minor point on 29 because it's agreed to,

16   but I am concerned again because the jurors will read this

17   literally, and we have two corporate entities here.  So do you

18   want to use just the word -- again, "a defendant must use his

19   or its," I was going to put in here, acts of racketeering,

20   because we're talking about two "it" defendants, so that they

21   don't get confused that this only applies to the individuals,

22   all right?

23           MR. CALHOUN:  Fine, Your Honor.

24           THE COURT:  All right.  In terms of racketeering

25   activity, my understanding is that everybody agreed to the

1196

1    first portion, and then the plaintiff wanted the Court to add

2    the other language, and the defendants wanted that omitted.

3            I'm going to omit the extra language following my

4    approach to giving the jury the skeleton but not all the flesh,

5    all right?  I don't think it's necessary to add that, and it's

6    again something I don't normally do with instructions.  Okay.

7            The same thing with mail fraud.  I think the

8    defendants' proposed -- that's No. 31.  I think that is a

9    cleaner, more explicit definition.  It doesn't differ

10   significantly from the plaintiff's, but I think that's better.

11           MR. GRELL:  Which one, Your Honor?

12           THE COURT:  Your -- I'm going to use the Defendants'

13   31, definition of "elements of mail fraud."

14           Okay.  You agreed on 32, racketeering activity in

15   terms of wire fraud.  Again, there was a little bit of a debate

16   about the elements of wire fraud.  I think the defendants'

17   again is the cleaner, simpler one, and therefore, I'm using the

18   defendants'.

19           You agreed on 36.  You agreed on 37.  There's no

20   problem with that.  38 is not a problem.

21           On 39, which is the definition of "false statements,"

22   I believe the only thing that you-all disagreed about was the

23   inclusion of that what I'll call the third paragraph in the

24   plaintiff's proposed, and I don't think you need that.  I think

25   the rest of the, of the instruction is perfectly clear.

1197

1       So the defendants' proposed one, as I recall, has

2  everything that was in the plaintiff's except for those four

3  numbered entities, and so I don't intend to give that.  So I

4  will give the defendants' version on that one.

5       Now, I looked at Instruction 40, and I looked, we had

6  the -- we had enough time to check all the cites on that.  I

7  think that is an appropriate instruction to give in this case

8  to make sure that the jury understands the difference between

9  racketeering and being involving in aggressive and possibly

10  frivolous legal activity.

11      The only sentence that I don't find is adequately

12  called for in the citations is the middle sentence:  "Likewise,

13  an attorney's performance of unauthorized work is at worst a

14  violation of the rules of professional responsibility but is

15  not an act of racketeering."

16      I don't think we need that.  I think the rest of it

17  adequately protects the attorney defendants' interests.

18      Mr. Calhoun?

19      MR. CALHOUN:  Your Honor, that might be fine, but I

20  would suggest that we take out the term "fraudulent" if it's

21  frivolous and baseless litigation activities, but when you say

22  "fraudulent," and then that's defined out of -- I'm concerned

23  that they'll say that's not mail fraud because the judge said

24  fraudulent litigation activities can't qualify.  And so there

25  needs to be a distinction between fraud and other types of

1198

1    activities.

2            THE COURT:  But this, this has to do with

3    racketeering.  That's the problem.  Because you've got the RICO

4    case in here.  And so I think it has to be there because the

5    essence of the racketeering cause of action is mail or wire

6    fraud.

7            MR. CALHOUN:  Correct, Your Honor, but if part of

8    that is a fraudulent litigation activity, that's part of the

9    RICO predicate, I'm afraid this is going to --

10           THE COURT:  Well, I mean, frankly, the case is

11   complicated because of the way you chose to do it.  You could

12   have just done this as a fraud case or as a, you know,

13   intentional interference with contract case.  You wouldn't get

14   your treble damages then, but by making it RICO, it makes it

15   complicated.

16           But this has to do with making it clear to the jury

17   what is or is not an act of racketeering, and I think that

18   "fraudulent" has to be in there, and that's supported by the

19   case law.

20           MR. CALHOUN:  Can we add "unless it qualifies as mail

21   or wire fraud"?

22           THE COURT:  It says "without more."  That "without

23   more," I think, adequately protects, and you can argue it.

24   You'll have the instruction if you feel you need to do that,

25   all right?

1199

1          Yes.

2          MR. GRELL:  Yeah, I agree.  He has argued about that,

3   that throughout the trial.

4          THE COURT:  All right?  So, so your 40 with that edit

5   is going in, all right?

6          MR. GRELL:  All right.

7          THE COURT:  But 41 is not going in.  I don't think

8   it's necessary, and again, I don't give instructions that are

9   unnecessary.  40, I think, adequately protects the defendants

10  from somehow the jury misconstruing things.

11         The issue about ratification, though, has come in in

12  this case, and I think the jury does need to understand what

13  that is, so I'm leaving that in.  I know the plaintiff did not

14  want it in there, but I think it's appropriate.  The issue has

15  been raised and needs to be addressed.

16         I, however, think that 43 starts to argue the case,

17  the defendants' proposal for intentional default.  The

18  plaintiff doesn't want that instruction, and I don't think

19  that's appropriate or necessary in this case, so that will not

20  go in.

21         The one I'm totally confused about is 44, because I

22  looked at Sand's on that, and that particular instruction about

23  unanimity, which I think is incredibly confusing, its only

24  source for that is the Fifth, Seventh, and Eleventh Circuits.

25  So obviously, not all circuits give it.  It's not been given in

1200

1    the Fourth Circuit, and I think it's going to unnecessarily

2    confuse the jury.

3         So I know that's a defense proposed instruction.

4    Mr. Grell?

5         MR. GRELL:  That was one proposed by Mr. Charnoff, so

6    I will defer to him.

7         THE COURT:  Mr. Charnoff?  I mean, I agree -- and,

8    you know, in certain criminal statutes, like a 371 conspiracy,

9    the jury has to be unanimous as to at least one overt act, but

10   I don't see where that's coming from in the RICO statutes or

11   the RICO cases that I've had.  I don't believe I've ever given

12   this instruction before, and it has so little authority for it.

13        Where did it come from?  Was it from Sand's?

14        MR. CHARNOFF:  This is 44, Your Honor?

15        THE COURT:  Yeah.  Was it from Sand's?

16        MR. CHARNOFF:  I got it from Modern Federal Jury

17   Instructions.  I don't feel strongly about it.  I mean, I

18   thought it was a proper instruction.

19        THE COURT:  All right.

20        MR. CHARNOFF:  A bizarre fact entered in this case.

21        THE COURT:  I mean, it's not -- had this complaint

22   listed very specifically, you know, acts, but it doesn't, and

23   so the jury would never figure this out.  So, okay, I'm going

24   to strike 44, all right?

