1239

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

NAVIENT SOLUTIONS, LLC,         .     Civil Action No. 1:19cv461
                                .
               Plaintiff,       .
                                .
     vs.                        .     Alexandria, Virginia
                                .     August 16, 2021
THE LAW OFFICES OF JEFFREY      .     9:00 a.m.
LOHMAN, et al.,                 .
                                .
               Defendants.      .
                                .
.   .   .   .   .   .   .   .   .   .

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE LEONIE M. BRINKEMA
UNITED STATES DISTRICT JUDGE

VOLUME VI

APPEARANCES:

FOR THE PLAINTIFF:              GEORGE R. CALHOUN, ESQ.
                                JEFFREY R. HAMLIN, ESQ.
                                Ifrah PLLC
                                1717 Pennsylvania Avenue, N.W.
                                Suite 650
                                Washington, D.C. 20006
                                  and
                                LISA M. SIMONETTI, ESQ.
                                Greenberg Traurig LLP
                                1840 Century Park East
                                Suite 1900
                                Los Angeles, CA 90067


FOR THE LOHMAN DEFENDANTS:      JEFFREY E. GRELL, ESQ.
                                Grell Feist PLC
                                825 Nicollet Mall, Suite 625
                                Minneapolis, MN 55402


(APPEARANCES CONT'D. ON FOLLOWING PAGE)

(Pages 1239 - 1414)

COMPUTERIZED TRANSCRIPTION OF STENOGRAPHIC NOTES

1240

1    APPEARANCES:  (Cont'd.)

2    FOR THE LOHMAN DEFENDANTS:      THOMAS F. URBAN, II, ESQ.
                                     Fletcher, Heald & Hildreth, PLC
3                                    1300 N. 17th Street, Suite 1100
                                     Arlington, VA 22209
4

5    FOR DEFENDANTS GST             MIKHAEL D. CHARNOFF, ESQ.
          FACTORING, INC.;          Perry Charnoff PLLC
6         GREGORY TRIMARCHE; AND    1010 N. Glebe Road, Suite 310
          RICK GRAFF:               Arlington, VA 22201
7

8    ALSO PRESENT:                  JEFFREY LOHMAN, ESQ.
                                     TROY STANDISH
9                                    ROBERT TANENBAUM, ESQ.

10

11   OFFICIAL COURT REPORTER:       ANNELIESE J. THOMSON, RDR, CRR
                                     U.S. District Court, Third Floor
                                     401 Courthouse Square
12                                   Alexandria, VA 22314
                                     (703)299-8595
13

14

15

16

17

18

19

20

21

22

23

24

25

1241

1        I N D E X

2

Closing Argument by Mr. Calhoun:          Page 1262

3

Closing Argument by Mr. Charnoff:         Page 1283

4

Closing Argument by Mr. Grell:            Page 1309

5

Rebuttal Argument by Mr. Calhoun:         Page 1340

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1242

```
 1                      P R O C E E D I N G S

 2                        (Jury out.)

 3            THE CLERK:  Civil Action 19-461, Navient Solutions,

 4   LLC, versus Law Offices of Jeffrey Lohman, P.C., et al.  Would

 5   counsel please note their appearances for the record.

 6            MR. CALHOUN:  Good morning, Your Honor.  George

 7   Calhoun, Lisa Simonetti, and Jeff Hamlin on behalf of the

 8   plaintiff, Navient.

 9            THE COURT:  Good morning.

10            MR. GRELL:  Good morning, Your Honor.  Jeff Grell and

11   Tom Urban on behalf of the Lohman defendants.

12            THE COURT:  All right.  Mr. Grell, your voice sounds

13   better.

14            MR. GRELL:  I know, but it sounds like Mr. Calhoun

15   might be struggling.

16            THE COURT:  It's been somewhat of a snakebitten

17   trial.

18            MR. CALHOUN:  Your Honor, I believe I have the Grell.

19            THE COURT:  You have the Grell?  All right.

20            MR. CALHOUN:  Just for the record, though, because I

21   did feel a little hoarse, I did get tested, and it is not

22   COVID.

23            THE COURT:  That's fine.  There's something going

24   around.  The number of tests, we tried to get one this weekend

25   at the pharmacy; they're completely gone.
```

1243

1    Mr. Charnoff, how are you this morning?

2    MR. CHARNOFF:  Good.  Good morning, Your Honor.  Mike

3    Charnoff on behalf of GST Factoring, Gregory Trimarche, and

4    Rick Graff.

5    THE COURT:  All right.  And, counsel, as you know, we

6    all worked over the weekend.  I know we were exchanging

7    e-mails.  I've had all those e-mails saved.  We'll make them a

8    sealed portion of the record, so if for any reason at some

9    point down the road someone needs to see how the exchange went

10   back and forth, there will be a physical record of that.

11   But in the meantime, this morning I received back no,

12   no more suggestions or changes, as I understand it, from any of

13   the defendants other than some discomfort with minor

14   grammatical changes that have been made by the, by the

15   plaintiff.

16   I can go through those with you right now.  We looked

17   at every one of them, and every one was, in our view,

18   appropriate.  Either there was a word that was wrong or an

19   indentation that should be there to show a paragraph.

20   We have -- what we have done is taken our

21   instructions and simply made those grammatical corrections to

22   our instructions.  We're not using the set that the plaintiff

23   sent us, so that I am 100 percent sure that what we are

24   submitting to the jury is exactly what counsel would have.

25   And just to put you more at ease, once we finish the

1   charging conference this morning, just for your records, we're

2   going to print out another set that you'll have for your

3   permanent files in paper.

4          All right, Mr. Grell?  I mean, we looked at them.  I

5   can go through them with you right now.

6          MR. GRELL:  No, no, Your Honor.  I was going to say

7   we looked through them, too.  I just wasn't expecting it.

8          THE COURT:  Okay.

9          MR. GRELL:  And so when I got it, I just wanted to

10  make a record that I, you know -- but we went through it.

11  That's fine.

12         THE COURT:  Excellent.  All right, that's fine.  So

13  then we're all set.

14         Now, in terms of the instructions then, my

15  understanding is that the plaintiff still wants a punitive

16  instruction.  We're not adding that in this case.  First of

17  all, you should have brought that up, in my view, earlier; but

18  secondly, I think in this case, if the plaintiff wins on those

19  RICO counts, the amount of damages will be astronomical.

20  Punitives would be on top of that, which would be ridiculous.

21         If the jury -- or compensatory damages, given the

22  number the plaintiff is looking for, that's going to be, from

23  what I can tell again, beyond the scope of what these

24  defendants can pay.  So I'm not going to add it.

25         And, Mr. Calhoun, you can note your objection if you

1245

1    wish to.

2           MR. CALHOUN:  That's fine, Your Honor.  We just

3    wanted to note it for the record.

4           THE COURT:  All right.  Now, what is this business

5    about at will contracts?  That was never mentioned in this

6    case.

7           MR. CALHOUN:  It was, Your Honor.  It was in our

8    proposals, but what you said earlier, I think, covers us that

9    what we've submitted is in the record, so I think we're

10   covered.  We don't need to reargue it.

11          THE COURT:  All right.  Then you're satisfied with

12   the charge as it's going to go to the jury?  I mean, you've

13   made -- this is the time --

14          MR. GRELL:  I've a couple of objections for the

15   record.

16          THE COURT:  All right.  This is the time, with masks

17   off because it's hard to hear you-all, this is the time to be

18   at the podium and put any clear objections on the record so

19   that it's there for appellate purposes, all right?

20          MR. GRELL:  Are you done, George?

21          THE COURT:  Mr. Calhoun, other than the failure to

22   give the punitive damages instruction and something about, you

23   know, at will contracts, which again, that's not what I think

24   is the issue in this case, is there any other substantive

25   objection that you want to put on the record?

1246

1    MR. CALHOUN:  No, Your Honor.

2    THE COURT:  All right.

3    Then Mr. Grell?

4    MR. GRELL:  Just a couple.  I want to lodge a formal

5    objection, continuing objection to Instruction No. 24, in

6    particular, the failure to instruct on the unique operation

7    management standards that are applicable to professionals like

8    attorneys set forth in *Reves* and *Handeen*.

9    I also object to Instruction 40 on causation.

10   "Reasonably probable" is language that is included in the

11   instruction.  In our opinion, that is erroneous.  The standard

12   is direct injury.  The "reasonably probable" language should be

13   removed.  I'm not sure where it comes from, but I just note

14   that objection.

15   Our, our biggest objection is to the verdict form,

16   and since I've been trying to work with it over this weekend

17   and construct my closing, I think it's really, really confusing

18   to not have answers on the affirmative defenses, because

19   they're not even mentioned in the verdict form.

20   So I'm going to mention them over and over again in

21   my closing, but there's really -- and if I was the plaintiff in

22   this case, I'm not even sure if I would want it to be the way

23   it is because it's almost an all or nothing -- you know, in

24   mitigation, it's not necessarily all or nothing.

25   And, you know, it's theoretically possible that they

1    could agree with us on accord and satisfaction but not agree

2    with us on collateral estoppel, so that would knock out the

3    settlements but not knock out the -- you know, there's all

4    kinds of permutations.  And I understand maybe it's -- I don't

5    know.  It's a bit confusing, and maybe there's just no way

6    around that confusion, but I do think that the current verdict

7    form, given its failure to address affirmative defenses, is

8    confusing, and I object on that basis.

9             THE COURT:  The only things that could arguably be

10   missing -- I don't think the verdict form is confusing.  What

11   may be confusing is not having a clear explanation to the jury

12   as to what an affirmative defense is and what happens if the

13   affirmative defense is established, but I think -- because

14   normally when there is an affirmative defense, I mean, the

15   fact -- as I said in my e-mail back to you, the fact that a

16   jury finds in favor of the plaintiff, the inference from that

17   is that they rejected the affirmative defense.

18            MR. GRELL:  Right.  And I --

19            THE COURT:  And I think that's how you should

20   argue the -- I assume you're going to argue that to the jury.

21            MR. GRELL:  Correct.  And, you know, I was -- I had a

22   proposed separate verdict form for the affirmative defenses,

23   and I thought that if, if the jury voted on any of those, then

24   Your Honor could, you know, figure out the scope of -- and how

25   they apply to the other answers on the verdict form.  So that

1248

1   was my original way of addressing it, and that's, I guess, one

2   way to do it theoretically, but, yeah, I'll just lodge that

3   objection, and we'll leave it at that.

4           And yes, I've made plenty of room to discuss that --

5   left discussion of that in the, in the closing.

6           And then I've got a couple of questions.  The first

7   question, Exhibit 2191, which is this ongoing issue with the

8   stipulation, we never received anything from Mr. Calhoun, so I

9   don't know where they're at.  I don't -- it's, it's not my

10  issue as to what they want us to commit to.

11          I just want to make sure that paragraph 21 of 2191,

12  the one that we used in cross-examining Mr. Standish, is read

13  into the record, because right now, that's the only stipulation

14  that is on the record, and I don't want that to slip through

15  the cracks.

16          THE COURT:  Right.

17          MR. GRELL:  And then my last question is the order of

18  the day.  Obviously, Mr. Calhoun will go first, and I believe I

19  was going to talk to Mr. Charnoff, but we weren't able to

20  because I got here a little late.  I kept my phone and had to

21  go back to the car.

22          I'm assuming that Mr. Charnoff will go after

23  Mr. Calhoun, and I would like to take a break before -- the

24  morning break before I go into my closing, just to -- but I

25  don't want to -- if you want to go right into my closing, then

1249

1   I can do that, too.  I just -- whatever is best for the jury.

2              THE COURT:  Okay.  I think actually this morning we

3   can have the benefit of some breaks for the jury so they're

4   really focusing.  They're certainly going to be given a break

5   before the jury instructions are read to them --

6              MR. GRELL:  Right.

7              THE COURT:  -- because I want them to be able to

8   focus.

9              And I want to do the charge all at one time.  I don't

10  want a break for the lunch break.  In other words, I want --

11  when we break for lunch, I want this case ready to go to the

12  jury, because they'll go downstairs.  We've got the third floor

13  jury assembly room set up for them and big tables.

14             What we're going to do is the exhibits that have been

15  entered into evidence are on the cart.

16             Now, the one thing I forgot to mention to you on

17  Friday, and I hope you have access to computers, I assume most

18  of you are at the hotel across the street or whatever.  I have

19  found in the past, and again, I could be wrong on this case,

20  but I have found in the past that where there's a ton of

21  exhibits that have been entered into evidence, the first

22  question we get from the jury is can they have an index or a

23  list of the exhibits that are in evidence.

24             And I'm sorry I didn't think about suggesting to

25  you-all -- and for future reference, when you have a big case

1250

```
1    like this with lots of exhibits, it's really wise to work on an

2    index if you can.

3            Now, the problem is the reason it needs to be done

4    sort of in advance is there can't be any editorializing about

5    what is the exhibit.  So it would be, you know, Plaintiff's

6    Exhibit 100, e-mail June 1 between so-and-so and so-and-so,

7    period.  It can't be concerning whatever.

8            So in this case, so many e-mails and other types of

9    little, you know, short documents were introduced, it may not

10   be as much help to the jury, but I'm just putting you on notice

11   that that may be the first question that we get.

12           Now, you have to be careful, obviously, that your,

13   your exhibit list can only be for those exhibits that were

14   actually entered into evidence, that have been accepted into

15   evidence.  So that's just something to be, you know, somewhat

16   prepared for.

17           But anyway, the plan will be then that they will get

18   only the exhibits that have been accepted by the Court that are

19   part of the record downstairs with them and their notebooks,

20   and they'll be a little bit cumbersome today.

21           Are you-all at the Westin Hotel?

22           MR. URBAN:  No, ma'am.

23           THE COURT:  You're not?  Okay.  Some of you are from

24   Arlington, aren't you?

25           MR. URBAN:  Yes, ma'am.  I'm over at Rosslyn, so we
```

1251

1    can run back there.

2         THE COURT:  Well, that's too -- oh, one of you could,

3    but the point is, remember, my normal practice is to require

4    counsel to stay, you know, either in the courtroom itself or

5    there is a jury -- there is a lawyer room on --

6         MR. URBAN:  On 4.

7         THE COURT:  On 4, yeah, where you can also go.

8         The main thing is that we need to know where you are

9    because if the jury has a question, I have to be able to -- I

10   don't want to take 20 minutes to round you up.

11        But I recognize that this jury probably is going to

12   be out a long time, and I don't want you to be totally wasting

13   your time, so we'll talk about that once we get the case to the

14   jury, but I just wanted to alert you to the possibility that we

15   may need -- we may get a question for an index, all right?

16        MR. CALHOUN:  Your Honor, I am across the street.  I

17   just didn't feel like commuting to Maryland every day, and we

18   have a draft of an, of an index.  I can go through that after

19   we break for lunch and share it with counsel, and maybe we can

20   come to an agreement on that.

21        THE COURT:  The ideal thing is that counsel have

22   exchanged those indexes, no one has any objections to any, you

23   know, comments or how they're tried, and then we would have

24   them ready.  It would be great if you do that.

25        Again, the question may not come up, but, boy, when

1252

1    it does come up and you're not ready, it can hold things up.

2    So that's -- I just want to alert you to that, all right?

3              And am I correct that the only exhibit that was

4    produced on a disc was that one phone call?

5              MR. CALHOUN:  That's correct, Your Honor.

6              THE COURT:  All right.  That's playable on a laptop,

7    is that correct, the format in which it is?

8              MR. CALHOUN:  That's correct.

9              THE COURT:  Okay.  We will be able to -- we will

10   probably -- if the jury wants to hear that, we'll probably have

11   to bring them into the courtroom to hear that because of the

12   way -- I don't think the laptop that we've got will be able to

13   play it, but you can take that up with Ms. Guyton after we

14   break, all right?

15             So -- I thought I had brought the stipulations up

16   here with me.  Well, let me see, what's the status of the

17   stipulation?

18             MR. CALHOUN:  Your Honor, we've gone back and forth

19   on this internally at length and ultimately decided that it

20   would just be -- as much as we think it sets up some things in

21   a clearer order, that the evidence that we need is in and we

22   intend not to push it.

23             THE COURT:  All right.  So the only stipulation is

24   the one that was formally discussed in court, right?

25             MR. CALHOUN:  I guess that's right, Your Honor.

1253

1       THE COURT:  All right.  Do the defense have a written

2  copy of that?  Or which number is it?

3       MR. GRELL:  It is --

4       MR. CHARNOFF:  I believe it's Stipulation 1, Your

5  Honor.

6       MR. GRELL:  It's 2191.

7       THE COURT:  Exhibit 2191.

8       MR. GRELL:  Paragraph 21.

9       THE COURT:  Paragraph 20?

10       MR. GRELL:  Yes -- 21.

11       THE COURT:  Paragraph 21.

12       MR. GRELL:  21.

13       THE COURT:  All right, let me see if we can find that

14  right now.

15       So in terms of the exhibits that go to the jury, what

16  we're going to do is I'm going to have my law clerk retype that

17  exhibit.  So Exhibit 2191 is going to consist solely of that

18  paragraph, all right?

19       Is everybody comfortable doing it that way?

20       MR. CHARNOFF:  That's fine on behalf of GST.

21       THE COURT:  Mr. Calhoun, is the plaintiff comfortable

22  with that?

23       MR. CALHOUN:  That's fine.

24       THE COURT:  All right.  So just wait one second.

25       MR. GRELL:  I would just ask that it look like a

1254

1    court document, have a caption on it.

2              THE COURT:  What we're going to do is we're going to

3    do "Stipulated Fact," all right?  I'm going to take the first

4    page, all right, it says "Stipulated Fact."  Then that first

5    paragraph, which says "Plaintiff Navient Solutions," etc.,

6    etc., and it lists all the defendants, we'll have to take out

7    Jeremy Branch's name, "hereby stipulate to the following fact."

8              MR. GRELL:  Okay.

9              THE COURT:  Singular, all right?  And I'm going to

10   give you a copy.  Everybody will have a copy of that new

11   exhibit.

12             And hold on.  So 21, just so I'm clear as to what it

13   is, "Privately owned loans serviced by NSL, whether or not

14   those loans are guaranteed by the federal government, are owned

15   by various trusts or other entities for which NSL is the

16   servicer and authorized agent."

17             All right?  That's what that will be, one page most

18   likely.

19             MR. GRELL:  And then the signature box.

20             THE COURT:  And the signature page.

21             MR. GRELL:  Because we referred to those in

22   examination.

23             THE COURT:  Yeah, yeah.  All right.  Again, as soon

24   as we break, I'll have Ms. Miller write that up.  We'll give it

25   to you-all.  If there's any objection, you know, immediately

1255

1    let us know, all right?

2            All right, we'll take care of that.  Is there

3    anything else of a housekeeping matter that we need to address?

4            Wait, Mr. Charnoff, since you have the benefit of

5    that position, is there anything that you want to put on the

6    record?

7            MR. CHARNOFF:  Your Honor, I simply want to note that

8    I have no further specific objections to the format in which

9    the jury instructions have been arrived at at this point, but

10   without waiving my motion for directed verdict and my renewed

11   motion for directed verdict, I think there's little or no

12   evidence that goes to many of the elements to any of the three

13   counts against my clients.

14           THE COURT:  All right.  Well, that's -- your time now

15   is to argue that to the jury.

16           MR. CHARNOFF:  I understand, Your Honor.  And also,

17   during opening argument, Your Honor, we had the lectern sort of

18   turn diagonally.  Can --

19           THE COURT:  It will be done the same way.

20           MR. CHARNOFF:  Can we do it just perpendicular?

21           THE COURT:  We have wires.  We have to be careful.

22           MR. CHARNOFF:  Oh, gotcha.

23           THE COURT:  We'll do the best we can, all right?

24           MR. CHARNOFF:  Okay.  Thanks so much.

25           THE COURT:  Oh, that reminds me, are there any

1256

1    demonstratives that anyone is planning to use during their

2    closing arguments?

3              MR. CALHOUN:  We do, Your Honor.  We exchanged them

4    over the weekend.  We have no objections to theirs.  I didn't

5    hear any objections to them.

6              THE COURT:  All right.  Are you needing an easel for

7    that, or is it going to be on the screen?

8              MR. CALHOUN:  Yes, Your Honor.

9              THE COURT:  All right.  Then I'll make sure that the

10   shades are closed so there's no glare problem.  All right, so

11   we took care of that problem.  All right.

12             MR. GRELL:  The only issue, Your Honor, is we want to

13   make sure we're not violating or running contrary to your

14   expectations, and we have both had conflicting recollections.

15   Is it okay if we use the verdict form and instructions?

16             THE COURT:  Absolutely.  Absolutely.

17             MR. GRELL:  And display them?  That's okay?

18             THE COURT:  That's also all right.

19             MR. GRELL:  Okay.

20             MR. CALHOUN:  That was -- we had two last issues,

21   Your Honor.  That was one of them.  In my experience, it's

22   totally fine to refer to the Court's instructions.  Defendants

23   want to actually put them up on the screen, and I don't think

24   that's appropriate.

25             THE COURT:  It's not inappropriate.

1257

1      MR. CALHOUN:  Well, it suggests that the instructions

2  are coming from counsel, not the Court.

3      THE COURT:  I will make sure that -- if that makes

4  you uncomfortable, I will tell the jury, you know, the Court

5  has developed these instructions with the input from counsel,

6  all right?

7      MR. CALHOUN:  All right.  And then the last thing,

8  Your Honor, is during, during closing, we would like to request

9  that you enforce the motion in limine and preclude the

10 defendants from arguing that Navient actually violated the TCPA

11 and using the term "robocall" to suggest that calls made by

12 Navient actually violated the TCPA.

13     We understood your ruling said that they could argue

14 that they believed or understood that Navient violated the

15 TCPA, and we wanted to make sure that is in force because we

16 didn't want to object.

17     THE COURT:  There wasn't going to be a problem with

18 that, was there, Mr. Grell?

19     MR. GRELL:  I mean, I'm trying to be as careful as I

20 can be.  I mean, I -- I'll continue to try.  I mean, I --

21     THE COURT:  It's not that difficult.  You know, the

22 law was unsettled at the time.  Your clients believed that they

23 were violating the law.  I mean, that's perfectly appropriate.

24     MR. GRELL:  And then that's why I used the term

25 "robocall" in my opening, because I wanted the jury to

1258

1    understand that didn't necessarily mean the calls violated the

2    TCPA.  I tried to be as clear as possible, but we have to refer

3    to these calls as something, and I didn't want to use "ATDS"

4    because I know that's the defendants' -- rightfully, there's

5    disputed issues as to what's in the ATDS or not.

6           So I -- we have to speak English, you know.  I don't

7    know -- I'll do my best, and I tried to do my best already.  At

8    least I'm not, you know -- I really want them to be instructed

9    not to bring up *Facebook* in their closing because they've done

10   that three times overtly.

11          THE COURT:  All right, neither side is going -- if

12   either side does that, I will interject, and that's even worse

13   when the judge stops counsel, all right?  But robocalls, not

14   all robocalls violate the TCPA, so --

15          MR. GRELL:  And they -- and I wouldn't care if there

16   was an instruction that said that.  It's -- I said it in my

17   opening.  That was why I said it, because I am not trying to

18   unfairly prejudice them.  It doesn't matter to me whether they

19   are currently violating the ATDS or not.  But anyway --

20          THE COURT:  All right.

21          MR. GRELL:  -- we've been -- we've hashed that over

22   and over.

23          Finally, just given Mr. Calhoun's last concern, and

24   it's fine if you don't want us to do this, can we highlight

25   specific language in the instructions as we go through or just

1259

1    put the instruction up and leave it there?

2              THE COURT:  You can do anything you want with the

3    instructions.

4              MR. GRELL:  Okay.

5              THE COURT:  Just don't, just don't misread them, all

6    right?  I mean, obviously.

7              MR. GRELL:  What's that?

8              THE COURT:  Don't misread them.  Don't --

9              MR. GRELL:  I know.  And when we were practicing last

10   night, I said I gotta because of your comment before.

11             THE COURT:  All right?  All right.

12             MR. GRELL:  Yeah.

13             THE COURT:  Actually, it doesn't bother me at all

14   because it helps the jury perhaps better understand the

15   instructions when they hear them, all right?  All right,

16   anything else?

17             And again, I want to commend you-all.  I was

18   expecting and fearing more disputes than we got.  You have -- I

19   know it's a hotly contested case, but you-all have really

20   worked well together despite an occasional little flare-up in

21   the courtroom.  So if I don't get a chance to tell you, you did

22   a good job.  It's a complex case.

23             And I appreciate the fact that we have 40 minutes.

24   You can go down and get some coffee if you need to or just

25   relax, but the main thing is, though, if you're going to use

1260

1  exhibits, you know, I am going to keep you pretty close to your

2  time estimates.

3          And I am going to give a break, Mr. Grell.  I didn't

4  forget your concern.

5          So it will be -- Mr. Calhoun, you're arguing both

6  ends of the plaintiff's?

7          MR. CALHOUN:  Yes.

8          THE COURT:  Okay.  Plaintiff will go first.

9  Mr. Charnoff, you go second.  We'll take a break, brief break.

10  Mr. Grell and rebuttal, all right?  And then break, jury

11  instructions.  That's what the morning looks like, all right?

12          If the jury is all here before ten, we may start a

13  couple of minutes before ten.  So I recommend you-all be back

14  in the courtroom no later than 10 of ten so that if we get

15  them -- you know, they've been great about being here on time,

16  and most of them are here early.  We can just get this case

17  moving, all right?

18          Anything further?

19                        (No response.)

20          THE COURT:  No?  Then we'll adjourn so that I can fix

21  up this instruction.

22          (Recess from 9:23 a.m., until 10:00 a.m.)

23                     (Jury present.)

24          THE COURT:  Well, good morning, ladies and gentlemen.

25  Once again, I think you get a record for being the best jury

1  I've had in terms of being here on time, so I want to thank

2  you-all.

3         As I said on Friday afternoon, we're going to start

4  with opening statements.  This is the time when the -- I'm

5  sorry, I should say we're going to start with closing

6  arguments.

7         This is the time when the lawyers are going to argue

8  the case to you, so I want you to listen very carefully to

9  their arguments, but remember, what lawyers say is not

10 evidence.  It's your memory of the evidence that is going to

11 prevail when it comes time for you to deliberate.

12        And just for the record, did any of you bump into any

13 problems over the weekend in terms of any exposure to anybody

14 who might be COVID positive?  I know we're all worried about

15 that these days.