25        MR. CHARNOFF:  I understand, Your Honor.

1201

```
 1              THE COURT:  Okay.  You agreed to the definition of

 2   "pattern of racketeering."  I've, of course, taken out witness

 3   tampering, so again, this one has to be edited slightly.

 4              I think, though, it's important whenever I have a

 5   multiple-defendant case, I do try to make sure the jury

 6   understands, I remind them as many times as possible they have

 7   to look at each individual defendant, so I'm going to be adding

 8   language, you know, the defendant at issue committed, I mean,

 9   or something to try to focus the jury's attention on they have

10   to consider each individual defendant in this case, all right?

11   But other than that, you agreed on the language.  That's fine.

12              You agreed on 46.

13              Now, with 47, which is the elements of a -- of the

14   conspiracy --

15              MR. GRELL:  Just to --

16              THE COURT:  I'm sorry.

17              MR. GRELL:  For editing purposes, "Mr. Branch" has to

18   be taken out.

19              THE COURT:  Yeah, we're going to try to make sure

20   we've gotten all of that.  If we miss one, that's the kind of

21   thing you should be reading for carefully on -- over the

22   weekend.

23              I'm having trouble truly parsing what the difference

24   is between the two versions that you want for the elements of

25   1962(d).
```

1202

1    MR. GRELL:  Well, Your Honor, my main issue is that

2    they have to prove a 1962(c) violation for reasons we discussed

3    already.

4        THE COURT:  Right.

5        MR. GRELL:  And I think that is the main difference.

6        I think also, I can't recall if it's in George's

7    final instruction, but I think at some point, he was -- to me,

8    the overall criminal objective is the 1962(c) violation, not

9    mail and wire fraud.  It's the whole RICO claim.  That's

10   what -- it's a conspiracy to violate RICO, not -- did you keep

11   that in, or did you change that?

12       MR. CALHOUN:  Which one are you on?

13       THE COURT:  We're on 47.

14       MR. GRELL:  I would just focus it on the RICO

15   violation and the overall criminal objective has to focus on

16   the RICO violation, and not the individual acts of

17   racketeering.

18       MR. CALHOUN:  Your Honor, I don't think there's a

19   major difference between these two instructions.  The -- you

20   know, we have some language from *Burgos* in here, but I think

21   Mr. Grell's, what he's asking is that we say we must prove that

22   one must have violated 1962(c).  1962 only requires that you

23   conspire to violate 1962(c).  That's the literal language of

24   the statute.

25       His point, frankly, comes up in damages.  If we don't

1203

1    prove a 1962(c) violation, there's no damages.

2              THE COURT:  There's no -- yeah.

3              MR. CALHOUN:  It doesn't belong here.

4              MR. GRELL:  Well, that is not true.

5              THE COURT:  If there's no underlying 1962(c), there

6    is no (d).

7              MR. GRELL:  Right.

8              THE COURT:  And you can give the jury an instruction

9    if you do not find liability as to Count II, bypass Count III.

10             MR. GRELL:  That's -- and that's what my verdict form

11   does.

12             THE COURT:  Yeah.

13             MR. GRELL:  And that's -- as long as it's on the

14   verdict form.

15             THE COURT:  No, it helps to have the instruction.

16             MR. GRELL:  Yeah.  I mean, the first thing, if they

17   get there and it's like, oh, we didn't find a 1962(c)

18   violation, so we don't need to read this, and then they can go

19   on to the next one.

20             So I think it's important to keep that first point in

21   that's in our proposed instruction, you know.

22             THE COURT:  Yours is that at least one defendant

23   violated Section 1962(c), right?

24             MR. GRELL:  Yeah.

25             THE COURT:  Now, I think where the problem may come

1204

1    is as an operator or manager.  I don't think that's necessary.

2         MR. GRELL:  And I don't -- however, I was trying to

3    make it clear, but again, what's clear to me, people tell me

4    this all the time, what's clear to me is not clear to everybody

5    else, so that may be too technical, and I'm not -- I just want

6    to make it clear for the jury, and I would defer to your

7    judgment on that, Your Honor.

8         THE COURT:  All right.  But you would agree that at

9    least one defendant violated 1962(c).

10        MR. GRELL:  Correct.

11        THE COURT:  That's the first and most pivotal

12   element.

13        MR. GRELL:  Yes.

14        THE COURT:  Right.  And then here's my problem:  The

15   terminology "another defendant," I mean, basically, to hold

16   somebody responsible for being part of the conspiracy, there

17   has to be first of all, there's one person -- the problem is

18   nobody can conspire by themself.

19        This is -- I realize this is language that's been

20   used before, but it really doesn't make good sense.

21        MR. GRELL:  Well, I mean, if I was the plaintiff, I

22   would have done this totally different.  I'm not the plaintiff,

23   and it was -- I was trying to work within the context of

24   Mr. Calhoun's instructions.

25        THE COURT:  Yeah.

1205

1    MR. GRELL:  You know, I understand sometimes, you

2    know, you define these terms like "conspirators" versus

3    "defendants" or "operators and managers" versus "conspirators,"

4    you sort of give the jury a definition of what these terms

5    mean, and I do that a lot in my complaints, so again, I, I was

6    trying to keep as much of the theme and sort of the

7    organization -- and I'm not putting the blame on Mr. Calhoun.

8    I was just trying to make things more similar so that it was

9    maybe easier to read.

10    But if you -- and you've seen more of these than I

11    have, so if you've got ways to clarify it, I will not object, I

12    can't imagine.

13    THE COURT:  All right.  We'll spend a bit of time on

14    this one, but take a careful look at it over the weekend when

15    you get these, all right, because that's one that I think we

16    may have to spend a bit of time working on.

17    And we may wind up combining 47 and 48 because 48 may

18    assist a little bit in understanding that, but anyway, there's

19    a partially agreed 48, and then on page 71, the plaintiff

20    wanted an additional section.  It says, "To prove that an

21    individual was a member of a RICO conspiracy, a plaintiff need

22    show only 'slight evidence.'"

23    No, that's not correct.  That would not be proper.

24    And you're taking that from the criminal jury instructions,

25    which I think is -- for the Eighth Circuit.  That's pretty poor

1206

1    authority in my view.

2              MR. CALHOUN:  That's where it came from.  I think

3    that's completely consistent with *U.S. v. Burgos* from the

4    Fourth Circuit, Your Honor.

5              THE COURT:  What, "slight evidence"?

6              MR. CALHOUN:  Once a conspiracy is established, yes.

7              THE COURT:  I'm not comfortable giving that unless --

8              MR. GRELL:  And, Your Honor, I object.  The Eighth

9    Circuit is a very, very reputable circuit.

10             THE COURT:  I didn't put the Eighth Circuit down.

11   I'm just saying that's --

12             MR. GRELL:  They actually have more, they do have

13   RICO instructions, so that's why I've borrowed it from there.

14             THE COURT:  I mean, have you used -- have you seen a

15   "slight evidence" instruction like this before?