16                    (Jurors shaking heads.)

17        THE COURT:  No?  Okay.

18        Any problem reading, hearing, or discussing anything

19 about the case?

20                    (Jurors shaking heads.)

21        THE COURT:  You've been a great jury.  So thank you

22 again for your service, and we're going to start with

23 Mr. Calhoun.  He'll make the opening closing argument for

24 Navient.  Then we're going to hear from Mr. Charnoff on behalf

25 of the GST defendants.  I'm going to give you a short break at

1262

1    that point.  Then Mr. Grell will present the argument on behalf

2    of the Lohman defendants, and then because the plaintiff has

3    the burden of proof, the plaintiff, Navient Solutions, LLC,

4    gets to go last with a short rebuttal argument.

5         We'll take another break at that point.  I'll give

6    you the instructions, and then we will break for lunch.

7         Lunch may start a little bit after one because I do

8    want you to get all the instructions at one time.  But that's

9    the schedule for this morning.

10        All right, Mr. Calhoun?

11        MR. CALHOUN:  Thank you, Your Honor.

12                    CLOSING ARGUMENT

13                    BY MR. CALHOUN:

14        Good morning, ladies and gentlemen.  First I want to

15   thank you for your time and attention over the past week.  We

16   know there have been a lot of challenges.  We've had challenges

17   with technology, sitting with masks, hearing witnesses,

18   witnesses who aren't here, certainly not what we would have

19   preferred in that regard.

20        You may remember when Judge Brinkema at the beginning

21   of the trial mentioned an analogy of jigsaw puzzles and box

22   tops.  I'm going to tell you how the pieces that you've heard

23   come in in all these various different ways fit into our box

24   top.  And I don't think you're going to hear that from the

25   other side.  You're going to -- they're going to try to tell

1263

1    you that pieces are missing, but you're entitled to collect all

2    these pieces, and if you can infer a piece, it's still there.

3            When I gave my opening on Monday, I promised to prove

4    defendants' claims with their own words, and you've seen that

5    come in.  You may have heard from some of the defendants over

6    the past week, but I really want to call your attention to what

7    they wrote at the time, when they were involved in this, what

8    they were saying and what they meant.

9            I want to walk through the claims shortly and orient

10   you to the enterprise.  I know all the evidence wasn't totally

11   easy to follow, but I want to just point out some big picture

12   things to you.

13           Attorneys normally represent people who come to them

14   with problems.  They don't create the problem and then try to

15   make money off of it.  That's not what you heard about this

16   week.

17           Here you heard about attorneys working together to

18   create a pipeline of deals and leads, not people who are

19   clients.  They were using people to line their own pockets and

20   to create claims.

21           If they couldn't use them, recall Mr. Mize's

22   testimony about clients not having usable calls and how much it

23   pissed him off, using his words.  If they couldn't use them,

24   they would ditch them.

25           How did they describe these people?  Ancillary catch,

1264

1   leads, deals.  And if they couldn't develop enough calls for

2   them, trash.

3           And through the same process, in an effort from

4   keeping these people from leaving this pipeline, they brought

5   these bogus claims against Navient.

6           Let me show you a chart of the enterprise, and I'll

7   explain to you how all these people fit together.

8           Can you make that whole screen, Jeff?

9           I'm going to show you how all these individuals and

10  companies in this scheme fit together.  It all started with

11  GST, with Graff, Trimarche, and Sievers, who had the idea for

12  this scheme, and that's a -- scheme is what we've always called

13  the enterprise of this.  The GST group or GST defendants

14  recruited the marketers, which included Kashto and Marshall,

15  who you heard from; Bill Carlson; Go2Finance; CDC; and many

16  others.

17          The GST group recruited a group of attorneys from

18  whom it could falsely claim the factor receivables.  Remember

19  they had factoring contracts but admitted they never did any

20  factoring.  Those were just cover.

21          The GST group had each of these attorneys hire CMS,

22  Champion Marketing Solutions, which was owned by a friend of

23  Rick Graff, Scott Freda.  And if you look at the chart, CMS

24  provided services to each attorney that was recruited by GST.

25  It started with Amanda Johanson, then with David Mize, then

1    with Slaughter.

2          Although the attorneys didn't have express contracts

3    with the marketers, each one of them worked with the marketers

4    to work on scripts and so-called compliance calls.  And you

5    have some of those e-mails in the record.  You'll get to look

6    at them and see what they said.

7          And not only that; the attorneys shared their

8    engagement agreements with the marketers and with CMS.  And so

9    the interconnectedness of this group is apparent.

10         Now, the program created by GST called for borrowers

11   to sign up with the attorneys in exchange for 40 percent

12   typically of their loan balance, and the attorneys were

13   purportedly to use lender violations, which they called them,

14   to attack the debt, but as you heard from Mr. Mize, there was

15   no plan for resolving these loans.  Unsurprisingly, the

16   cancellation rate was high.

17         They had to do something about that, and the Lohman

18   defendants were the capstone of the scheme.  Lohman worked with

19   each of the attorneys involved in the scheme in an effort to

20   reduce cancellation and to keep the pipeline of deals and

21   leads, as they called them, flowing, and that was a critical

22   role in the scheme.

23         So that gives you the big picture.  There are lots of

24   sub-people involved in several of these companies.  You don't

25   need to know who all of them are, but this is the structure,

1266

1  and you can see the Lohman defendants operate essentially as a

2  rim to the wheel of this structure.

3       I want to walk through some of the evidence last

4  week.  It didn't all come in order, and I know it was

5  confusing, so I just kind of want to walk through what the

6  evidence showed.

7       You heard Mr. Graff, Mr. Marshall, and Mr. Mize all

8  testify about how GST formed the enterprise to recruit and

9  funnel student loan borrowers into the program for their fees.

10  You saw the affiliate agreements that GST entered into with the

11  marketers in which they agreed to recruit factored contracts.

12       You, you saw CMS employees involved in the drafting

13  of the scripts and the compliance materials for the marketers.

14  So you could see how they were linked.

15       And you can look at the script that the marketers

16  used.  That's Exhibit 28 if you want to go back and read it.

17  It reads more like a late night infomercial than a description

18  of legal services.

19       So I invite you again when you go back in your

20  deliberations to take a look at that and see, see what they

21  were supposed to tell borrowers.  We know that's not all that

22  they told borrowers because we saw from the borrowers and we

23  saw the recording of what they were actually telling borrowers

24  when they called.  It didn't even sound like the script, but if

25  they stuck to the script, it was deceptive.

1267

1      You heard Mr. Trimarche talk about recruiting

2  Johanson, Mize, and Slaughter into the scheme, and importantly,

3  you heard Mr. Lohman introduced Ruggiero to Mize to take over

4  Johanson's role.  Now, allegedly, you heard him testify that he

5  refused to take cases from Amanda Johanson, but he did continue

6  to take cases from Mize and Slaughter and worked to replace

7  Johanson.

8      I suppose they're going to tell you this was

9  coincidence, but I don't think the facts support that.  In

10  fact, you saw the marketers were suffering from a high rate of

11  cancellations.  GST was paid millions of dollars, all coming

12  from borrowers, and those were, those were loan payments that

13  they would have otherwise been making to their lenders.  And

14  then I believe you heard them testify that approximately 75

15  percent of the lenders for, for Amanda Johanson borrowers were

16  Navient.

17      And while, you know, listening to Mr. Trimarche's

18  deposition testimony may not have been scintillating, he did

19  testify that GST essentially had no expenses.  That was just

20  all money going into his pocket.  He had a great incentive to

21  keep the pipeline running.

22      The marketers, however, were paying customer service

23  agents.  They were creating mailers, sending those out.  That

24  was expensive.  Cancellations were a real problem for them.

25      For GST, if someone cancelled, no big deal.  They're

1268

1    getting essentially profit, but for the marketers, every

2    cancellation was money not coming into their pocket.  So you

3    saw e-mails where they're complaining about the cancellation

4    rate and how this wouldn't work.

5           It's about that time that Lohman reached out to Mize.

6    Now, Lohman will tell you that he just found Mize, but then you

7    heard in his deposition testimony that he admitted that he met

8    Mize through debt relief contacts, and again just

9    coincidentally, he also admitted that he knew Bill Carlson.

10   Bill Carlson was the owner of Go -- one of the owners of

11   Go2Finance and one of the marketers.

12          And as Mize was brand new to debt relief, you can

13   infer that whoever referred Mr. Lohman to Mize knew about the

14   program.  Nothing else makes sense.

15          In any case, Mize and Lohman immediately did what?

16   They went to work to recruit Navient borrowers to create

17   claims.  You saw their e-mails going back and forth.  It was

18   all about Navient.  It's all about let's create TCPA claims.

19          Mize's purpose in this was obvious.  He expressly

20   told Mr. Lohman:  I want a reference to reduce cancellations.

21   In other words, we need to keep the pipeline flowing.

22          That was a big problem the scheme was having, and

23   that's what Lohman was brought in to fix.

24          And we also heard that right after Lohman comes on

25   board, what happened?  The marketers get e-mails -- or talk in

1269

1   e-mails about a new revocation process.  And what is that in

2   reference to?  Mr. Kashto told you that was in reference to

3   phone calls.  That was in reference to creating TCPA claims.

4   And what did they hope that revocation process would do?

5   Reduce cancellations, keep the pipeline flowing.

6          In fact, every witness you heard from this week

7   admitted that no one calls a borrower when they're paying.  The

8   revocation process was an obvious reference to the TCPA, and in

9   this program, you heard not a single borrower continued to pay.

10          You can read the script and the clever words they --

11   it's not clever.  It was disingenuous.  It was a -- it was a

12   sort of disguised attempt to say how can we tell them to stop

13   paying without actually saying "stop paying"?  And they told

14   them we can't help you, you know, reduce your leverage if you

15   continue to pay.

16          But if they did continue to pay, what did Mr. Mize

17   tell you?  He wouldn't work with them.  What did Mr. Lohman

18   testify to?  They didn't work with anyone who was paying

19   because they wouldn't get calls.

20          And we know Lohman's involvement wasn't coincidental.

21   How?  How do we know that?  You can see the e-mails where

22   Lohman e-mails Slaughter and Mize together, he admitting to

23   knowing that both they and Johanson worked with CMS.

24          Why would he do that unless they worked together?

25   Most people don't communicate with unrelated business partners

1270

1   on the same e-mail.  He knew they were all connected.  It's not

2   normal to e-mail people who aren't connected on the same

3   e-mail, especially not to say, hey, I'm going to -- you've

4   heard of my ability to build these cases.

5          And how do we know that was their plan?  Because

6   after Ruggiero got recruited by Mr. Lohman into the program, he

7   wrote back and said, hey, I'm going to start to work with

8   Mr. Mize.  Let's -- how do I build these cases?

9          They knew what they were doing.  Don't let them tell

10  you otherwise.

11         Now, you can see from the outline of the -- that I

12  put up of the enterprise that the Lohman defendants are the

13  rim.  They're on the outside.  You're going to hear from GST,

14  we didn't know Lohman, they didn't know us.  That doesn't

15  matter.

16         You're going to hear from Judge Brinkema when she

17  instructs you about what a conspiracy means and how that

18  applies.  You don't have to know everyone in the scheme.  You

19  don't have to know everyone in the conspiracy.

20         But you do have to share a common purpose, and the

21  purpose here is obvious.  They're creating this pipeline of

22  deals and leads, and it's not normal attorney conduct to do

23  this.  They all took advantage of student loan borrowers and

24  lenders.  They induced them into default.

25         And to be sure, they took money out of this -- out of

1271

1    these borrowers and out of Navient in different ways, but they

2    shared the purpose, which was keeping the pipeline flowing.

3    They all relied on multiple deals, multiple leads.

4            And why -- it's important to keep in mind that.  You

5    know, under this pipeline, they were taking 40 percent of the

6    money out at the front.  You heard Mr. Mize talk a little bit

7    about how he negotiated some of these debts.  You also heard

8    Mr. Standish talk about what their programs were for borrowers

9    and how they could help them, but keep in mind, a borrower

10   can't go to Navient and say, hey, that 15 percent reduction

11   you're going to give me?  That sounds great, when he's already

12   agreed to give a lawyer 40 percent of their loan balance.

13           Essentially what these -- what this program did is it

14   made programs that were attractive or were available from

15   Navient, it made them almost impossible for the borrowers to

16   work.  In order for them to get a -- for Mr. Mize to negotiate

17   a better deal for one of these clients, he would have to do

18   more than 40 percent better than the borrower could do on their

19   own.  There's certainly no evidence that they did that.

20           The evidence in short shows that the defendants

21   looked at these borrowers as a source of cash.  Lohman

22   testified he didn't bring a case for most of his referrals.

23   Those borrowers, the vast majority, they simply had their

24   credit destroyed, as Mr. Muhtaseb testified.

25           And for some, Lohman's brought a case, and for some

1272

1    they got a result, some got dismissed, a lot of them got

2    dismissed for a loss, and for those people, they got nothing.

3    A few people, yeah, they lucked out and got settlement out of

4    Navient's pocket.

5            And we know that the way that they recruited these

6    borrowers was definitely crooked.  Not many of the mailers have

7    survived, they weren't able to discover them, but you got to

8    see them.

9            And you heard from Mr. Marshall and Mr. Kashto, who

10   are associated with the most prolific marketer, that they

11   engaged in their multiple mass mailings all over the country.

12   You saw the chart setting out the states to which they felt

13   that they could send these mailers and that they did.

14           And you saw an e-mail from Mr. Kashto's associates --

15   It's Exhibit 530, which we're going to put up for you -- where

16   they talked about what their plan was.  And what was their

17   plan?  They, they expressly discussed, hey, we don't think

18   these market -- these materials that we're going to send out

19   are compliant.

20           They talked about doing a loan.  They talked about

21   doing other things, but they expressly noted it's not

22   compliant.  And what does "not compliant" mean?  It means

23   fraudulent.  It means illegal.

24           And then you heard Mr. Kashto at the end, what did he

25   say?  "I think we can do both."

1273

1    They wanted to get in and out.  They wanted to run

2    these deals as long as they could, and then when they saw

3    trouble, they were going to stop.

4        And you can take a look at one of these mailers.

5    Look at Exhibit 158.  There's others in the materials, Exhibit

6    23, Exhibit 600.  I invite you to go back, read them, and see

7    if they accurately describe what was being offered.

8        According to this screenshot that Mr. Marshall sent

9    of a mailer, you can see that what they're talking about is

10   being preselected for a payment saver personal loan program.

11   That didn't exist.  This was mail fraud.  They're bringing

12   people into this program through false promises.

13       Indeed, Mr. Marshall admitted that their mailers were

14   drafted generically by a mail house, and although they made

15   some comments, the mailers didn't even really reflect their

16   services.

17       Now, you'll hear from the Court in an hour or so that

18   mail fraud involves a scheme to defraud using the mail.  The

19   mail doesn't have to be used to send the fraudulent statement.

20   The mailing doesn't even have to contain false information.

21       Here, though, there's no doubt that mails were being

22   used, and they did contain deceptive information.  What that

23   means is that the basic requirement for the -- for a mail fraud

24   predicate act under RICO is established because the marketers

25   were involved in this conspiracy.

1274

1    And we also know that the mail fraud and tortious

2   interference claims have been implicated because Mize and GST

3   and others all suffered judgments in an action by the Consumer

4   Finance Protection Bureau, which establishes that their conduct

5   in sending out these mailers was inappropriate.

6    We also know that GST accepted wires from borrowers

7   all around the country and then distributed those funds

8   electronically to the marketers, the GST defendants, Mize,

9   Slaughter, Johanson, and others.

10    Now, we also know that Lohman instituted three-way

11   calls with borrowers and Navient in the firm which also

12   implicated the wires in multiple states, and we're going to

13   talk some more about wires in just a minute, but just so you

14   know, wire fraud is one of the other predicate acts for RICO,

15   and the wires essentially means the telephone, e-mails.

16   Anything that's sent electronically is a wire.

17    Now, you heard again from Mr. Mize that there was

18   initially no plan on how they were going to deal with these

19   borrowers once they brought them into the pipeline, and what

20   you saw in Exhibit 404 was they expected that a huge number of

21   them would be resolved through the statute of limitations.  And

22   I don't know if you even got into that, but that's -- what that

23   means is they were going to wait.  They were just hoping that

24   these claims would last so long that the, that the lender could

25   no longer sue the borrower.  That's not a plan.

1    Now, Judge Brinkema is going to tell you in a little

2    bit about the RICO statute.  Navient claims here are too broad

3    under the RICO statement.  One is for fraud; one is for

4    tortious interference.  She's going to explain all those to

5    you.  I'm not going to take a lot of time going over it.

6    But there are two claims under RICO.  One is a direct

7    claim under 1962(c).  One is a claim for conspiracy under

8    1962(d).  There are some general requirements that apply to

9    both of those.  The first is that there's an enterprise.

10    Judge Brinkema is going to tell you that a group

11    qualifies as an association in fact if it possesses three

12    characteristics:  first, the members of the group have to share

13    a common purpose; the members of the group has to have some

14    relation with one other; and the group has to possess something

15    that's called longevity.  Longevity is not an issue in this

16    case because the scheme operated for years and was operating

17    when we filed the complaint.

18    But we know that there was an enterprise here, and

19    how do we know it?  One of the conspirators admitted it.  If

20    you look at Exhibit 215, this is the e-mail that you saw from

21    Scott Freda complaining to David Mize, and he, he notes in his

22    e-mail "when we started this enterprise," all right?  So he's

23    coming right out.  This is in the context of a RICO case.  Not

24    this RICO case; a different one.

25    And he just flat out admits, when we started this

1276

 1    enterprise.  And he's talking to David Mize, Rick Graff, Greg

 2    Trimarche.

 3              And one of the other things he admits in that e-mail

 4    is, by the way, I didn't want to be doing this in writing.

 5              And what does that tell you?  They knew, they knew

 6    what they were doing was wrong.

 7              I put up earlier the chart showing all of the

 8    connections with the different defendants and conspirators and

 9    how that forms an association in fact.  Defendants are going to

10    argue there's no common purpose here.  GST -- the GST folks

11    wanted this 40 percent, and the Lohman folks wanted contingency

12    fee out of litigation.  It's true they took money out

13    differently, but the scheme wasn't that.  The scheme was let's

14    create a pipeline of leads and deals.  That's the common

15    purpose.

16              They wanted the pipeline of leads and deals to make

17    money off of student loan borrowers and Navient alike.  If they

18    didn't have that, it dried up.  They didn't have anything to

19    do.  And so these marketing materials and the marketers were

20    critical to all of them.

21              And recall when this started, Lohman was a brand new

22    attorney.  Do you know how many cases he brought against

23    Navient before this scheme?  None.  And you can see that in

24    Exhibit 44.  He's got a list of all his Navient cases.  They're

25    all post-2016.

1    Now, they also -- there's also a requirement that

2  they operate through a pattern of racketeering.  Again, here

3  there's no question that they did.  It was all about the leads

4  and the deals.

5    Judge Brinkema is also going to explain to you what

6  it means to have a -- operate through a pattern of RICO acts.

7  I'm not -- there's highly technical terms in there, but

8  basically what this means is we have to show you that there

9  were repeated instances of mail or wire fraud.  And, ladies and

10 gentlemen, I submit to you that you can't conclude that there's

11 anything but that.

12   You saw their carefully scripted efforts to lead

13 people into signing up for this program.  You saw the

14 fraudulent mailers.  You heard the phone call, or you had the

15 opportunity to hear it if you didn't hear it well thanks to our

16 technical difficulties.

17   And we know that the -- many of the borrowers, Mize,

18 Lohman, all wanted phone calls because they had been told what

19 this fraudulent scheme was all about.  The borrowers had been

20 told that every call they got was $500.  You saw that in the

21 Lohman engagement agreement.  And so when they got calls, they

22 celebrated.

23   If you look at Exhibit 52, which is an e-mail from

24 Mr. Millora, one of the borrowers in this program, he writes to

25 Mr. Lohman, and what does he say?  Oh, no I'm getting harassed;

1278

1    I've got phone calls?

2          No, that's not what it says.  He says:  It's good

3    news.  I'm getting calls.  The plan is working.

4          And you saw the e-mails from Mize and others.  Mize

5    came back and said:  I'm going to go away.  I'm having a baby.

6    I want to come back to lots of people getting calls.  Hooray.

7          You see in Exhibit 272, where Mr. Lohman is telling

8    borrowers:  You're getting calls.  That's a good thing.

9          And most importantly, when -- if you look at Exhibit

10   254, this is an e-mail chain with a borrower, read the whole

11   thing when you go back.  The client says:  I'm not getting

12   calls.

13         Lohman doesn't write and say:  Great job.  You

14   stopped the harassment.  Congratulations.

15         Now, what does he ask?  Are you doing anything to

16   cause the calls to stop or slow down?

17         And Mize replies that he identified his cease and

18   desist letters.  So what did they do?  They didn't send cease

19   and desist letters to everybody.  That might stop the calls and

20   cause them to slow down.  They stopped sending cease and desist

21   letters.

22         The second claim under the RICO claim we have is a

23   conspiracy claim, and there's a really important point I want

24   to make to you.  Judge Brinkema is going to tell you a person

25   may join in an agreement or understanding as required by this

1279

1    element without knowing all the details of the agreement or

2    understanding and without knowing who all the other members

3    are.

4              You're going to hear from Mr. Charnoff:  No one knew

5    my people, and we didn't know Lohman.

6              That doesn't matter.  You're going to see.  Read the

7    instructions.  They're going to tell you that doesn't matter.

8    As long as they knew the common purpose and knew what they were

9    doing, they can form a conspiracy.  You don't have to know

10   everyone by name to form a conspiracy.  When you have a big

11   drug conspiracy, the guy on the corner doesn't know everyone

12   all the way up to the kingpin.

13             You have to share a purpose, and the purpose here was

14   to get a lucrative stream of litigation, much better than back

15   in the TPCA mill he was building.  They were converting way

16   more of the Mize leads than his normal leads.

17             Just briefly talk about tortious interference.

18   You're going to hear about that from Judge Brinkema also.  It's

19   Instruction 46.  There's no dispute here that the scheme

20   intended for those borrowers to stop paying their loans.

21   They're going to try to confuse you about the ownership

22   structure of the promissory notes.  It's just an effort to

23   confuse you.

24             Here's what you know.  As Mr. Standish explained,

25   every write-off of a Navient loan hits Navient's bottom line

1280

1    the month that it occurred.  And we know that the argument that

2    Navient didn't have an interest in these loans is not

3    meritorious because Mr. Lohman sat over here -- right over here

4    and explained to you that they couldn't just file any TCPA

5    claim.  They had to have enough calls to offset the judgment

6    that Navient would get on these loans, and so they had to have

7    more calls in order to try to exceed that.

8            And it's all a red herring anyway because as you'll

9    see in the instructions, for tortious interference, if there's

10   a business expectancy, if Navient had a relationship even as an

11   intended beneficiary of a contract and that was interfered

12   with, as it unquestionably was here, that's sufficient.

13           GST is also going to argue that it never heard of

14   Navient.  Yeah, we wanted these people to stop paying their

15   loans, but we didn't know who it was.

16           Well, I like to use the throw-the-rock analogy.  If

17   you throw a rock into a crowd, you can't argue that you didn't

18   intend to hit somebody.  It doesn't matter that you didn't know

19   their name.  If you intend to hit them with a rock, you're

20   still guilty.

21           You know, what they had was a script, and the script

22   says if you pay, you're going to take away our leverage, and

23   their practice was if you pay, we're not going to work with

24   you.  So they knew what they were doing.  They knew they were

25   making these borrowers stop paying, and they knew the plan was

1    to try to fix that with a lawsuit.

2           Navient also has a claim for fraud, and here you

3    heard, for example, Mr. Muhtaseb testify about how they filed

4    lawsuits without ever even talking to their clients, and when

5    you file a lawsuit, you implicitly represent that you have that

6    authority.  That was material.

7           They called Navient and said, we don't want calls

8    with Lohman employees on the line, when, in fact, they did want

9    the calls.  That was their whole plan.

10          Mr. Grell may talk about whether Navient relied on,

11   excuse me, those representations, but Navient had no choice.

12   You heard Mr. Standish testify when a lawsuit comes in, whether

13   it's an arbitration or complaint, we have to do something.

14          If Navient did nothing, said, nah, I'm not fooled by

15   that, do you know what would happen?  A default judgment.

16   Hundreds of thousands of dollars.  They have to defend them, or

17   they have settle them, and they tried to do it as cheaply as

18   possible.

19          THE COURT:  You have about two minutes left.

20          MR. CALHOUN:  I know.  I'm wrapping up.

21          Now, you're going to also hear in a few minutes that

22   from the defense, they're going to argue that Navient caused

23   its own damages by, by placing calls, and there's probably

24   going to be over the top, but you're -- what they're trying to

25   do is smear Navient.

1    You heard from Mr. Standish every call that was

2    made -- almost every call that was made in this case was done

3    by a live -- with a live person on the line.  Navient believed

4    it wasn't violating the TCPA.  Even the Lohmans admitted that

5    many of Navient's calls didn't.

6         And the conduct here really is abhorrent.  They're

7    duping struggling borrowers, with no regard to the people who

8    are cast off as chaff.  What happened to those people who

9    stopped paying?  What happened to those people whose debts if

10   they were cast off, there was no way to resolve their loan?

11        Many of the participants in this enterprise are

12   attorneys, and rather than look to help, they looked for deals

13   and they looked for leads and built cases.  That's their word.

14   They built cases.  All while looking to line their own conduct.

15        And you should think about the evidence carefully.

16   The majority of the borrowers in this program were induced to

17   default, had their credit destroyed, as Mr. Muhtaseb noted, and

18   they had nothing to show for it.

19        And you can take the statements that you're going to

20   hear in a little bit that they were just acting like lawyers

21   with a grain of salt.  This is, this is not how lawyers act.

22        Lawyers don't describe their clients as, with

23   demeaning terms like ancillary catch, leads, deals, and if they

24   don't have enough calls, trash.  They were building a pipeline

25   of cases, leads, and deals.