16             MR. GRELL:  No, no, no.  I completely agree with you.

17   It confuses the preponderance of the evidence situation.

18             THE COURT:  Yeah.  So I'm going to give just what's

19   on 70 there because you-all had agreed to the language on 70.

20   All right?

21             Then 81, page 81 -- I'm sorry, page 72, Instruction

22   49, this is only the defendant's proposal for civil standing.

23   "In order to recover damages under RICO, Navient must have

24   standing.  A plaintiff has standing only if it is the type of

25   victim that was authorized by Congress to bring a civil lawsuit

1207

1    under RICO."

2            I think you can argue that issue, but I don't think

3    it's appropriate to give it this way because we have elsewhere

4    in the instructions the need to have, to have been injured.

5            MR. GRELL:  Well, the issue is -- I was just trying

6    to define what "standing" meant in the statutory context

7    because it's come up through various witnesses, the issue of

8    standing, because who's got standing under the, under the TCPA,

9    who has -- you know, standing is basically who, who Congress

10   authorizes to bring a civil claim under that statute --

11           THE COURT:  Right.

12           MR. GRELL:  -- which, which I agree, it normally

13   would be confusing, but in this context, where standing is,

14   like, it's not only an issue in the RICO case, but it's also an

15   issue in the underlying TCPA litigation.

16           THE COURT:  But you'll confuse the jury by using a

17   technical term like "standing."  Your argument in the case has

18   been the plaintiff wasn't injured because it doesn't own the

19   debt or it doesn't get the debt until all this is over, and

20   that's what you're really arguing, that there's been no injury.

21           MR. GRELL:  And I, I would defer to you on whether we

22   need a "standing" definition.  My main thing about proposing

23   this instruction, I was just trying to be projecting an issue

24   that might confuse the jury, but I'll defer to you.

25           THE COURT:  All right.

1208

1    MR. GRELL:  My main thing is that the whole, you

2  know, civil standing under RICO, which is statutory standing,

3  not constitutional standing, statutory standing is a higher, a

4  higher burden, and you have to prove what Congress has said.

5  This, Navient, you must prove these two elements to, to have

6  standing under the statute.

7    We don't need to tell the jury -- you've got to

8  prove -- to recover damages, you need to prove injury by reason

9  of to your, to your business or property.

10    THE COURT:  Well, in any case, I wouldn't be

11  surprised if when we look again at the damage instructions,

12  that this basically is going to be there.  The plaintiff will

13  always have the burden of proving by a preponderance of the

14  evidence that it was the victim, that it was damaged.

15    MR. GRELL:  I am not wedded to this instruction.

16    THE COURT:  Okay.

17    MR. GRELL:  I mean, I just think as a housekeeping

18  thing, it kind of sets up an outline for the jury on why we're

19  moving to this next, like you said, the count things, dividing

20  it up into counts --

21    THE COURT:  Yeah.

22    MR. GRELL:  -- I just don't want the jury to be

23  confused, like, okay, we're moving from 1962(c), and they won't

24  have the statute, but it is a different statute so --

25    THE COURT:  Well, I understand the argument.  It's

1209

1   not --

2            MR. CALHOUN:  I'm sorry, if you're going to take it

3   out, I won't say anything.

4            THE COURT:  I'm taking it out.  You won.  You should

5   sit down.

6            MR. CALHOUN:  I'm sitting down.

7            THE COURT:  Okay.  All right, the next one is 50, and

8   this really again begins to dovetail the previous one because

9   it's the proposed RICO injury definition, and it's right there,

10  I think, the obligation, the requirement that it must prove the

11  defendant RICO violations were the proximate cause of injury to

12  Navient's business or property.  "Therefore, you must find that

13  Navient suffered an injury to its business or property and that

14  the injury was caused by reason of the defendants' violation of

15  RICO."  Right?

16           So that really covers, Mr. Grell --

17           MR. GRELL:  I -- it was just a housekeeping

18  instruction.

19           THE COURT:  Okay.

20           MR. GRELL:  So like I said, you've done this a lot

21  more than I have, so --

22           THE COURT:  So I think I'm having trouble parsing

23  where the really -- where the rub is here other than this

24  language, where's the real difference between -- because

25  O'Malley supports the plaintiff's instruction.

1210

1    What is it in yours that you feel needs to be here

2    that is not adequately covered by O'Malley's instruction?

3         MR. GRELL:  Well, I think O'Malley -- first of all,

4    there's no -- I'm not sure that it's so important in the

5    context of this case, but I think O'Malley is wrong.  I mean,

6    for one thing, there's no requirement of "but for" causation.

7    That's just right out of *Holmes*.

8         And then, and then there are -- there's -- again,

9    there's so much authority for the proposition that the acts of

10   racketeering need to be the cause of injury, not -- and that's

11   right out of *Sedima*, which again, in this case, there's so many

12   things, like there's negligence, there's ethical violations.

13        The jury needs to know it has to be mail and wire

14   fraud that caused the injury, not this other stuff, and that's

15   *Sedima*, and I don't think O'Malley sufficiently addresses that.

16   I don't think O'Malley sufficiently addresses the fact that

17   RICO does not confer standing upon misfortunes visited upon

18   third parties.

19        Again, it's a critical issue here because -- and that

20   is, and that is out of *Holmes* and *Hemi*, and it's a critical

21   issue because we've got this whole issue with promissory notes

22   and who owns the notes versus Navient is just a servicer.

23        And these are Supreme Court cases.  I mean, this is

24   very strong authority that we're relying upon here.

25        THE COURT:  Well, I think the language -- we do have

1211

1   to have in here -- I'm going to probably cobble the two

2   together because, for example, the plaintiff cannot recover for

3   harm visited upon third parties.

4           MR. CALHOUN:  Right.  And we're not trying to.

5           THE COURT:  All right.  So -- but again, that issue

6   is circulating in this case.

7           MR. CALHOUN:  It's a consideration if they get to

8   punitives, but it's not an element of our damages.

9           MR. GRELL:  Your Honor, they're trying to -- they're

10  trying to recover on behalf of themselves when they're, they're

11  a third party to this whole loan contract.

12          THE COURT:  Well, that's an argument.

13          MR. CALHOUN:  That's an argument.  And that's the --

14          MR. GRELL:  I know, but that's --

15          MR. CALHOUN:  Can I finish my argument, please?

16          THE COURT:  All right.  So on 50, I'm going to

17  probably meld some of the things that you wanted into the

18  plaintiff's instruction, because I think that one, amongst

19  others, is certainly important.