1283

```
1        Now, Navient has asked for a significant recovery in
2   this case, nearly $3 million in compensatory damages.  I ask
3   that you take that at face value.  The claims involved here are
4   serious.  They involved a particularly egregious violation of
5   trust, and Navient had no choice but to respond to these sham
6   lawsuits.  If it hadn't, Navient would have suffered millions
7   of dollars in default judgments.
8        You have an opportunity to hold the people
9   responsible for this accountable.  There's nowhere else to go.
10  If you don't stop it, it's likely to continue.  We ask that you
11  send the message and enter judgment in favor of Navient.
12        THE COURT:  All right, thank you.
13        Mr. Charnoff?
14        MR. CHARNOFF:  Thank you, Your Honor.  May it please
15  the Court.
16                    CLOSING ARGUMENT
17                  BY MR. CHARNOFF:
18        Good morning, ladies and gentlemen.  I too want to
19  begin by thanking you for your patience throughout this
20  process.  I recognize that this is an important duty, but it's
21  also being burdensome, and we appreciate your time.
22        When you conclude your deliberations, I'm going to
23  ask that you mark on the verdict form, I'm going to ask that
24  you mark "No" on Question 1; Question 2; and on the second
25  page, on Question 4.  That's what I'm asking for, so you know
```

1284

1  at the beginning and the end, that's what I want you to mark,

2  "No."  That's with respect to my clients:  GST, Greg Trimarche,

3  and Rick Graff.

4         Now, when all of the attorneys are done with our

5  closing statements, Judge Brinkema is going to read to you jury

6  instructions, and then she's going to hand you a copy for

7  reference that you can read, so you don't need to write down

8  what I'm going to say.  You're going to have this here, and

9  Judge Brinkema will read them to you.

10         And these are not brief.  I think there's 54

11  instructions.  It's pretty dense stuff.  So I'm not going to

12  review 54 instructions with you, but I am going to go over some

13  of them with you because I think it will be helpful when you're

14  evaluating the evidence.

15         Jury Instruction No. 5 is called "Judging the

16  Evidence," and it says in part:  "You are expected to use your

17  good sense in considering and evaluating the evidence in the

18  case," and later it goes on to say:  "give the evidence a

19  reasonable and fair construction in the light of your common

20  knowledge."

21         Now, as you saw last week, trial has many

22  technicalities, many formalities.  Sometimes the lawyers

23  disagree over the proper way to ask a question or whether a

24  piece of evidence should be admissible or not, but you don't

25  have to worry about that.  The evidence is in, and your

1285

1    recollection of the testimony and the exhibits you review,

2    that's the process, and you are entitled and able to use your

3    good sense and your common sense in evaluating the evidence,

4    and so, you know, you don't need to be lost in the legalese is

5    really what I'm trying to impart, and don't be afraid to look

6    at your fellow juror and say, I just don't think this

7    particular part of the case makes sense.

8              You're allowed to use your common sense.

9              Jury Instruction No. 6, there's multiple sections,

10   and the last subsection is called "Jury's Recollection

11   Controls."  So you've heard from many of the parties in this

12   case throughout last week.  You heard a number of witnesses.

13   Your recollections do control.

14             So I'm going to be telling you what, you know, my

15   recall of some of the evidence was, and you heard from

16   Mr. Calhoun how he portrayed the evidence, but ultimately, if

17   an attorney tells you, you know, Witness X said Y, if you don't

18   remember that, that's up to you.  Your recollection controls,

19   not what any of the attorneys are telling you what the

20   testimony was, and that's -- I think it's important.

21             Jury Instruction 14, from the defense perspective,

22   this is an important instruction.  This is called "Adverse

23   Witness."  Again, you don't have to write down the name of it.

24   You'll be able to read all of this.

25             But let me just read to you the very first sentence:

1286

1  "The plaintiff called several defendants as adverse witnesses.

2  The plaintiff is bound by as much of the defendants' testimony

3  given as an adverse witness as is clear, logical, reasonable,

4  and uncontradicted."

5          And again, you'll be hearing that from the judge, and

6  you'll have a chance to read that.

7          Here my clients -- Greg Trimarche, Rick Graff, and

8  GST through Greg Trimarche's testimony -- Navient is bound by

9  their testimony that was clear, logical, reasonable, and

10 uncontradicted.  And we're going to come back to this in a few

11 minutes, but I'm going to respectfully submit to you that

12 virtually everything that my clients said under oath is

13 uncontradicted by any other evidence in this case.

14         Navient introduced that evidence; they're bound by

15 it.

16         Jury Instruction 16 I'm only going to address

17 briefly.  This explains to you how you are to evaluate expert

18 testimony in this case.  The very last sentence in the

19 instruction reads:  "If you feel that the expert's opinion is

20 outweighed by other evidence, you may disregard it entirely."

21         Here Navient offered, you heard expert testimony in

22 their case-in-chief from an attorney named Wayne Travell.  He's

23 the first of two attorneys to take the stand.  And his opinion

24 was that one cannot form an opinion or opine on the

25 reasonableness of attorneys' fees in this case and the

1287

1    underlying TCPA fees because there was no evidence of what the

2    market rates are and almost two dozen different places where

3    TCPA cases were litigated, either in federal courts or in

4    arbitration.

5         That was his opinion.  You can't -- it came in

6    through Navient.  One cannot form an opinion as to

7    reasonableness.

8         The defendants, we didn't offer any expert testimony

9    because there was nothing to oppose.  Nevertheless, Navient

10   then introduced what they called a rebuttal expert.  This was

11   Mr. Harvey.  And he tried to claim that there was a national

12   market rate.  You might remember I was asking him about that.

13   He claims there could be a national market rate, but then he

14   admitted he's not licensed in any of these two dozen other

15   jurisdictions where actual TCPA cases were being litigated.

16        The testimony from both of the experts was that none

17   of these cases were in Virginia, D.C., or Maryland, where these

18   attorneys are licensed.  They have no basis to evaluate what

19   the reasonableness of fees are in various markets from any of

20   these underlying TCPA cases, none.

21        In fact, the very example that Mr. Harvey used, I

22   think this was -- again, your recollection controls, but I

23   believe the example he used was that not only are attorney

24   rates different from state to state and city to city, but they

25   are different within the same law firm, depending where that,

1288

1    you know, where the litigation is occurring, and that an

2    attorney in Peoria cannot charge what an attorney in Manhattan

3    is charging.

4           I believe that was the example he used.  Your

5    specific recollection controls if he used a different

6    Midwestern city to compare to Manhattan, but that's the

7    analogy.

8           There is no national rate.  And, you know, so you

9    literally have no ability to accept the reasonableness of

10   attorneys' fees, which is significant because attorneys' fees

11   form a very large part of the damages that Navient is trying to

12   take from the defendants.  You have no ability to assess that,

13   and you can reject that evidence.

14          Jury Instruction 18 describes the burden of proof.

15   With respect to my clients, the claims have to be proven by

16   what we call a preponderance of the evidence.  Again, it's a

17   long instruction.  I'm just going to read two sentences for you

18   and then try to establish it.

19          "To establish a fact by a 'preponderance of the

20   evidence' means to prove that the fact is more likely true than

21   not true.  A preponderance of the evidence means the greater

22   weight of the evidence."

23          Again, this is a very lengthy instruction.  You

24   should read it carefully, but the way from a high-level sort of

25   understanding, and this might make more sense to those of you

1  who, you know, follow baseball at all, but the expression I use

2  is tie goes to the runner.  Fielder throws the ball to second

3  base, the runner and the ball arrive at the same time, the

4  runner is safe.

5       So that's -- really is just another way of saying

6  that it's Navient who always has the burden of proof, and under

7  preponderance of the evidence, and we're about to get into sum

8  and substance, I would suggest that they have little or no

9  evidence as to most of the elements that they're going after

10 here, but even if you found on one element that it was

11 fifty-fifty, that's not good enough.  Fifty-fifty means you've

12 got to go with the defense.

13      Jury Instruction 19 again is lengthy.  It begins

14 introducing you to the concept of RICO.  I'll just point out

15 just in the middle so you don't miss it, the plaintiff must

16 prove each element of a RICO violation.  So we're going to get

17 into that.

18      Jury Instruction 21, and you already heard a little

19 bit about this from Mr. Calhoun, this sets out the elements of

20 what's called a Section 1962(c) violation, okay?  This is the

21 substantive claim that they're making in this case.

22      And I'm going to quote the relevant part:  "To show

23 that any defendant violated Section 1962(c), plaintiff must

24 prove each of the following elements by a preponderance of the

25 evidence" -- which we just discussed a minute ago, tie goes to

1290

1    the runner -- "first, the existence of an enterprise affecting

2    interstate or foreign commerce; second, that the defendant was

3    employed by or associated with the enterprise" -- and again,

4    you're going to be able to read all this -- "third, that the

5    defendant conducted or participated in the conduct of the

6    enterprise's affairs; and fourth, that the defendant's

7    participation was through a pattern of racketeering activity."

8              Again, it's a mouthful.  It's a lot of legalese.

9    We're doing our best to try to explain what these things really

10   mean, but ultimately, you're going to have to read and

11   understand these.

12             This is a definition of the RICO claim, of Count II,

13   substantively.  The failure of even one of those elements means

14   the count fails.  And we're going to go through each element

15   together, and I'm going to respectfully suggest that there's

16   little or no evidence for any of the elements, but, you know,

17   one element goes out, one of the four legs of the table goes

18   out, the whole table comes down.

19             Jury Instruction 22 is a definition of "enterprise."

20   Again, quoting from the instruction just in part because it's

21   lengthy:  "Plaintiff has alleged an association-in-fact

22   enterprise.  A group otherwise qualifies as an association in

23   fact if it possesses the following three characteristics:

24             "First, that the members of the group share a common

25   purpose; second, that the members of the group have some

1291

1 relation with one another; and three, that the group possesses

2 sufficient longevity to permit the members to pursue the

3 enterprise's purpose."

4          So let's start with the first of these three

5 characteristics, the members of the group share a common

6 purpose.  What is it?  Of course, the evidence is that there

7 was no common purpose.  Each defendant in this case had their

8 own legitimate purpose.

9          What was the testimony?  Greg and -- Greg Trimarche

10 and Rick Graff from GST testified that their purpose was to

11 give private student loan debtors affordable access to

12 attorneys, people who could not afford large retainers and who

13 could assist them.

14          That was the only testimony as to GST's purpose here,

15 and they testified to that repeatedly.  No witness testified to

16 the contrary.  No one.

17          Conversely, the GST defendants did not have a purpose

18 to file TCPA claims.  The undisputed testimony was that GST is

19 not a law firm.  Rick Graff is not an attorney.  Greg Trimarche

20 is not a debt relief attorney.

21          GST defendants never filed a TCPA claimed.  They

22 never asked anyone to file a TCPA claim.  They never suggested

23 to anyone to file a TCPA claim.

24          The testimony was they didn't even know what a TCPA

25 claim was.  They didn't know the statute.  They didn't know the

1292

1 language.  They didn't know what it was.

2          And they certainly never told Mr. Mize, who was sort

3 of in middle of the weather pattern pizza chart we looked at

4 earlier, David Mize was sort of in the middle there, they

5 didn't tell David Mize, hey, why don't you look into the TCPA,

6 file TCPA claims?

7          It came from the other direction.

8          David Mize testified exactly the same way.

9          And also, conversely, despite what the plaintiffs

10 insist must be true somehow, GST didn't have a purpose of

11 defrauding Navient.  The only testimony was that the GST

12 defendants didn't even know who Navient was until much later.

13         Greg Trimarche, his testimony was that they never

14 counseled borrowers to stop making payments, which even as you

15 just heard from Mr. Calhoun is crucial to their theory, they

16 never did that.  In fact, he said they had no contact, no

17 communications with borrowers at all.  None.

18         That was the testimony that you're bound by because

19 there's nothing to the contrary.

20         Second characteristic is that the members of the

21 group have some relation to one another.  This is especially

22 stark.  Mr. Calhoun knew I was going to go here, and, frankly,

23 I think by the end of last week, most of you knew what my

24 questions were going to be for many of the fact witnesses as

25 they each took the stand.

1293

1      The undisputed testimony was that the GST defendants

2  had no relationship with the Lohman defendants.  In fact, even

3  on the pie chart, I think it shows that there's no, there's no

4  relationship.

5      Let's go through it briefly for the last time.  Rick

6  Graff testified he never spoke with Jeff Lohman, he never spoke

7  with Jeff Lohman, he never communicated with him by e-mail or

8  otherwise.

9      Rick Graff testified he never communicated with any

10  other attorney in Mr. Lohman's firm.  He never asked or

11  directed any attorney in Mr. Lohman's firm to do anything.

12  They never asked him to do anything.

13      Greg Trimarche testified he's never met Mr. Lohman.

14  He's never spoken to Mr. Lohman.  He's never e-mailed or

15  otherwise communicated with Mr. Lohman.

16      Greg Trimarche testified GST never entered into a

17  factoring agreement with the Lohman defendants.  This is

18  undisputed.  They never entered into any contract with Lohman

19  defendants.  They had no business arrangements with Lohman

20  defendants whatsoever.  This is undisputed testimony.

21      Greg Trimarche testified that GST never directed any

22  of the student debtors to sign an independent engagement

23  agreement with the Lohman defendants.  They never shared,

24  meaning GST, Mr. Trimarche, Mr. Graff, never shared any revenue

25  or money with the Lohman defendants, and the Lohman defendants

1294

1    never shared any revenue or money with my clients.  Again,

2    undisputed.

3            In fact, you heard from the other side of that

4    equation, Mr. Lohman and you'll recall earlier in the case we

5    had Mr. Branch here, the younger attorney, Jeremy Branch, they

6    both testified they have no recollection whatsoever of any

7    phone calls, e-mails, any communications with my clients.

8    Didn't happen.

9            Navient has offered no testimony in the course of all

10   of last week to contradict anything I just told you.  And you

11   can refer once again to Jury Instruction 14.  That tells you

12   Navient is bound by the adverse witness testimony that they

13   elicited.  So respectfully, there is no enterprise.  The very

14   first element of Count II fails.

15           Jury Instruction 23, this is the definition of

16   "association."  Again, I'm only going to read part of it

17   because it's a longer instruction.  "A person cannot be

18   associated with, or employed by, an enterprise, if he or she

19   does not know of the enterprise's existence or the nature of

20   its activities.  Thus, in order to prove this element, the

21   plaintiff must prove by a preponderance of the evidence" --

22   sound familiar? -- "that the defendant in question was

23   connected to the enterprise in some meaningful way and that the

24   defendant knew of the existence of the enterprise and of the

25   general nature of its activities," and it goes on and on.

1295

1    We've already discussed the evidence that there is no

2  common purpose, that there is no enterprise, and there's no

3  relationship among these defendants.  But that same evidence

4  shows even if there was some sort of enterprise, which we

5  contend did not exist, the GST defendants wouldn't and didn't

6  know about it.

7    And you heard more testimony that demonstrates this

8  lack of knowledge.  David Mize.  David Mize was called by

9  Navient.  He testified over two days.  You recall he testified

10 by video later on Monday, and he testified on Tuesday morning.

11   He testified that GST arranged to have student

12 debtors or potential clients referred to him to see if he could

13 assist them, and otherwise, his contact with GST was largely

14 limited to arranging for refunds for any students who decided

15 at some point they didn't want to move forward with their

16 representation.

17   He testified that my clients were not providing legal

18 services to student debtors.  He testified GST once again never

19 suggested to him to file TCPA cases.  It came in the opposite

20 direction.  He testified GST is not a law firm.

21   He testified that my clients didn't tell him how to

22 practice law.  He's a lawyer.  He decides what he does with his

23 law practice.  My clients aren't going to tell him how to

24 practice law.

25   And he testified that when a matter was settled for a

1    student debtor client, which happened regularly, nothing was

2    even communicated to GST.  A total disconnect.

3          So again, there was no enterprise.  If there was, my

4    clients didn't know about it.

5          Jury Instruction 24, I'm not going to quote from it

6    other than to say that this involves defining how a person has

7    to either conduct or participate in this alleged affair of the

8    enterprise.  Again, I risk being repetitive at this point, so

9    let me just address kind of head on the notions of conduct and

10   participation.

11         What was GST's conduct?  You heard Greg Trimarche

12   testify that they entered, you know, into agreements with debt

13   relief attorneys.  There's nothing unlawful about that.  You

14   heard him testify that they entered into marketing agreements

15   with marketing affiliates.  There's nothing unlawful about

16   that.

17         And you heard that even though they entered into

18   factoring agreements with the debt relief attorneys, which is

19   not Lohman, remember, there was no agreement with Lohman

20   attorneys, the debt relief attorneys, that even though they

21   entered into factoring agreements, they were functionally

22   serving as the outsource accounting or financial services group

23   for the debt relief attorneys.

24         That was the only testimony that was offered about

25   what their actual role was, and there's nothing to contradict

1   it.

2          You heard from the two marketing witnesses that -- I

3   think Mr. Calhoun referenced them briefly.  You heard from them

4   as well as the GST defendants, the affiliates were largely

5   marketing for their own business.  They were marketing for

6   federal student loan borrowers.

7          And you might remember there was some testimony about

8   the distinction between federal loan borrowers versus private

9   student debtors.  Many of these companies had existed for

10  years.  They did their own business.

11         The point is that they do their own advertising and

12  their own marketing for their own business, and there's little

13  evidence that they were doing a lot of separate marketing for

14  this separate offshoot.

15         And I know it's spoken of sort of in a derogatory

16  fashion by Navient's counsel, but, you know, the concept of

17  ancillary catch, I mean, that was, that was the business idea.

18  Who are students who call into this number involving, you know,

19  helping them with federal student loans, who they said, oh, I

20  actually don't, I have a private loan.

21         And they're, but we can't help you.  And that used to

22  be the end of it.

23         And the basic business concept here was, well, wait a

24  minute.  Maybe we can refer to attorneys who can try to help

25  you with that, and, you know, you're students, you're in your

1298

1   twenties or in your thirties, you can't afford to pay a huge

2   retainer, but we can do some system where you can pay small

3   monthly payments and see if an attorney can help you or not.

4            That's it.  That's the whole concept.  There's

5   nothing unlawful about that.

6            Rick Graff, returning to the marketers, Rick Graff

7   testified that GST didn't have any right or ability to control

8   any of the affiliates, okay, their business operations.  He

9   testified that GST didn't have the ability to approve, reject,

10  or control any of the marketing or advertising efforts.  He

11  testified he never wrote a script and he wasn't involved in

12  developing a script.  No one -- there's no testimony to the

13  contrary.

14           Greg Trimarche testified that the GST defendants,

15  again, they didn't prepare any scripts, they didn't approve any

16  scripts, and he testified that they didn't prepare, write,

17  distribute, or approve any deceptive marketing materials.

18           He also testified, like Rick, that they had no

19  control over any of their internal activities over at the

20  affiliates, and there's a lot of testimony about this, but Greg

21  testified the debt relief attorneys, they drafted their own

22  attorney-client agreements ultimately and their own FAQs, and

23  that's what was provided to the affiliates, the marketers as to

24  how they're supposed to, you know, advertise if they're going

25  to do any separate advertising for what this sort of side

1299

1    project was.

2           All of that came from the debt relief attorneys.

3    It's not coming from GST.  GST didn't draft it.

4           I feel I need to go just a little deeper into this

5    just because of some of the comments from Navient.  Let's

6    return briefly to this purpose of -- notion of purpose.  The

7    consistent and repeated testimony from Greg Trimarche was that

8    when GST was asked about marketing, and you probably will see a

9    list of e-mails about that, what GST always said was, refer to

10   what the attorney said.  Whatever the attorneys say, you can do

11   that, okay?

12          Don't do your own thing.  If you're going to do any

13   advertising, it's got to be whatever the attorneys say is part

14   of the program and what's not part of the program, and that's

15   it.

16          He specifically testified, and I hope you remember

17   this, that he was aware that there were bad actors in the debt

18   relief industry, and we wanted to distinguish ourselves from

19   them, okay?  That's why there was always deference to the

20   language of the debt relief attorneys.  That's why there were

21   so many discussions about compliance calls.  That's why there

22   was concern about any affiliates deviating, which is the word

23   you've heard consistently in this trial, deviating from what

24   could be accurately represented about the program.

25          If the purpose was to defraud, why was so much time

1300

1    and effort spent trying to do it correct, trying to do it

2    properly?  It doesn't make any sense.

3           And if you read through the e-mails again where GST

4    is even copied or responding, because they're frequently not in

5    these e-mails, that was the recurring topic.

6           I'm trying to shorten this a little bit.  Let me just

7    kind of wrap this part up by saying, you know, ask yourself how

8    could it benefit anyone to mislead the student borrower in an

9    intake if they're just going to be going right back out the

10   next day or the next week on a cancellation?  It doesn't make

11   any sense.  From a business perspective, it doesn't make --

12   there's no purpose to it.

13          There is one exhibit -- I am going to ask you to

14   write this down -- that I want you to look at because they keep

15   referring to testimony, you know, testimony under oath of the

16   witnesses obviously is crucial evidence in a case, but you can

17   look at documents, too, and I want you to look at Navient's

18   Exhibit 762.  It looks like this.

19          You're probably going to have a couple hundred

20   exhibits to flip through, but this is what it looks like.  It's

21   762.

22          These are written answers under oath by GST, with

23   information provided by both Greg Trimarche and Rick Graff, and

24   I want you to look at page 4, okay?  And again, I'm trying to

25   shorten this for time, but page 4 states many of the items that

1   I just discussed.  It just sets them right out.  GST's

2   inability to control what any of the marketers were actually

3   writing or doing, it's throughout there, and I'm going to

4   quote:  "GST's only interactions with the affiliates in these

5   areas were routine, general communications whereby GST sought

6   to confirm that the affiliate was not misstating or

7   misrepresenting the services being offered by any of the

8   attorneys with whom GST did business."

9           That is the evidence that you have before you.

10  What's Navient's evidence?  A couple of mailers.  Mailers that

11  don't mention GST, don't mention David Mize, don't mention

12  other debt relief attorneys.

13          I mean, if you look at just one of the ones -- I

14  think Mr. Calhoun mentioned two or three.  This is Exhibit 23.

15  Where's -- where is there a reference to any of my clients?

16  Where is there a reference to the debt relief attorneys?  Where

17  is there a reference to Mr. Lohman?

18          It's, it's not on here.  It's not, it's not even

19  obvious that this has anything to do with our case.

20          By the way, this mailer, this is 23, this went to a

21  student you never heard from in this trial.  The only student

22  you heard from in this trial was Brad Moore, whose testimony

23  was read from the stand early in the week.  I think it was

24  Tuesday maybe.

25          Brad Moore never mentioned my clients.  He never

1302

1    mentioned GST, Greg Trimarche, or Rick Graff.

2             So again, in summary, my clients did not conduct the

3    affairs of an enterprise.  They didn't manage or control the

4    affairs of an enterprise.  There wasn't one to begin with.

5             Again, I'm trying to move a little bit more quickly.

6    Jury Instruction 27 is the elements of mail fraud.  I'm just

7    going to go through the first -- well, I'll read you the three

8    elements briefly:  "First, defendants willfully and knowingly

9    participated in a scheme to defraud plaintiff; second,

10   defendants did so with an intent to defraud; and third,

11   defendants either mailed something or caused it to be mailed in

12   furtherance of their scheme."

13            Once again, as I just went over the evidence

14   repeatedly, the overwhelming evidence is that there is no

15   scheme.  There was no intent of my clients to defraud anybody.

16   My clients didn't cause anything fraudulent to be mailed.

17            Same with Jury Instruction 29.  This is elements of

18   wire fraud:  "First, defendants willfully and knowingly

19   participated in a scheme to defraud plaintiff; and second,

20   defendants did so with an intent to defraud."  I'm sure this

21   will sound familiar.  Again, overwhelming evidence that this

22   didn't occur.

23            Move forward a little bit.  Very first sentence of

24   Jury Instruction 31, which is intent to defraud:  "In order to

25   establish fraudulent intent on the part of a defendant,

1303

1    plaintiff must prove that the particular defendant knowingly

2    and intentionally attempted to deceive the plaintiff."

3         That's the exact first sentence.  The plaintiff is

4    Navient.  You heard uncontradicted testimony that GST didn't

5    even know who Navient was, okay, when they were organizing the

6    business, when they were running the business, and there was no

7    testimony by any witness in this trial who spoke to the intent

8    of my clients, that they were trying to deceive anyone.  You

9    didn't hear a single witness talk about that.

10        This runs into Jury Instruction 33, which is false

11   statements.  The very last sentence of the instruction reads:

12   "In other words, plaintiff must prove by a preponderance of the

13   evidence that a defendant or defendants specifically intended

14   to deprive plaintiff of something of value through

15   misrepresentation or similar dishonest conduct, which indeed

16   did cause plaintiff harm."

17        Not only is there no evidence of this that was

18   introduced; Troy Standish, who testified on behalf of Navient,

19   he testified under oath Navient had no communications with my

20   clients.  No false statement could ever have been made by my

21   clients to Navient under their evidence.  No Navient witness

22   testified that there was ever such a communication.

23        Just three instructions left.  I do want to address

24   something that just came up in counsel's closing with respect

25   to the students.  Near the end of his comments, he said:  Think

1304

1   about the students.

2          I want to be completely clear on the evidence in this

3   case.  The student debtors are not victims here.  You heard no

4   testimony from any student debtor who said that they were

5   victimized.

6          And the GST defendants, the affiliates, and David

7   Mize all testified without contradiction that any student who

8   asked for a refund got a refund, every one.  There's no

9   evidence that the students lost money because of anything that

10  my clients did.

11         I'm trying to wrap this up, Your Honor.

12         There's three instructions left that I want to

13  briefly discuss.  Jury Instruction 38, which is the elements of

14  the conspiracy statute, again, I'll be as quick as I can.  I'm

15  only going to read -- there's four elements.  You can read them

16  for yourself.  I won't read them to you, but I do want to

17  discuss the evidence that would apply to it.

18         The only testimony was that the GST defendants had no

19  agreement with anybody else to bring TCPA cases.  GST didn't

20  know what the TCPA statute was.  GST was not a law firm.  They

21  had no ability to control other law firms.  None of the debt

22  relief attorneys ever brought a single TCPA claim, okay?  So

23  when you look at the chart, the attorneys that my clients had a

24  relationship with, they didn't bring TCPA claims.

25         My clients, once again, had no communication with the

1305

1    Lohman defendants, and in their own professional judgment, the

2    Lohman defendants filed TCPA cases which in their professional

3    judgment they thought were valid, and they won cases, and most

4    of the cases were settled.