20          MR. CALHOUN:  Yeah, certainly the last couple, Your

21  Honor, we thought were just argument.

22          THE COURT:  All right.  And then we have 51 is

23  another one, injury to business or property.  And the

24  defendant -- again, this is out of O'Malley, and I'm just going

25  to make sure, I'm going to trust you, Mr. Calhoun, if you tell

1212

1    me O'Malley, you've not edited O'Malley.

2            MR. CALHOUN:  I don't think that we have, Your Honor.

3            THE COURT:  I don't think you have.  I haven't sat

4    down and parsed it word for word, but I think this is correct.

5            MR. GRELL:  Well, I would doubt O'Malley refers to

6    Navient, and -- unless there's a bracketed comment.  I think

7    that there's a lot of argument in here, and I would be

8    surprised that O'Malley is this biased in favor of the

9    plaintiff, but maybe I'm wrong.

10           THE COURT:  But I'm looking -- I'm looking at yours

11   because it's shorter.  I like shorter, and everything I'm

12   seeing in here so far is consistent.

13           Again, some of it's going to be repetitive of other

14   damage instructions, and I don't want to have to give the same

15   instruction twice, but, I mean, my general damage ones would

16   say they can't be speculative.

17           MR. GRELL:  And the, and the thing about our

18   instruction is we give them injury to business or property.

19   we're not even -- there's no need to define it because we say

20   that they're a business.  They can only be injured in their

21   business or property.  They don't have emotional distress.

22           I don't know why they didn't take that, but they

23   didn't take it.

24           THE COURT:  All right.

25           MR. GRELL:  So I just point that out, too.

Anneliese J. Thomson  OCR-USDC/EDVA (703)299-8595

1213

1          THE COURT:  I'm actually inclined, even though I like

2    O'Malley usually, I think this is a shorter, simpler

3    instruction.  I may just change my other damage instruction a

4    little bit on that, okay?

5          So right now, I'm inclined to give 51.  I'll think

6    about it a little more, but that looks like a better

7    instruction.

8          All right.  Now, the elements of fraud, so what I

9    would be doing is I'd make it clear to the jury that this has

10   to do with Count 4 of the complaint so that it's clear that

11   it's different from what we've been discussing with the RICO,

12   and it's right there.  So I think it's important to put "In

13   Count 4 of the complaint, Navient claims," again, we'll take

14   out "Mr. Branch," and this is only as to the Lohman defendants.

15         And I'm not going to repeat the claim itself because

16   that's -- I'm not going to do that, but I don't think you

17   disagree on the essential elements here.

18         MR. GRELL:  No, it's mostly -- I think reliance,

19   there's a separate instruction on reliance, so that I don't

20   think is appropriate in this instruction, and then I haven't

21   found any -- I, I looked at Mr. Calhoun's authority on the

22   reckless indifference.  I know that's a common standard, but I

23   couldn't find reckless indifference under any Virginia case,

24   let alone the ones that he cites, and so I took that paragraph

25   out.

1214

1    And that was my only -- my biggest issue was that

2    reliance was misplaced, and I don't know where he gets the

3    authority for reckless indifference.

4    THE COURT:  Mr. Calhoun, do you remember where you

5    got it from?

6    MR. CALHOUN:  I don't, Your Honor.

7    THE COURT:  I think that is potentially a problem.

8    MR. GRELL:  I mean --

9    MR. CALHOUN:  I think it is a standard, but that's --

10    MR. GRELL:  I literally searched Virginia for

11    reckless indifference, federal and state in Westlaw, and there

12    are just no cases.

13    THE COURT:  Yeah.  Well, that is a state cause of

14    action, so we'd be using the state definition of the, of the

15    elements.

16    MR. GRELL:  Right, but to the extent, though, for,

17    like, you in this case applying Virginia law, it should have

18    come up.  I just -- I did a very simple search, and it just

19    didn't come up.

20    THE COURT:  All right.  We'll take a look at that,

21    but basically, that's the main rub there.

22    All right.  And then we have reliance.  I mean, I

23    know that Virginia has case law on what is considered to be

24    reasonable reliance or unreasonable reliance, and something

25    does have to be given there.  I'm not really fond of -- I see

1215

1   the plaintiff doesn't want an instruction, and the defendant

2   does.  It does have to be something.

3          MR. CALHOUN:  Your Honor, our main concern here is

4   that whatever the instruction is doesn't completely preclude

5   the forced reliance argument that we've been making throughout

6   the case.

7          THE COURT:  Okay.  Yeah.  This, this, though, you've

8   got too much, I mean, argument, it seems to me.  "Truth in the

9   discovery process," yeah, that's beyond where it should be.  So

10  we'll take a 30-second look at that.  That shouldn't be

11  difficult.

12         Okay.  Fraud damages, no issue there.

13         And then this is Count 5, the business expectancy,

14  and this goes to -- okay.  I think you basically agree to most

15  of this.

16         MR. CALHOUN:  Yeah.  Your Honor, I think that the

17  main thing that we disagree on is their final instruction,

18  which is essentially asking Your Honor to take the issue of

19  whether Navient has an interest or business expectancy away

20  from the jury.  We don't think that last paragraph belongs in

21  here.

22         MR. GRELL:  Well, again, they stipulated to it.  They

23  pled it in their complaint.  It's been an undisputed fact since

24  the beginning of this litigation.

25         Just because Mr. Standish tries to muddy the water

1216

1    doesn't make it any less undisputed.  It's just, it's just an

2    undisputed fact.

3              THE COURT:  Well, you're going to be able to argue

4    this to the jury.

5              MR. GRELL:  Okay.

6              THE COURT:  To argue it.  I'm not going to give it to

7    them as an instruction because you have -- yeah.  I was just

8    going to take that out, but otherwise, I don't think there's

9    any dispute there.

10             MR. GRELL:  And that's the only thing I'd want in the

11   stipulation is to the extent I cross-examined Mr. Standish on

12   that language, that's all I want, just that.

13             THE COURT:  That, that portion of the stipulation is

14   in, all right?  I mean, again, because -- yes.

15             MR. CALHOUN:  That's -- it was in the testimony.

16   That's the kind of stuff you said to take out so it's not

17   duplicative.

18             MR. GRELL:  No, but I questioned him about it, and

19   the important thing was that it was in a stipulation, and, and

20   the thing was he hadn't reviewed it with his lawyer.  Of

21   course, he wants it out.  It's embarrassing for them.

22             MR. CALHOUN:  It's not embarrassing.

23             THE COURT:  Wait, wait, wait, wait.

24             MR. GRELL:  You've tried to embarrass my client.  I'm

25   talking about their client.  So back atcha, buddy.