5            Jury Instruction No. 39, which goes to the RICO

6    conspiracy agreement, I'm going to read you the opening

7    sentence and then one in the middle because I don't want you to

8    miss it:  "To hold a particular defendant liable for conspiracy

9    to violate the RICO statute, plaintiff must prove by a

10   preponderance of the evidence that the particular defendant

11   knowingly reached an agreement or understanding with at least

12   one other person to participate, directly or indirectly, in the

13   affairs of an enterprise through a pattern of racketeering

14   activity."

15           Again, these are a mouthful, and these are difficult

16   concepts to digest, but I don't want you to lose sight of the

17   last sentence of the second paragraph, which states:  "A person

18   who has no knowledge of a conspiracy but who happens to act in

19   a way which advances some purpose of one does not thereby

20   become a member."  That's part of the instructions you're going

21   to hear in this case.

22           The last - very last instruction that I want to

23   discuss with you is Instruction No. 46.  This is the elements

24   of tortious interference with contract.  And I want you -- I'm

25   going to -- I'm going to read the opening paragraph in its

1306

1    entirety because I want you to understand the idea, the notion

2    that is attempted to be proved here:

3            "In Count 5 of its complaint, the plaintiff claims

4    that the defendants engaged in tortious interference with

5    contract or business expectancy by inducing student loan

6    holders -- including ones who were not behind on their

7    payments -- to stop making payments on their promissory notes,

8    go into default, and to trigger telephone calls from plaintiff

9    that arguably violated a law against automatic calls."  So

10   that, that long description is everything they're trying to

11   prove in this count.

12           Four elements of tortious interference:  the

13   existence of a valid contractual relationship; knowledge of the

14   relationship on the part of, in my case, my clients;

15   intentionally inducing or causing a breach or termination of

16   the relationship; and fourth, the breach caused damage.

17           So those are the four elements, and I'll discuss them

18   briefly, and we can move on.  First, as you heard, Navient did

19   not directly own any of these loans.  Navient was a servicer of

20   the loans, and you should consider that when deciding if it's

21   possible to ever meet this element.

22           You will be hearing a stipulated fact that Your Honor

23   will read and I'm going to read myself verbatim:  "Privately

24   owned loans serviced by Navient Solutions, LLC, whether or not

25   those loans are guaranteed by the federal government, are owned

1  by various trusts or other entities for which NSL is the

2  servicer and authorized agent."

3          That's evidence that you're going to be able to

4  consider when you discuss these concepts, and that's important

5  because the second of the four elements is knowledge of the

6  relationship on the part of the interferer, which allegedly is

7  my clients.

8          As I've told you probably three times this morning,

9  my clients didn't know that Navient existed.  Certainly there

10 is no evidence -- if it's Navient's position now that Navient

11 actually owns some derivative, indirect, complex interest in

12 loans owned by various trusts, there's no evidence that my

13 clients would or did know about it.  It's completely

14 improbable, and you heard no evidence about that.

15         Where is the evidence that my clients knew years ago

16 about this relationship that you heard testified about in trial

17 about some complex, you know, future derivative interest?

18 There's no, there's no way my clients ever could have known

19 about that, and there's no evidence you heard that they did.

20 So that element is destroyed.  And again, any one of the

21 elements goes out, the whole claim goes out.

22         Third, intentionally inducing or causing the breach.

23 As I pointed out many times, my clients never communicated

24 directly with student borrowers.  They never counseled

25 borrowers to stop paying their loans.

1308

1      The only evidence was that that didn't happen.  You

2  heard that testimony under oath.  It's uncontradicted.  Under

3  Jury Instruction 14, that's what you have to accept.

4      And as we discussed many times already, my clients

5  didn't know what the TCPA was.  They didn't file any cases.

6  They didn't ask anyone to file TCPA cases.  This is all

7  uncontradicted.  So again, where is the intentional disruption

8  of this contractual relationship?  It doesn't exist.

9      And the fourth element is damages.  You know,

10  respectfully, there's no even remote evidence that my clients

11  in any way harmed Navient.  It's a company they didn't know,

12  with a method they didn't know about and they didn't employ.

13      So this case is about evidence.  It's not about

14  missing puzzle pieces.  It's not about inferences upon

15  inferences upon inferences.  It's about evidence.

16      What testimony did you hear under oath?  And I want

17  you to think about that carefully.

18      And before you leave, Exhibit 762 which I mentioned,

19  I told you to read page 4.  Do me a favor and take a look at

20  page 5 and 6 also.  It addresses some of these other counts

21  that we've been discussing.  And that's in addition and

22  augmenting all of your recollection as to what the witnesses

23  testified to.

24      And again, I am thankful and respectful of your time.

25  Once again, this is your verdict form.  You're going to see one

1309

1   as to GST; one as to my client Mr. Greg Trimarche; one as to

2   Rick Graff.  I'm going to ask that you check "No" as to

3   Question 1, that's their substantive RICO count; "No" as to

4   Question 2, this is the conspiracy that doesn't exist, 2; and

5   on the second page, No. 4, this is the tortious interference

6   count that we just discussed, which I respectfully submit

7   cannot possibly exist, and I'm going to ask you to check "No."

8           And I again am very thankful of your time.  This is a

9   complex and complicated topic, and we all thank you very much.

10          THE COURT:  All right.  I think at this point, it

11  will make sense to take a ten-minute break, and we will finish

12  the closing arguments.  We'll take ten minutes.

13              (Recess from 11:11 a.m., until 11:24 a.m.)

14                          (Jury present.)

15          THE COURT:  All right, Mr. Grell, on behalf of the

16  Lohman defendants?

17          MR. GRELL:  Thank you, Your Honor.

18                      CLOSING ARGUMENT

19                      BY MR. GRELL:

20          Once again, thank you, ladies and gentlemen.  Again,

21  it's -- we're really grateful for your time and your patience

22  and attention, and I'm happy to tell you we're almost done, but

23  not quite yet.  As everybody else has indicated, we've still

24  got to fill out this verdict form.

25          And, Tom, if you want to put that up?

1310

1        So what do you do with this, this verdict form?  What

2   you do with it is you answer no to each and every question it

3   asks.  Based on the evidence presented in this trial, Jeffrey

4   Lohman and the Law Offices of Jeffrey Lohman are not liable for

5   anything.  If you agree, then like I said, answer all the

6   questions no.  No, no, no, no, no.  Especially those that

7   relate to Jeffrey Lohman or the Law Offices of Jeffrey Lohman.

8        And then when it comes to the damages questions,

9   you'll see blanks in there that I think have dollar signs next

10  to them.  Just leave them blank.  Just leave them blank.

11       I also want to clarify that for the rest of the day,

12  when I refer to Lohman, I'm referring to both Jeffrey Lohman

13  the individual and his law firm, the Law Offices of Jeffrey

14  Lohman.  Now that Mr. Branch is out of the case, that's just

15  simpler and easier.

16       So believe it or not, I'm going to end up talking

17  about a couple of guys, these two guys, William Shakespeare and

18  John Wayne.  How do they relate to this case?  Well, they do.

19       I'm going to try to -- there's a lot of abstract,

20  sort of lofty principles that get discussed, and reality is

21  lost in a place like this.  It's almost outside of time and

22  space when we're here.  These two guys will bring us back to

23  reality, but I can't go to them yet.

24       I first have to review all of these exhaustive

25  instructions, and that's a very technical discussion.  You've

1311

1    been taking notes this morning, I see, already.  I want to

2    encourage you to do that.  We're going to cover a lot of

3    ground.  I want to make things very, very clear in the context

4    of the applicable law.  The law matters.

5            And you notice Mr. Calhoun didn't show you one jury

6    instruction, nothing he showed you, and he accused us of

7    muddying the water, of trying to somehow mislead you -- not

8    mislead you but argue a perspective that was muddied and

9    unreasonable.

10           I'm going to go through every instruction that I

11   think matters, and I want you to understand how we view the law

12   because that's what matters.  Once you understand the law,

13   you'll understand how fundamentally flawed Navient's case is.

14           And when you go back to the jury room -- and I know,

15   like Mr. Charnoff was going through lots of numbers, I'm going

16   to go through lots of numbers.  The judge is going to read

17   these instructions, and you're going to get a stack of papers,

18   and you'll be able to take them back to the jury room, and

19   you'll be able to look at them, so that's why it's important to

20   note which ones that we're talking about so you can refer to

21   them later.

22           So Instruction 18, burden of proof, I'm going to

23   start out where Mr. Charnoff started out, that's the first

24   fundamental flaw of this case.  Navient did not bear its burden

25   of proof.

1       After we spent the first four days listening to the

2   evidence presented by Navient, you were probably surprised when

3   Jeffrey Lohman took the stand for about 45 minutes and then we

4   rested.  Well, remember in my opening when I said Lohman has

5   nothing to hide.  He also has nothing to prove.

6       Navient bears the burden of proof.  Navient was given

7   every opportunity to prove its claims, and it utterly, utterly

8   failed.  As I said in my opening, Lohman did nothing wrong.

9   Nothing in those endless, monotonous deposition transcripts

10  prove that he did.  He didn't do anything wrong.

11      He doesn't even -- I can't even talk about the GST

12  group because my client doesn't even know them.  So I'm going

13  to say a little bit on enterprise, but that's it.  I have

14  nothing further to say.  I barely paid attention because my

15  client doesn't know these people.  We don't know their

16  business.  We don't know what they do.

17      There's nothing to prove that my client did anything

18  wrong in this case.  Now, Mr. Lohman did not choose to be here,

19  and given Navient's failure to bear its burden, he wasn't going

20  to subpoena a bunch of people, drag them across the country,

21  and put them through this charade.  Enough is enough.

22      So that's why -- now, I'm going to go step by step, a

23  lot like Mr. Charnoff did, but we're going to put the

24  instructions up on the screen so that you can follow them,

25  hopefully.

1313

1        Again, as Mr. Charnoff said, to prevail on Count II,

2   the RICO claim under Section 1962(c), Navient must prove an

3   enterprise.  Instruction No. 22 tells us what an enterprise is.

4   Nothing in Instruction 22 says that a crazy chart proves an

5   enterprise.  In fact, the instruction says nothing, nothing

6   about charts.  And the instruction certainly doesn't say that

7   an enterprise is proven or not proven by whoever uses

8   PowerPoints in the most creative way.

9        Here's Mr. Calhoun's chart.  He says it looks like a

10  rim and a wheel.  Then he says his enterprise is actually a

11  pipeline.  It does not look like a pipeline or a rim or a wheel

12  to me.  It looks like a piece of pizza.

13       What does that prove?  I've got a chart.  Put my

14  chart up there, Tom.

15       Here's, here's my chart.  There's my chart.

16       These charts mean nothing.  I mean, you can look at

17  it if you want.  You can make a chart about anything.  All

18  these charts prove is that Mr. Calhoun and me are creative, but

19  we're not competitors in a junior high art fair.

20       This trial requires evidence.  Nothing I say, nothing

21  Mr. Calhoun says is evidence, and likewise, our art projects

22  aren't evidence either.

23       What does Instruction 22 say about the evidence

24  required to prove an enterprise?  Now, everybody's gone through

25  these three elements already:  common purposes, relatedness,

1314

1    and longevity.  I'm just going to focus on one because

2    Mr. Calhoun proved that very well.

3             Navient has absolutely failed to prove that first

4    element, common purpose.  At most, Navient proved that Mize,

5    Slaughter, Johanson, the marketing affiliates, and GST shared

6    the common purpose of charging students for debt negotiation.

7    At most, Mize, Slaughter, Johanson, and Lohman shared the

8    common purpose of bringing TCPA claims, but there is no common

9    purpose among all members of this enterprise, there's not one

10   purpose that binds Mize, Slaughter, Johanson, the marketing

11   affiliates, GST, and Lohman together.  They didn't even share

12   revenue.

13            I mean, when you think of a normal, like, criminal

14   case, somebody robs a victim of their wallet and takes their

15   money and then goes up to their buddy and says, here, take some

16   of the money I just stole from that victim, and then the guy

17   takes it.

18            This didn't happen here.  They were doing their own

19   businesses, doing their own objectives, pursuing their own

20   agendas.  There's simply no common purpose.  GST and Lohman had

21   different impacts, different objectives, different methods of

22   commission, different results.

23            The Freda e-mail that refers to the enterprise?  Look

24   at that.  I invite you to look at that.  My clients are nowhere

25   on that e-mail.  My clients have nothing to do with that

1315

1    e-mail.  It has nothing -- I don't know where it fits into this

2    enterprise, this piece of pizza that Mr. Calhoun -- it applies

3    to a few of them but not the enterprise.  They need to prove

4    the common purpose of the enterprise.

5            And if you talk about a pipeline, if that's a common

6    purpose, then what is a -- then we're all members of this

7    enterprise.  The U.S. Postal Service, various banks, Verizon,

8    the guys who keep the streets clean, I mean, everybody is in

9    this pipeline apparently.  It's ridiculous.  If you interpret

10   common purpose that broadly, the element becomes meaningless.

11           So I'm not even going to talk much about GTS (sic)

12   after this because I have nothing more to say really.  It will

13   probably come up a few times.

14           Navient also bears the burden to prove that Lohman

15   willfully and knowingly participated in a scheme in violation

16   of the mail and wire fraud statutes.  Navient didn't come close

17   to proving this burden.

18           "Willfully" means with specific intent to do

19   something the law forbids.  Navient's entire wire fraud case is

20   based on the students' revocation calls, but Mr. Standish sat

21   right there and acknowledged under the TCPA, a student has the

22   right to revoke consent at any time for any reason.

23           Revoking consent to read robocalls is allowed by the

24   law, not forbidden by the law.  Navient failed to prove that

25   Lohman engaged in any wire fraud.

1316

1    And as far as mail fraud goes, we've got this one

2    mailer that's barely legible.  One was thrown out because it

3    was so illegible.  Lohman had nothing to do with that mailer.

4    Navient requested during discovery in one of the

5    underlying TCPA cases, the client gave the mailer to Lohman,

6    and then Lohman gave it to Navient because they asked for it.

7    That's his connection with it.

8    And again, Lohman was obligated to provide Navient

9    with the discovery it requested.  It's ridiculous to argue that

10   an attorney violates the law when he provides a document that

11   the opposing party requested in discovery.

12   Here's another fundamental flaw:  Navient's effort to

13   prove fraudulent intent.  How could Lohman intend to do

14   something that the law forbids when he won so many TCPA cases?

15   If you're winning cases, if arbitrators are agreeing with your

16   interpretation of the law and how the facts apply to that law,

17   then how can you possibly think you're doing something the law

18   forbids?

19   Navient was always aware of this claim that the TCPA

20   cases were fraudulently manufactured.  It argued this defense,

21   this unclean hands defense to arbitrator after arbitrator after

22   arbitrator from 2017 throughout the period in question.  Not a

23   single arbitrator agreed with Navient's position.  In fact,

24   *Ibarra*, we saw that decision, that defense was expressly

25   rejected in *Ibarra*.

1317

1       In the cases that Lohman lost, they were lost on

2  other grounds, like the student didn't revoke consent.  They

3  were not lost on the basis of any unclean hands.

4       Branch, Lohman, Muhtaseb all testified that they

5  never intended to defraud Navient.  They intended to enforce

6  their clients' rights under the TCPA.  Enforcing TCPA rights is

7  not something the law forbids.  Navient would like it to be,

8  but it's not.

9       Enforcing the TCPA is exactly what the law

10  anticipates that lawyers like Jeff Lohman will do.  It's

11  undisputed, students have the right to revoke consent under the

12  TCPA.  Once Navient informs students that a revocation may be

13  recorded, there's no evidence that it's illegal for the

14  students to also record the call.

15      There's nothing unlawful about keeping track of cell

16  phone calls.  There's nothing unlawful about answering your

17  cell phone or not answering your cell phone.  There's no

18  evidence that the TCPA requires students to call back or pick

19  up any phone call.  There's no -- nothing that says you have to

20  be sad when you get robocalls and you can only bring a TCPA if

21  you're sad.  There's no evidence that the TCPA requires

22  students to bring calls -- or lawsuits after one call or a

23  thousand calls.  It's up to the student.

24      And, of course, all of this depends on robocalls.

25  None of this happens if robocalls aren't placed.  Navient bears

1318

1    the burden to prove fraudulent intent, and none of these

2    actions prove fraudulent intent.  Lohman does not bear the

3    burden to prove his innocent intent, but the far greater weight

4    of the evidence in this case supports the conclusion that

5    Lohman's intent was, was innocence.

6              He's just a lawyer zealously advocating and advancing

7    his clients' rights under the TCPA.  Navient doesn't like it,

8    but that's what he was doing.  That's all he intended, and that

9    intent should be celebrated and not condemned.

10             And this isn't -- this RICO claim, it seems to be

11   based on an intentional breach or a default of contracts.  What

12   were Navient's settlement agreements?  Go back and look at

13   them, Exhibits 2129 to 2182, Exhibit 2218.  You decide whether

14   those settlement agreements were intentionally breached when

15   Navient brought this suit.

16             I mean, they accuse us of bringing lawsuits based on

17   intentional breaches?  That's the pot calling the kettle black.

18   We shouldn't be here.  They intentionally breached every one of

19   their settlement agreements.

20             Finally, Lohman did not file unauthorized TCPA

21   claims.  Look at the Lohman engagement agreement, Exhibit 2030.

22   When clients sign that agreement, the Lohman firm is authorized

23   to represent them in matters relating to the TCPA.  Clients

24   agree that Lohman could handle the matter and litigate the

25   cases.  No results were guaranteed.

1319

1     Lohman's testimony that every client signed an

2  engagement letter is unrefuted, but more important, no one has

3  ever accused Lohman of anything fraudulent or unethical.  And

4  even if there were no engagement agreements, which there are,

5  every client ratified Lohman's representation by then signing

6  the settlement agreements when everything was done, and that's

7  Instruction 35, ratification.

8     When the clients signed the settlement agreements

9  with Navient and kept the benefits of those settlement

10  agreements, the clients ratified their contracts with Lohman,

11  and then those contracts became obligatory from their

12  inception, meaning they were binding from the beginning of time

13  forward.

14     Navient's fraudulent intent claim is also undermined

15  by common sense.  Navient -- Lohman wasn't manufacturing TCPA

16  claims.  What did Lohman say?  I think he said like 5 percent

17  of the people that are referred to him end up actually filing

18  TCPA lawsuits.  That doesn't evidence manufacturing.

19     A manufacturing process results in the intended

20  product 100 percent of the time.  If you bring raw materials in

21  the front door of a car factory, a car comes out the back of

22  the factory 100 percent of the time.  It's not like one out of

23  every ten cars is a bicycle or seven out of every ten cars just

24  disappears and vanishes into thin air as it sits on the

25  assembly line.  A manufacturing process works 100 percent of

1    the time, not 5 percent of the time.

2            Do you know why TCPA claims resulted from only 5

3    percent of the cases?  Lohman said it's because other creditors

4    abided by the revocation of consent and quit calling.

5    Robocalls are the critical raw material required to build a

6    TCPA claim.  Navient and Navient alone provided that essential

7    raw material.  Without robocalls, the potential TCPA claim

8    simply doesn't exist.  It disappears.

9            Robocalls did not result from a manufacturing

10   process.  They were the result of potential TCPA compliance

11   failure because the law was unsettled back then.  They had

12   their side, we had our side, but they ran that risk of being

13   called into noncompliance, and they're responsible for that

14   decision.

15           Instruction No. 33, false statements, Navient's claim

16   is also fundamentally flawed because it hasn't proven a

17   misrepresentation or similar dishonest conduct.  That's

18   required by the instruction.

19           Not one witness testified that Lohman lied to

20   Navient.  Only two Navient employees testified:  Mr. Reinhart,

21   who just talked about a bunch of numbers and stuff; and

22   Mr. Standish, who admitted that he never talked to Lohman, was

23   never engaged in settlement discussions with Lohman, never

24   litigated against Lohman.  Mr. Standish did not cite a single

25   document or any other evidence to support his claim.

1321

1    Mr. Standish's claim is based only on the hearsay statements of

2    his in-house and outside counsel.

3              So why aren't those lawyers here?  Why?  He says

4    we're hiding things?  Why are they -- why did they not bring

5    their own lawyers into this courtroom to testify and tell you,

6    to explain how is Lohman dishonest to them, to explain the

7    misrepresentations that Lohman made to them?

8              It's safe to infer that Mr. Lueck and the other

9    lawyers didn't testify because their testimony would not have

10   supported Navient's case.  How else can you interpret that?

11             What did Mr. Lueck do?  According to Mr. Standish,

12   Mr. Lueck and Navient's in-house counsel advised him that it

13   was cheaper to settle the TCPA claims than to fight them.

14             Navient did not offer the testimony of a single

15   employee or attorney who was purportedly lied to by Navient.

16   This claim that Lohman lied to Navient is supported only by

17   Mr. Calhoun's repeated catch phrases and his commentary during

18   questioning.  None of Mr. Calhoun's questions or comments are

19   evidence, and I can't say that loudly enough.

20             Take a really close look at Instruction No. 34,

21   litigation activities.  It says that litigation activity does

22   not constitute mail and wire fraud unless it is corrupt

23   litigation activity, like bribing a witness or a party.

24   Bribing a witness or a party to prove mail and wire fraud in

25   this case, they have to prove corruption, that Jeff Lohman

1322

1    engaged in corruption at that level.

2            Where is that evidence?  That evidence does not

3    exist.  There's nothing here that comes close to bribery.

4    Lohman was a lawyer being a lawyer, and he didn't engage in

5    mail and wire fraud by simply acting like a lawyer.

6            Okay.  Done with Count II, moving to Count III.  It's

7    also fundamentally flawed.  The most important thing here is

8    that Navient failed to prove a violation of 1962(c) under Count

9    II.

10           So Count III is conspiracy.  To have a conspiracy

11   charge, you have to conspire to do something, and in this case,

12   it's to conspire to violate 1962(c).  Since they failed to

13   prove the 1962(c) claim, 1962(d), the conspiracy claim, also

14   fails.  So it's no, no, no, no, no, no, no, all the way down

15   that verdict form.

16           Okay.  Even if they had proved a 1962(c) claim, which

17   they were far from doing, there's no dispute that Lohman had no

18   knowledge of GST or the marketing defendants, and vice versa,

19   GST and the marketing defendants had no knowledge of Lohman.

20           Again, Mr. Charnoff covered this thoroughly, and I

21   don't think I need to re-cover that ground.  All of those

22   arguments apply equally to us.  Nobody knew anybody in this

23   supposed -- I mean, Mize is, like, the only common person, but

24   this isn't a conspiracy with Mize.  This is this giant piece of

25   pepperoni pizza that they're talking about.

1323

1    You can't tie all of those people together, and they

2    certainly did not do that with the evidence.  For all those

3    reasons, no on the verdict form Counts III and II.

4    Causation is also a big issue here, so even if they

5    had proven the substantive liability under Counts II and III,

6    they have to prove that that RICO violation damaged Navient,

7    and to that extent, they must prove that the acts of mail and

8    wire fraud damaged Navient.  It is not possible for anyone to

9    violate RICO by merely breaching ethical rules of their

10   profession or committing professional negligence.

11   And again, what evidence did Navient not present to

12   you?  They presented a lot of what I consider pointless

13   depositions.  Navient did not present the single -- a single

14   lawyer, expert or otherwise, who opined on whether Lohman

15   violated the rules of ethics or committed negligence.

16   Again, while he's questioning witnesses, Mr. Calhoun

17   intimates that such things occurred, but where is the proof?

18   If there was no breach of ethics or negligence by Lohman, there

19   certainly is no fraud, especially fraud like bribery.  So

20   whatever these other lawyers did, whatever disciplinary

21   problems they had, that's not Lohman's issue, but he intimates

22   that somehow Lohman is responsible for what they were doing.

23   There's no evidence of that, none.

24   Moreover, injuries that Navient inflicted on itself

25   are not caused by reason of defendants' actions, let alone any

1324

1    acts of mail and wire fraud.  All of the injuries in this case

2    were self-inflicted by Navient.  If Navient had simply complied

3    with the students' revocation of consent and not robocalled

4    students, there would have been no basis for a TCPA claim.  No

5    calls, no possible TCPA claim.  It's that simple.  It's not

6    rocket science.

7           Navient and Navient alone chose how to respond to

8    students who revoked consent and chose not to answer their

9    phone calls.  Navient and Navient alone chose how to respond

10   when a student defaulted.  Lohman is not responsible for

11   Navient's self-inflicted injuries.

12          Navient also caused its own damages by choosing to

13   settle so many claims.  Mr. Standish testified that Navient

14   settled because it was cheaper to settle than to litigate.

15   That was Navient's judgment call, Navient's cost/benefit

16   analysis.

17          Who knows whether that call was right?  Who knows?

18   It's impossible to know.

19          I mean, if Navient had not settled those cases and

20   gone on to fight them, I don't know, maybe -- they won some of

21   the cases.  Maybe they would have won 75 percent, 10 percent.

22   It's impossible to tell now.

23          If they'd litigated and won more cases, maybe Lohman

24   would have quit suing them altogether, slowed if not entirely

25   stopped.  But because Navient chose to settle, Navient's choice

1325

1   forever disables you and me and everyone in the world from

2   determining whether its cost/benefit analysis was accurate,

3   whether it was -- it cost more to litigate the TCPA claims than

4   it did to settle, and now Navient's asking you to award damages

5   for its own decision, its own decision.  It voluntarily paid

6   out those settlements.

7          Again, Mr. Lohman is not liable for injuries that

8   Navient inflicted on itself.

9          Finally the RICO violation must be a proximate cause

10  of plaintiff's, plaintiff's business -- injury to business or

11  property.  Clearly, even if GST defrauded students of money,

12  which it didn't in my opinion, that fraud proximately injured

13  the students, not Navient.

14         Likewise, to the extent loans were forgiven,

15  Mr. Standish and Mr. Reinhart begrudgingly and eventually

16  agreed that Navient did not own the loans.  I had to confront

17  them with that stipulation.  If it owned the loans, some

18  employee would have sat in that chair and said plainly, loudly,

19  and simply Navient owns the loans.  Again, no testimony was

20  presented, none.

21         Navient has the burden to prove that it owns the

22  loans, and it failed to establish that burden.  It's

23  equivocating, you know -- who understood what they were trying

24  to say, the residual waterfall?  I mean, you own your house,

25  you own your house.  You don't own a residual waterfall that

1326

1  amortizes 20-50 years.  Who knows?

2         They had the burden.  That's the point.  They didn't

3  prove that they owned the loans.  In fact, they admitted in the

4  stipulation that they did not own the loans, and Mr. Charnoff

5  already read that stipulation.