1217

1        It has to be in the stipulation because of that.

2    It's critical that it's in the stipulation.  That was the point

3    of the cross-examination with him.

4        I'm the only one who used the stipulation in trial,

5    by the way.

6        THE COURT:  Yeah, that stipulation.  Boy, everyone

7    should have learned a lesson on that one for future litigation.

8    All right, let's keep this going.

9        Tortious interference, justification and privilege,

10   this is the Defendants' Proposed 56.  I think that's a fairly

11   fair instruction.  I may not give the whole thing, but I do

12   think that that second-to-last paragraph is certainly

13   appropriate for this case, that is, that a legal advisor loses

14   the privilege if he acts solely to feather -- well, I'm not

15   sure "only" is the proper word, but if he acts solely to

16   feather his own nest, and without believing that (or caring

17   whether) he is helping his client, and he causes the client to

18   break a contract to the detriment of the other party to the

19   contract.

20       Something like that, something along these lines is

21   appropriate to this case.  I think this may be too much

22   editorializing, and I want to just make sure that the

23   authorities fully support that, especially the Virginia

24   authorities, all right, because it's a Virginia cause of

25   action.

1218

1    In terms of damages, there is a dispute between
2    you-all on that.  And you would admit, Mr. Grell, all but the
3    first paragraph.
4    MR. GRELL:  I am fine with everything but when he --
5    he's talking about -- their damage charges are damages, and
6    then he's got lost profits.  Damage to business reputation?
7    They never alleged anything like that.  They haven't submitted
8    any evidence of damage.
9    THE COURT:  Yeah, that --
10    MR. GRELL:  We didn't submit evidence of business
11    reputation.
12    THE COURT:  Yeah.
13    MR. GRELL:  I just don't see -- that's confusing
14    because there's no evidence of either lost profits or damage to
15    business reputation.  The expenses, yes, because they have the
16    attorneys' fees, but I don't get where the rest of it comes in.
17    THE COURT:  And there's no real evidence of profit
18    either because we don't really know how that's calculated in
19    this case.  So I just --
20    MR. GRELL:  Their damages are the damage chart --
21    THE COURT:  Yeah.
22    MR. GRELL:  -- which we can argue the elements of it,
23    but that's their damages.
24    THE COURT:  I think that's correct.
25    MR. CHARNOFF:  And, Your Honor, just very briefly, I

1219

1    would again for the record want to be quite clear that it's my

2    position that they have no admissible evidence on the

3    reasonableness of those attorneys' fees, which means they can't

4    be considered at all by the jury.

5            THE COURT:  Well, that's an issue we'll have to

6    decide down the road.  I'm going to let this case go to the

7    jury, as I said, and we may have to clean it up afterwards.

8    We'll see what they do, all right?

9            MR. CHARNOFF:  Thank you.

10           THE COURT:  Okay.  Yeah, I think the first paragraph

11   is all that's necessary there.  And again, there's a -- okay.

12           All right.  Now, punitive damages.  The defendants

13   object to that.  I think there's enough evidence in this case.

14   To me, the statement in one of Mr. Lohman's e-mails, "I hate

15   Navient," would be evidence potentially of malice.  So, I mean,

16   again, the evidence is in the case, and I think it's not

17   unfair -- again, it has to be individual -- as to each

18   individual.  The GST defendants don't have any direct

19   connection with Navient in that respect so --

20           MR. CHARNOFF:  Correct, Your Honor.  The evidence by

21   every single witness and all the documents is there's no

22   relationship, they didn't even know who Navient was.  How on

23   earth could there ever be the intent?

24           And the punitive damages, I've lectured on this a

25   couple times.  Punitive damages, you have to have -- it's the

1220

1  highest -- it's the highest burden under Virginia law.  Again,

2  we're talking about state law now.

3       THE COURT:  You know, I'm inclined because of the

4  nature -- first of all, because RICO is in this case and RICO

5  already exposes the defendants to triple damages.

6       MR. CHARNOFF:  Correct.

7       THE COURT:  All right?  In addition, it exposes --

8  any of these claims expose Mr. Lohman to bar problems if he's

9  found to have committed fraud.  So I don't know why we need to

10 have punitive damages in this case.

11      MR. GRELL:  And if they get -- if they win this case

12 under RICO --

13      THE COURT:  Yeah.

14      MR. GRELL:  -- they're not going to get -- they can

15 have a judgment of $100 billion.

16      They're not -- Mr. Lohman only has so much money.

17      THE COURT:  All right.

18      MR. GRELL:  You say we're getting paid.  I hope we

19 get paid.

20      THE COURT:  All right.  So I really in this case

21 don't think punitive damages are necessary or appropriate.

22      MR. CALHOUN:  I hear Your Honor.  For the record, we

23 think there is evidence of malice, and there is evidence of

24 reckless disregard.  It should go to the jury.

25      THE COURT:  I mean, if you, if you get -- if you get

1221

1    to RICO, you've got punitives.

2              MR. CALHOUN:  We understand.

3              THE COURT:  All right?  So I'm going to knock that

4    one out, which will shorten, I think, the verdict form a little

5    bit, too.  So 59 also would come out then.

6              Okay.  You both wanted 60.  I'll let it in.  I think

7    the one thing the jury probably knows at this point if nothing

8    else, they probably already know that, but we'll leave it in.

9              But I don't know if we need -- I mean, again, I don't

10   like to use jury instructions as a primer on the law, and

11   actually, let me rethink that.  Why do we need any of these

12   right now?  I mean, I don't want to start getting into the

13   definition of "ATDS."  I don't think it's appropriate at this

14   point, certainly not in an instruction.

15             MR. GRELL:  I'm fine with that, Your Honor.

16             MR. CALHOUN:  And we only wanted this because of the

17   motion in limine.  In particular, we're, you know, they were

18   supposed to have argued only that --

19             THE COURT:  Okay.

20             MR. CALHOUN:  -- their view was that we had violated

21   TCPA, but their arguments and the testimony that they elicited,

22   they argued repeatedly that we actually violated TCPA, which is

23   completely inconsistent with Your Honor's ruling on the motion

24   in limine.

25             THE COURT:  Well, that's a subtle point.  I mean --

1222

1    but I don't think we need to get these in jury instructions.  I

2    mean, the jury has heard what the theory of the case was.

3          MR. CALHOUN:  Certainly maybe a cautionary

4    instruction, something like that, might be appropriate.

5          MR. GRELL:  And, Your Honor, I was very, very careful

6    about this issue.  I always couched it as -- I defined

7    "robocall" in my opening statement, which -- and I think the

8    only time it was, it was -- there was somebody stepped across

9    the line was maybe when Mr. Muhtaseb said something like we

10   sued them because they violate the TCPA, but I think he was

11   talking in the context of when we were -- the time they were

12   bringing these, these claims.