6         So any injury related to a student's failure to repay

7  or Navient's forgiveness of the loan was not injury to Navient.

8  The loans are the property of the trust.  Navient is merely the

9  servicer of the loans.  It is not a directly injured party.

10  The "No" blanks should be checked on all RICO questions.

11         So, fraud.  We should be able to move through Count

12  IV pretty quickly.  Fraud requires a false representation.

13  What fraud false representation again was made by Lohman?

14         Not a single Navient witness took the stand and

15  testified as to any communications between Lohman and Navient,

16  fraud or otherwise.  Mr. Standish never talked to Lohman, and

17  they didn't present the testimony of anybody who did.  There's

18  not even correspondence with Navient.

19         But the fatal flaw in this claim is lack of reliance.

20  Navient has failed to prove that it relied on this fictional

21  false statement.

22         Instruction No. 44, reliance.  Reliance is a belief

23  that a representation is true which causes a person to take

24  action he would not otherwise have taken.

25         The first settlement Navient entered with Lohman was

1327

1   in September of 2017.  That's the same month that Navient's

2   arbitration briefs started to assert the unclean hands defense.

3   If you recall, September 7, in the -- September 7, 2017, in the

4   *Moore* brief, that's Exhibit 2089, and September 22, 2017, in

5   the *McClogan* brief, that's Exhibit 2090.

6            Navient's own briefs established that it never

7   believed in the truth of Lohman's TCPA claims.  Lohman believed

8   in their truth, but Navient didn't.  It argued it over and over

9   again.  So Navient never relied on the truth of those claims.

10            And, well, we were forced to defend it.  No.  Your

11   only option is to defend or default.  I mean, there's lots of

12   ways to defend a case.  You can, you can dismiss it.  You can,

13   you can ask a judge to, to grant judgment on the pleadings.

14   Lawyers know how to litigate cases.

15            When he says things like that, he's only saying that

16   because you're not lawyers.  They had many options, many, many

17   alternatives rather than just ignore the case and take a

18   default.  It's -- yeah.  Well, I'll leave it at that.

19            Instruction No. 46, tortious interference, finally

20   Count V, first, there is no evidence that Lohman told anyone to

21   default on their loans.  Mr. Calhoun's assertions to the

22   contrary again are not evidence.

23            If Lohman did counsel people to intentionally

24   default, which he didn't do, tortious interference requires

25   that the breach caused damage to the party whose relationship

1328

1    or expectancy has been disrupted.

2              Again, there's no evidence that Navient owned these

3    loans.  If a student intentionally defaulted, that default was

4    on a contract between a student and one of these trusts, not

5    Navient.  Remember, no one from Navient could sit there and

6    simply say loudly and clearly that Navient owned these loans,

7    and even if Navient owned the loans, Lohman still isn't liable

8    for tortious interference.

9              Look at Instruction 47.  Lohman's conduct was

10   justified and privileged.  As a lawyer, Lohman had the legal

11   right to advise his clients.  Even if he told them to default

12   on their loans or advised them that he couldn't help them as

13   long as they were current, Lohman can only be liable if he

14   acted solely to feather his own nest and did not believe or

15   care that he was helping his clients.

16             Do you really think that Lohman didn't want to help

17   his clients?  Not a single client showed up in this courtroom

18   to testify against him.  If clients were upset with Lohman,

19   where are they?

20             Not only did Lohman want to help his clients and care

21   about his clients, but we know, in fact, he did help his

22   clients.  How do we know this?  Look at Navient's damage chart.

23   There would be no damage claim in this case if Navient had

24   not -- if Lohman had not helped his clients.

25             So again, based on the evidence, check "No" to all

1329

1    the fraud questions.  Check "No" to all of the questions

2    concerning tortious interference.

3           That's it with regard to Navient's claims, but now I

4    need to talk about affirmative defenses.  This is the first

5    time we've talked about this.

6           Affirmative defenses are, are generally our burden to

7    prove.  There's one exception to that, and it's an important

8    one, and that's the affirmative defense under the First

9    Amendment, and I'm going to get to that later, but all of the

10   other defenses are our burden to prove.

11          And there's no particular place on the verdict form

12   where you get to check accord and satisfaction applies or

13   collateral estoppel applies.  There's no place for that on the

14   verdict form.  So if you, if you believe that these affirmative

15   defenses bar our liability, you check "No."  You check "No" on

16   the fraud claim, the RICO claim, conspiracy claims, again leave

17   zero in all the damage blanks.  That's how you -- that's how

18   you enact that judgment on the verdict form.

19          And regardless of whether -- and this assumes that if

20   Navient proved its burden, sustained its burden on its claim,

21   if we meet the burden on our affirmative defenses, it wipes all

22   of that out, all of it.  Okay?  So it's a little confusing, but

23   that's the way the verdict form is.

24          Now, Lohman has asserted a bunch of defenses, and

25   they all rely on a basic principle a party cannot relitigate a

1330

1    case over and over and over again.

2           The first defense is accord and satisfaction.  What

3    does that mean?  And that's Instruction 50.  If you settle a

4    case, it's over.  If you settle it, it's over.  You can't

5    relitigate a case.  And contrary to Navient's assertion, these

6    settlement agreements barred Navient from suing Lohman again.

7           For example, let's look at 2143, the *Mendoza*

8    settlement.  The last page of that settlement agreement, what

9    do we find?  Lohman's signature.  All of these settlement

10   agreements are signed by one of the Lohman lawyers.  Navient

11   cannot dispute that fact.

12          Let's look at paragraph 17.  Paragraph 17 says this

13   agreement, this agreement, not part of it, but this agreement

14   shall inure to the benefit of the attorneys.  This agreement,

15   not one provision, not two provisions, not half of it.  This

16   agreement inures to the benefit of the attorneys, not just the

17   parties.  And Lohman benefits from the entire agreement, not

18   just one paragraph.

19          As a result, Lohman benefits from paragraph 2, which

20   states:  "The parties acknowledge and agree the disputes

21   between them, whether asserted in the action or not, have been

22   settled and compromised . . .."  Unclean hands, as we've said.

23   It was asserted over and over and over and over and over again

24   in all of these underlying TCPA cases.  This paragraph bars the

25   relitigation of that issue in this case.

1    And this agreement was written by Navient.  They

2 drafted these agreements.  When Navient wanted to limit the

3 scope of the agreements and say it only applies to, you know,

4 one thing or the other, it doesn't apply to the whole

5 agreement, well, look at paragraph 5.  That paragraph says the

6 release does not impact Mendoza's liability for all of her

7 other loans serviced by Navient.

8    All of these agreements are admitted into evidence,

9 so they are there for you to review.

10    The settlement agreements also contain paragraph 11:

11 "Each party" -- and Navient is a party; there's no dispute

12 about that -- "shall bear their own costs and attorneys'

13 fees . . .."  That's a big element of their current claim right

14 here.

15    They already gave up those, those -- their right to

16 recover attorneys' fees by entering into these settlement

17 agreements.  I mean, you can't, you can't say it more clearly.

18 And again, there's law on this.

19    Instruction No. 52, waiver:  "'Waiver' is the

20 intentional relinquishment . . . of a known right."  Nothing

21 could better evidence an intentional and knowing waiver of

22 attorneys' fees than paragraph 11.

23    And waiver is also important when it comes to

24 voluntary dismissal.  When Navient voluntarily dismissed a

25 case, it waived any right to fees or costs.

1332

1        Again, look at Exhibit 2192, the stipulation of

2   voluntary dismissal by Carlos Johnson.  Navient never contested

3   that stipulation, never put in any other stipulations, and in

4   that stipulation, Navient gave up its right to attorneys' fees

5   and costs, and it's not submitted another stipulation where it

6   somehow reserved its right to recover costs.  In all of those

7   dismissals, it, it waived its right to further recovery.

8        So like I said, Instructions 50 and 52 basically said

9   you can't relitigate a case once you settle it.

10       Instruction 51, collateral estoppel, that sounds

11   really fancy.  It's not that big of a -- not that complicated.

12   It basically means if you litigate a case and get a judgment,

13   get a result out of it, you litigate an issue and it's decided,

14   you can't relitigate it.  Regardless of whether you win or

15   lose, nobody can relitigate that question once it's litigated.

16       Jeff Lohman testified again Navient asserted over and

17   over and over that the TCPA claims were manufactured.  That was

18   an argument made in federal court and in arbitration.  Navient

19   never won this argument.

20       Mr. Reinhart testified that Navient had full and fair

21   opportunity to litigate those defenses in every TCPA case.  And

22   what about this whole argument that arbitration doesn't allow

23   for adequate discovery?  If, if you believe Navient, okay, I'm

24   going to use their own words against them, then these

25   promissory notes are their documents.  If they don't like an

1333

1    arbitration clause, why do they have an arbitration clause in

2    their own document?

3         No student is going to handwrite in an arbitration

4    clause while they're, you know, at the bank or whatever trying

5    to sign up for a student loan.  Leave it out if you don't like

6    it.  Don't blame the victim after they do what you tell them to

7    do or they exercise an option that you give to them.  That's

8    ridiculous.

9         Again, once you resolve a claim through litigation or

10   settlement, it's over.  You can't relitigate it.  And so if you

11   meet -- if you agree with me and you think that these defenses

12   apply, again, even if Navient met its burden of proof, it's no,

13   no, no, no, no, all the way down that verdict form.

14        Okay.  Failure to mitigate, Instruction No. 53.

15   Navient's failure to mitigate, this is an exception to the

16   affirmative defenses, it could wipe out all of -- any liability

17   that you might find, or it could just offset it to the extent

18   that Navient failed to mitigate.

19        So a couple of serious issues here.  Mr. Standish

20   said Navient was considering a RICO claim against Lohman in

21   2018.  Navient deposed Lohman in November 2017.  Navient

22   obviously failed to mitigate damages after it decided to sue

23   Lohman.

24        Mr. Harvey opined that no one would intentionally

25   enter a settlement agreement with the expectation that they'd

1334

1  recover the settlement in a subsequent lawsuit, but Mr. Harvey

2  wasn't here when Mr. Standish testified, and Mr. Standish

3  testified that that's exactly what he intended to do.

4  Mr. Standish said that by settling cases, Navient could cut its

5  costs in arbitration, essentially not waste money on

6  arbitration, and then just relitigate the claims in this RICO

7  lawsuit.

8          Mr. Harvey is right, no reasonable person would do

9  what Navient did, and that -- Mr. Harvey is their expert.

10 After it decided it was going to bring this RICO claim against

11 Lohman, Navient had zero incentive to mitigate, and it did not

12 mitigate.  It settled case after case after case after case,

13 and in Navient's mind, that was just adding more damages to

14 this claim.  They had no incentive to mitigate.

15         Same goes for attorneys' fees.  Once Navient decided

16 to pursue this RICO claim, what incentive did it have to keep

17 attorneys' fees reasonable?  There's no evidence that Navient's

18 attorneys' fees were reasonably incurred.

19         Mr. John Wayne, let's bring him out.  Let's bring

20 this back down to earth.  The technical part of this speech is

21 over.  So when you look at a guy like John Wayne, what do you

22 see?  Do you see a hero?  That's what a lot of people see, but

23 he was actually just an actor who pretended to be a hero.

24         When Navient says, oh, all we want to do is help

25 students, all we want to do is keep students from defaulting,

1335

1     Navient is simply acting like a hero, pretending to be a hero.

2     Heroes do not oppress people.

3           Heroes do not perpetually harass people.  Heroes do

4     not ignore a person's request to be left alone.

5           Navient claims to be heroic because it helps nine out

6     of ten people.  Well, that's great, Mr. Standish, but what

7     about that tenth person?  What about that forgotten person?

8     What gives you the right to harass, bully, and badger that

9     forgotten person into perpetuity?

10          Navient doesn't even pretend to care about that

11    person.  Navient drives that person deeper and deeper into

12    despair, so far into despair that he or she is willing, willing

13    to sign up for programs that will destroy their credit, and he

14    or she is willing to take on a behemoth like Navient simply

15    because she or he can't take it anymore.

16          And for every million students serviced by Navient,

17    that leaves 100,000 of these forgotten people, 100,000 people

18    that Navient feels free to bully, beat up, abuse day after day

19    after day after day after day, call after call.  100,000

20    forgotten people.  That's a lot of people.

21          Where do those people go?  They go to Jeff Lohman.

22    He's a guy that doesn't pretend.  They go to the only person in

23    this whole lawsuit who indisputably helped them, who

24    indisputably put money back into their pockets.

25          You heard Mr. Harvey and Mr. Travell:  Oh, 3-, 400

1336

1    dollars, that's a bargain.

2              For who?  For who?  For Navient.

3              Jeff Lohman's clients don't have $100, $200, they

4    sure as heck don't have $500 an hour to spend on a lawyer.

5    They don't have a penny.  Yet Jeff Lohman represents them.  He

6    stands up for them.  Yes, he makes money on those contingency

7    fees, but would you take that gamble?  Would you pay the

8    airfare to go to depositions and hearings?  Would you pay the

9    filing fees and the arbitration fees?  Would any of us have the

10   guts to bet on these forgotten people, who literally have

11   nothing?

12             We know Navient wouldn't.  What does Navient do to

13   these people?  They file negative credit information after

14   negative credit information, and they continue to drive their

15   credit into the gutter.  That's what they do.  That's their

16   idea of heroism.

17             But Jeff Lohman bets on these people over and over

18   and over again, and because he makes that bet, those forgotten

19   people are not forgotten, not by Jeff Lohman.  Those people

20   have a champion, and he's sitting right there in this

21   courtroom.

22             Jeff Lohman is no John Wayne.  He's not a pretender.

23   He's the real deal, and Navient knows this.  Navient knows

24   Lohman, that guy who graduated from some unknown law school

25   somewhere, he is their David to Goliath, which brings us to

1    Shakespeare.

2            In Shakespeare's *Henry VI*, Dick the Butcher says:

3    "The first thing we do, let's kill all the lawyers."  We see

4    this on T-shirts, and we laugh, we think it's funny, but it's

5    actually a profound compliment to my profession, to my legal

6    profession.

7            In the context of *Henry VI*, Dick the Butcher knew

8    that killing the lawyers would deprive the people of access to

9    the courts.  Social unrest would ensue, and that unrest would

10   advance the agenda of people who considered themselves above

11   the law.  They didn't have the TCPA back then, but they

12   considered themselves above other laws.

13           And that's what Navient is doing here today.  They're

14   not literally killing Jeff Lohman, but they are trying to kill

15   him professionally.  They are trying to cut off the access to

16   the courts that he offers these forgotten people.

17           Navient is here to silence the one, one, one voice

18   that stands up to them, and that's why I have not discussed the

19   most single instruction until now.  That's Instruction 49, the

20   First Amendment.  If you've forgotten every word I've said, you

21   can forget it.  Up until now, just forget it.  I don't -- I

22   care, but this is the one that really matters.  This is the one

23   that really matters:  First Amendment immunity.

24           If you agree with me, the only blanks that you can

25   check are the "No" blanks on that verdict form for the Lohman

1338

1   defendants.  Regardless of how else you feel about any other

2   issue, if you agree with me on this issue, it wipes it all off.

3   The noes, noes, noes, noes, noes must rain down.  The zeroes

4   must be exhibited on that verdict form.

5           Under the First Amendment, we all have a right to

6   petition the courts.  That is a First Amendment right like

7   freedom of speech, freedom of religion.  It's one of those

8   fundamental rights that the Constitution guarantees to us.

9           Navient is exercising that right here in this

10  courthouse today.  That's why we're all here.  But in this,

11  this action, Navient seeks to take away the right to petition

12  the courts that belongs to those forgotten people represented

13  by Jeff Lohman.  Navient is using its right to petition this

14  Court to achieve an insidious, insidious and despicable goal.

15  Navient is trying to silence -- Mr. Calhoun, you think this is

16  funny?

17          THE COURT:  Wait, counsel, you've got three minutes.

18          MR. GRELL:  Silence Jeff Lohman, to crush him and to

19  kill his career as a lawyer.  In doing so, it seeks to block

20  court access he provides to the forgotten people, these

21  forgotten school borrowers.

22          Navient can't do that.  Navient doesn't own the First

23  Amendment.  That's one thing it can't buy.  And the First

24  Amendment continues to protect us all, especially those of us

25  who are forgotten.  It continues to shield them.

1339

1    A lawyer only loses that First Amendment protection

2  if he engages in sham litigation, and there's no evidence that

3  those TCPA claims were sham.  The law was unsettled, but yet

4  Lohman won a significant number of the claims.  Navient settled

5  many more.  From Lohman's perspective, what could better

6  evidence that your claims have a valid basis?  Your adversary

7  would rather settle than to litigate those claims.

8    How could Jeff Lohman imagine that any reasonable

9  person would, would use those settlements to set up this

10  bizarre, crazy RICO claim and use that claim to abusively and

11  corruptly petition this Court?  There is zero evidence that any

12  Navient lawyer who actually litigated against Lohman thought

13  that Lohman was engaged in sham litigation.  Likewise, no

14  evidence that any arbitrator or judge thought that was sham

15  litigation.

16    There was expert testimony on fees.  Where is the

17  expert testimony on litigation and whether this was sham

18  litigation?  Zero, none of it.  They didn't present it.

19    But yet there's plenty of evidence that many people

20  thought these claims had merit, so much merit that the claims

21  were settled, so much merit that the claims were successful.

22    I implore all of you, this is no laughing matter.

23  This is not a laughing matter.  Do not take away the one man

24  whose legal experience and expertise he uses on behalf of these

25  forgotten debtors.

1340

1       The courts are not just open to people who consider

2  $500 an hour a bargain.  The courts are open to everyone.  The

3  First Amendment guarantees it, but the First Amendment is in

4  your hands today.  The First Amendment is in your care today.

5       And I'm not laughing about this.  This is my

6  profession.  I want to protect it.  And I, please, need you to

7  defend it.  I need you to be the hero.  We can't let these

8  First Amendment protections be laughed at.

9       THE COURT:  All right.  Mr. Calhoun, you have ten

10  minutes for your rebuttal.

11                    REBUTTAL ARGUMENT

12                    BY MR. CALHOUN:

13       I told you it would be over the top.

14       You just heard a lot of testimony that you didn't

15  hear in this week-long trial.  You don't have to pay any

16  attention to that.  Pay attention to what you heard from the

17  witnesses and the documents.  Mr. Grell's diatribe is not

18  evidence.

19       You heard from Mr. Lohman that he hates Navient.  You

20  saw him set up these cases against Navient.  You heard

21  Mr. Grell say that he won a significant number of cases.  He

22  won four cases.  We think those cases were wrong, but

23  importantly, contrary to what you're saying, we're not trying

24  to relitigate anything.  There's not a single borrower that was

25  sued here by Navient.  When we entered a settlement agreement

1    with the borrower, we're honoring that settlement agreement.

2    We didn't sue them, but importantly, we also didn't release

3    them, and we didn't release the Lohman defendants.

4             In fact, you heard testimony that they asked for a

5    mutual release, and Navient refused.  Now, why would that be

6    necessary if they already had that in these settlement

7    agreements?  Well, you know the answer to that.  They don't.

8    They don't have that.

9             But judge for yourself.  Defense counsel just sat

10   here and told you what to think.  I'm not going to tell you

11   what to think.  You've all been sitting here paying attention

12   through what's not always very interesting material, and you're

13   smart people.  You're going to do the right thing.

14            You heard Mr. Grell say that Navient could have fixed

15   all this if it didn't robocall.  Navient didn't robocall.  You

16   heard Mr. Standish said there's a live operator on all those

17   calls.

18            You also heard Mr. Grell say, hey, if this were

19   manufacturing, they would have had 100 percent of cases

20   created.  There's no evidence for that, but if you do go back

21   and look at why the GST pipeline was important to them, take a

22   look at the percentage of cases that he was able to build

23   through the GST pipeline.  More than 5 percent.

24            He also said that only Navient was calling people,

25   but you heard from them.  They sued other people:  AES, Capital

1342

1    One, other banks.  Think for yourself.

2             Owning the loans isn't the issue.  They've tried to

3    tell you we're not harmed.  We don't own the loans.

4             You heard Mr. Standish.  When these loan write-offs

5    happened, whose books were impacted?  It's not the trusts'.

6    It's Navient's.  Navient recognized the loan write-offs.

7    That's undisputed.  They didn't call anybody to say that's

8    different.

9             Technical ownership, yeah, it's confusing, but the

10   evidence that it hurt Navient, that's not confusing, and it's

11   in the record.  It's the only thing in the record.

12            Again, it's the same argument on the tortious

13   interference.  They want to say Navient didn't own the loans,

14   so we couldn't have interfered with the contract.

15            I don't care if you look at it as the loan is the

16   contract or the servicing agreement is the contract.  They're

17   all contracts, and they knew they were interfering with them

18   because they depended on those loans stop paying, and either

19   way, when either of those things happened, it hurt Navient.

20   That's who it hurt.

21            Same on reliance.  They argue that Navient's argued

22   unclean hands in the underlying cases, and so it did.  An

23   unclean hands defense is not a RICO case.  It's not a fraud

24   claim.  This issue has not been litigated.  This is the only

25   place this has ever been litigated.

1343

1    Did we suspect that they were doing things that were

2    improper?  Sure we did.  This is where we have the evidence.

3    This is the only place we could get it.  We weren't allowed to

4    depose Mr. Mize before or to get discovery of the marketers.

5    That's also in the record, and it's also undisputed.

6    You also heard this impassioned plea in defense of

7    the First Amendment.  Well, that defense technically is called

8    the *Noerr-Pennington* defense, and it applies to litigation

9    activities, but look at all of the testimony that came through

10   and the evidence that came through about the conduct of this

11   case.  The litigation activity is at the end, but that's not

12   when they were telling borrowers to default.  That's not when

13   they were misleading them into the program with fliers and

14   mailers and e-mails and calls.

15   That's all pre-litigation activity.  The First

16   Amendment has nothing to do with that.

17   You heard testimony from Mr. Lohman and others that

18   they've got a whole department downstairs in their office where

19   they've got people set up who call hundreds of people a day or

20   a week, counseling them on how they can help them only if

21   they're not paying their loans, walking them through phone

22   calls, recording them surreptitiously, telling them never to

23   pick up the phone.

24   All that stuff -- and guess what?  None of those

25   people were clients of Jeff Lohman.  They were just leads at

1344

1  this point.  You can't claim First Amendment immunity for that.

2  It's not litigation activity.

3          I'm not going to tell you what to think, like they

4  did.  You're going to think for yourself.

5          GST also did just what I said.  They asked you to

6  believe their self-serving statements.  Look at what the

7  documents say.  Look at what the evidence that came in says.

8          Did they refund people?  Sure, they refunded a lot of

9  people.  But why?  You get to decide.  But what they were

10  really concerned about is regulatory scrutiny.  They knew that

11  complaining clients results in bar complaints and federal

12  regulatory investigations.  Guess what?  They ended up with

13  federal regulatory judgments and bar complaints.

14          They said there's nothing wrong with taking these

15  40 percent fees for the work that they did.  You heard the work

16  that was done.  It was an automatic cease and desist letter

17  that went out, a few phone calls to Navient, and then a hope

18  that maybe they could build a TCPA claim.

19          Some of these borrowers owed tens of thousands or

20  more.  You can add that up and figure out what the hourly rate

21  that was being charged for that 40 percent was.  It's a lot

22  more than $500.

23          They also asked you to listen to the experts and, of

24  course, saying there's no evidence about the reasonableness of

25  the fees.  Attorneys' fees are crazy, we get that, but the idea

1345

1    that Navient can't prove the reasonableness of its fees if it

2    doesn't go to every single jurisdiction, most of which are

3    going to recognize rates, you know, as Mr. Harvey said, way

4    more than $300, consider that evidence on your own.

5            You know, Mr. Harvey explained it.  It is perfectly

6    clear that Navient did what it could to mitigate these damages.

7            You know, you heard conflicting arguments from

8    defense counsel:  Navient didn't mitigate, and then it had

9    somehow, it was trying to inflate the claims.  There's no

10   evidence that it tried to inflate the claims.  Those questions

11   were asked.

12           You heard Mr. Reinhart say, well, why would we

13   inflate the fees?  Why is that in our interest?

14           They didn't do it.  There's no evidence of it.

15   Inflating fees that we actually pay out of pocket to come here

16   and then ask that you give them to us, that makes no sense.

17           Ladies and gentlemen, this is a chance to stop a

18   wrong.  Navient contacting its borrowers is not the wrong

19   you're being asked to stop.  You heard Mr. Grell argue that

20   we're ruining the lives of 100,000 people out of a million.

21           Mr. Standish -- they didn't even have the numbers

22   right.  Mr. Standish said that we help nine out of ten people

23   that we call, that Navient calls.  It calls those people when

24   they're missing payments.

25           Nine out of ten people are not missing their

1346

1    payments.  The overwhelming majority of people are able to make

2    their payments, and Navient is able to help most of those

3    people.  And when these people who they can't work something

4    out go and get taken advantage of by unscrupulous debt relief

5    people, all of the types of scheme that we've seen and heard

6    about this week, that's what we need to stop.

7              Again, we appreciate you very, very much, and thank

8    you.

9              THE COURT:  All right.  Ladies and gentlemen, because

10   again the instructions are somewhat complicated, I want to make

11   sure that you're all nice and fresh and able to focus on them,

12   so we're going to give you one last break, if you need a sip of

13   water or to use the restrooms, and then I want to give you the

14   instructions in toto before lunch.  So we may be actually

15   pushing your lunch break a little bit later.

16             Once, however, you get the case, once we excuse you

17   this morning, you can bring your lunch into the jury

18   deliberation room.  So you can be eating and starting your

19   deliberations if you want to.

20             You're -- as I said Friday, you're going to

21   deliberate downstairs on the third floor in the jury

22   deliberation room.  It's much larger than any of our small jury

23   rooms on this floor, so you'll have plenty of space.

24             And it's going to take us a little bit of time to get

25   the exhibits down to you and the instructions and all of that,

1347

1  so you won't be able to start your deliberations immediately

2  after we recess, but we'll try to get everything down to you

3  just as quickly as possible.

4          So we're going to take another one 10-minute break

5  and then come back and do the instructions.

6          (Recess from 12:17 p.m., until 12:30 p.m.)

7                      (Jury present.)