13         THE COURT:  Okay.

14         MR. GRELL:  And I tried to abide by the limitations

15   that were -- I'm much better than these guys.  Three times they

16   tried to get *Facebook* in.

17         MR. CALHOUN:  Your Honor, I just -- I won't belabor

18   it.

19         THE COURT:  All right.  My point is I don't think we

20   need 60 or 61, all right?

21         MR. GRELL:  I agree.

22         THE COURT:  All right.  Mr. Charnoff, do you have any

23   objection to that?

24         MR. CHARNOFF:  I have no objection to giving the jury

25   less instructions than more.

1223

1        THE COURT:  I agree with you on that.  Okay.  So
2   those are out.

3        MR. URBAN:  Was that 60 and 61?

4        THE COURT:  Yes, 60 and 61.

5        All right.  Now, 62 is the *Noerr-Pennington* immunity
6   issue, and as I said, I really don't want to scare the jury
7   with any more legalese than they have to have.

8        MR. CALHOUN:  Your Honor, if we took out the term
9   "*Noerr-Pennington*" and just said that --

10       MR. GRELL:  No, our instruction is First Amendment.

11       MR. CALHOUN:  Yeah, I think what you have to do here,
12  Your Honor, based on that, is merging these.

13       THE COURT:  I agree.  I think something -- I'm going
14  to look at the two of them and put one together that covers
15  this issue, but let me just --

16       MR. GRELL:  And I would say he -- he cites *Waugh* for
17  this idea that you've got to look at the whole, not just
18  individual success, when you're dealing with mass whatever
19  litigation is.  I don't disagree with that concept, but our
20  instruction includes that, but really the way that they're --
21  they've set up their damage claim is that a jury could go
22  through and say, okay, on this one, it was sham; this one it
23  was not sham; this one it was sham; this one it was not sham.
24  And they could literally strike rows out of their damage
25  calculations.

1224

1   And so I, I think it's okay to instruct them on

2   *Waugh*, but I think the problem with the plaintiff's instruction

3   is that it overwhelms the whole instruction otherwise and --

4   given the way they pled it.

5   And two, *A Fisherman's Friend* says that successful

6   litigation is not a sham, and I'm not -- that is the case I've

7   relied upon since Day One, and they don't even cite to it.

8   They act like I'm citing some other case.  It's *A Fisherman's*

9   *Friend* that I've relied upon, because I remember that name

10  because it's a silly name.

11  THE COURT:  *A Fisherman's Best*, I think it is.

12  MR. GRELL:  Yeah.

13  MR. CALHOUN:  Your Honor, *Waugh* is the standard.  It

14  sets forth the standard in this circuit.  It expressly rejects

15  in this situation the *PRE* test that they put in that

16  instruction.  I think it would be error to include it even if

17  they'd liked to do it line by line.  The jury can do whatever

18  the jury wants to do, and they can do that under *Waugh*.

19  THE COURT:  All right.  Well, I'm going to look at

20  that, but some, some careful instruction on that does have to

21  be in here.  I mean, we have it to some degree already in that

22  earlier instruction.

23  MR. GRELL:  What's that?

24  THE COURT:  The protection of legal activity is

25  already --

1225

1    MR. GRELL:  Yeah, we've already got that.  I think we

2    can -- I'll look forward to your merger.

3    THE COURT:  All right.  And it may all go wind up in

4    one instruction.  I want to see whether it's more elegant just

5    to have it in one because I'll save a few trees in the course

6    of having --

7    MR. GRELL:  There's a lot of overlap between those

8    two issues.

9    THE COURT:  Okay.  Now, accord and satisfaction,

10   that's another issue that really has not been significantly

11   discussed in the case by the defendants, and I don't want to

12   pop issues in the instructions that doesn't match up with

13   what's been argued or evidenced in the case.

14   MR. GRELL:  Your Honor, I think in my opening

15   statement, I did argue that they signed settlements.  And all

16   of the settlement agreements, by the way, are in evidence.

17   They came in without objection.

18   I think it's -- I did not discuss it during the

19   opening because I tend to focus on what their burden of proof

20   is, and I wanted to keep the opening short.

21   THE COURT:  Okay.

22   MR. GRELL:  But I will connect this in my closing,

23   and I think I have a right to do that because the evidence is

24   all in the record.

25   THE COURT:  Well, as I understand it, you've all

1226

1  agreed to everything except the plaintiff just wants that one

2  sentence taken out at the end of paragraph 1.  Do I read how

3  you submitted this --

4            MR. GRELL:  Yeah.  I mean, it's -- it's the whole

5  satisfaction.

6            THE COURT:  Or was your proposal just that one

7  sentence and everything else would -- you-all agree on the

8  first long sentence.

9            MR. CALHOUN:  It's just the one sentence that we want

10 in that they want in.  We think it should include --

11           THE COURT:  You want that "In order for the

12 defendants to prevail on this defense, they must show that the

13 parties specifically agreed to the defendants' release with

14 respect to an existing obligation."

15           MR. CALHOUN:  Correct, Your Honor.

16           THE COURT:  You want that in.

17           MR. CALHOUN:  Correct.

18           THE COURT:  And the defense would omit that.

19           MR. GRELL:  We think the requirement that there be a

20 full satisfaction is expressed clearly, etc., that addresses

21 that issue that they're trying to get to adequately.  I think

22 it's repetitive, the question -- the sentence they want.

23           MR. CALHOUN:  It's not because, Your Honor -- accord

24 and satisfaction requires a specific agreement.

25           THE COURT:  Yeah.  "Accord is a satisfaction agreed

1227

1    upon between the party injuring and the party injured, which,

2    when performed, is a bar to all actions upon the claim."  I

3    mean, the words "agreed upon" mean just that.

4            So again, the next paragraph, the language "the

5    accord is the agreement between the parties," so I think that

6    that extra sentence is redundant.  I mean, I think it's more

7    than adequately expressed there.

8            And then, "To be valid, the agreement must be offered

9    and accepted and there must be an exchange of consideration."

10   The jury doesn't know what "consideration" is, but, I mean --

11   okay.  So all of this, the only thing that was in dispute was

12   that one sentence.

13           MR. GRELL:  Yes.

14           THE COURT:  I'm going to omit the sentence because I

15   think it's more than adequately covered in the rest of the

16   language there.

17           And then collateral estoppel, another legal term

18   which is going to send shivers --

19           MR. GRELL:  Well, we could use issue preclusion.  The

20   title doesn't matter to me.

21           THE COURT:  How about just a party cannot, you know,

22   a party cannot relitigate issues that were decided in a prior

23   proceeding?