8          THE COURT:  All right, ladies and gentlemen, now that

9  you have heard all of the evidence that is to be received in

10  this trial and each of the arguments of counsel, it becomes my

11  duty to give you the final instructions of the Court as to the

12  law that is applicable to this case.  You should consider these

13  instructions to guide you in your decisions.

14          All of the instructions of law given to you by the

15  Court -- those given to you at the beginning of the trial,

16  those given to you during the trial, and these final

17  instructions -- must guide and govern your deliberations.

18          It is your duty as jurors to follow the law as stated

19  in all of the instructions of the Court and to apply these

20  rules of law to the facts as you find them from the evidence

21  received during the trial.

22          Counsel have quite properly referred to some of the

23  applicable rules of law to you in their closing arguments.  If,

24  however, any difference appears to you between the law as

25  stated by counsel and that as stated by the Court in these

1348

1    instructions, you are to be governed by the instructions given

2    to you by the Court.

3            You are not to single out any one instruction alone

4    as stating the law but must consider the instructions as a

5    whole in reaching your decisions.  Neither are you to be

6    concerned with the wisdom of any rule of law stated by the

7    Court.

8            Regardless of any opinion you may have as to what the

9    law ought to be, it would be a violation of your sworn duty to

10   base any part of your verdict upon any other view or opinion of

11   the law than that being given in these instructions, just as it

12   would be a violation of your sworn duty as the judges of the

13   facts to base your verdict upon anything but the evidence

14   received in the case.

15           You were chosen as jurors for this trial in order to

16   evaluate all of the evidence received and to decide each of the

17   factual questions presented by the allegations brought by the

18   plaintiff, Navient Solutions, LLC, in its complaint and the

19   denial of those allegations by the defendants, that is, the Law

20   Offices of Jeffrey Lohman, Jeffrey Lohman, Rick Graff, Gregory

21   Trimarche, and GST Factoring, Inc.

22           In resolving the issues presented to you for decision

23   in this trial, you must not be persuaded by bias, prejudice, or

24   sympathy for or against any of the parties to this case or by

25   any public opinion.

1349

1    Justice through trial by jury depends upon the
2  willingness of each individual juror to seek the truth from the
3  same evidence presented to all the jurors here in the courtroom
4  and then to arrive at a verdict by applying the same rules of
5  law as are now being given to each of you in these
6  instructions.

7    Now, during this trial, I permitted you to take
8  notes.  Many courts do not permit note-taking by jurors, and a
9  word of caution is in order.  There is always a tendency to
10  place undue importance to matters which one has written down.
11  Some testimony which is considered unimportant at the time
12  presented and thus not written down may take on greater
13  importance later in the trial in light of all of the evidence
14  presented.

15    Therefore, you are instructed that your notes are
16  only a tool to aid in your own individual memory, and you
17  should not compare your notes with other jurors in determining
18  the content of any testimony or in evaluating the importance of
19  any evidence.  Your notes are not evidence and are by no means
20  a complete outline of the proceedings or a list of the
21  highlights of the trial.  Above all, your memory should be your
22  greatest asset when it comes time to deliberate and render a
23  decision in this case.

24    Moreover, you are coequal judges of the facts, and
25  each juror's memory of and opinion about the evidence is worthy

1350

1  of consideration by all the other jurors.  That a juror may

2  have taken extensive notes does not mean that his or her memory

3  or opinion is worthy of more consideration than the memory or

4  opinion of a juror who took few or no notes.

5       You should consider and decide this case as a dispute

6  between parties of equal standing in the community, of equal

7  worth, and holding the same or similar stations in life.  A

8  corporation is entitled to the same fair trial as a private

9  individual.

10       All persons, including plaintiff, Navient Solutions,

11  LLC, and defendants the Law Offices of Jeffrey Lohman, Jeffrey

12  Lohman, Rick Graff, Gregory Trimarche, and GST Factoring, Inc.,

13  stand equal before the law and are to be treated as equals.

14       Although some of the defendants in this trial are

15  being represented by the same counsel, you are not to treat

16  them as one person.  Each defendant is entitled to your

17  separate consideration.  The question of whether liability has

18  been proven is personal to each defendant and must be decided

19  by you as to each defendant individually.  Similarly, if you

20  award damages, you must decide the amount of damages separately

21  as to each party.

22       You may have noticed throughout the trial that

23  counsel for various defendants have consulted with each other

24  and have divided the work of the trial in an effort to

25  facilitate their presentation and to avoid duplication.  This

1   does not mean that the defendants' cases are to be viewed

2   together.  Again, the issue of each defendant's liability is

3   personal and must be decided by you as to each defendant

4   individually.

5          There is nothing particularly different in the way

6   that a juror should consider the evidence in a trial from that

7   in which any reasonable and careful person would deal with any

8   very important question that must be resolved by examining

9   facts, opinions, and evidence.  You are expected to use your

10  good sense in considering and evaluating the evidence in the

11  case.  Use the evidence only for those purposes for which it

12  has been received, and give the evidence a reasonable and fair

13  construction in the light of your common knowledge of the

14  natural tendencies and inclinations of human beings.

15         Testimony and/or exhibits can be admitted into

16  evidence during a trial only if it meets certain criteria or

17  standards.  It is the duty of the attorney on each side of a

18  case to object when the other side offers testimony or an

19  exhibit which that attorney believes is not properly admissible

20  under the rules of law.  Only by raising an objection can a

21  lawyer request and then obtain a ruling from the Court on the

22  admissibility of the evidence being offered.

23         If I sustain an objection to a question or the

24  admission of an exhibit, you must ignore the question and must

25  not guess what the answer to the question might have been.  In

1352

1   addition, you must not consider evidence that I have ordered

2   stricken from the record.

3        Do not attempt, moreover, to interpret my rulings on

4   objections as somehow indicating how I think you should decide

5   this case.  I am simply making a ruling on a legal question

6   regarding that piece of testimony or exhibit.

7        It is the duty of the Court to admonish an attorney

8   who, out of zeal for his or her cause, does something which I

9   feel is not in keeping with the rules of evidence or procedure.

10  You are to draw absolutely no inference against the side to

11  whom an admonition of the Court may have been addressed during

12  the trial of this case.

13       And during the course of a trial, I may occasionally

14  ask questions of a witness.  Do not assume that I hold any

15  opinion on the matters to which my questions may relate.  The

16  Court may ask a question simply to clarify a matter, not to

17  help one side of the case or hurt the other side.  Remember at

18  all times you are the final judges of the evidence.

19       The questions asked by a lawyer for either party to

20  this case are not evidence.  If a lawyer asks a question of a

21  witness which contains an assertion of fact, therefore, you may

22  not consider the assertion by the lawyer as any evidence of

23  that fact.  Only the answers are evidence.

24       If any reference by the Court or by counsel to

25  matters of testimony or exhibits does not coincide with your

1    own recollection of that evidence, it is your recollection

2    which should control during your deliberations and not the

3    statements of the Court or of counsel.

4         Now, there are two types of evidence that are

5    generally presented during a trial:  direct evidence and

6    circumstantial evidence.  Direct evidence is the testimony of a

7    person who asserts or claims to have actual knowledge of a

8    fact, such as an eyewitness.  Circumstantial evidence is proof

9    of a chain of facts and circumstances indicating the existence

10   of a fact.

11        An example of circumstantial evidence is the

12   following:  You leave your house at noon on a cold February

13   day.  Your front yard is bare at that time.  It then starts to

14   snow.  You return home at 5 p.m., and you see a footprint in

15   the snow that now covers your yard.

16        From the facts that you left your home at noon and

17   returned at 5 p.m., you see the footprint, and you know from

18   common experience that human beings are associated with

19   footprints, you can infer that there was a person in your yard

20   sometime between noon and 5 p.m.  If you had actually seen a

21   person, that would be direct evidence of that fact.

22        The law makes no distinction between the weight or

23   value to be given to either direct or circumstantial evidence.

24   Nor is a greater degree of certainty required of circumstantial

25   evidence than of direct evidence.  You should weigh all the

1    evidence in the case in making your decisions.

2         Now, your decision on the facts of this case should

3    not be determined by the number of witnesses testifying for or

4    against a party or by the number of exhibits introduced by one

5    side or the other.  You should consider all the facts and

6    circumstances in evidence to determine which of the witnesses

7    you choose to believe or not believe and which of the exhibits

8    have more or less value.

9         You may find that the testimony of a smaller number

10   of witnesses on one side is more credible than the testimony of

11   a greater number of witnesses on the other side, or that one or

12   two exhibits may have more significance to your evaluation of

13   the case as against numerous exhibits which you find have less

14   significance.

15        To sum up this instruction, always consider the

16   quality of the evidence rather than the quantity of the

17   evidence.

18        In certain circumstances, evidence may be admitted

19   only for a particular purpose and not generally for all

20   purposes.  For the limited purposes for which this evidence has

21   been received, you may give it such weight as you feel it

22   deserves.  You may not, however, use this evidence for any

23   other purpose not specifically mentioned.

24        Now, the next several instructions go to the

25   credibility of witnesses, and in the law, the

1355

1    word "credibility" means the degree to which you're going to

2    believe a person.

3         You as jurors are the sole and exclusive judges of

4    the credibility of each of the witnesses called to testify in

5    this case, and only you determine the importance or the weight,

6    if any, that their testimony deserves.  After making your

7    assessment concerning the credibility of a witness, you may

8    decide to believe all of that witness's testimony, only a

9    portion of it, or none of it at all.

10        In making your assessment of that witness, you should

11   carefully scrutinize all of the testimony given by the witness,

12   the circumstances under which the witness has testified, and

13   all of the other evidence that tends to show whether the

14   witness is worthy of belief.

15        Consider each witness's intelligence, motive to

16   falsify, state of mind, and appearance and manner while on the

17   witness stand.  Consider the witness's ability to observe the

18   matters as to which he or she has testified, and consider

19   whether the witness impresses you as having an accurate memory

20   or recollection of these matters.

21        Consider also any relation a witness may bear to

22   either side of the case, the manner in which each witness might

23   be affected by your verdict, and the extent to which, if at

24   all, each witness is either supported or contradicted by other

25   evidence in the case.

1356

1    Inconsistencies or discrepancies in the testimony of

2    a witness or between the testimony of different witnesses may

3    or may not cause you to disbelieve or discredit such testimony.

4    Two or more persons witnessing an incident or a transaction may

5    simply see or hear it differently.  Innocent misrecollection,

6    like failure of memory, is not an uncommon human experience.

7    However, in weighing the effect of a discrepancy, always

8    consider whether it pertains to a matter of importance or to an

9    insignificant detail, and consider whether the discrepancy

10   results from innocent error or from intentional falsehood.

11   After making your own judgment or assessment

12   concerning the believability of a witness, you can then attach

13   such importance or weight to that testimony, if any, that you

14   feel it deserves.

15   Now, a witness may be discredited or impeached by

16   contradictory evidence or by evidence that at some other time

17   the witness has said or done something or has failed to say or

18   do something that is inconsistent with the witness's present

19   testimony.  If you believe any witness has been impeached and

20   thus discredited, you may give the testimony of that witness

21   such credibility, if any, you think it deserves.

22   If a witness is shown knowingly to have testified

23   falsely about any material matter, you have a right to distrust

24   such witness's other testimony, and you may reject all the

25   testimony of that witness or give it such credibility as you

1357

1  may think it deserves.

2          An act or omission is knowingly done if the act is

3  done voluntarily and intentionally, and not because of mistake

4  or accident or other innocent reason.

5          If you believe from the evidence that a party -- and

6  parties are plaintiff-defendant.  Those are the parties.

7          So if you believe from the evidence that a party

8  previously made a statement inconsistent with his testimony at

9  this trial, that previous statement may be considered by you as

10  evidence that what the party previously said was true.

11          Now, during the trial, certain testimony has been

12  presented by way of deposition.  The deposition consisted of

13  sworn, recorded answers to questions asked of the witness in

14  advance of the trial.  The testimony of a witness who for some

15  reason is not present to testify from the witness stand may be

16  presented in writing under oath or as a videotape.  Such

17  testimony is entitled to the same consideration and is to be

18  judged as to credibility and weighed and otherwise considered

19  by you insofar as possible in the same way as if the witness

20  had been present and had testified from the witness stand.

21          The plaintiff called several defendants as adverse

22  witnesses.  The plaintiff is bound by as much of the

23  defendants' testimony given as an adverse witness as is clear,

24  logical, reasonable, and uncontradicted.

25          The plaintiff is not bound by any of the defendants'

1    testimony given as adverse witnesses that conflicts with any of

2    the other evidence in the case.

3         When one of the parties testifies unequivocally to

4    facts within his own knowledge, those statements of fact and

5    the necessary inferences from them are binding upon him.  He

6    cannot rely on other evidence in conflict with his own

7    testimony to strengthen his case.

8         However, you must consider his testimony as a whole,

9    and you must consider a statement made in one part of his

10   testimony in the light of any explanation or clarification made

11   elsewhere in his testimony.

12        The rules of evidence ordinarily do not permit

13   witnesses to testify as to opinions or conclusions.  There is

14   an exception to this rule for expert witnesses.  An expert

15   witness is a person who by education or experience has become

16   an expert in some art, science, profession, or calling.  Expert

17   witnesses may state their opinions as to matters in which they

18   profess to be an expert and may also state their reasons for

19   their opinions.

20        You should consider each expert opinion received in

21   evidence in this case and give it such weight as you think it

22   deserves.  If you should decide that the opinion of an expert

23   witness is not based upon sufficient education or experience,

24   you should conclude that the reasons given -- you should

25   conclude that the reasons given in support of the opinion are

1359

1    not sound.  If you feel that the expert's opinion is outweighed

2    by other evidence, you may disregard it entirely.

3          Now, the next instructions start to go into the

4    issues in the case, and first I'm going to give you an

5    introduction, just an overview of the litigation.

6          In this litigation, plaintiff, Navient Solutions,

7    LLC, raises four claims against defendants.  Count II is a

8    substantive RICO violation alleging that all defendants

9    conducted or participated in the conduct of an enterprise

10   through a pattern of racketeering activity.  In this case, the

11   racketeering activity is alleged to be mail fraud and wire

12   fraud.

13         In Count III, plaintiff alleges that all defendants

14   conspired to violate the RICO statute.  In Count IV, which only

15   applies to the Lohman defendants, plaintiff alleges that

16   Jeffrey Lohman and the Law Offices of Jeffrey Lohman committed

17   fraud.  And in Count V, plaintiff alleges that all defendants

18   committed tortious interference with contract.

19         The defendants deny plaintiff's allegations and raise

20   the affirmative defenses of First Amendment protection, accord

21   and satisfaction, collateral estoppel, waiver, and plaintiff's

22   failure to mitigate its damages.

23         The plaintiff has the burden of proving its claims as

24   to Counts II, III, and V by a preponderance of the evidence,

25   and its claim as to Count IV, which is the fraud count, by

1360

1    clear and convincing evidence.  Plaintiff also bears the burden

2    to prove that the Lohman defendants engaged in sham litigation

3    by a preponderance of the evidence.

4           The defendants have the burden of proving their

5    affirmative defenses of accord and satisfaction, collateral

6    estoppel, waiver, and mitigation of damages by a preponderance

7    of the evidence.

8           I'm going to go -- some of this next instruction is

9    slightly repetitive, but I'll just go through it with you

10   exactly again.  Some of plaintiff's claims must be proven by a

11   preponderance of the evidence, that is, all the counts except

12   for the fraud count, whereas other claims made by the

13   plaintiff, that is, Count IV, the fraud count, must be proven

14   by clear and convincing evidence.  And defendants bear the

15   burden of proving their affirmative defenses.  Defendants must

16   establish their affirmative defenses by a preponderance of the

17   evidence.

18          Now, some of you may have had heard of proof beyond a

19   reasonable doubt, which is the proper standard of proof in a

20   criminal trial.  That requirement does not apply to a civil

21   case such as this, and you should put it out of your mind.

22          To establish a fact by a preponderance of the

23   evidence means to prove that the fact is more likely true than

24   not true.  A preponderance of the evidence means the greater

25   weight of the evidence.  It refers to the quality and

1361

1    persuasiveness of the evidence, not to the number of witnesses

2    or documents.  In determining whether a claim has been proven

3    by a preponderance of the evidence, you may consider the

4    relevant testimony of all witnesses, regardless of who may have

5    called them, and all the relevant exhibits received in

6    evidence, regardless of who produced them.

7          If you find that the credible evidence on a given

8    issue is evenly divided between the parties, that it is equally

9    probable that one side is right as it is that the other side is

10   right, then you must decide that issue against the party having

11   this burden of proof, and that is because the party bearing

12   this burden must prove more than simply equality of the

13   evidence.  The party must prove the element at issue by a

14   preponderance of the evidence.

15         On the other hand, the party with this burden of

16   proof need prove no more than a preponderance.  So long as you

17   find that the scales tip, however slightly, in favor of the

18   party with the burden of proof, that what that party claims is

19   more likely true than not true, then the element will have been

20   proven by a preponderance of the evidence.

21         Remember at the beginning of the trial, I gave you

22   the example of the balance scale.  In fact, I think on the

23   window behind some of you, we have a balance scale -- the

24   scales.  Just look at how they are balanced.

25         In contrast to the preponderance of the evidence

1362

1    standard, clear and convincing evidence is a more exacting

2    standard.  Clear and convincing, however, is not as high a

3    standard as the burden of proof applied in criminal cases,

4    which is proof beyond a reasonable doubt.

5            Clear and convincing evidence proof leaves no

6    substantial doubt in your mind.  It is proof that establishes

7    in your mind not only that the proposition at issue is probable

8    but also that it is highly probable.  It is enough if the party

9    with the burden of proof establishes his claim beyond any

10   substantial doubt.  It does not have to dispel every reasonable

11   doubt.

12           Although the RICO statute uses the terms "racketeer,"

13   "racketeering," and "corrupt organizations," Congress did not

14   mean that plaintiff must prove that any defendant is a

15   racketeer or a member of what is commonly referred to

16   as organized crime to recover damages.  You should not assume

17   that the Law Offices of Jeffrey Lohman, Jeffrey Lohman, Rick

18   Graff, Gregory Trimarche, or GST Factoring, Inc., are

19   racketeers simply because they have been sued under the RICO

20   statute.

21           The use of the terms "racketeering," "racketeer," or

22   "corrupt organization" in the RICO statute and the use of these

23   words during this trial and in these instructions should not be

24   thought of as having anything to do with your determination of

25   whether plaintiff has established the elements of its claim.

1363

1    In addition, Navient Solutions, LLC, must prove each

2 element of a RICO violation.  I will explain those elements to

3 you, and I will also explain the difference between someone who

4 violates the RICO statute by conducting the affairs of an

5 enterprise through a pattern of racketeering and someone who

6 violates the RICO statute by conspiring to conduct the affairs

7 of an enterprise through a pattern of racketeering.

8    Now, in Count II of its complaint, plaintiff claims

9 that the defendants violated Section 1962(c) of Title 18 of the

10 United States Code, which is the RICO Act.  And the relevant

11 provision provides:

12    "It shall be unlawful for any person employed by or

13 associated with any enterprise engaged in, or the activities of

14 which affect, interstate or foreign commerce, to conduct or

15 participate, directly or indirectly, in the conduct of such

16 enterprise's affairs through a pattern of racketeering

17 activity . . .."

18    Section 1962(c) of the RICO statute prohibits the

19 conduct of an enterprise through a pattern of racketeering

20 activity.  To show that any defendant violated Section 1962(c),

21 the plaintiff must prove each of the following elements by a

22 preponderance of the evidence:

23    First, the existence of an enterprise affecting

24 interstate or foreign commerce;

25    Second, that the defendant was employed by or

1364

1    associated with the enterprise;

2         Third, that the defendant conducted or participated

3    in the conduct of the enterprise's affairs; and

4         Fourth, that the defendant's participation was

5    through a pattern of racketeering activity.

6         For purposes of the RICO statute, an enterprise

7    includes any individual, partnership, corporation, association,

8    or other legal entity.  An enterprise may also be any group of

9    individuals associated in fact although not a legal entity.

10   The plaintiff in this case has alleged what we call an

11   association-in-fact enterprise.  A group otherwise qualifies as

12   an association-in-fact if it possesses the following three

13   characteristics:

14        First, that the members of the group share a common

15   purpose;

16        Second, that the members of the group have some

17   relation with one another; and

18        Three, that the group possesses sufficient longevity

19   to permit the members to pursue the enterprise's purpose.

20        The existence of an enterprise is an element distinct

21   from the pattern of racketeering activity, and proof of one

22   does not necessarily establish proof of the other.  However,

23   the evidence used to prove the pattern of racketeering activity

24   and the evidence used to prove an enterprise may coalesce.

25        An enterprise affects interstate or foreign commerce

1365

1  if the enterprise either engages in or pursues activities

2  affecting commerce between the states or between the states and

3  foreign countries.

4           Proof of a minimal effect on interstate commerce will

5  sustain the plaintiff's burden on that issue.

6           The second element that the plaintiff must prove is

7  that the defendant was associated with or employed by the

8  enterprise.

9           It is not required that a defendant has been employed

10  by or associated with the enterprise for the entire time that

11  the enterprise existed.  It is required, however, that the

12  plaintiff prove by a preponderance of the evidence that at some

13  time during the period indicated in the complaint, the

14  defendant in question was employed by or associated with the

15  enterprise.

16           A person cannot be associated with or employed by an

17  enterprise if he or she does not know of the enterprise's

18  existence or the nature of its activities.  Thus, in order to

19  prove this element, the plaintiff must prove by a preponderance

20  of the evidence that the defendant in question was connected to

21  the enterprise in some meaningful way and that the defendant

22  knew of the existence of the enterprise and of the general

23  nature of its activities, but it is not necessary that a

24  defendant be aware of all racketeering activities of each of

25  the participants in the enterprise.

1366

1   To participate in the conduct of the enterprise's

2   affairs requires that a person has conducted or participated,

3   directly or indirectly, in the conduct of the enterprise's

4   affairs through a pattern of racketeering activity.  To

5   participate, directly or indirectly, in the conduct of the

6   enterprise's affairs, the defendant must participate in the

7   operation or management of the enterprise itself.

8   A person also participates in the operation of the

9   affairs of the enterprise if he or she has some part in

10   directing those affairs.  RICO liability is not limited to

11   those with primary responsibility for the enterprise's affairs

12   or to those with a formal position in the enterprise.  An

13   enterprise may be operated not just by upper management but

14   also by lower-rung participants in the enterprise who are under

15   the direction of upper management.

16   A defendant must conduct his or her acts of

17   racketeering through the enterprise.  That means there must be

18   some connection between the defendant's predicate acts and the

19   enterprise.  The term "through" or "through requirement" is

20   satisfied when the defendant uses his position in the

21   enterprise to commit the racketeering acts or uses the

22   resources, property, or facilities of the enterprise to commit

23   the acts.

24   A defendant does not conduct acts of racketeering

25   through an enterprise where the defendant easily could have

1367

1  accomplished the same scheme on its own with minimal assistance

2  from other members of the enterprise.

3        The term "racketeering activity" as used in these

4  instructions includes the acts of mail fraud and wire fraud.

5  Plaintiff contends that the defendants violated the RICO

6  statute by committing acts of mail and wire fraud that

7  constituted a pattern of racketeering activity.

8        Now, the mail fraud statute involves Section 1341 of

9  Title 18 of the United States Code, and that provides in

10  pertinent part, that:

11        "Whoever, having devised or intending to devise any

12  scheme or artifice to defraud, or for obtaining money or

13  property by means of false or fraudulent pretenses,

14  representations, or promises, for the purpose of executing such

15  scheme or artifice or attempting so to do, places in any post

16  office or authorized depository for mail matter any matter or

17  thing whatever to be sent or delivered by the Postal Service,"

18  shall violate the statute.

19        In order to establish that mail fraud has been

20  committed for purposes of this case, the plaintiff must prove

21  by a preponderance of the evidence that:

22        One, defendants willfully and knowingly participated

23  in a scheme to defraud the plaintiff;

24        Two, defendants did so with an intent to defraud; and

25        Three, defendants either mailed something or caused

1368

1    it to be mailed in furtherance of their scheme.  To cause the

2    mails to be used is to do an act with knowledge that the use of

3    the mails will follow in the ordinary course of business, or

4    where such use can reasonably be foreseen, even if the actual

5    use of the mails was accomplished by someone other than the

6    defendants.

7         There is no requirement that each defendant

8    personally used the mails in furtherance of the scheme.  It is

9    enough if a defendant knows that in the execution of the

10   scheme, letters are likely to be mailed, and if, in fact, they

11   are mailed.

12        There is not any requirement that the mailing itself

13   contain false information.  Even a victim -- victim's or third

14   party's use of the mails violates the statute if it furthers or

15   facilities the scheme to defraud and was caused by the

16   defendant.

17        Each separate use of the mails in furtherance of a

18   scheme or plan to defraud is a separate predicate act of mail

19   fraud.

20        The other racketeering activity involved in this case

21   involved violation of the wire fraud statute, which is Section

22   1343 of Title 18 of the United States Code, and provides in

23   pertinent part, that:

24        "Whoever, having devised or intending to devise any

25   scheme or artifice to defraud, or for obtaining money or

1369

1    property by means of false or fraudulent pretenses,

2    representations, or promises, transmits or causes to be

3    transmitted by means of wire, radio, or television

4    communication in interstate or foreign commerce, any writings,

5    signs, signals, pictures, or sounds for the purpose of

6    executing each scheme or artifice, shall be" liable for that

7    statute.

8           Now, in order to establish that wire fraud has been

9    committed for purposes of this case, the plaintiff must prove

10   by a preponderance of the evidence:

11          First, that the defendants willfully and knowingly

12   participated in a scheme to defraud the plaintiff;

13          Two, defendants did so with an intent to defraud; and

14          Three, that defendants either used or caused the use

15   of the interstate wires in furtherance of their scheme.  To

16   cause the use of the interstate wires is to do an act with

17   knowledge that the use of the interstate wires will follow in

18   the ordinary course of business or where such use can

19   reasonably be foreseen even if the actual use of the interstate

20   wires was accomplished by someone other than defendants.

21          There is no requirement that each defendant

22   personally use the interstate wires in furtherance of the

23   scheme.  It is enough if the defendant knew -- I'm sorry, it is

24   enough if the defendant knows that, in the execution of the

25   scheme, the interstate wires are likely to be used and, in

1370

1  fact, are used.