24           MR. GRELL:  Sure.

25           THE COURT:  All right?  Rather than -- all right.  A

1228

1   party cannot relitigate issues that were decided in a prior

2   proceeding in which it was involved.

3           MR. CALHOUN:  Your Honor, we'll just reserve the

4   right to take a look at it.

5           THE COURT:  Sure.  That's why we're going to get them

6   to you ahead of time.

7           MR. GRELL:  I think that's it.

8           THE COURT:  Do we need anything more than that?  I

9   mean, in other words, do we need the 1, 2, 3, and 4 there?

10          MR. GRELL:  Where are you looking at?

11          THE COURT:  I'm still looking at 64.  I mean,

12  certainly there's nothing inaccurate about that statement, but

13  it's just more things for the jury to start thinking about.

14          MR. CALHOUN:  That's the reason why I made the

15  reservation, Your Honor.  I think your sentence is so broad, it

16  could take collateral estoppel for more than it is, but --

17          MR. GRELL:  Well, the one nuance is that it is

18  defensive collateral estoppel, you know, and if you do research

19  on the, on the standard, that's why I'm using a federal claims

20  court case.

21          MR. CALHOUN:  And there's a bunch of wrinkles here

22  because it's different parties.

23          MR. GRELL:  It's not different.  You guys, you guys

24  were a party to those claims, and they were decided against

25  you --

1229

1    THE COURT:  All right.  Well, I'm going to leave it

2  in without the fancy terminology, and hopefully that will not

3  confuse things too much.

4    MR. GRELL:  Okay.  Thank you.

5    THE COURT:  Okay.  And you agreed on waiver, and you

6  agreed on the duty to mitigate, and you agreed on rendering a

7  verdict.  So I think all the rest of it you agreed on, right?

8    Is there anything else we didn't cover?  Am I missing

9  any?  I don't think so.  That's page 105.

10    (No response.)

11    THE COURT:  All right.  So for the record, since we

12  want to finish up things, now, the other thing is I don't know

13  whether you need all these exhibits in here.  I mean, at this

14  point, if you don't have your assistants or whoever brought

15  these over in the first place, why don't you arrange Monday to

16  get them out of here, all right?  Maybe once -- how long does

17  it take for you to box these up and get them out?

18    MR. CHARNOFF:  It takes a good 20 minutes, Judge.

19    THE COURT:  Okay.

20    MR. CHARNOFF:  So if -- depending on what time you

21  actually want to speak with us, I know you said 9:30, then you

22  said maybe 8:45.  I didn't know if that was --

23    THE COURT:  Maybe I'll compromise it, nine o'clock.

24  I think we did pretty well this afternoon.  I don't really see

25  a huge amount of dispute going on here.

1230

1    MR. CHARNOFF:  And so then, Your Honor, so if you
2  anticipate between, you know, nine and however long it takes us
3  to resolve final issues, then we could have assistants come in
4  before ten and take the boxes out or just --
5    THE COURT:  No.
6    MR. CHARNOFF:  I just want to make sure we have
7  enough time to do it.
8    THE COURT:  Yeah, I think the better thing would
9  be --
10    MR. CALHOUN:  I think it would be better to do it
11  after, Your Honor.
12    THE COURT:  After.  We'll just keep the courtroom
13  ugly for a while.  So -- but plan to have your people here,
14  okay, so that we can clean up the courtroom.
15    All right.  So what I'm waiting on you-all for, back
16  to me, will be the stipulation.  Hopefully there can be an
17  agreement.  You're going to get from me at some point -- and it
18  actually may even be tomorrow morning; we'll try to get it to
19  you tonight; but I can't guarantee you that we'll have it
20  finished -- the proposed new verdict form and a clean copy of
21  the instructions, okay?
22    And as I said, the order may be a little bit
23  different from what we just did, because I think a couple
24  things may be out of order, and if you see anything -- first of
25  all, it still gives you a chance if there are some additional

1231

1    instructions, I'm not looking for them, but if you think that

2    there is something you left out, get it to opposing sides, and

3    get us a copy right away, and if there's any corrections or

4    changes you want made to what I send you, then get it to us no

5    later than 7:30 Monday morning, and I'll make sure that Gillian

6    gives you the e-mail that you'll send it to, because the court,

7    you know, is closed.  And then we'll have a chance to fine-tune

8    things.

9              So I think nine o'clock should be fine Monday.  I'm

10   hoping we don't have too much argument, all right?

11             So we know what time for the arguments.  And the last

12   thing is file any final motions just for the record.

13             MR. CALHOUN:  Yes, Your Honor.  I mean, I understand

14   you're sending it to the jury, but for the record, we would

15   make a Rule 50 motion for a verdict.

16             THE COURT:  All right.  It's denied.  I don't need to

17   hear argument on that.

18             MR. GRELL:  And for the record, we will also reassert

19   our Rule 50 as well.

20             THE COURT:  All right.  And that is denied.

21             MR. URBAN:  And I just wanted to clarify that not

22   only are we renewing what we had already argued, but the

23   reasonableness of attorneys' fees, because what I had said

24   before was we were waiving it at that juncture.

25             THE COURT:  I understand that.

1232

1          MR. URBAN:  And we are reasserting it now.

2          THE COURT:  All right.

3          MR. URBAN:  One last thing, Your Honor?

4          THE COURT:  Yeah.

5          MR. URBAN:  Three times plaintiffs have tried to get

6   in *Facebook*.  Now, I talked to them after the first time they

7   did it, and they said, well, you opened the door.

8          Look, if they want to argue to you that we opened the

9   door, we need to have that argument and not them try to just

10  slip it in.  So I hope that they're not going to try to do that

11  in the closing somehow.

12         THE COURT:  All right.  I really think, we all know

13  it's terribly bad form to object during a closing argument, so

14  all sides have to be careful to make sure that what is argued

15  is within the parameters of the evidence that came in during

16  the trial and any, you know, rulings, and your understanding of

17  what the instructions are going to be, but you're all very good

18  professionals.  I really don't expect that to happen, all

19  right?  But that's all I can say on that one.

20         I mean, again, I've told the jury this, and I'll

21  write out a small instruction and just make it crystal clear to

22  them, you know, the law as to whether or not the system that

23  plaintiff was using at the time was unsettled.  That is clearly

24  the situation, and the proof of that is that judges and

25  arbitrators were going all over the place, and it took the

1233

1    Supreme Court to address one of these issues.

2              It's a very complicated statute, all right?

3              MR. CHARNOFF:  And, Your Honor, that is one of the

4    stipulations that goes back to summary judgment from --

5              THE COURT:  I understand that.  So there shouldn't be

6    any problem with that, all right?  Okay.