2       There is not any requirement that the wire

3  transmission itself contain false information.  Even a victim's

4  or a third party's use of the interstate wires violates the

5  statute if it furthers or facilitates the scheme to defraud and

6  was caused by the defendant.

7       Each separate use of the interstate wires in

8  furtherance of a scheme or plan to defraud is a separate

9  predicate act of wire fraud.

10      As used in the RICO statute, to act "knowingly" means

11 to act voluntarily and intentionally, not because of mistake or

12 accident.

13      "Willfully" means that the action was done

14 voluntarily and purposely, with the specific intent to do

15 something the law forbids.

16      To establish fraudulent intent on the part of a

17 defendant, plaintiff must prove that the particular defendant

18 knowingly and intentionally attempted to deceive the plaintiff.

19 One who knowingly and intentionally deceives another is

20 chargeable with fraudulent intent notwithstanding the manner

21 and form in which the deception was attempted.

22      To act with intent to defraud means to act knowingly

23 and with the specific intent to deceive, ordinarily for the

24 purpose of causing some financial loss to another or bringing

25 about some financial gain to one's self.

1371

1        The words "scheme" and "artifice" in the mail fraud

2   and wire fraud statutes include any plan or course of action

3   intended to deceive others and to obtain by false or fraudulent

4   pretenses, representations, or promises money or property from

5   persons so deceived.

6        You have heard and will hear throughout these

7   instructions references to "knowingly," "willfully," and

8   "intentionally" in relation to the various elements of the

9   offenses or predicate acts charged.  These terms refer to the

10  state of mind of the defendants.  You must decide whether

11  various acts were committed by the defendants with a certain

12  state of mind.

13       You may infer a defendant's state of mind from both

14  the defendant's words and the defendant's actions.  The

15  commission of an act may more clearly show a defendant's state

16  of mind than the defendant's words or explanation uttered long

17  after the act's occurrence.

18       You may determine a defendant's state of mind based

19  upon the facts and circumstances surrounding the act and any

20  reasonable inferences drawn from those acts and circumstances.

21       A statement or representation is false or fraudulent

22  within the meaning of the mail and wire fraud statutes if it

23  relates to a material fact and is known to be untrue or is made

24  with reckless indifference as to its truth or falsity and is

25  made or caused to be made with intent to defraud.  A statement

1372

1 or representation may also be false or fraudulent when it

2 constitutes a half-truth or effectively conceals a material

3 fact with intent to defraud.

4       A fact, falsehood, or representation is material if

5 it has a natural tendency to influence or is capable of

6 influencing the decisions of a reasonable person in deciding

7 whether to engage or not to engage in a particular transaction.

8 However, whether a fact, falsehood, or representation is

9 material does not depend on whether the person was actually

10 deceived.

11       What plaintiff must prove by a preponderance of the

12 evidence is that defendants knowingly and willfully devised or

13 intended to devise a scheme to defraud plaintiff.  Within the

14 meaning of the mail fraud and wire fraud statutes, "to defraud"

15 means to use dishonest methods or schemes and usually signifies

16 the deprivation of something of value by trick, deceit,

17 chicanery, or overreaching.

18       In other words, plaintiff must prove by a

19 preponderance of the evidence that a defendant or the

20 defendants specifically intended to deprive the plaintiff of

21 something of value through misrepresentations or similar

22 dishonest conduct, which indeed did cause the plaintiff harm.

23       Frivolous or baseless litigation activities, without

24 more, are not acts of racketeering.  Obstructive or abusive

25 litigation tactics may be dealt with during the course of the

1373

1  litigation in which they arose, and do not justify a subsequent

2  RICO claim.  Even if an attorney makes incorrect allegations in

3  a pleading, that litigation conduct does not constitute a

4  scheme to defraud.  A scheme to defraud requires corrupt

5  activity like bribing witnesses or parties.

6        A party may ratify a contract by any conduct

7  indicating assent to the contract.  If a contract is ratified,

8  the ratification relates back to the execution of the contract

9  and renders it obligatory from its inception.

10       Now, in this case, plaintiff contends that the

11  activities of the defendants in using the mails and telephone

12  wires to communicate with each other, their clients, courts,

13  arbitration panels, plaintiff and its lawyers, and others in

14  filing and prosecuting numerous fraudulent Telephone Consumer

15  Protection Act cases against plaintiff constituted a pattern of

16  racketeering activity.  Acts of racketeering activity may

17  include, as plaintiff alleges in this case, violations of the

18  federal mail fraud and wire fraud statutes.

19       To establish a pattern of racketeering activity,

20  plaintiff must prove by a preponderance of the evidence that:

21       One, defendants committed at least two acts of

22  racketeering within ten years of each other.  While the two

23  acts of racketeering activity need not be the same kind, you

24  must find by a preponderance of the evidence that at least two

25  acts of racketeering activity occurred within the time

1374

1 specified;

2          Two, the acts of racketeering shared the same or

3 similar purposes, results, participants, victims, or methods of

4 commission, or otherwise are interrelated by distinguishing

5 characteristics and are not isolated events; and

6          Three, the acts of racketeering were continuous.

7 Acts of racketeering are sufficiently continuous if they

8 occurred over a substantial period of time or if the acts of

9 racketeering were a regular way in which defendants did

10 business or if the acts of racketeering would have gone on

11 indefinitely in the absence of this lawsuit.

12          In Count III of the complaint, Navient Solutions,

13 LLC, claims that the Law Offices of Jeffrey Lohman, Jeffrey

14 Lohman, Rick Graff, Gregory Trimarche, and GST Factoring, Inc.,

15 violated the RICO statute, Section 1962(d), by forming a

16 conspiracy to violate Section 1962(c).

17          With respect to Count III, conspiracy to violate the

18 RICO statute, plaintiff must prove by a preponderance of the

19 evidence that the defendant at issue became a member of the

20 alleged conspiracy by agreeing to further or facilitate a

21 violation of Section 1962(c).

22          Specifically, plaintiff must prove the following:

23          First, at least one of the members of the conspiracy

24 violated Section 1962(c);

25          Second, the defendant at issue understood the

1375

1   unlawful character of the enterprise involved in that violation

2   and agreed to adopt the goal of furthering that enterprise;

3           Third, the defendant at issue must be aware of the

4   existence and purpose of that enterprise; and

5           Fourth, the defendant agreed that the enterprise

6   would be conducted through a pattern of racketeering activity.

7   This means that the commission of at least two predicate crimes

8   by the conspiracy was contemplated.

9           For the jury to conclude that a defendant became a

10  member of the alleged conspiracy, it need not determine that

11  the defendant committed or agreed to commit the two predicate

12  acts that constitute a substantive RICO offense under Section

13  1962(c).  In other words, plaintiff need not prove an overt act

14  by every member of the conspiracy; instead, it must prove that

15  each conspiring defendant intended to further an endeavor that,

16  if completed, would satisfy all of the elements of Section

17  1962(c).  It suffices that a defendant adopt the goal of

18  furthering or facilitating the criminal endeavor.

19          A conspiracy may exist even if a conspirator does not

20  agree to commit or facilitate each and every part of the

21  Section 1962(c) violation.  If conspirators have a plan which

22  calls for some conspirators to perpetrate the crime and others

23  to provide support, the supporters are as guilty as the

24  perpetrators.

25          If you find that the alleged conspiracy existed, then

1  the acts and statements of the conspirators are binding on all

2  of those who you find were members of the conspiracy.  Once a

3  person is found by you to be a member of a conspiracy, he is

4  presumed to remain a member and is responsible for all actions

5  taken by all conspirators during and in furtherance of the

6  conspiracy until it is shown that the conspiracy has been

7  completed or abandoned or that the person has withdrawn from

8  the conspiracy.

9           To hold a particular defendant liable for conspiracy

10  to violate the RICO statute, plaintiff must prove by a

11  preponderance of the evidence that the particular defendant

12  knowingly reached an agreement or understanding with at least

13  one other person to participate, directly or indirectly, in the

14  affairs of an enterprise through a pattern of racketeering

15  activity.

16           The agreement or understanding need not be an express

17  or formal agreement or be in writing or cover all the details

18  of how it is to be carried out.  Nor is it necessary that the

19  members have directly stated between themselves the details or

20  purpose of the scheme.

21           You should understand that merely being present at

22  the scene of an event or merely acting in the same way as

23  others or merely associating with others does not prove that a

24  person has joined in an agreement or understanding.  A person

25  who has no knowledge of a conspiracy but who happens to act in

1377

1   a way which advances some purpose of one does not thereby

2   become a member.

3        But a person may join in an agreement or

4   understanding, as required by this element, without knowing all

5   the details of the agreement or understanding, and without

6   knowing who all the other members are.  Further, it is not

7   necessary that a person agree to play any particular part in

8   carrying out the agreement or understanding.  A person may

9   become a member of a conspiracy even if that person agrees to

10  play only a minor part in the conspiracy as long as that person

11  has an understanding of the unlawful nature of the plan and

12  voluntarily and intentionally joins in it.

13       In determining whether the alleged conspiracy

14  existed, you may consider the actions and statements of all the

15  alleged participants.  The agreement may be inferred from all

16  the circumstances and the conduct of the alleged participants.

17       For plaintiff to prevail under the RICO statute, it

18  must prove by a preponderance of the evidence that the

19  defendants' RICO violations were the proximate cause of injury

20  to plaintiff's business or property.  Therefore, you must find

21  that plaintiff suffered an injury to its business or property

22  and that the injury was caused by reason of the defendants'

23  violation of the RICO statute.

24       An injury or damage is proximately caused when the

25  act played a substantial part in bringing about or actually

1378

1   causing injury or damage and that the injury or damage was

2   either a direct result or a reasonably probable consequence of

3   the act.  In other words, the racketeering acts must themselves

4   cause the injury.  A defendant does not violate the RICO

5   statute and is not liable for damage under the RICO statute for

6   wrongful conduct that does not constitute an act of

7   racketeering, such as violating the ethical rules of their

8   professionals, committing professional negligence, or

9   committing criminal acts that are not acts of racketeering

10  punishable under the RICO statute.

11          Therefore, you must find that the commission of the

12  acts of racketeering by that particular defendant or the

13  pattern of racketeering by that defendant, or the conduct of

14  the affairs of the enterprise through the pattern of

15  racketeering activity by that defendant directly resulted in

16  the injury or played a substantial role in producing the

17  injury.  If plaintiff would have incurred the alleged damages

18  regardless of any RICO violation by a defendant, then those

19  damages are not proximately caused by that defendant's RICO

20  violation.

21          The fact that I will instruct you as to the proper

22  measure of damages should not be considered as indicating any

23  view of mine as to which party is entitled to your verdict in

24  this case.  Any amount of damages requested is not evidence in

25  this case.  You should not consider it as evidence in arriving

1379

1    at your verdict.

2          The damages claimed by plaintiff in this lawsuit are

3    injuries to its business or property; however, plaintiff can

4    only recover damages that are concrete, ascertainable, and

5    reasonably quantifiable.  Speculative damages which are

6    contingent on some future event, lost profits, or unanticipated

7    unaccepted future expenses are not recoverable.

8          Like all other elements of its claim, plaintiff must

9    prove its damages by a preponderance of the evidence.

10          In addition to the RICO claims, in Count IV, Navient

11   Solutions, LLC, alleges that defendants Jeffrey Lohman and the

12   Law Offices of Jeffrey Lohman violated Virginia law by

13   committing fraud.  The GST defendants are not involved in

14   Count IV.

15          Do not confuse fraud under Virginia law with mail and

16   wire fraud under federal law.  I've already instructed you with

17   regard to the mail and wire fraud under federal law.

18          To be liable for fraud under Virginia law, Navient

19   Solutions, LLC, must prove by clear and convincing evidence

20   that the defendants Jeffrey Lohman and the Law Offices of

21   Jeffrey Lohman:  one, made a false representation; two, of a

22   material fact; three, intentionally or knowingly; four, with

23   intent to mislead; five, that Navient Solutions, LLC,

24   detrimentally relied on the false statement; and six, that

25   reliance resulted in damage to Navient Solutions, LLC.

1380

1    Reliance is a belief that a representation is true

2    which causes a person to take action he would not otherwise

3    have taken.

4    If you find that plaintiff has established the

5    necessary elements of fraud, plaintiff is entitled to full

6    compensation for all injuries in a manner that would restore it

7    to the position it held before the fraud.

8    In Count V of its complaint, the plaintiff alleges

9    that all the defendants engaged in tortious interference with

10   contract or business expectancy by inducing student loan

11   holders, including ones who were not behind on their payments,

12   to stop making payments on their promissory notes, go into

13   default, and to trigger telephone calls from plaintiff that

14   arguably violated a law against automatic calls.

15   The essential elements in an action for tortious

16   interference with contract or business expectancy are:

17   One, the existence of a valid contractual

18   relationship;

19   Two, knowledge of the relationship on the part of the

20   interferer;

21   Three, intentionally inducing or causing a breach or

22   termination in the relationship or expectancy; and

23   Four, the breach caused damage to the property (sic)

24   whose relationship or expectancy has been disrupted.

25   Malice is not required for a showing of tortious

1381

1   interference.

2          Tortious interference may include interference by

3   conduct that is unethical, illegal, or independently tortious,

4   although a plaintiff claiming intentional interference with

5   contract or business expectancy need not allege and prove all

6   elements of liability for an underlying independent tort.

7          A defendant does not tortiously interfere with a

8   contract where the defendant's conduct was justified, that is,

9   where the defendant was legally entitled to perform acts

10  complained of by the plaintiff.  Liability attaches only if the

11  defendant acts solely to feather the defendant's own nest, and

12  without believing that, or caring whether, the defendant is

13  helping the client, and causes the client to break a contract

14  to the detriment of the other party to the contract.

15         The defendant must prove this affirmative defense

16  that the conduct at issue was justified by a preponderance of

17  the evidence.

18         Tortious interference:  Damages.  If you find that

19  plaintiff has established the necessary elements of a tortious

20  interference with contract or business expectancy, it is

21  entitled to an amount of money shown to be fair and adequate

22  compensation for such, for such damage, if any, as proximately

23  resulted from the tortious interference.

24         First Amendment immunity.  Defendants Jeffrey Lohman

25  and the Law Offices of Jeffrey Lohman maintain that all of

1382

1   Navient Solutions, LLC's claims against them are barred by the

2   First Amendment.

3           Under the First Amendment, an attorney or law firm is

4   immune from liability for litigation conduct, unless the

5   litigation was a sham.

6           Arbitration is part of the adjudicatory process and

7   litigation activity in the context of arbitration is protected

8   by the First Amendment.  Conduct incidental to the prosecution

9   of a lawsuit, including communications between private parties,

10   is also protected by the First Amendment.

11           In determining whether the Lohman defendants' pattern

12   of litigation against the plaintiffs constituted sham

13   litigation and therefore was not protected by the First

14   Amendment, you may consider the total number of arbitration or

15   federal lawsuits the Lohman defendants filed against Navient

16   Solutions, LLC; how many of those arbitrations or lawsuits the

17   defendants dismissed, won, or lost; how many of those

18   arbitrations or lawsuits plaintiff settled; any evidence as to

19   the subjective motivation of the defendants for filing the

20   arbitrations or lawsuits; the objective merits of the

21   arbitrations or lawsuits defendants filed, whether those

22   arbitrations and lawsuits constituted an abuse of the

23   arbitration or judicial processes, and any other evidence in

24   the record that you find relevant.

25           To defeat the defendants' First Amendment defense,

1383

1   Navient Solutions, LLC, has the burden of proving by a

2   preponderance of the evidence that the defendants' pattern of

3   litigation constituted sham litigation.

4            Defendant Jeffrey Lohman and the Law Offices of

5   Jeffrey Lohman contend that the agreements signed by Navient

6   Solutions, LLC, to settle various legal claims released those

7   defendants from any subsequent legal claim related to these

8   facts, demonstrating that the parties reached an accord and

9   satisfaction of any of their obligations to Navient Solutions,

10  LLC.

11           Accord is a satisfaction agreed upon between the

12  party injuring and the party injured, which when performed, is

13  a bar to all actions upon the claim.

14           In plain language, the accord is the agreement

15  between the parties.  The satisfaction is the exchange of

16  consideration between the parties that satisfies or settles or

17  discharges the claim.

18           To be valid, the agreement must be offered and

19  accepted, and there must be an exchange of consideration.  The

20  agreement must also contain a written and conspicuous statement

21  that it is offered in full satisfaction of the claim.  A

22  reasonable person would understand that the agreement was

23  tendered in full satisfaction of the claim.

24           A person is a third-party beneficiary of an agreement

25  if the parties to the agreement have agreed between themselves

1384

1  to bestow a benefit upon the third party.  A third-party

2  beneficiary may enforce the terms of a contract even though he

3  is not a party to the contract.  The essence of a third-party

4  beneficiary's claim is that others have agreed between

5  themselves to bestow a benefit upon the third party but one of

6  the parties to the agreement is failing to upheld its portion

7  of the bargain.

8          Defendants must prove this affirmative defense of an

9  accord and satisfaction by a preponderance of the evidence.

10         Collateral estoppel.  The doctrine of collateral

11 estoppel bars the relitigation of issues that were decided in a

12 prior proceeding between the same parties.  Issues cannot be

13 relitigated in a subsequent proceeding if:

14         One, the issues are identical to those in a prior

15 proceeding;

16         Two, the issues were actually litigated;

17         Three, the determination of the issues was necessary

18 to the resulting judgment; and

19         Four, the parties seeking to relitigate the issues

20 had a full and fair opportunity in the prior litigation to

21 litigate the issues.

22         Collateral estoppel will not apply where the parties

23 are different.  If you find that the conduct of the defendants

24 was not at issue in any prior proceeding because no defendant

25 was a party to those proceedings, collateral estoppel cannot

1385

1    apply.

2          Defendants must prove this affirmative defense by a

3    preponderance of the evidence.

4          Waiver is the intentional relinquishment or

5    abandonment of a known right.  For waiver to apply, defendants

6    must establish:  one, that plaintiff had knowledge of the facts

7    basic to the exercise of the right; and two, plaintiff intended

8    to relinquish the right.

9          Defendants must prove this affirmative defense by

10   clear, precise, and unequivocal evidence.

11         A plaintiff must pursue all contingencies likely to

12   mitigate its loss.  The defendant bears the burden to prove

13   that the plaintiff failed to mitigate damages.

14         Mitigation of damages is not a defense that, if

15   proven, constitutes an absolute bar to the plaintiff's claim.

16   Instead, a defense of mitigation recognizes that a plaintiff's

17   conduct may have contributed to its own damage and may, thus,

18   be reasonable for reducing damages, but it does not necessarily

19   bar all recovery.

20         We've reached the last instruction.  I know these are

21   tough, folks.  You've just had, you know, two years' worth of

22   law school in about, you know, 60 minutes.

23         Upon retiring to your jury room to begin your

24   deliberation, you must first elect one of your members to act

25   as your foreperson.  The foreperson will preside over your

1    deliberations and will be your spokesperson here in court.

2           And I always tell jurors, remember, you're eight

3    coequal judges, so the fact that one of you is going to be a

4    foreperson doesn't mean that that person's memory or opinion

5    about the evidence is worthy of more consideration than that of

6    the other seven jurors, but we do need somebody for

7    administrative purposes who will sort of be your spokesperson

8    here in court.

9           Now, your verdict must represent the collective

10   judgment of the jury.  In order to return a verdict, it's

11   necessary that each juror agree to it.  In other words, your

12   verdict must be unanimous.

13          It is your duty as jurors to consult with one another

14   and to deliberate with one another with a view towards reaching

15   an agreement if you can do so without violence to your

16   individual judgment.  Each of you must decide the case for

17   yourself, but do so only after an impartial consideration of

18   the evidence in the case with your fellow and sister jurors.

19   In the course of your deliberations, do not hesitate to

20   reexamine your own views and to change your opinion if

21   convinced it is erroneous; however, do not surrender your

22   honest conviction solely because of the opinion of your fellow

23   or sister jurors or for the mere purpose of thereby being able

24   to return a unanimous verdict.

25          Remember at all times you are not partisans.  You

1387

1    don't represent the plaintiff, and you don't represent the

2    defendants.  Instead, you are judges, specifically, judges of

3    the facts of this case.

4           Your sole interest is to seek the truth from the

5    evidence received during the trial.  Your verdict must be based

6    solely upon the evidence received in this case.  Nothing you

7    have seen or read outside of court may be considered.  Nothing

8    that I have said or done during the course of this trial is

9    intended in any way to somehow suggest to you what I think your

10   verdict should be.  Nothing said in these instructions and

11   nothing in any form of verdict is to suggest or convey to you

12   in any way or manner any intimation as to what verdict I think

13   you should return.

14          What the verdict shall be is the exclusive duty and

15   responsibility of the jury.  As I have told you many times, you

16   are the sole judges of the facts.

17          Now, we've prepared five verdict forms for you, and

18   again, this is to reinforce the earlier instructions that each

19   defendant is entitled to his or its own individual evaluation.

20   I'm not going to read all five to you because structurally

21   they're about the same, but I'm going to read two of them to

22   you.

23          We'll start with what I'll call one of the -- the two

24   verdict forms that apply to the Lohman defendants, that is,

25   Mr. Lohman himself and his law firm.  They each have a separate

1388

1    verdict form.

2              We're going to be asking the jury to answer some

3    questions, and remember, as the verdict form reminds you, to

4    answer any of the following questions, the jury must be

5    unanimous, which means the eight of you must agree.

6              Question No. 1, as to Count II (RICO Violation 21

7    U.S.C. 1962(c)), has -- and I think we may have actually the

8    wrong cite there.  Isn't it 18?

9              MR. GRELL:  What's that?

10             THE COURT:  It's Title 18 U.S.C.

11             MR. GRELL:  Yes.

12             THE COURT:  We've got the wrong -- we'll correct

13   that.  That's wrong on the verdict form.  But anyway, has

14   Navient Solutions, LLC, proven by a preponderance of the

15   evidence that the Law Offices of Jeffrey Lohman conducted or

16   participated in conducting an enterprise through a pattern of

17   racketeering?

18             That's Question No. 1, and you will just indicate yes

19   or no, no or yes, whatever your answer is unanimously, all

20   right?

21             The next question:  As to Count III (Conspiracy to

22   Violate the RICO statute), has Navient Solutions, LLC, proven

23   by a preponderance of the evidence that the Law Offices of

24   Jeffrey Lohman conspired to conduct or to participate in the

25   conduct of an enterprise through a pattern of racketeering?

1389

1    And you'll answer either yes or no, whatever you

2    unanimously agree upon.

3    Now, if and only if you answered yes to either the

4    first or second question, the next question is what, if any,

5    damages do you unanimously find Navient Solutions, LLC, has

6    proven by a preponderance of the evidence?

7    And on that line, you would indicate what, if any,

8    damage number you find appropriate as to that defendant.

9    The next question, No. 4:  As to Count IV (Fraud),

10   now, that's the Virginia fraud statute, has Navient Solutions,

11   LLC, proven by clear and convincing evidence, so this reminds

12   you that it's a different burden for that particular count,

13   that the Law Offices of Jeffrey Lohman committed fraud against

14   Navient Solutions, LLC?

15   And there you would indicate yes or no.

16   The next question:  If and only if you answered yes

17   to Question 4, what, if any, damages do you unanimously find

18   Navient Solutions has proven by a preponderance of the

19   evidence?

20   And again, there'd be a line where you'd put your

21   answer.

22   As to Count V (Tortious Interference with Contract or

23   Business Expectancy), has Navient Solutions, LLC, proven by a

24   preponderance of the evidence that the Law Offices of Jeffrey

25   Lohman tortiously interfered with Navient Solutions, LLC's

1390

1    contracts or business expectancies?

2            You'd indicate yes or no.

3            The next question, No. 7:  If and only if you

4    answered yes to Question 6, what, if any, damages do you

5    unanimously find Navient Solutions has proven by a

6    preponderance of the evidence?

7            And you'd indicate that.

8            And then the last question is:  If the jury has

9    awarded damages for more than one count, did the jury intend

10   for the damages to be added to each other?

11           In other words, we're trying to find out whether you

12   intended the damages to add one to the other or just one number

13   to prevail.

14           Then we will ask whoever the foreperson is to sign

15   the verdict form and print his or her name, because we can't

16   always read your signatures, and you would put the date the

17   decision is made on the, on the date line.

18           The verdict form for Mr. Lohman is exactly the same

19   as it is for his law offices.

20           The difference between the verdict forms for the

21   Lohman defendants and the GST defendants is that the GST

22   defendants are not involved in the Virginia common law fraud

23   claim, so it's a little bit shorter.  Otherwise, it's

24   structured in the exact same way.

25           So when you go to do your deliberations, you will

1    have the -- we're printing up eight sets of the jury

2    instructions, so each of you will have your own set of

3    instructions.  There's only one verdict form you can have, so

4    the foreperson will need to hold onto the verdict forms, the

5    five forms.  You may take your notebooks back with you, I know

6    you've been taking notes, and you will have all the exhibits

7    that have been entered into evidence for your deliberations.

8           If it becomes necessary during your deliberations to

9    communicate with the Court, the proper procedure is that you

10   must send a note signed by the foreperson or by another member

11   of the jury, and you'll do that through my court security

12   officer, Mr. Hendrick, whom you know very well at this point.

13          Now, no members of the jury should ever attempt to

14   communicate with the Court by any means other than a signed

15   writing, and the Court will never communicate with any member

16   of the jury concerning this case other than in writing or

17   orally here in open court.

18          And obviously, you are never to reveal in any

19   question or any comment you make to the Court where you are on

20   your votes.  In other words, I don't want to know from the

21   jury, you know, so many think this, so many think that.  That's

22   not proper for us to know.

23          Obviously, you can't discuss your deliberations with

24   my court security officer, court staff, or anybody else.

25          I always ask jurors to do a couple of things which

1392

1  really help us.  Number one, the first order of business when

2  we release you and when you decide -- when you first start

3  deliberating would be to decide who is going to be the

4  foreperson, and then also to sit down and think about how you

5  want to conduct your schedule.

6       And the reason I always ask jurors to give me that is

7  the following:  I've learned over the years that juries sort of

8  get used to the pattern that we have in court, you know, taking

9  a lunch break at one o'clock, mid-afternoon break at 3:30 or

10  four, whatever, and how long it's going to last.

11       I'm going to require the lawyers to be either in the

12  courtroom or very close by while you're deliberating.  You may

13  deliberate, you know, today, tomorrow, all week.  I don't know

14  how long it will take.  It's a complicated case.