7              Yes, sir.

8              MR. CHARNOFF:  Your Honor, very briefly, GST, Greg

9    Trimarche, and Rick Graff, we respectfully and humbly reassert

10   our Rule 50 motion, that there is literally no evidence on

11   multiple elements of the two RICO counts against them and with

12   respect to the tortious interference count, where they

13   literally didn't know who Navient was, never formed any

14   agreements to harm them.  There's -- every witness said that.

15             There's literally no evidence that the jury could

16   possibly render a verdict against my clients on those issues.

17   And so I respectfully resubmit our Rule 50 motion.

18             THE COURT:  Mr. Calhoun, address that last issue for

19   the GST defendants in terms of tortious interference of

20   contract.

21             MR. CALHOUN:  Their not knowing who Navient was?

22             THE COURT:  Yeah.

23             MR. CALHOUN:  Your Honor, it's really pretty simple.

24   If you and all the court staff were sitting in a room having a

25   chat and I throw a rock into the room and I don't care who I

1234

1    hit and I hit you, it doesn't matter that I didn't intend to

2    hit you.  I intended to throw a rock into the room.

3            Here GST created a system, a program to generate

4    deals, as they were called in the parlance, whereby they would

5    recruit borrowers and send them to attorneys who didn't know

6    what they were doing.  Mr. Trimarche testified he had no idea

7    how these contracts would be resolved, but he reviewed and

8    approved the scripts that were subtly and not so subtly telling

9    borrowers that they can't participate in the program or they

10   give up their leverage if they're paying their debts.

11           They knew that they were encouraging borrowers into

12   this program.  They were going to take 40 percent of the

13   balance from them.  They knew that they were going to encourage

14   them to default.  That's pretty clear from the evidence.

15           So the fact that when they started it, they didn't

16   know that it would turn out that most of the loans would be

17   Navient doesn't matter.  They knew they were interfering in

18   these contracts.  They just didn't know who the name was on the

19   contract.

20           THE COURT:  But your -- all of the losses that are at

21   issue in this case are not as a result of debtors defaulting.

22           MR. CALHOUN:  I disagree with that, Your Honor.

23           THE COURT:  It's that the debtors defaulted and

24   brought TCPA claims against you.

25           None of your -- none of your losses in this case are

1235

1    related to a simple default.  Every one of them has to do with

2    a suit, an arbitration, or a lawsuit that was filed against

3    Navient for a TCPA violation.

4            MR. CALHOUN:  That -- well, for an alleged TCPA

5    violation, I'll give you.

6            THE COURT:  All right.

7            MR. CALHOUN:  Your Honor, in our view, it's -- it was

8    all because this whole program was a pipeline to litigation.  I

9    mean, that's what the program that Gregory Trimarche wrote

10   about was.  We're going to assist your -- you with your debt by

11   finding violations -- they just called it violations -- of

12   federal law.

13           The very thing that they envisioned and that they

14   sold was the creation of a lawsuit, and so you can't separate

15   one from the other in our view.

16           THE COURT:  Well, we'll have to -- again, I'm going

17   to wait and see what the jury does in this case, all right?

18   And I'm prepared for an avalanche of post-verdict, possibly

19   not.  The jury may not be able to reach a decision, whether the

20   eight of them can agree on this.  It's a complicated case the

21   way it's been, you know, structured, and these are not lawyers.

22   They've paid careful attention, but it will be interesting to

23   get what eight ordinary citizens think about the issues in this

24   case.

25           We'll have to see.  We're going to let it go like

1236

1    that, all right?  I have certain concerns myself, but I'm going

2    to wait and see what they do.

3           Yes?

4           MR. URBAN:  I just wanted a clarification of the

5    comment you just made.  You said the eight jurors.  Are you

6    going to have all eight --

7           THE COURT:  Oh, yeah.  I thought I made that clear.

8    I mean, the federal rules say six to twelve.

9           MR. URBAN:  Okay.

10          THE COURT:  All right?  And my practice in all civil

11   cases, unless it's an incredibly long one, is eight jurors.  In

12   case one or two had to drop out for some reason --

13          MR. URBAN:  You get to the six.

14          THE COURT:  -- we'll still have our minimum six, but

15   I thought I had made that clear when I --

16          MR. URBAN:  No, I guess I misunderstood.

17          THE COURT:  There are no alternates.  This is the

18   eight who are going to decide the case, all right?

19          MR. URBAN:  Thank you for that clarification, Your

20   Honor.

21          THE COURT:  Okay.  All right.  So I'm going to let

22   you-all go home, and we'll try to get some answers to you as

23   quickly as we can.

24          MR. CHARNOFF:  Your Honor, just for clarity on the

25   record --

1237

1    THE COURT:  Yeah.

2    MR. CHARNOFF:  -- you're formally at this time

3    denying the GST --

4    THE COURT:  I'm sorry.

5    MR. CHARNOFF:  -- Greg Trimarche, and Rick Graff

6    renewed motion Rule 50?

7    THE COURT:  Yes.  I'm denying the motions.  The case

8    is going to go to the jury.  You get to argue the case one more

9    time.

10    You-all take it easy over the weekend.  Mr. Grell, I

11    hope you get your voice back because I want to be able to hear

12    you.

13    MR. GRELL:  I do, too.

14    THE COURT:  All right?  The only other thing is if

15    anyone's going to use demonstratives, make sure you've cleared

16    them with the other side in advance.  They have to be big

17    enough, it doesn't make any sense to use them if the jury can't

18    see them.  You may, you may also use, you know, exhibits on the

19    screen, but they eat up time, so be careful if you're going to

20    do that.

21    MR. URBAN:  Could we get a deadline for that?  Just

22    because I've been getting e-mails at 5:50 in the morning, and

23    I'm not up at 5:50 in the morning.

24    THE COURT:  You're not?

25    MR. URBAN:  No, ma'am.  I'm, I'm a little on the

1238

1    older side.

2              THE COURT:  Okay.  I think --

3              MR. URBAN:  Sunday, five o'clock, if we could?

4              MR. CALHOUN:  I'm fine with that.

5              THE COURT:  I was going to -- I was going to say

6    Sunday by noon.

7              MR. URBAN:  All right.  Sunday by noon would be --

8              THE COURT:  Come on, you've got to have some break

9    because you-all come in cranky Monday if you're working too

10   late, all right?  I might be cranky, which is even worse by the

11   way.

12             Okay.  That's it for today.  We'll get stuff to you

13   as soon as we can.  All right, we'll recess court.

14     (Recess from 4:16 p.m., until 9:00 a.m., August 16, 2021.)

15

16                   CERTIFICATE OF THE REPORTER

17      I certify that the foregoing is a correct transcript of

18   the record of proceedings in the above-entitled matter.

19

20

21    _____
                        /s/
22                  Anneliese J. Thomson

23

24

25