15       But if we know you're not deliberating, that is,

16  you've decided to take a one-hour lunch break and you're not

17  going to work during lunch, you're going to go out for a walk

18  or do whatever, then I can let the lawyers sort of leave the

19  courtroom.

20       And the reason I have to keep them nearby is if you

21  have questions and I have to run those questions by the

22  lawyers, I can't answer them without having checked with

23  everybody, and so that means if I've let them go across -- you

24  know, downtown to get lunch or something, we can't answer your

25  question.  We're going to hold you up.  And as I've said

1393

1  several times before, I don't want to waste your time.

2         So if we know when you're not working, then they can

3  comfortably leave the floor, and I don't have to worry about

4  that.

5         So I will ask those sort of two housekeeping matters.

6  If you can think about, you know, how you want to structure the

7  rest of the day and what your plans would be for tomorrow, that

8  would be great.

9         All right.  Counsel, any objection to the charge as

10  just given to the jury?  Mr. Calhoun, any objection other than

11  what may previously have been discussed?

12         MR. CALHOUN:  No, Your Honor.

13         THE COURT:  Mr. Charnoff?

14         MR. CHARNOFF:  No, Your Honor, thank you.

15         THE COURT:  Mr. Grell?

16         MR. GRELL:  No, Your Honor.

17         THE COURT:  All right.  Then we're all set to go.

18         So, folks, I'm going to ask -- I think it would be

19  nice for us to know who the foreperson is going to be and what

20  your plans are for the rest of the day, so maybe if the eight

21  of you don't mind being in my jury room for a couple of

22  minutes, you've all got your masks on, and just, you know, keep

23  a couple of feet between yourselves.  Decide who's going to be

24  your foreperson.  Decide how you want to work the rest of the

25  day, which could include how long you want to stay tonight, all

1394

1  right?  I mean, if you're tired and you want to go home at five

2  o'clock, you run the case from here on out, and we'll work

3  around your schedule.  Then I can let the lawyers know for

4  planning purposes this afternoon, all right?

5          As soon as you've done that, knock on the door, and

6  Mr. Hendrick will get your note, and then I may have you come

7  back in for just one second, all right?

8          So we're going to stay in session while the jury goes

9  out.

10                      (Jury out.)

11          THE COURT:  I can't believe with all the legal minds

12  in this room, we missed the citation for the RICO statute.

13  Unbelievable.  All right.  Anyway, we'll have to run these

14  verdict forms yet again to fix that, all right?

15          All right.  Are you-all satisfied you know what the

16  exhibit list should look like, the indexes?  Is there any issue

17  about what's in or not in?

18          MR. GRELL:  Well, we have to look and --

19          THE COURT:  We read everything, though, for the

20  record, right?

21          MR. URBAN:  We actually read it at the end of

22  plaintiff's evidence.  I don't think -- there was a few

23  exhibits that came in afterwards.

24          THE COURT:  Why don't we just check and make sure,

25  all right?

1395

1    Ms. Guyton, do you remember where we left off last

2    time?

3    THE CLERK:  I did make a note --

4    THE COURT:  Let's see.

5    THE CLERK:  -- that we -- after I read the exhibits

6    before, the new exhibits admitted for plaintiff were 924, 915

7    to 922, 926 to 930, 936 to 945, 947 to 948, 950, 952, 954, 956

8    to 959, 961 to 963, 965, 967 to 979, 980 to 987, 989 to 993,

9    994 to 997, and 1002.

10   Defendants' Exhibits 2076, 2082, 2078, 2222, and

11   2033.

12   THE COURT:  All right.  Mr. Calhoun, do you think any

13   of yours are missing?

14   MR. CALHOUN:  I don't think so, Your Honor.  Was that

15   2022 or 2222?

16   MR. GRELL:  2222.

17   THE COURT:  2222.

18   Do we have a note from the jury?

19   THE COURT SECURITY OFFICER:  No.  They wanted a few

20   minutes.  I stepped out, ma'am.

21   THE COURT:  Fine.

22   All right.  Any problem then, Mr. Calhoun?  You think

23   all yours are in?

24   MR. CALHOUN:  I think so, Your Honor.

25   THE COURT:  All right.  Mr. Grell?

1396

1    MR. GRELL:  That looks right.

2    THE COURT:  All right.  I just want to make

3    absolutely sure, the settlement agreements were what numbers

4    again?

5    MR. GRELL:  They were --

6    THE COURT:  I think you referenced some of them in

7    your closing.

8    MR. GRELL:  Yeah, I got them all in my closing.  With

9    the exception of one, they're all in one big group.  2129

10   through 2182 --

11   THE COURT:  Wait, hold on a second.  2129?

12   MR. GRELL:  Right.

13   THE COURT:  Okay.

14   MR. GRELL:  Through 2182.  And then 2218 is one that

15   got inadvertently misplaced.

16   THE COURT:  But it's there?

17   MR. GRELL:  That's it, yeah.

18   THE COURT:  All right.  And that's consistent with

19   what you have, Ms. Guyton, right?

20   MR. GRELL:  What's that?

21   THE COURT:  Wait, I want to make sure we've got that.

22   The one thing that concerned me, when we were cleaning up the

23   bench, I found sitting up here confidential settlement

24   agreement release claims from Erica A-r --

25   MR. GRELL:  Erica Arndts?

1397

1    THE COURT:  Yeah.  I just want to make sure this
2  somehow didn't get -- I don't know why it's sitting on the
3  bench.
4    MR. CALHOUN:  I believe that's 2218, Your Honor.  It
5  was left out, and then he handed it up.
6    THE COURT:  All right.  Do you have 2218?
7    THE CLERK:  Yes.
8    THE COURT:  You do.  All right, we're all set then.
9  I just wanted to make sure then.  All right.
10   Okay.  So we'll just wait a second and see what the
11 jury's plan is.  I'm sure they're going to take a lunch break.
12   You know, I didn't look.  Are the jury instructions
13 wrong on this citation for RICO, or did we get it right there?
14 It should be Title 18.  It's a criminal statute.
15   MR. CALHOUN:  It should be Title 18 everywhere.
16   THE COURT:  All right.
17   MR. CALHOUN:  It's correct in the jury instruction,
18 Your Honor.
19   THE COURT:  Yeah, all right.  So just the verdict
20 form got it wrong.
21   MR. CALHOUN:  Your Honor, while we have a moment?
22   THE COURT:  Yeah.
23   MR. CALHOUN:  What would be the preferred procedure?
24 I mean, if we go across the street or whatever, just to give a
25 phone number to the clerk or --

1398

1    THE COURT:  Well, you can go across the street for

2  lunch, all right?  Because I'm sure the jury is going to tell

3  us that they're going to take a lunch break.

4                      (Knock on door.)

5    THE COURT:  And, you know, I only need one attorney

6  per side, so --

7    All right, our foreperson is Sarah Danzi.  Today's

8  schedule, they're going to take lunch from two to three, so

9  you-all have an hour break.  They're going to end the day at

10  five, and tomorrow they want to start at ten, with a lunch

11  break of one to two.

12    So I'm going to let them go to lunch now, all right?

13    THE COURT SECURITY OFFICER:  Okay.

14    THE COURT:  And that means we will have them set up

15  downstairs, but you-all don't need to be back here until three

16  o'clock, all right?

17    And again, I'm not going to give them the index

18  unless they ask for it, but having it available will be useful,

19  all right?

20    Anything else we need to address?  No?

21    MR. CHARNOFF:  Not from GST, Your Honor.

22    THE COURT:  All right.  It is my practice, we'll give

23  this to you after lunch.  We keep -- the original note stays in

24  the file, and we make you a photocopy for your records of every

25  communication we get from the jury, no matter how mundane,

1399

1  like, you know, we need a chalkboard, okay?  So that's how we

2  function.

3         At some point this after- -- probably not this

4  afternoon.  At some point tomorrow -- I don't think I have

5  court tomorrow.  I don't think I have anything on my calendar

6  for tomorrow.  No.

7         Sometime tomorrow, I'd like you to start moving your

8  exhibits out of here so we can get the courtroom cleaned up,

9  unless you've made plans for this afternoon.

10         MR. CALHOUN:  That was the last housekeeping matter.

11  We have, we have lined people up this afternoon.  I think

12  defense counsel have as well.

13         THE COURT:  Fantastic.

14         MR. CALHOUN:  So, you know, once we get out of here,

15  we can get back to our phones, we can tell them, if it's all

16  right with Your Honor, to go ahead and start that process.

17         THE COURT:  All right.  We can get somebody else --

18  yeah, we can get somebody to help.

19         THE COURT SECURITY OFFICER:  Yes, Judge.

20         THE COURT:  All right.  Work with Ms. Guyton to make

21  sure that none of the exhibits that are going to the jury go

22  out of the room.

23         All right, very good.  Then we'll recess court to

24  await the decision of the jury.

25         (Recess from 1:54 p.m., until 4:00 p.m.)

1400

1           A F T E R N O O N   S E S S I O N

2                        (Jury out.)

3           THE COURT:  All right.  Well, you see the question

4    from the jury.  They want an overhead projector so they can

5    display exhibits to the whole group for review.

6           We don't have an overhead projector that is portable.

7    The one that's in here is hard-wired.  I'm told by our IT

8    people that they have a system whereby if the evidence is on a

9    flash drive or a disc, they can plug it into the system and

10   look at it that way because there are screens downstairs, but

11   the trick is you both have to -- all three of you have to be

12   comfortable that whatever disc or flash drive is given to the

13   jury only has those exhibits that were entered into evidence.

14          So how do you-all feel about that?  Mr. Calhoun?

15          MR. CALHOUN:  Your Honor, I'm happy to work with

16   opposing counsel to get something to them.  My only concern was

17   I can understand, appreciate why they wouldn't want to crowd

18   around a document, try to look at it for safety reasons.

19          THE COURT:  Right.

20          MR. CALHOUN:  It will take some time to -- we have

21   all the exhibits electronically, but it will take -- you know,

22   we probably can't get it to them today, but tomorrow morning we

23   could have it for them.

24          THE COURT:  And, I mean, again, my only concern is,

25   because I know more exhibits were included on your electronic

1401

1   systems than were entered into evidence.

2           MR. CALHOUN:  Correct.

3           THE COURT:  That's the only danger.

4           MR. CALHOUN:  I think the only way we could do it, if

5   we can do it, is for one side or the other, whichever one,

6   create an electronic repository of the admitted exhibits, share

7   it with the other, have the other side bless it, and then burn

8   it.  That's the only way I think it can work, if the Court's

9   inclined to do it.  I'm happy to do it.

10          THE COURT:  I agree.

11          Now, Mr. Grell, what's your view?

12          MR. GRELL:  Yeah, I think, I mean, I agree with

13  Mr. Calhoun, we could easily do it by tomorrow morning, get a

14  folder that has the admitted exhibits of plaintiff and folder

15  with the admitted exhibits of defendants.  If you wanted us, I

16  can send a link or bring a flash drive or whatever you guys

17  want.  I think that would be once we each review, like we were

18  doing with the physical exhibits, to make sure it's okay.

19          THE COURT:  Right.  All right.  Does -- any objection

20  from our GST folks?

21          MR. CHARNOFF:  No objection from GST, Your Honor.

22  That sounds --

23          THE COURT:  You introduced almost no exhibits.  Zero.

24          MR. CHARNOFF:  I introduced no exhibits on purpose,

25  but no.

1402

1    THE COURT:  All right, that's fine.

2         All right, I think I'm just going to send a note to

3    the jury, all right?  And I'll give you a copy of what I send

4    them.  It's basically going to be, we don't have an overhead

5    projector.  Counsel are going to arrange to have all the

6    exhibits available for you electronically that can be displayed

7    on a laptop, and then they'll have screens downstairs, but

8    that's not going to be available until tomorrow morning.  And

9    I'll urge them to continue deliberating on the paper that

10   they've got.

11        How's that?  Anybody got a problem with telling them

12   that way?

13                    (No response.)

14   THE COURT:  All right.  And then check with my

15   courtroom deputy, Ms. Guyton, to see what format will work best

16   with the system downstairs because there's no sense of putting

17   it on some format that they can't use.  So we're in touch with

18   the IT people.  We should be able to have that set up pretty

19   quickly.  All right?

20        MR. CALHOUN:  I think they're all PDFs, so we

21   would -- I don't know of any other format we can provide.

22        THE COURT:  Yeah.  I don't think there should be a

23   problem in that respect, okay?

24        All right, we'll recess court, and I'll just give you

25   back the note that I -- so you have a record of what I sent to

1403

1    the jury, all right?

2              (Recess from 4:04 p.m., until 5:04 p.m.)

3                        (Jury present.)

4         THE COURT:  Ladies and gentlemen, it's five o'clock,

5    and I'm not going to keep you past the time that you wanted to

6    finish for today.  First of all, I want to commend you on your

7    very astute questions.  I'm going to -- the question that I

8    have right now I'll address with you first thing tomorrow

9    morning.

10        I want to make sure you continue to follow the

11   instructions of the Court.  In particular, it's very important

12   now that you've started deliberating that you not have any

13   private communications with each other, you know, no e-mails,

14   no personal phone calls or anything like that, because again,

15   this is a collective decision-making process.  All eight of you

16   must always be present when you're talking about the evidence,

17   and so it would not be proper for you to have any sort of

18   sidebars.

19        And the other thing is, obviously, you must leave all

20   the evidence downstairs in the room.  Tomorrow morning, when

21   you come in at ten, we will have set up at that point,

22   hopefully there are no technology problems, the computer.

23   You'll have a laptop.  We'll have the evidence on disc, and

24   hopefully you'll be able -- and the IT people will show you how

25   to operate the system, and there should be enough screens.  We

1404

1    don't have one big screen, but I think there will be enough

2    screens that you can all be looking at the same document at the

3    same time, all right?

4            So just remember my cautions.  Again, conduct

5    absolutely no investigation.  Again, the best thing is to get a

6    good night's sleep, and you will not begin to begin

7    deliberating until you're all together.

8            We're going to have you start up in this courtroom

9    again at ten o'clock because I have to give you the answer to

10   the question that you've sent us, and we'll see you at that

11   time.  So you're free to go home this evening, and we'll see

12   you tomorrow at ten.  We're going to stay in session, however,

13   all right?  Thank you, folks.

14                        (Jury out.)

15           THE COURT:  Well, once again, as I've said many

16   times, it shows you how carefully our juries think about things

17   and how sometimes lawyers make things far more complicated than

18   is necessary.

19           So the question is:  Both the individuals in this

20   case, i.e., Lohman and Graff and Trimarche, and their

21   respective businesses are charged separately.  Could the Court

22   provide any guidance or clarity on how to separate the

23   individual from their business as we deliberate?

24           Great question.  I mean, in one respect, certainly

25   the corporation acts through the officers that it's got.  It's

1405

1   really kind of not quite one and the same, but, I mean, it's a

2   subtle difference.

3        But let me start with you, Mr. Calhoun, because it's,

4   you know, you were the one who drafted the complaint.

5        MR. CALHOUN:  Your Honor, obviously, they are

6   separate corporate legal entities.  I think because they're all

7   closely held entities, as a matter of proof, there's no real

8   difference.

9        THE COURT:  A corporation -- I mean, I'm sure what

10  they're thinking and what ordinary non-lawyers would think is

11  corporations don't -- because they're not human beings, they

12  can't intend, all right?

13       MR. CALHOUN:  Right.  And that's --

14       THE COURT:  So they act through their corporate

15  officials.  The corporation acts through its employees, you

16  know, respondeat superior.

17       MR. CALHOUN:  Right.  Yeah.

18       THE COURT:  But we didn't give them an instruction

19  along those lines, and, of course, that doesn't solve the whole

20  thing because the law offices is a separate type of entity.

21       So what do you want me to tell the jury?

22       MR. CALHOUN:  So I think we just need to tell them

23  that the corporations act through their principals.  I mean,

24  the thing that's helpful here is with Branch being out of the

25  case, all of the -- Lohman is the principal of the Law Offices

1406

1   of Jeffrey Lohman, and Trimarche and Graff are principals of

2   GST, and therefore, I think, under the law of every state,

3   authorized to bind those entities, and so we can tell the jury

4   that they act on behalf of the corporation when they act within

5   the scope of things that their corporations do.

6          THE COURT:  Which, though, from the eyes of a

7   non-lawyer would make them question, why are we looking at them

8   separately?  That may be the next question.

9          MR. CALHOUN:  We don't actually look at them all that

10  separately, but just for purposes of having a judgment that we

11  can enforce.

12         THE COURT:  Yeah, I know.  You want the --

13         MR. CALHOUN:  Yes.

14         THE COURT:  Yeah, all right.  Mr. Grell, how do you

15  want the Court to phrase it?

16         MR. GRELL:  Well, I think you probably hit the nail

17  on the head there when you're talking about intent and how do

18  you ascribe intent, intent to a legal fiction.

19         THE COURT:  You do it by -- you ascribe it to the

20  fiction by looking at its officers who can bind the corporation

21  by their actions.

22         MR. GRELL:  The control group, right.

23         THE COURT:  The control group.

24         MR. GRELL:  And then Lohman's situation, he is the

25  control group, and I don't know about the GST situation, but, I

1407

1   mean, Lohman is the control group for Lohman law offices, so

2   his intent would be the best evidence of the corporate intent.

3           I, I have to be careful, though.  I'm not an

4   insurance coverage attorney, and there is insurance coverage in

5   this situation, which I've always been careful of because I

6   just -- I'm not sure who has the coverage, who doesn't have the

7   coverage, and who -- so --

8           THE COURT:  Well, I mean, my experience with business

9   insurance, it usually covers the business and its executives.

10          MR. GRELL:  Right.  And, and the insurance is

11  exhausted by now, so I'm not even sure what difference it

12  makes, but I would -- you know, they have to make a separate

13  determination for each of these defendants still.  It's not

14  like they can just lump them all together, but they -- I think

15  it's -- obviously, the only person whose intent can be ascribed

16  to the corporation is Lohman's intent.

17          MR. CALHOUN:  Your Honor, that could be the other

18  question they're asking about because there is evidence about

19  the, you know, Kirstie Hernandez and some of the other people

20  working for Lohman telling people not to pick up the phone and

21  do certain things, and maybe wondering whether that is binding

22  on the corporation as an admission of the corporation.

23          THE COURT:  Mr. Charnoff?

24          MR. CHARNOFF:  Yes, Your Honor.  On behalf of -- you

25  know, on behalf of GST, maybe I'm looking through the

1408

1  rose-colored lenses, but when I, when I first saw this

2  question, what I -- I read it to say that they're looking to

3  let the individuals out, but they're trying to figure out can

4  the businesses stay in without them.  That's how I read it.

5  Maybe that's my misread.

6         So, I mean, in my experience, the right answer to a

7  question that's difficult is often, of course, no answer at

8  all.  I know different courts feel differently about that.  I

9  know in state court in Virginia, certainly the answer is, you

10 know, if there's any, any dispute at all, the answer is

11 usually, we can't tell you anything else.  Go back and read the

12 instructions we already gave you.

13        I know in D.C., it's the opposite.  They bend over

14 backwards to give long answers to these short questions.

15        I don't know what Your Honor's preference is.  I

16 mean, I certainly don't want to craft new instructions.

17        THE COURT:  Well, I don't believe in making a jury

18 struggle.  It's a legitimate question if it can be properly

19 answered, all right?  I will -- what I will do is I will look

20 at the Virginia definition of "respondeat superior," since we

21 do have a Virginia cause of action here.

22        But I think a very simple answer along the lines that

23 we've been talking, that is, that non-human legal entities such

24 as corporations or law firms essentially act through the

25 conduct of their managing officers, something like that, and I

1409

1  think that's a correct statement of the law, and it may assist

2  them in figuring out what to do.

3           I mean, as a practical matter, liability here is

4  coextensive, right?  I cannot see any way in which the jury

5  could find GST, Inc., liable and the individuals not liable.

6           MR. CHARNOFF:  Your Honor, I, I hold out hope that

7  they can exactly do that.

8           THE COURT:  I can't see how that would happen.

9           MR. CHARNOFF:  Okay.  What I don't -- and I know

10 Mr. Urban wants to speak.  What I don't want to do is I don't

11 want -- I don't want to deemphasize what the Court's already

12 instructed the jury, which is that --

13          THE COURT:  Individuals.

14          MR. CHARNOFF:  -- the plaintiff bears the burden with

15 respect to each separate individual defendant.

16          THE COURT:  Right.

17          MR. CHARNOFF:  And I don't want the sort of, hey,

18 we're just lumping everyone together.  If they don't believe

19 that there's evidence as to, you know, Mr. Graff, for example,

20 who testified a lot less than Mr. Trimarche, I want Mr. Graff

21 to be able to get out and not have to be --

22          THE COURT:  All right.  But they're not concerned

23 about the individuals.  It's the individuals versus the two

24 non- -- the two inanimate defendants.

25          MR. CHARNOFF:  I understand.  I just don't want to

1410

1   unfairly deemphasize your existing instructions.

2          THE COURT:  All right.

3          MR. URBAN:  My concern is we haven't addressed the

4   corporate entity.  In other words, there's the corporate

5   entity -- in other words, there's nothing here about piercing

6   the corporate veil.  All of these actions were done qua the

7   entity, not -- I mean, in other words, you know, all these were

8   done through the corporate entity, and normally that protects

9   the individuals from any liability absent piercing the

10  corporate veil, and I don't think plaintiff has ever presented

11  any evidence that would allow this jury to pierce the corporate

12  veil.

13         As a matter of fact, they didn't plead anything about

14  piercing the corporate veil, so at least for the tortious

15  interference and the fraud, I don't think -- I mean, I think

16  that there's a serious question about, you know, if everything

17  was done on behalf of the corporation, then only the

18  corporation would be liable, but the individuals should not be

19  liable unless there was -- there's never been any evidence of

20  piercing the corporate veil.  There's never been an ask for an

21  instruction on it.

22         So I think that needs to be factored into anything

23  you provide to them, because Virginia law is very clear on, you

24  know, the corporate entities, and it's the corporate entity

25  that's liable if things are done on behalf of the corporate

1411

1  entity unless there has been a piercing of the corporate veil,

2  and I've done many cases where I've pierced the corporate veil.

3          THE COURT:  Well, we have two very different types of

4  business entities here, too.  I mean, the law office, your

5  clients --

6          MR. URBAN:  It's still a P.C.

7          THE COURT:  Has it been designated as such in the

8  paperwork?

9          MR. URBAN:  Yes.

10          THE COURT:  It just says Law Offices of.

11          MR. URBAN:  Law Offices of Jeffrey Lohman, P.C.

12          THE COURT:  I don't think we have that in the formal

13  title, do we?

14          MR. GRELL:  Yes, it is.  It's right here.

15          THE COURT:  Is it?  All right.

16          MR. URBAN:  It's in the complaint.

17          THE COURT:  Okay.

18          MR. URBAN:  So given that it's professional

19  corporation, I do think we've got to factor the whole piercing

20  the corporate veil, and the fact that they've never adduced any

21  evidence to pierce the corporate veil, they've never alleged

22  that they should be able to pierce the corporate veil.

23          THE COURT:  All right.  Well, I'll think about it.

24  At the present time, the safest way, and this one might just be

25  to reiterate that there are five separate defendants in this

1412

1    case, and they have to look at the individual evidence and

2    leave it at that.  That's certainly the safest given what we've

3    said.

4         But what -- I would suggest that -- be in court

5    tomorrow at 10 of ten, and we'll do the final fleshing out of

6    that, but anyway, the jury will come in at ten.  Orally I'll

7    give them whatever answer I'm going to give them, and we'll

8    send them on their merry way.  The most important thing is

9    hopefully there will not be any technological glitch on the

10   disc, all right?

11        Are your tech people -- or are you going to do it

12   yourselves?  I mean, how are you planning to put that disc

13   together?

14        MR. GRELL:  I think that the disc is the big issue

15   because we can do it.  It's just that one of us -- one side is

16   going to have to burn the disc, and I don't think either side

17   trusts the other to burn a disc and make sure it gets to you

18   with all the exhibits, and we have to examine it, and we don't

19   even have --

20        MR. CALHOUN:  You can burn the disc.  I trust you.

21        MR. GRELL:  Okay.  All right.  So we'll burn the

22   disc, and then we'll bring it tomorrow morning.

23        THE COURT:  Okay.  I mean, again, the job is we don't

24   want to hold the jury up.  My plan was to have it here and

25   probably you want to bring it here so that you can give it to

1413

1   Lance, our IT person, so he can put it on the system, make sure

2   that it, that it plays, all right?

3          MR. GRELL:  Yeah.  As long as, I mean, it's just

4   burning it.  We can't even do it on our laptops.  So we

5   couldn't even do it together.  So if Mr. Calhoun is comfortable

6   with us doing it --

7          MR. CALHOUN:  I think we should bring a USB.

8          MR. GRELL:  Yeah, we can copy it onto a USB.

9          THE COURT:  Yeah, that's not a bad idea, all right?

10  So -- and I see we've cleaned up the courtroom.  It looks so

11  much better.  That's great.

12         And again, Mr. Urban, you're local counsel?

13         MR. URBAN:  Yes, Your Honor.

14         THE COURT:  Okay.  I mean, certainly you're an

15  important part of this case, but again, I really technically

16  only need one lawyer per side, so if --

17         MR. URBAN:  Well, we're going to probably switch out.

18  I mean, he'll be here for a while; I'll be here for a while.

19         THE COURT:  Okay.  That's fine.

20         MR. URBAN:  But we were -- I was just here because

21  the jury had sent out --

22         MR. GRELL:  He's my ride.

23         THE COURT:  All right.

24         MR. URBAN:  Yeah, I'm also his ride.

25         THE COURT:  All right, very good.  Well, anyway, you

1414

1  can see, though, when I told you before, our juries are very

2  astute.  And you've probably checked it out, but our foreperson

3  is, I believe, is an engineer, so you're going to have a very

4  analytical approach to the evidence, and this is a really good

5  jury.  Whatever answer you get is going to be a pretty good

6  answer.

7          All right, we'll recess court for the evening.  See

8  you tomorrow morning.

9     (Recess from 5:20 p.m., until 9:50 a.m., August 17, 2021.)

10

11                   CERTIFICATE OF THE REPORTER

12     I certify that the foregoing is a correct transcript of

13  the record of proceedings in the above-entitled matter.

14

15

16                              _____
                                            /s/
17                                 Anneliese J. Thomson

18

19

20

21

22

23

24

25